# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF COLORADO; STATE OF RHODE ISLAND; STATE OF CALIFORNIA; STATE OF MINNESOTA; STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF CONNECTICUT; STATE OF DELAWARE;  DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR *ex rel.* Andy Beshear, in his official capacity as Governor of the COMMONWEALTH OF KENTUCKY; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; JOSH SHAPIRO, in his official capacity as Governor of the COMMONWEALTH OF PENNSYLVANIA; and STATE OF WISCONSIN, <br><br>        Plaintiffs, <br><br>    v. <br><br> U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, <br><br>        Defendants. | Case No. <br><br> **COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF** <br><br><br> **REQUEST FOR EMERGENCY TEMPORARY RESTRAINING ORDER UNDER FEDERAL RULE OF CIVIL PROCEDURE 65(B)** |

**INTRODUCTION**

1.      With no advance notice or warning, the U.S. Department of Health and Human Services ("HHS") abruptly and arbitrarily terminated $11 billion of critical public health funding beginning on the evening of March 24, 2025. This funding provides essential support for a wide range of urgent public health needs such as identifying, tracking, and addressing infectious diseases; ensuring access to immunizations; fortifying emergency preparedness; providing mental health and substance abuse services; and modernizing critical public health infrastructure. These termination notices and substantially similar subsequent notices (collectively, "Public Health Terminations") immediately triggered chaos for State and local health jurisdictions. If the funding is not restored, key public health programs and initiatives that address ongoing and emerging public health needs of Plaintiffs (collectively, "Plaintiff States") will have to be dissolved or disbanded. Large numbers of state and local public health employees and contractors have been, or may soon be, dismissed from their roles. The result of these massive, unexpected funding terminations is serious harm to public health, leaving Plaintiff States at greater risk for future pandemics and the spread of otherwise preventable disease and cutting off vital public health services.

2.      The sole stated basis for Defendants' decision is that the funding for these grants or cooperative agreements was appropriated through one or more COVID-19 related laws. According to Defendants, this vital public health funding has been terminated "for cause" because "the grants and cooperative agreements were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grants and cooperative agreements are no longer necessary as their limited purpose has run out." HHS, Notice of Award (Mar. 24, 2025). In communications to grantees, that bare statement (or slight variations thereof) constituted all of

Defendants' analysis and explanation as to why "the grants and cooperative agreements are no longer necessary" and could be terminated "for cause." Pursuant to these conclusory, boilerplate statements, Defendants issued mass terminations for billions of dollars in vital public health funding with no warning and effective immediately.

3.      The Public Health Terminations exceed Defendants' statutory and regulatory authority and are unlawful under the Administrative Procedure Act ("APA"). The foreseeable end of the COVID-19 pandemic is not a lawful basis to terminate "for cause." *See, e.g.*, 42 U.S.C. § 300x-55(a) (allowing "for cause" terminations only based on the grant recipient's "material failure" to comply with the agreement). Defendants have never alleged, much less demonstrated, any failure by fund recipients to comply with the applicable terms and conditions of the grants and agreements. Nor did Congress limit the funding at issue here to the period of the COVID-19 emergency. During the pandemic, Congress made wide-ranging public health investments extending beyond COVID-19 and the immediate public health emergency. And after the pandemic was declared over, Congress reviewed the COVID-19 related laws, rescinded $27 billion in funds, but determined not to rescind any of the funding at issue here. *See, e.g.*, Fiscal Responsibility of Act of 2023, Public Law 118-5, Div. B, Title I.

4.      The Public Health Terminations also violate the APA because they are arbitrary and capricious, for reasons including: (1) assuming, with no legal or factual support, that all appropriations in COVID-19 related laws were only intended for use during the pandemic, when the relevant statutes indicate the opposite; (2) failing to undertake any individualized assessments of the grants or cooperative agreements, including any analysis of the benefits of this public health funding or the dire consequences of termination; (3) ignoring the substantial reliance interests of Plaintiff States (and their local health jurisdictions) and the tremendously harmful impact of

immediately terminating, without any advance warning, billions of dollars in congressionally appropriated funds midstream; (4) asserting that this public health funding was suddenly unnecessary due to the "end of the pandemic"—an event that occurred almost two years ago; (5) failing to explain HHS's sudden change in position regarding availability of funds; and (6) arbitrarily misapplying a "for cause" termination provision.

5.     Defendants' unlawful withholding of funds has already caused substantial confusion and will result in immediate and devastating harm to Plaintiff States (and their local health jurisdictions), their residents, and public health writ large. The Public Health Terminations attempt to rescind billions of dollars Defendants have committed to pay, and on which Plaintiff States' and their local health jurisdictions' budgets rely—monies Plaintiff States need to carry out their duty to "guard and protect" the "safety and health of the people." *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905). Already, the Public Health Terminations have impeded planning, caused waste of resources in attempts to mitigate potential impacts, and unnecessarily halted needed public health work. If this critical public health funding is not restored, Plaintiff States will be unable to provide these essential public health services for residents, pay large numbers of public employees, satisfy obligations to public and private partners, and carry on the important business of government.

6.     Accordingly, Plaintiff States bring this action against Defendants HHS and Secretary of Health and Human Services Robert F. Kennedy, Jr. seeking to: vacate and set aside the Public Health Terminations and the decision to issue the Public Health Terminations; preliminarily and permanently enjoin Defendants from implementing or enforcing the Public Health Terminations or reinstituting the terminations for the same or similar reasons and without

required statutory or regulatory process; and declare that the Public Health Terminations violate the APA.

## JURISDICTION AND VENUE

7.      This Court has subject-matter jurisdiction pursuant to 28 U.S.C. § 1331 because this action arises under the laws of the United States, including the Administrative Procedure Act ("APA"), 5 U.S.C. §§ 701-706.

8.      Venue is proper in this district pursuant to 28 U.S.C. §§ 1391(b)(2) and (e)(1). Defendants are United States agencies or officers sued in their official capacities. Rhode Island is a resident of this district, and a substantial part of the events or omissions giving rise to this Complaint occurred and continues to occur within the District of Rhode Island.

## PARTIES

A.      **Plaintiffs**

9.      The State of Colorado is a sovereign state in the United States of America. Colorado is represented by Phil Weiser, the Attorney General of Colorado. The Attorney General acts as the chief legal representative of the state and is authorized by Colo Rev. Stat. § 24-31-101 to pursue this action.

10.      The State of Rhode Island is a sovereign state in the United States of America. Rhode Island is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

11.      The State of California is a sovereign state in the United States of America. California is represented by Rob Bonta, the Attorney General of California. The Attorney General acts as the chief legal representative of the state and is authorized by the California state constitution, article V, section 13, to pursue this action.

12.    The State of Minnesota is a sovereign state in the United States of America. Minnesota is represented by Keith Ellison, the Attorney General of the State of Minnesota. The Attorney General's powers and duties include acting in federal court in matters of State concern. Minn. Stat. § 8.01. The Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Minnesota residents and to vindicate the State's sovereign and quasi-sovereign interests.

13.    The State of Washington is a sovereign state in the United States of America. Washington is represented by Attorney General Nicholas W. Brown. The Attorney General of Washington is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern.

14.    The State of Arizona is a sovereign state in the United States of America. Arizona is represented by Attorney General Kris Mayes. The Arizona Attorney General is the chief law enforcement office of Arizona and is authorized to act in federal court on behalf of the State.

15.    The State of Connecticut is a sovereign state in the United States of America. Connecticut is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

16.    The State of Delaware is a sovereign state in the United States of America. Delaware is represented by and through its Attorney General, Kathleen Jennings. The Attorney General is Delaware's chief law enforcement officer and is authorized to pursue this action pursuant to 29 Del. C. § 2504.

17.    The District of Columbia is a municipal corporation organized under the Constitution of the United States. It is empowered to sue and be sued, and it is the local government

6

for the territory constituting the permanent seat of the federal government. The District is represented by and through its chief legal officer, Attorney General Brian L. Schwalb. The Attorney General has general charge and conduct of all legal business of the District and all suits initiated by and against the District and is responsible for upholding the public interest. D.C. Code. § 1-301.81.

18.     The State of Hawai'i, represented by and through Attorney General Anne E. Lopez, is a sovereign state in the United States of America. The Attorney General is Hawai'i's chief legal officer and chief law enforcement officer and is authorized by Hawai'i Revised Statutes § 28-1 to pursue this action.

19.     The State of Illinois is a sovereign state in the United States of America. Illinois is represented by Attorney General Kwame Raoul. The Attorney General of Illinois is the chief legal adviser to the State and is authorized to act in federal court on behalf of the State on matters of public concern. *See* Ill. Const. art. V, § 15; 15 ILCS 205/4.

20.     Plaintiff Office of the Governor, *ex rel.* Andy Beshear, brings this suit in his official capacity as the Governor of the Commonwealth of Kentucky. The Kentucky Constitution makes the Governor the Chief Magistrate with the "supreme executive power of the Commonwealth," Ky. Const. § 69, and gives the Governor, and only the Governor, the duty to "take care that the laws be faithfully executed," Ky. Const. § 81. In fulfilling his constitutional duties, the Governor has authority to bring this action.

21.     The Commonwealth of Massachusetts is a sovereign state in the United States of America. Massachusetts is represented by Andrea Joy Campbell, the Attorney General of Massachusetts, who is the chief law officer of Massachusetts and authorized to pursue this action.

22.     The State of Maine is a sovereign state in the United States of America. Maine is represented by Aaron M. Frey, the Attorney General of Maine. The Attorney General is authorized to pursue this action pursuant to 5 Me. Rev. Stat. § 191.

23.     The State of Maryland is a sovereign state in the United States of America. Maryland is represented by and through its chief legal officer, Attorney General Anthony G. Brown. Under the Constitution of Maryland, and as directed by the Maryland General Assembly, the Attorney General has the authority to file suit to challenge action by the federal government that threatens the public interest and welfare of Maryland residents and Maryland's public institutions. Md. Const. art. V, § 3(a)(2); 2017 Md. Laws, J. Res. 1.

24.     The State of Michigan is a sovereign state in the United States of America. Michigan is represented by Attorney General Dana Nessel. The Attorney General is Michigan's chief law enforcement officer and is authorized to bring this action on behalf of the State of Michigan pursuant to Mich. Comp. Laws § 14.28.

25.     The State of North Carolina is a sovereign state in the United States of America. North Carolina is represented by Attorney General Jeff Jackson who is the chief law enforcement officer of North Carolina.

26.     The State of Nevada is a sovereign state in the United States of America. Nevada is represented by Attorney General Aaron Ford, the State's chief law enforcement officer.

27.     The State of New Jersey is a sovereign state in the United States of America. New Jersey is represented by Matthew Platkin, the Attorney General of New Jersey, who is the chief law enforcement officer of New Jersey and authorized to sue on the State's behalf.

28.     The State of New Mexico is a sovereign state in the United States of America. New Mexico is represented by Attorney General Raúl Torrez who is the chief law enforcement officer of New Mexico.

29.     The State of New York is a sovereign state in the United States of America. As a body politic and a sovereign entity, it brings this action on behalf of itself and as trustee, guardian, and representative of all residents, and political subdivisions of New York. Attorney General Letitia James is the chief law enforcement officer for New York.

30.     The State of Oregon is a sovereign state in the United States of America. The State of Oregon is represented by Attorney General Dan Rayfield, who is the chief legal officer of the State of Oregon. Attorney General Rayfield is authorized by statute to file suit in federal court on behalf of the State of Oregon to protect the interests of the state. Or. Rev. Stat. §180.060.

31.     Plaintiff Josh Shapiro brings this suit in his official capacity as Governor of the Commonwealth of Pennsylvania. The Pennsylvania Constitution vests "[t]he supreme executive power" in the Governor, who "shall take care that the laws be faithfully executed." Pa. Const. art. IV, § 2.  The Governor oversees all executive agencies in Pennsylvania.

32.     The State of Wisconsin is a sovereign state in the United States of America. Wisconsin is represented by Josh Kaul, the Attorney General of Wisconsin, who is the chief law enforcement officer of Wisconsin and is authorized to sue on the State's behalf.

**B.      Defendants**

33.     Defendant the United States Department of Health and Human Services is a cabinet agency within the executive branch of the United States government. HHS includes subagencies and components, which include but are not limited to the National Institutes of Health, Centers for Disease Control and Prevention, and Substance Abuse and Mental Health Services Administration.

34.     Defendant Robert F. Kennedy, Jr. is Secretary of the United States Department of Health and Human Services and that agency's highest ranking official. He is charged with the supervision and management of all decisions and actions of that agency. 42 U.S.C. § 300u. He is sued in his official capacity.

## FACTUAL ALLEGATIONS AND LEGAL BACKGROUND

**A.      During the COVID-19 Pandemic, Congress Appropriated Substantial Funds to Strengthen Public Health Programs That Were Not Tied to the Duration of the Public Health Emergency.**

35.     During the COVID-19 pandemic, Congress enacted numerous major appropriations laws to respond to the nationwide health crisis and economic devastation, place the nation on a path to recovery once the pandemic had ended, and ensure that the nation was better prepared for future public health threats. Some of these appropriations laws include:

- Coronavirus Preparedness and Response Supplemental Appropriations Act ("2020 Supplemental Act"), Pub. L. 116-123, 134 Stat. 146 (2020) ($8.3 billion);

- The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020) ($2.1 trillion);

- Paycheck Protection Program and Health Care Enhancement Act ("Paycheck Protection Act"), Pub. L. No. 116-139, 134 Stat. 620 (2020) ($483 billion);

- The Coronavirus Response and Relief Supplemental Appropriations Act ("2021 Supplemental Act"), 2021 (Div. M of the Consolidated Appropriations Act, 2021), Pub. L. No. 116-260, 134 Stat. 1182 (2021) ($900 billion); and

- The American Rescue Plan Act of 2021 ("ARPA") Pub. L. No. 117-2, 135 Stat. 4 (2021) ($1.9 trillion).

36.    In addition to directing funds toward amelioration of the immediate effects of the COVID-19 emergency, these wide-ranging appropriations sought to address challenges facing American society in COVID-19's wake, including gaps in the public health system. These many critical public health investments were not tied to the duration of the public health emergency.

37.    For example, ARPA contains many public health investments that were not limited to the public health emergency and could be expected to have uses extending to other pathogens or future emergencies, including funding for genome sequencing and surveillance; data modernization and forecasting; public health workforce development; and public health investments in community health centers, teaching health centers, family planning, and nurses.

38.    Similarly, in the CARES Act and the 2020 Supplemental Act, Congress appropriated $1.5 billion and $950 million, respectively, for grants and cooperative agreements with States and local jurisdictions to carry out surveillance, epidemiology, laboratory capacity, infection control, mitigation, communications, and other preparedness and response activities. CARES Act, Title VIII, 134 Stat. at 554; 2020 Supplemental Act, Title III, 134 Stat. at 147. Congress did not limit the expenditure of these funds to the duration of the public health emergency.

39.    ARPA also included funds to supplement state vaccination programs and efforts, ARPA § 2301, 135 Stat. at 37-38, including $1 billion to "strengthen vaccine confidence in the United States," and "to improve rates of vaccination throughout the United States." *Id.* § 2302, 135 Stat. at 38-39. Again, Congress did not limit expenditure of these funds to the duration of the public health emergency.

40.    Congress likewise appropriated $3 billion in block grants to support state governments' efforts to promote mental health and prevent substance abuse to be spent over the

course of five years. *Id.* §§ 2701, 2702, 135 Stat. at 45-46. Congress did not limit the expenditure of these funds to the duration of the public health emergency.

41.    In contrast, where Congress intended to limit the application of programs or appropriations in COVID-19 related laws, it did so expressly within these statutes. *See, e.g., id.* § 9401, 135 Stat. at 127 ("during the emergency period . . . and the 1-year period immediately following the end of such emergency period"); *id.* § 9811(hh), 135 Stat. at 211 ("ends on the last day of the first quarter that begins one year after the last day of the emergency period"); CARES Act § 1109(h), 134 Stat. at 306 ("until the date on which the national emergency . . . expires").

42.    The examples listed above are but a small subset of Congress's wide-ranging public health investments made during the COVID-19 pandemic, funding that was not limited to the duration of the public health emergency.

43.    HHS utilized these appropriations, as Congress intended, to offer the wide-ranging grants and cooperative agreements to States and their local jurisdictions, many of which are the subject of this action. This Complaint refers to these grants and cooperative agreements collectively as the "public health funding." Some of this public health funding involved additional funding to existing, longstanding programs while others represented new efforts and programs. A non-exhaustive description of some of these major projects follows.

44.    Long before the 2020 public health emergency, HHS's Centers for Disease Control and Prevention ("CDC") established the Epidemiology and Laboratory Capacity for Prevention and Control of Emerging Infectious Diseases ("ELC") Cooperative Agreement as a mechanism to fund the nation's state and local health departments to detect, prevent, and respond to infectious disease outbreaks. These agreements have funded local responses to pathogen threats like H1N1 (swine flu), Zika, and Ebola. The program provides financial and technical resources to: (1)

strengthen epidemiologic capacity; (2) enhance laboratory capacity; (3) improve health information systems; and (4) enhance collaboration among epidemiology, laboratory, and information systems components of public health departments. During the 2020 public health emergency, the CDC used the ELC funding mechanism to provide supplemental support to the States.

45.    For example, Minnesota received three awards for $220 million bolstering the capacity of the public health workforce in the areas of disease surveillance, detection, and outbreak response. This includes (1) hiring and training staff in the areas of laboratory testing, epidemiology, and data informatics to increase capacity to monitor COVID-19 and other emerging diseases or conditions of public health significance; (2) expanding and strengthening capacity of public health laboratories to test and conduct surveillance for COVID-19 and other emerging diseases; and (3) improving data systems to permit faster and more complete data exchange and reporting between laboratories, health care providers, and health departments to allow for faster detection and more effective monitoring of COVID-19 and other conditions of public health significance.

46.    In California, Sacramento County is a subgrantee of the California Department of Public Health's ELC grant and uses grant monies of nearly $60 million to investigate outbreaks of foodborne diseases, COVID-19, mpox, and any other yet to be identified communicable diseases. Riverside County likewise uses its ELC funding in the amount of $101 million in part to implement and conduct wastewater surveillance to detect the early presence of COVID-19, mpox, and other communicable diseases.

47.    Similarly, the New Jersey Department of Health uses this funding to support 94 local health departments to cover staff; data infrastructure; community outreach and education;

infectious disease preparedness; coordination and crisis response; renovations and facility improvements; and professional development and training.

48.    Through the project Advancing the Centers of Excellence in Newcomer Health, the CDC provided funding to improve the health of immigrant populations by focusing on surveillance, clinical training, and developing resources for both clinicians and newcomers, building upon existing infrastructure and collaborating with partners.

49.    The Immunization and Vaccines for Children program is another long-standing CDC program to which new appropriations were added. These appropriations provided funds to support broad-based distribution, access, and vaccine coverage. These resources supported the implementation of the COVID-19 vaccine program, and in 2023, the CDC issued guidance recognizing that COVID-19 vaccination was increasingly integrated into the administration of other routine vaccinations. Setting up and continuing an effective COVID-19 vaccination program requires expanding the existing immunization infrastructure, engaging in additional community partnerships, and implementing and evaluating new strategies to reach affected populations (such as those who may be vaccine hesitant and those who are in racial and ethnic or other minority groups). These activities, including providing COVID-19 vaccination to vulnerable populations like nursing home residents, are continuing in the States.

50.    Through the Community Health Workers for COVID Response and Resilient Communities program, the CDC provided funding to the States to build out networks of community health workers to connect communities affected by the 2020 public health emergency to supportive resources, increasing access to care and decreasing hospitalization. The States have continued with this work as communities continue to recover.

14

51.     Through the National Initiative to Address COVID-19 Health Disparities Among Populations at High-Risk and Underserved, Including Racial and Ethnic Minority Populations and Rural Communities, the CDC provided funding to expand state and local health departments' capacity to better serve the most vulnerable and underserved communities, including establishing new State and local partnerships. For example, in Rhode Island, the grant allowed for new partnerships with Block Island, the state's designated rural community. In California, the City and County of San Francisco uses its over $4.6 million grant approved through May 30, 2026, to identify and serve especially marginalized communities that are underrepresented in routine public health surveys or services delivery, and to educate residents about infectious disease prevention (including COVID-19) and the opioid epidemic.

52.     HHS's Substance Abuse and Mental Health Services Administration ("SAMHSA") administers a longstanding program to provide annual block grants—the Substance Abuse Prevention and Treatment Block Grant and the Community Mental Health Services Block Grant—for each State to address mental health and substance abuse. 42 U.S.C. § 300x(a). Block grants are a common method of providing federal funding to state and local governments to assist them in addressing broad purposes, such as public health, that generally provide recipients with more control over the use of the funds. As noted earlier, through ARPA, Congress added $3 billion in additional funds to these block grants to be expended within five years to address increased mental health and substance use crises. ARPA §§ 2701, 2702, 135 Stat. at 45-46.

**B.    HHS and Congress Continued to Make These Public Health Funds Available After the End of the Pandemic.**

53.     Since the World Health Organization and the United States declared an end to the public health emergency caused by COVID-19 in May 2023, HHS consistently recognized that the public health funds at issue are properly available after the end of the COVID-19 emergency.

15

54.     HHS was aware of, and expressly approved of, the continued use of this funding for Plaintiff States' public health program activities, including substance use disorder prevention and treatment and mental health services, improvements to infectious disease monitoring and response, and modernizing and improving critical public health infrastructure. In fact, HHS granted numerous extensions to the performance period of many grants issued to Plaintiff States and their local health jurisdictions, some of which were scheduled to end as late as June 2027. These extension applications included a detailed plan identifying the specific uses of the funding, which HHS approved.

55.     For example, the CDC repeatedly extended the period during which Minnesota could expend the ELC supplemental funds described earlier. In October 2023, the CDC granted an extension that extended the period of performance end date, or allowed funds to be expended, for all three awards to July 31, 2026.

56.     Congress similarly has taken legislative action indicating that these funds remain available after the end of the pandemic. Shortly after the end of the public health emergency, Congress took action to cancel $27 billion in related appropriations through the Fiscal Responsibility of Act of 2023, Pub. L. 118-5, Div. B, 137 Stat. 10, 23 (June 3, 2023). Through this Act, Congress went through various COVID-related laws and rescinded certain funds that it determined were no longer necessary. *Id.* Div. B Sec. 1-81.

57.     But Congress chose not to rescind the funding for the grants and cooperative agreements at issue in this case. Thus, *after* the COVID-19 public health emergency was over, Congress reviewed the funding in COVID-19 related laws, identified funds to be rescinded, but determined not to revoke the public health funding at issue here.

**C.    HHS Abruptly Terminated $11 Billion in Grants and Cooperative Agreements Funded by Appropriations From COVID-19 Related Laws.**

58.    Beginning on March 24, 2025, HHS abruptly, with no advance notice or warning, changed its position and terminated $11 billion in critical public health funds. The notices of termination arrived in grant portals and e-mail inboxes, often late at night. Some staff of Plaintiff States' health agencies did not receive these notices until they came to work on March 25.

59.    As public health workers in each Plaintiff State began to receive and digest these termination notices, at least some of which appeared as an "amendment" in the grant administration portal, it became clear that grants and cooperative agreements that applied to obligated "COVID-19 funding" were being terminated, allegedly "for cause." The terminations appeared to be effective immediately.

60.    Later on March 25, HHS released a statement that it "will no longer waste billions of taxpayer dollars" on programs it characterized as "responding to a non-existent pandemic that Americans moved on from years ago." HHS claimed that it would instead prioritize funding alternate projects, making no mention that these funds were attached to specific Congressional appropriations. Nathaniel Weixel, *Trump Administration Revokes State and Local Health Funding*, The Hill (Mar. 26, 2025), https://thehill.com/policy/healthcare/5216704-trump-administration-revokes-state-local-health-funding/.

61.    The mass terminations across multiple HHS agencies appeared to be clearly coordinated with the same basic features:

- The terminations were all issued on roughly the same date (March 24-25, 2025).

- The terminations were all issued with no warning or advance notice.

- The sole stated basis for each termination was that the funding was being terminated "for cause."

17

- The terminations all used slight variations of the same conclusory, boilerplate explanation: "The end of the pandemic provides cause to terminate COVID-related grants. Now that the pandemic is over, the grants are no longer necessary."

- The terminations all contained no individualized assessment or explanation as to why the funding was no longer necessary or why the agency had suddenly changed its longstanding position that the end of the pandemic did not limit the availability of this public health funding.

- The terminations were all effective immediately and contained no assessment or explanation accounting for reliance interests.

62.    Specifically, on March 24 and 25, 2025, Plaintiff States and their local health jurisdictions received, with no warning or advanced notice, nearly identical mass termination notices from the CDC ("CDC Termination Notices") that state in relevant part:[1]

> The purpose of this amendment is to terminate this award which is funded by COVID-19 supplemental appropriations. The termination of this award is for cause. HHS regulations permit termination if "the non-Federal entity fails to comply with the terms and conditions of the award", or separately, "for cause." The end of the pandemic provides cause to terminate COVID-related grants and cooperative agreements. **These grants and cooperative agreements were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grants and cooperative agreements are no longer necessary as their limited purpose has run out.** Termination of this award is effective as of the date set out in your Notice of Award.

---

[1] Plaintiff States received voluminous terminations across programs, and some of the notices have minor, non-substantive variations from this text.

63.    The "date set out in your Notice of Award" was March 24, 2025, meaning the CDC grants had been terminated immediately, and, in at least some cases, retroactively.

64.    The CDC Termination Notices cite no specific regulation or statute as legal authority but claim to apply HHS regulations permitting termination "for cause."

65.    While purporting to terminate "for cause," the CDC Termination Notices do not allege any failure on the part of Plaintiffs to comply with the terms or conditions. Plaintiffs have complied with the terms and conditions of the awards and are not aware of any allegation to the contrary.

66.    At the same time, beginning on March 24, 2025, Plaintiff States and their local health jurisdictions received, with no warning or advanced notice, nearly identical mass termination notices from SAMHSA that state in relevant part:

> On April 10, 2023, President Biden signed PL 188-3 terminating the national emergency concerning the COVID-19 pandemic. Consistent with the President's Executive Order 14222, Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative requiring a comprehensive review of SAMHSA grants, and where appropriate and consistent with applicable law, terminate such grants to reduce the overall federal spending this grant is being terminated effective March 24, 2025. **These grants were issued for a limited purpose: To ameliorate the effects of the pandemic. The end of the pandemic provides cause to terminate COVID-related grants. Now that the pandemic is over, the grants are no longer necessary.**

67.    These notices cite no regulation or statute that would permit SAMHSA to terminate these grants and do not offer an opportunity for a hearing.

68.    A few days later, SAMHSA attempted to paper over its prior failings with new notices. These new notices ("SAMHSA Termination Notices") cite 42 U.S.C. § 300x-55 as the termination authority. This statute permits termination "for cause" if the State "has materially failed to comply with the agreements or other conditions required for the receipt of a grant under

the program involved." 42 U.S.C. § 300x-55(a). However, instead of citing any failure with an individualized explanation, this form pointed to "the end of the pandemic," an external event, as a "for cause" reason to terminate public health grants and cooperative agreements. The notices stated that the recipient could "dispute" the termination within 15 days.

69. SAMHSA's action conflicts with the plain language of the applicable block grant termination statute. The statute strictly limits that "[b]efore taking action against a State," the agency must "provide to the State involved adequate notice and an opportunity for a hearing." *Id.* § 300x-55(e). As of March 24, 2025, SAMHSA unlawfully terminated the grants without providing any prior notice or opportunity for hearing. Similarly, before taking action to withhold funding, HHS needed to have investigated and found material non-compliance with the grant's terms and conditions. *See id.* 300x-55(a), (g)(3). It did not.

70. In sum, through conclusory, boilerplate mass terminations, HHS terminated billions of dollars of public health funding. The mass terminations appear to cover any public health funding, regardless of purpose or program, that happened to still have funds appropriated from one or more COVID-19 related laws.

**D.    The Terminations Have Caused and Will Continue to Cause Irreparable Harm.**

71. The immediate termination of billions of dollars in critical public health funding deprives Plaintiff States, and their local health jurisdictions, of money Congress appropriated to fund vital state and local government public health programs. These terminations are causing, and will continue to cause, significant and irreparable harm to Plaintiff States. Plaintiff States and their local health jurisdictions have operated their programs in reliance on the fact that, as long as they complied with the terms and conditions, they would receive these funds for the stated time period in the awards.

20

72.     This critical loss of public health funding has caused tremendous chaos to Plaintiff States, including immediate harm to public health initiatives and the termination of large numbers of state and local public health employees and contractors.

73.     For example, in Washington, HHS rescinded approximately $118 million in ELC funds, impacting approximately 150 full-time employees. Loss of these funds would cause an immediate reduction in the state public health agency's ability to respond to emerging outbreaks for mpox, measles, and H5N1. These funds also support data analytics work related to surveillance for post-COVID conditions, COVID-risk factors, and health care access and health workforce challenges across the state of Washington.

74.     In Colorado, the CDC terminated four awards with over $200 million remaining to be spent that would have furthered critical public health efforts including bolstering State laboratory capacity and increasing vaccine distribution capabilities. The Colorado Department of Public Health and Environment ("CPDHE") estimates that these cuts will require it to cut or significantly reduce the roles of over 190 staff and contractors who perform important public health roles including immunization distribution, laboratory services, and programmatic duties. The loss of $154 million in remaining ELC funds alone means that CDPHE will be forced to end its training for local public health agencies focused on infectious disease surveillance and investigation. Additionally, the CDPHE will no longer be able to complete contracts to replace worn out lab equipment, placing at risk CHDPHE's ability to meet ongoing testing needs for COVID as well as emerging threats such as H5N1, measles, and bioterrorism response.

75.     California's Department of Public Health has received notice of termination of multiple CDC grants, including: an Immunization and Vaccine for Children's Grant with an approved extension through June 30, 2027; an ELC Supplement Grant via bona fide fiscal agent

Heluna Health through July 31, 2026; and a National Initiative Health Disparities Grant with an approved extension through May 31, 2026. These grants total over $2 billion as granted with approximately $800 million remaining (roughly $500 million obligated to the state and roughly $300 million obligated to local health departments). The grants, for example, support its public health agencies and local health jurisdictions' efforts to respond to measles, seasonal and avian influenza, and other vaccine-preventable diseases. For example, its state public health department relies on ELC funds to support software and systems known as CalCONNECT, which monitor, investigate and appropriately and timely respond to infectious disease outbreaks. CalCONNECT helps improve timely and efficient management of complex cases, contact investigations, and outbreaks, reducing delays in investigation, contact tracing, monitoring, and public health communications. CalCONNECT has allowed for automation that helps the state and local health jurisdictions collect and share infectious disease data faster, prioritize contacts at highest risk for more timely public health interventions (e.g., medicines to prevent a second case), and minimize errors. This information is used for disease investigation activities at the state and local level for infectious disease including Tuberculosis, mpox, HIV, and other sexually transmitted diseases, and to monitor cases of novel infections including Avian flu, Ebola, and Marburg. It also provides a secure way for local health jurisdictions to track individuals who require follow-up and check-ins to prevent the spread of disease. Without these federal funds, the modernized systems face risks including delays in care and in reporting and identifying outbreaks, which could exacerbate the spread of disease and puts at risk California's preparedness for future pandemics.

76.    The Public Health Terminations have also devastated California's local health jurisdictions, which deliver essential health care services throughout the state. For example, HHS terminated over $45 million of funding that had been directly awarded to Los Angeles County,

which is home to nearly 100 acute care hospitals, 70 emergency departments, and over 300 skilled nursing facilities. The county is a major hub for international travel and a port of entry with roughly 55 million travelers passing through the Los Angeles International Airport alone (the country's third busiest airport), making it especially likely to face continuing risk of emergence of Dengue, Chikungunya, and Zika Viruses, as well as resurgences of diseases such as COVID-19 and measles. The County relied on federal funding to support its response to over 50 current infectious disease outbreaks. Because most of the outbreak team staff will be terminated as a result of the funding loss, the County will not be able to respond in a timely manner, if at all, to outbreaks in jails, shelters, assisted living facilities, and worksites. The funding termination will likely increase the incidence of communicable and infectious disease case clusters and outbreaks, which will pose a serious health and safety risk to the County's residents and persons visiting the region.

77.    The arbitrary termination of Minnesota's supplemental ELC grants will result in the unanticipated loss of more than $220 million from the Minnesota Department of Health's ("MDH") budget. This amount represents the remaining unpaid encumbrances and monies for activities and items approved by the CDC that had not yet been carried out pursuant to MDH's approved workplans.

78.    Elimination of Minnesota's CDC grants is not just about dollars. The abrupt termination of these awards is directly and immediately impacting the work of multiple programs within MDH, as well as local public health departments and community partners, many of whom rely on these awards for their day-to-day operations and community health programs. The terminated awards fund many MDH staff and contractors, and MDH does not have the financial capacity to fund all these positions through other funding sources. As a result, approximately 200 MDH employees will be laid off from their position. This represents a layoff of about 12% of

MDH's current workforce. Additionally, 48 individuals providing services to MDH on a contract basis have already been released from MDH. The employees and contractors who will be laid off or released as a result of these grant terminations include licensed physicians, epidemiologists, research scientists, and other highly skilled and trained workers.

79.    The loss of funds and workforce in turn has significant and immediate implications for programs fulfilling critical public health functions in Minnesota. For example, the terminated ELC grant supports tracking and responding to ongoing outbreaks of infectious diseases in high-risk settings, such as nursing homes, assisted living facilities, correctional facilities, and homeless shelters. Termination of the ELC supplement means loss of funding for dedicated staff to detect and respond to outbreaks in some of the state's most vulnerable populations.

80.    The termination of Minnesota's ELC grants also directly impacts MDH programs and initiatives that provide disease control and prevention efforts for infectious diseases other than COVID-19, such as: (1) Surveillance for respiratory illnesses, including influenza, and respiratory syncytial virus (RSV) through MDH's respiratory illness surveillance dashboard, which allows health care settings, public health agencies, media outlets, and the public to access user-friendly respiratory data for situational awareness, risk assessment, and staffing preparedness; (2) Detection, monitoring, treatment, and control activities for avian influenza (H5N1) and other zoonotic diseases, such as rabies, anthrax, and blastomycosis; (3) Surveillance and laboratory processing and reporting for tuberculosis; (4) Surveillance, response, and containment for antimicrobial-resistant organism outbreaks, where older adults, people with disabilities, and residents in long-term care and congregate settings are most at risk for antimicrobial-resistant organism infections; and (5) Monitoring and prevention efforts related to pregnancies with congenital syphilis exposure. Infants with congenital syphilis who do not receive treatment may

die shortly after birth, or experience blindness, deafness, or developmental delays among other complications.

81.    Ordering grantees and contractors to stop work is having immediate impacts on Minnesota communities. MDH passed through approximately $45 million in ELC supplemental funds to local public health agencies, and approximately $13 million were unobligated or still available for future use as of the date the federal awards were terminated. Many of the local public health agencies receiving these pass-through funds used and were continuing to use the funds to support vaccination education campaigns and community-based clinics. These initiatives are focused on both youth and adult COVID-19 vaccination, and include measles, mumps, and rubella (MMR), influenza, and other vaccines. Local public health agencies focus their efforts on those most vulnerable in Minnesota's communities, and serve a variety of community settings, including schools, public housing locations, and jails. One local public health agency reported that it held 21 childhood vaccination clinics and provided approximately 1,400 vaccinations to children in 2024. It also held 87 general vaccination clinics in 2024. As a result of the termination of the ELC supplemental funds, it has immediately ceased all vaccination clinics for 2025.

82.    In Rhode Island, HHS abruptly rescinded $13 million in remaining supplemental funds for the Immunization and Vaccines for Children program. The CDC had previously indicated that the project could be extended through June 30, 2027, through a "No Cost Extension." Accordingly, the state public health department developed a workplan for its immunization program that included an April 2025 vaccination clinic for seniors, provided salaries for highly trained technicians to ensure that vaccine doses are stored and refrigerated correctly to prevent waste of vaccines purchased with other tax-payer dollars, planned computer system upgrades, and covered printing costs for communications about vaccine campaigns. In addition, HHS abruptly

rescinded more than $14 million in ELC funds, which had been extended for use until July 2026. These funds were slated for salary support for crucial infectious disease detection and prevention personnel as well as equipment needed for the transition to a new laboratory facility scheduled for summer 2025.

83.    In the Commonwealth of Massachusetts, the CDC terminated four grants that had been previously awarded to the Massachusetts Department of Public Health. The outstanding value of these CDC grants represents a loss of $84 million, if not more. The Commonwealth of Massachusetts has experienced, and will continue to experience, irreparable harm due to these grant terminations. The termination of this funding threatens numerous services and programs, including rural immunization support, operation of the State Public Health Laboratory's Laboratory Information Management System, contracts with community health centers, and in-home vaccination services. All told, these cuts have a significant impact on some of the Commonwealth's most vulnerable residents, including children and the elderly.

84.    HHS abruptly terminated at least six grants to the Nevada Division of Public and Behavioral Health related to epidemiology and lab capacity, immunization access, and mental health services. These terminations led Nevada to immediately terminate 48 state employees and to order contractors working under these awards to immediately cease all activity. The loss of funding will have substantial impacts on public health in Nevada.

85.    In the Commonwealth of Pennsylvania, HHS abruptly terminated more than a half billion dollars in grants awarded to the Pennsylvania Department of Health, the Pennsylvania Department of Human Services, and the Pennsylvania Department of Drug and Alcohol Programs. These include three grants awarded to the Department of Health that represent a loss of more than $495 million and impact funding for more than 150 Commonwealth employees and contracted

staff. These grants are critical to support the Department of Health's efforts to respond to and mitigate the spread of infectious disease across the Commonwealth, and to recover and support public health and communities from the detrimental impacts of a global pandemic. For the Department of Drug and Alcohol Programs, losing these grant funds will mean an inability to provide allocations to local treatment authorities for substances use disorder (SUD) intervention, treatment, and recovery services. HHS's termination of these funds means an abrupt decrease or full termination of funds awarded to private entities that deliver recovery support services, employment services, pregnancy support services, and drop-in centers directly to persons who have or are in recovery from SUD. Without continued funding, the Department of Human Services will not be able to help counties and local providers timely and efficiently serve extremely vulnerable individuals who are experiencing severe mental health conditions. This includes providing technical assistance, training and outcome monitoring for providers who serve individuals experiencing psychosis, and related local support group and psychoeducational funding across the Commonwealth. A reduction in grant funding will also adversely impact the analysis of involuntary mental health commitments in the state that is meant to help prevent unnecessary treatment.

86.    Termination of the SAMHSA awards will immediately impact a wide range of services throughout Plaintiff States including: crisis resolution teams, services for adults with Serious Mental Illness, peer services for those in recovery for substance use disorder, and support for young adults who have experienced an early onset of psychotic spectrum illness—just to name a few. In so many cases, these are life-saving programs and services and will cause significant risk for those residents relying on them for support.

87.    In Colorado, for example, SAMHSA terminated four awards valued at $29 million that funded vital programs to address pressing issues related to mental health and substance abuse treatment. These cuts will force the Colorado Behavioral Health Administration ("BHA") to curtail support for its Mobile Crisis Response, leading to longer response times from crisis professionals who provide immediate services to both rural and urban areas across the State. Similarly, the BHA will be forced to reduce or eliminate services through its Assertive Community Treatment program, which supports over 650 individuals to reduce hospitalizations and law enforcement contacts by adults with serious mental illness. The BHA and its 68 grantee partners will be forced to lay off staff and reduce services throughout the State. Overall, these cuts will have a particularly negative impact on Colorado's most vulnerable, including high-risk children, individuals with serious mental illness, and individuals seeking behavioral health services.

88.    Furthermore, in California, SAMHSA terminated awards in excess of $119 million. The Public Health Terminations will cause widespread harm, including potentially significant adverse health outcomes such as increased overdose rates, increased psychiatric emergency admissions to hospitals and emergency departments, and increased suffering due to untreated behavioral health conditions. For example, the terminations may deprive over 100 California community-based organizations, tribal organizations, county governments, clinics, and coalitions the funding necessary to provide important mental health and addiction services. California's Department of Health Care Services will no longer administer a program that assists foster youth with co-occurring substance use and mental health needs. And California's counties will experience immediate, detrimental impacts, including loss of staffing and reduction in infrastructure capabilities, which would reduce access to critical Crisis Care Mobile Units and Mobile Crisis Services.

89.     New Jersey's SAMHSA mental health block grant supports *direct* provision of services to individuals receiving mental health services. The abrupt termination leaves the New Jersey Department of Human Services with no ability to ensure that these individuals will be appropriately transitioned to other services. This disruption of care could be life-threatening.

90.     SAMHSA similarly terminated three grants to the Commonwealth of Massachusetts. The sudden termination of these funds, with no notice to the Massachusetts Department of Mental Health, creates an immediate risk to the continuity and transition of vital programs in the Commonwealth, including intensive in-home services for young adults and trauma-informed care and services. The funding loss jeopardizes contracts to 27 providers/organizations that offer critical community mental health services for adults with serious mental illness and children with serious emotional disturbance.

91.     All Plaintiff States have suffered, and will continue to suffer, similar immediate irreparable harms to these examples.

92.     That HHS carried out these terminations without any warning only exacerbates the harm to Plaintiff States by depriving them of the opportunity to plan for an orderly winddown of impacted programs.

93.     For example, States and their public health jurisdictions that used these public funds to hire employees had less than 24 hours to determine how to address the sudden lack of funding for those positions before beginning to incur potential costs, including wages that they purportedly will not be able to recover.

94.     In sum, Defendants' actions to unlawfully and suddenly terminate these grants midstream have already resulted in immediate and irreparable harm to Plaintiff States, their public

health agencies and local health jurisdictions, and their residents. Those harms will deepen considerably if the Public Health Terminations are not reversed.

95.     The sudden loss of federal funds from the Public Health Terminations threatens Plaintiff States' ability to track COVID-19 trends and other emerging diseases, modernize disease data systems, respond to outbreaks, and provide critical immunization access, outreach, and education—leaving communities more vulnerable to future public health crises. Additionally, the Public Health Terminations hinder Plaintiff States' ability to provide services for those with Serious Mental Illness, to address substance abuse disorders, and to support young adults experiencing mental health crises. Without restoration of these federal funds, Plaintiff States and their residents will suffer immediate and irreparable harm from the withholding of millions of dollars in federal financial assistance and the loss of critical funding to support mental health services and public health.

## CAUSES OF ACTION

### COUNT I

### Violation of the Administrative Procedure Act – Contrary to Law

### SAMHSA Termination Notices

96.     Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if set forth herein.

97.     The Public Health Terminations, including the SAMHSA Termination Notices, as well as the decision to issue the terminations, are final agency actions subject to the APA.

98.     Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions found to be . . . not in accordance with law; . . . contrary to constitutional right, power, privilege, or immunity;" or "in excess of statutory jurisdiction, authority, or limitations, or

short of statutory right." 5 U.S.C. §§ 706(2)(A)–(C). Here, Defendants have acted contrary to law in at least three ways.

99.    An agency may not take any action that exceeds the scope of its constitutional or statutory authority or is otherwise contrary to law.

100.    The statutes that authorize these programs provide that HHS is required to expend the funds allocated in the amount and for the purposes that Congress authorized.

101.    Federal agencies lack authority to impose terms on Congressional programs that conflict with the requirements or purpose of the program.

102.    First, Defendants acted contrary to law and in excess of statutory authority by unlawfully applying the "for cause" provision in 42 U.S.C. § 300x-55 to terminate the grants. This statute addresses "failure to comply with agreements." Pursuant to 42 U.S.C. § 300x-55(a), "if the Secretary determines that a State has materially failed to comply with the agreements or other conditions required for the receipt of a grant," the Secretary may "terminate the grant for cause."

103.    Defendants have never identified any material failure to comply with agreements or other required conditions.

104.    The SAMHSA Termination Notices explain: "The end of the pandemic provides cause to terminate COVID-related grants. Now that the pandemic is over, the grants are no longer necessary." This is not a lawful basis to terminate a grant under 42 U.S.C. § 300x-55, the legal authority SAMHSA identified for the terminations.

105.    Moreover, ARPA does not authorize the end of the pandemic as a ground for termination, and none of the appropriations at issue were scheduled to terminate at the end of the pandemic. To the contrary, Congress affirmatively chose to continue funding the public health

grants at issue as recently as June 2023—after Congress itself approved the resolution formally ending the COVID-19 national emergency.

106.    Second, Defendants acted contrary to law because 42 U.S.C. § 300x-55(e) requires: "Before taking action against a State under any of subsections (a) through (c) . . . , the Secretary shall provide to the State involved adequate notice and an opportunity for a hearing." *Id.* But Defendants provided absolutely no notice or opportunity for a hearing before immediately taking action to terminate the grants.

107.    Third, 42 U.S.C. § 300x-55(g) bars HHS from withholding any funds unless it has first "conducted an investigation concerning whether the State has expended payments under the program involved in accordance with the agreements required under the program." *Id.* Defendants violated the law by withholding funds without conducting any investigation.

108.    Defendants' actions were in blatant violation of the statute by illegally applying the "for cause" termination provision, illegally terminating the grants without any prior notice or opportunity to be heard, and illegally withholding funds without any investigation.

109.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the SAMHSA Termination Notices are contrary to law, outside of statutory authority, and in violation of the APA.

110.    Plaintiffs are also entitled to vacatur of the SAMHSA Termination Notices, Defendants' decision to issue those notices, and Defendants' actions implementing the SAMHSA Terminations Notices pursuant to 5 U.S.C. § 706; all appropriate preliminary relief under 5 U.S.C. § 705; and a preliminary and permanent injunction preventing Defendants from implementing or enforcing the SAMHSA Termination Notices or reinstituting the terminations for the same or similar reasons and without required statutory or regulatory process.

**COUNT II**

**Violation of the Administrative Procedure Act – Contrary to Law**

**CDC Termination Notices**

111.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if set forth herein.

112.    The Public Health Terminations, including the CDC Termination Notices, as well as the decision to issue the terminations, are final agency actions subject to the APA.

113.    Similar to the SAMHSA Termination Notices, the CDC Termination Notices claim to terminate the grants and cooperative agreements "for cause" because "[n]ow that the pandemic is over, the grants and cooperative agreements are no longer necessary." The only substantive difference is that the CDC Termination Notices cite "HHS regulations" (presumably 45 C.F.R. § 75.372) as the legal authority. Some cite to no legal authority at all.

114.    45 C.F.R. § 75.372(a)(2) does permit a "for cause" termination, but the end of the COVID-19 emergency does not satisfy that provision.

115.    Defendants have made no findings that State Plaintiffs or their local health jurisdictions failed to comply with any award terms and conditions. Defendants simply applied the "for cause" provision to terminate the public health funding based on the end of the COVID-19 pandemic in 2023 when, as a matter of law, that is not a lawful "for cause" basis to terminate.

116.    The relevant appropriations do not authorize the end of the pandemic as a ground for termination. To the contrary, Congress affirmatively chose to continue funding the public health grants at issue as recently as June 2023—after approval of the resolution formally ending the COVID-19 emergency.

117.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the CDC Termination Notices are contrary to law and in violation of the APA.

118.    Plaintiffs are also entitled to vacatur of the CDC Termination Notices, Defendants' decision to issues those notices, and Defendants' actions implementing the CDC Termination Notices pursuant to 5 U.S.C. § 706; all appropriate preliminary relief under 5 U.S.C. § 705; and a preliminary and permanent injunction preventing Defendants from implementing or enforcing the CDC Termination Notices or reinstituting the terminations for the same or similar reasons and without required statutory or regulatory process.

## COUNT III

### Substantive Violation of the Administrative Procedure Act – Arbitrary & Capricious

### All Public Health Terminations

119.    Plaintiffs incorporate by reference the foregoing paragraphs of this Complaint as if set forth herein.

120.    The APA requires that a court "hold unlawful and set aside agency action, findings, and conclusions found to be" "arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law[.]" 5 U.S.C. § 706(2)(A).

121.    An agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

122.    The Public Health Terminations violate the APA because they are arbitrary and capricious, for reasons including: (1) assuming, with no legal or factual support, that all appropriations in COVID-19 related laws were only intended for use during the pandemic, when the relevant statutes indicate the opposite; (2) failing to undertake any individualized assessments of the grants or cooperative agreements, including any analysis of the benefits of this public health funding or the dire consequences of termination; (3) ignoring the substantial reliance interests of Plaintiff States (and their local health jurisdictions) and the tremendously harmful impact of immediately terminating, without any advance warning, billions of dollars in congressionally appropriated funds midstream; (4) asserting that this public health funding was suddenly unnecessary due to the "end of the pandemic"—an event that occurred almost two years ago; (5) failing to explain HHS's sudden change in position regarding availability of funds; and (6) arbitrarily misapplying a "for cause" termination provision.

123.    Defendants have not provided a rational basis for the Public Health Terminations. The notices supporting the terminations explain as the basis (with slight variations): "Now that the pandemic is over, the grants or cooperative agreements are no longer necessary." Coming almost two years after the federal government's declaration of an end to the COVID-19 emergency, this explanation is nonsensical.

124.    Defendants departed significantly from their normal procedures in issuing the Public Health Terminations.

125.    The Public Health Terminations point to no other facts supporting termination. They contain no acknowledgment of the public health purposes for which the grants actually have been and are being used, much less an explanation of why those uses are no longer necessary. Indeed, substantial evidence before the agency shows that the grants at issue continued to be used

for needed purposes such as supporting state governments' efforts to support mental health and substance abuse prevention, as Congress intended.

126.    There is no indication that Congress intended Defendants to rely on the pandemic being "over" as a reason to rescind public health grants.

127.    In making the Public Health Terminations, Defendants conducted no individualized assessment of grants and did not compare the benefits of the grants with their costs. Defendants failed to take into consideration the substantial reliance interests of Plaintiff States (and their local health jurisdictions) and the tremendously harmful impact of immediately terminating, without any warning, billions of dollars in congressionally appropriated funds.

128.    Defendants have provided no other rational explanation for the timing of the Public Health Terminations or for their sudden change in position since approving the grants, agreements, and extensions of time.

129.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2201, Plaintiffs are entitled to a declaration that the Public Health Terminations violate the APA because they are arbitrary and capricious.

130.    Plaintiffs are also entitled to vacatur of the Public Health Terminations and the decision to issue those terminations pursuant to 5 U.S.C. § 706; all appropriate preliminary relief under 5 U.S.C. § 705; and a preliminary and permanent injunction preventing Defendants from implementing or enforcing the Public Health Terminations or reinstituting the terminations for the same or similar reasons and without required statutory or regulatory process.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs pray that this Court:

i.    Pursuant to 5 U.S.C. § 706 and 28 U.S.C. § 2202, vacate and set aside the Public Health Terminations, Defendants' decision to issue the Public Health Terminations, and any other further actions taken by Defendants to implement or enforce the Public Health Terminations;

ii.   Pursuant to 28 U.S.C. § 2201, issue a judicial declaration that the Public Health Terminations were unlawful acts that violated the APA;

iii.  Preliminarily and permanently enjoin Defendants from implementing or enforcing the Public Health Terminations or reinstituting the terminations for the same or similar reasons and without required statutory or regulatory process;

iv.   Award Plaintiffs their reasonable fees, costs, and expenses, including attorneys' fees, pursuant to 28 U.S.C. § 2412; and

v.    Grant other such relief as this court deems appropriate, just, and proper.

Respectfully submitted,

**PHILIP J. WEISER**
Attorney General of Colorado


By: */s/ David Moskowitz*
David Moskowitz*
*Deputy Solicitor General*
Sam Wolter*
*Assistant Attorney General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov
Samuel.Wolter@coag.gov


*Counsel for the State of Colorado*



**ROB BONTA**
Attorney General of California


By: /s/ Crystal Adams
Neli Palma*
*Senior Assistant Attorney General*
Crystal Adams*
Anna Rich*
Heidi Lehrman*
*Deputy Attorneys General*
1300 I Street
Sacramento, CA 95814
(916) 210-7522


*Counsel for the State of California*

**PETER F. NERONHA**
Attorney General of Rhode Island


By: /s/ Sarah W. Rice
Sarah W. Rice (RI Bar No. 10465)
*Deputy Chief, Public Protection Bureau*
*Assistant Attorney General*
Keith Hoffmann (RI Bar No. 9874)
*Chief of Policy*
*Assistant Attorney General*
Julia Harvey (RI Bar No. 10529)
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2054
srice@riag.ri.gov
khoffmann@riag.ri.gov
jharvey@riag.ri.gov


*Counsel for the State of Rhode Island*



**KEITH ELLISON**
Attorney General of Minnesota


By: */s/ Brian S. Carter*
Brian S. Carter*
Jennifer Moreau*
*Assistant Attorneys General*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-7403
Brian.Carter@ag.state.mn.us
Jennifer.Moreau@ag.state.mn.us


*Counsel for the State of Minnesota*

**NICHOLAS W. BROWN**
Attorney General of Washington

By: *s/ Ellen Range*
Ellen Range*
*Assistant Attorney General*
Office of the Washington State Attorney
General
7141 Cleanwater Drive SW
P.O. Box 40111
Olympia, WA 98504-0111
(360) 709-6470
Ellen.Range@atg.wa.gov

Cristina Sepe*
*Deputy Solicitor General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200
Cristina.Sepe@atg.wa.gov

*Counsel for the State of Washington*

**KRISTIN K. MAYES**
Attorney General of Arizona

By: */s/ Mary M. Curtin*
Mary M. Curtin*
*Senior Litigation Counsel*
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Mary.Curtin@azag.gov

*Counsel for the State of Arizona*

**WILLIAM TONG**
Attorney General of Connecticut

*/s/ Andrew Ammirati*
Andrew Ammirati*
*Assistant Attorney General*
165 Capitol Avenue
Hartford, CT 06106
Phone: (860) 808 5020
Andrew.Ammirati@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: */s/ Vanessa L. Kassab*
Ian R. Liston*
*Director of Impact Litigation*
Vanessa L. Kassab*
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**BRIAN L. SCHWALB**
Attorney General for the District of
Columbia

/s/ Samantha Hall
Samantha Hall*
*Assistant Attorney General*
Public Advocacy Division
Office of the Attorney General for the
District of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
(202) 788-2081
Samantha.hall@dc.gov

*Counsel for the District of Columbia*

**KWAME RAOUL**
Attorney General of Illinois

By: /s/ John Hazinski
John Hazinski*
*Assistant Attorney General*
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(773) 590-6944
john.hazinski@ilag.gov

*Counsel for the State of Illinois*

**ANNE E. LOPEZ**
Attorney General of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
*Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**OFFICE OF THE GOVERNOR *ex rel.*
ANDY BESHEAR**
in his official capacity as Governor of the
Commonwealth of Kentucky

*/s/ Travis Mayo*
S. Travis Mayo*
*General Counsel*
Taylor Payne*
*Chief Deputy General Counsel*
Laura C. Tipton*
*Deputy General Counsel*
Kentucky Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

40

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ Katherine B. Dirks*
Katherine B. Dirks*
*Chief State Trial Counsel*
Phoebe Lockhart*
Assistant Attorney General
1 Ashburton Pl.
Boston, MA  02108
(617.963.2277)
katherine.dirks@mass.gov
phoebe.lockhart@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Jennifer M. Jackson*
Jennifer M. Jackson (P67126)*
Carl Hammaker (P81203)*
Assistant Attorneys General
Michigan Department of Attorney General
Attorneys for State of Michigan
525 W. Ottawa St.
Lansing, MI 48933-1067
517.335.7573
jacksonj5@michigan.gov
hammakerc@michigan.gov

*Counsel for the State of Michigan*

**AARON M. FREY**
Attorney General of Maine

By: /s/ Margaret Machaiek
Margaret Machaiek*
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
Fax:  207-287-3145

*Counsel for the State of Maine*

**AARON D. FORD**
Attorney General of Nevada

By: /s/ Heidi Parry Stern
Heidi Parry Stern (Bar. No. 8873)*
*Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Counsel for the State of Nevada*

**MATTHEW J. PLATKIN**
Attorney General of New Jersey

*/s/ Jessica L. Palmer*
Jessica L. Palmer*
Anaiis Gonzales*
*Deputy Attorneys General*
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-4607
Jessica.Palmer@law.njoag.gov
Anaiis.Gonzales@law.njoag.gov

*Counsel for the State of New Jersey*

**LETITIA JAMES**
Attorney General of New York

By: */s/ Gina Bull*
Gina Bull*
*Assistant Attorney General*
28 Liberty St.
New York, NY 10005
(646) 574-2180
gina.bull@ag.ny.gov

*Counsel for the State of New York*

**RAÚL TORREZ**
Attorney General of New Mexico

By: /s/ Anjana Samant
Anjana Samant*
*Deputy Counsel*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
asamant@nmdoj.gov
(505) 270-4332

*Counsel for the State of New Mexico*

**JEFF JACKSON**
Attorney General of North Carolina

By /s/ Daniel P. Mosteller
Daniel P. Mosteller*
*Associate Deputy Attorney General*
Laura Howard
*Chief Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

*Counsel for State of North Carolina*

42

**DAN RAYFIELD**
Attorney General of Oregon

By: /s Deanna J. Chang
Deanna J. Chang*
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Deanna.J.Chang@doj.oregon.gov

*Counsel for the State of Oregon*

**JOSH SHAPIRO**
in his official capacity as Governor of the
Commonwealth of Pennsylvania

Jennifer Selber
*General Counsel*

/s/ Aimee D. Thomson
Aimee D. Thomson*
Jonathan D. Koltash*
*Deputy General Counsel*
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(223) 234-4986
aimeethomson@pa.gov
jokoltash@pa.gov

*Counsel for Governor Josh Shapiro*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: /s/ Lynn K. Lodahl
Lynn K. Lodahl*
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 264-6219
lodahllk@doj.state.wi.us

*Counsel for the State of Wisconsin*

*Pending pro hac vice applications to be filed*