# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF COLORADO; STATE OF RHODE
ISLAND; STATE OF CALIFORNIA; STATE OF
MINNESOTA; STATE OF WASHINGTON;
STATE OF ARIZONA; STATE OF
CONNECTICUT; STATE OF DELAWARE;
DISTRICT OF COLUMBIA; STATE OF
HAWAIʻI; STATE OF ILLINOIS; OFFICE OF
THE GOVERNOR *ex rel.* Andy Beshear, in his
official capacity as Governor of the
COMMONWEALTH OF KENTUCKY; STATE
OF MAINE; STATE OF MARYLAND;
COMMONWEALTH OF MASSACHUSETTS;
STATE OF MICHIGAN; STATE OF NEVADA;
STATE OF NEW JERSEY; STATE OF NEW
MEXICO; STATE OF NEW YORK; STATE OF
NORTH CAROLINA; STATE OF OREGON;
JOSH SHAPIRO, in his official capacity as
Governor of the COMMONWEALTH OF
PENNSYLVANIA; and STATE OF
WISCONSIN,

        Plaintiffs,

   v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES; ROBERT F. KENNEDY,
JR., in his official capacity as Secretary of Health
and Human Services,

        Defendants.

Case No. 1:25-cv-00121

**REQUEST FOR EMERGENCY
TEMPORARY RESTRAINING
ORDER UNDER FEDERAL
RULE OF CIVIL PROCEDURE
65(B)**

## MOTION FOR TEMPORARY RESTRAINING ORDER

# TABLE OF CONTENTS

**Page**

Introduction ................................................................................................ 1

Background ................................................................................................. 3

    I.     Congress Appropriated Critical Funds Strengthening Public Health
Programs to Address Emerging Threats and Increase Preparedness. ........ 3

    II.    Consistent With Congress's Intent, HHS Utilized the Appropriations
to Fund Wide-Ranging Public Health Programs Beyond COVID-19
and the Pandemic. ................................................................................. 5

    III.   HHS and Congress Continued to Make These Public Health Funds
Available After the End of the Pandemic. ............................................... 7

    IV.   HHS Abruptly Terminated $11 Billion in Grants Funded by
Appropriations From COVID-19 Related Laws. ...................................... 8

    V.    Plaintiff States Have Suffered and Will Suffer Substantial Harm. .......... 11

Legal Standard .......................................................................................... 16

Argument .................................................................................................. 17

    I.     This Court Has Jurisdiction over Plaintiff States' Claims. ...................... 17

          A.    Plaintiff States Have Standing to Assert Their Claims. ............... 17

          B.    The Tucker Act Does Not Apply to the Claims in the
Complaint. ................................................................................. 18

    II.    Plaintiff States Have Established a Likelihood of Success on the
Merits. ................................................................................................. 19

          A.    HHS's Mass Termination of Grants Constitutes Final Agency
Action Subject to Judicial Review. ............................................. 19

          B.    The Terminations Are Contrary to Law. ..................................... 21

          C.    The Terminations Are Arbitrary and Capricious. ........................ 24

    III.   Plaintiff States Will Be Irreparably Harmed Absent a Temporary
Restraining Order. ............................................................................... 28

    IV.   The Public Interest and the Balance of Equities Strongly Favor Entry
of a Temporary Restraining Order. ........................................................ 30

    V.    Requested Relief. ................................................................................. 32

Conclusion ............................................................................................... 32

Index of Exhibits ...................................................................................... 39

**INTRODUCTION**

On March 24 and 25, with no advance notice or warning, the U.S. Department of Health and Human Services ("HHS") arbitrarily terminated $11 billion of critical public health grants appropriated by Congress. These grants address a wide range of urgent public health needs, such as identifying, tracking, and addressing infectious diseases; ensuring access to immunizations; fortifying emergency preparedness; providing mental health and substance abuse services; and modernizing critical public health infrastructure. Despite the critical importance of these programs, HHS terminated them with the stroke of a pen and for the flimsiest of reasons. According to HHS, these programs were terminated "for cause"—not because of any failure on the part of Plaintiff States to comply with the terms of their grants and cooperative agreements, but instead because HHS claimed that "[n]ow that the pandemic is over, the grants and cooperative agreements are no longer necessary." *See, e.g.*, Ex. 3, Fanelli Decl. ¶ 14; Ex. 6 Perez Decl. ¶ 11; Ex. 7, Philip Decl. ¶ 28.[1]

The terminations have caused immediate chaos and irreparable harm for Plaintiff States and their local health jurisdictions. Without emergency relief, key public health programs and initiatives will have to be dissolved or disbanded. Large numbers of public health employees and contractors have been, or may soon be, terminated. These programs and initiatives address urgent ongoing and emerging public health needs of Plaintiff States, including preventing collapse of the health system in the face of emerging threats like measles and H5N1 (avian influenza). To take one example, Minnesota faces the loss of more than $220 million that was directed towards improving its public health programs and infrastructure related to disease surveillance, detection, and outbreak response. These programs transcend COVID-19 and are directed toward all manner

---

[1] An index of exhibits is located at the end of this motion, beginning on page 39.

of infectious diseases of public concern, like RSV, influenza, and avian influenza. The Minnesota Department of Health expects that the sudden loss of funding will require it to layoff approximately 200 employees, or 12% of its staff. Ex. 24, Grescyzk Decl. ¶ 41.

These unlawful terminations are both contrary to law and arbitrary and capricious agency actions. The terminations unlawfully applied a "for cause" termination provision that, as a matter of law, does not apply here. *See, e.g.*, 42 U.S.C. § 300x-55(a) (allowing "for cause" terminations only for "material failure" to comply with the agreement). The terminations fail to provide a rational explanation and merely assume, with no factual support, that all appropriations in COVID-19 related laws were only intended for use during the pandemic, which is contrary to those statutes. The terminations fail to undertake any individualized assessments, including any analysis of the public health uses and benefits of these grants and cooperative agreements (collectively, "public health funding") or why they are no longer necessary. The terminations fail to explain the agency's sudden determination that this public health funding was no longer necessary based on the end of the pandemic—which occurred almost two years ago—when HHS has consistently and repeatedly recognized the continued need for this funding until a few days ago. The terminations fail to consider the substantial reliance interests and the tremendously harmful impact of immediately terminating, with no warning, billions of dollars in public health funds. Simply put, the Administrative Procedure Act ("APA") was enacted to prevent exactly this kind of erratic decision-making. Plaintiff State are highly likely to succeed on the merits.

Pursuant to Federal Rule of Civil Procedure 65(d), Plaintiff States move for an emergency temporary restraining order to avoid the grave harm to their public health systems and massive layoffs that will be inflicted without swift relief from the Court. Plaintiff States request a TRO

that restrains Defendants from enforcing or implementing the public health terminations for Plaintiff States and their local health jurisdictions.

## BACKGROUND

**I. Congress Appropriated Critical Funds Strengthening Public Health Programs to Address Emerging Threats and Increase Preparedness.**

During the COVID-19 pandemic, Congress enacted numerous major appropriations laws to respond to the nationwide health crisis and economic devastation, place the nation on a path to recovery once the pandemic had ended, and ensure that the nation was better prepared for future public health threats. Some of these appropriations laws included:

- Coronavirus Preparedness and Response Supplemental Appropriations Act ("2020 Supplemental Act"), Pub. L. 116-123, 134 Stat. 146 (2020) ($8.3 billion);

- The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020) ($2.1 trillion);

- Paycheck Protection Program and Health Care Enhancement Act ("Paycheck Protection Act"), Pub. L. No. 116-139, 134 Stat. 620 (2020) ($483 billion);

- The Coronavirus Response and Relief Supplemental Appropriations Act ("2021 Supplemental Act"), 2021 (Div. M of the Consolidated Appropriations Act, 2021), Pub. L. No. 116-260, 134 Stat. 1182 (2021) ($900 billion); and

- The American Rescue Plan Act of 2021 ("ARPA") Pub. L. No. 117-2, 135 Stat. 4 (2021) ($1.9 trillion).

In addition to directing funds toward amelioration of the immediate effects of the COVID-19 emergency, these wide-ranging appropriations sought to address challenges facing American society in COVID-19's wake, including gaps in the public health system. These critical public health investments were not tied to the duration of the public health emergency.

For example, ARPA contains many investments in public health that were not limited to the COVID-19 public health emergency and could be expected to extend to other pathogens or future emergencies, including funding for genome sequencing and surveillance; data

modernization and forecasting; and public health workforce development. ARPA, §§ 2402, 2404, 2501, 135 Stat. at 41-42. ARPA also included funds to supplement state vaccination programs and efforts, including $1 billion to "strengthen vaccine confidence in the United States," and "to improve rates of vaccination throughout the United States." *Id.* § 2302, 135 Stat. at 39. Congress likewise appropriated $3 billion dollars in block grants to support state governments' efforts to promote mental health and prevent substance abuse to be spent over the course of five years. *Id.* §§ 2701-2702, 135 Stat. at 45.

Similarly, in the CARES Act and the 2020 Supplemental Act, Congress appropriated $1.5 billion and $950 million, respectively, for grants and cooperative agreements with States and local jurisdictions to carry out surveillance, epidemiology, laboratory capacity, infection control, mitigation, communications, and other preparedness and response activities. CARES Act, Title VIII, 134 Stat. at 554; 2020 Supplemental Act, Title III, 134 Stat. at 147.

These examples are but a small subset of Congress's wide-ranging public health investments made during the COVID-19 pandemic. None of this important funding was limited to the duration of the COVID-19 public health emergency.

In contrast, where Congress intended to limit the application of programs or appropriations in COVID-19 related laws, it did so expressly within these statutes. *See, e.g.*, ARPA § 9401, 135 Stat. at 127 ("during the emergency period . . . and the 1-year period immediately following the end of such emergency period"); *id.* § 9811(hh), 135 Stat. at 210-11 ("ends on the last day of the first quarter that begins one year after the last day of the emergency period"); CARES Act § 1109(h), 134 Stat. At 306 ("until the date on which the national emergency . . . expires").

**II.    Consistent With Congress's Intent, HHS Utilized the Appropriations to Fund Wide-Ranging Public Health Programs Beyond COVID-19 and the Pandemic.**

HHS utilized these appropriations, as Congress intended, to offer wide-ranging grants and cooperative agreements to States and their local jurisdictions, many of which are the subject of this action. Some of this public health funding involved additional funding to existing, longstanding programs while others represented new efforts and programs.

For example, long before the 2020 public health emergency, the Centers for Disease Control and Prevention ("CDC") established the Epidemiology and Laboratory Capacity for Prevention and Control of Emerging Infectious Diseases ("ELC") Cooperative Agreement as a mechanism to fund the nation's state and local health departments to detect, prevent, and respond to infectious disease outbreaks. *See, e.g.*, Ex. 21, Kalyanaraman Decl. ¶ 22; Ex. 13, Orefice Decl. ¶ 8; Ex. 4, Ferrer Decl. ¶ 7. These agreements have funded local responses to pathogen threats like H1N1, Zika, and Ebola. The program provides financial and technical resources to: (1) strengthen epidemiologic capacity; (2) enhance laboratory capacity; (3) improve health information systems; and (4) enhance collaboration among epidemiology, laboratory, and information systems components of public health departments. *See, e.g.*, Ex. 10, Bookman Decl. ¶ 62; Ex. 15, Clark Decl. ¶ 10; Ex. 13, Orefice Decl. ¶ 13; Ex. 3, Fanelli Decl. ¶ 22; Ex. 7, Philip Decl. ¶¶ 20-21, 33. During the 2020 public health emergency, the CDC used the ELC funding mechanism to provide supplemental support to the States and their local health jurisdictions. *See, e.g.*, Ex. 10, Bookman Decl. ¶ 64; Ex. 13, Orefice, ¶ 9; Ex. 3, Fanelli Decl. ¶ 22; Ex. 7, Philip Decl. ¶¶ 20-21, 33; Ex. 9, Saruwatari Decl. ¶¶ 37-38.

In California, Sacramento County is a subgrantee of the California Department of Public Health's ELC grant and uses grant monies of nearly $60 million to investigate outbreaks of foodborne diseases, COVID-19, mpox, and any other yet to be identified communicable

diseases. Ex. 5, Kasirye Decl. ¶ 25. Riverside County likewise uses its ELC funding in the amount of $101 million in part to implement and conduct wastewater surveillance to detect the early presence of COVID, mpox, and other communicable diseases. Ex. 9, Saruwatari Decl. ¶¶ 39, 51.

The Immunization and Vaccines for Children program is another long-standing CDC program to which new appropriations were added. These appropriations provide funds to support broad-based distribution, access, and vaccine coverage. Ex. 10, Bookman Decl. ¶ 40; Ex. 3, Fanelli Decl. ¶ 10. These resources supported the COVID-19 vaccine program, and in 2023 the CDC issued guidance recognizing that COVID-19 vaccination was increasingly integrated into the administration of other routine vaccinations. Ex. 38, Campagna Decl. ¶ 23; Ex. 3, Fanelli Decl. ¶ 10.

Through the National Initiative to Address COVID-19 Health Disparities Among Populations at High-Risk and Underserved, Including Racial and Ethnic Minority Populations and Rural Communities, the CDC provided funding to expand state and local health departments' capacity to better serve the most vulnerable and underserved communities, including establishing new state and local partnerships. Ex. 34, Drum 1 Decl. ¶ 7; Ex. 3, Fanelli Decl. ¶ 40; Ex. 7, Philip Decl. ¶ 50; Ex. 9, Saruwatari Decl. ¶ 6. For example, in Rhode Island, the grant allowed for new partnerships with Block Island, its designated rural community. Ex. 38, Campagna Decl. ¶ 17. In California, the City and County of San Francisco uses its over $4.6 million grant approved through May 30, 2026, to identify and serve especially marginalized communities that are underrepresented in routine public health surveys or services delivery, and to educate residents about infectious disease prevention (including COVID-19) and the opioid epidemic. Ex. 7, Philip Decl. ¶¶ 51-52, 55.

HHS's Substance Abuse and Mental Health Services Administration ("SAMHSA") administers a longstanding program to provide annual block grants—the Substance Abuse Prevention and Treatment Block Grant and the Community Mental Health Services Block Grant— for each State to address mental health and substance abuse. 42 U.S.C.A. § 300x(a). Ex. 26, Adelman Decl. ¶ 9; Ex. 6, Perez Decl. ¶¶ 9-10. Block grants are a common method of providing federal funding to state and local governments to assist them in addressing broad purposes, such as public health, that generally provide recipients with more control over the use of the funds. Through ARPA, Congress added $3 billion in additional funds to these block grants to be expended within five years to address mental health and substance use crises. ARPA, §§ 2701-2702, 135 Stat. at 45. These funds are critical to address the currently ongoing mental health crisis caused by COVID disruptions, particularly affecting our youth. Ex. 41, Kirschbaum Decl. ¶¶ 30-33.

Again, these are just a few of the voluminous examples of how the public health funding provided by HHS to Plaintiff States and their local health jurisdictions extends far beyond the end of the pandemic and to diseases beyond COVID-19. *See* Exs. 1-44.

### III. HHS and Congress Continued to Make These Public Health Funds Available After the End of the Pandemic.

Since the end to the declared COVID-19 public health emergency in May 2023, HHS has consistently recognized that the public health funds at issue are properly still available. HHS was aware of, and expressly approved, the continued use of this funding for Plaintiff States' public health program activities, including substance use disorder prevention and treatment and mental health services, improvements to infectious disease monitoring and response, and modernizing and improving critical public health infrastructure. *See, e.g.*, Ex. 13, Orefice Decl. ¶ 10; Ex. 6, Perez Decl. ¶¶ 40-50; Ex. 27, Baston Decl. ¶ 18. In fact, HHS granted numerous extensions to

the performance period of many grants issued to Plaintiff States and their local health jurisdictions, some of which were scheduled to end as late as June 2027. *See, e.g.*, Ex. 24, Gresczyk Decl. ¶¶ 11, 22; Ex. 32, Morne Decl. ¶ 19; Ex. 3, Fanelli Decl. ¶¶ 13, 21, 41; Ex. 9, Saruwatari Decl. ¶¶ 61, 83; Ex. 4, Ferrer Decl. ¶ 9; Ex. 7, Philip Decl. ¶ 57. HHS likewise issued guidance for how these funds could be used beyond the COVID-19 pandemic. Ex. 3, Fanelli Decl. ¶¶ 10, 22, 48.

Congress similarly has taken legislative action indicating that these funds were to remain available after the end of the pandemic. In June 2023, after the end of the COVID-19 public health emergency, Congress canceled $27 billion in appropriations through the Fiscal Responsibility of Act of 2023, Pub. L. 118–5, Div. B (June 3, 2023). Through this Act, Congress went through the COVID-19 related laws and rescinded certain funds that it determined were no longer necessary. *Id.* at Div. B Sec. 1-81. But Congress chose not to rescind the funding for the grants and cooperatives agreements at issue in this case. Thus, *after* the pandemic ended, Congress reviewed the funding in COVID-19 related laws, identified funds to be rescinded, but determined not to revoke the public health funding at issue here.

## IV. HHS Abruptly Terminated $11 Billion in Grants Funded by Appropriations From COVID-19 Related Laws.

Beginning on March 24, 2025, HHS abruptly, with no advance notice or warning, changed its position and terminated $11 billion in critical public health funds. The mass terminations across multiple HHS agencies appeared to be clearly coordinated with the same basic features:

- The terminations were all issued at roughly the same time (March 24-25, 2025).

- The terminations were all issued with no advance notice.

- The sole stated basis for each termination was that the funding was being terminated "for cause."

- The terminations all used slight variations of the same conclusory, boilerplate explanation: "The end of the pandemic provides cause to terminate COVID-related grants. Now that the pandemic is over, the grants are no longer necessary."

- The terminations all contained no individualized assessment or explanation as to why the funding was no longer necessary or why the agency had suddenly changed its longstanding position that the end of the pandemic did not limit the availability of this public health funding.

- The terminations were all effective immediately and contained no assessment or explanation accounting for reliance interests.

*See*, *e.g.*, Ex. 40, Fehrenbach Decl. Attach. A-E; Ex. 41, Kirschbaum Decl. Attach. C-D; Ex. 27, Baston Decl. Attach. D, F, H, J.

Specifically, without any advanced notice or warning, starting on March 24, 2025, the CDC sent Plaintiffs termination notices (generally through amended Notices of Awards), which state in relevant part[2]:

> The termination of this award is for cause. HHS regulations permit termination if "the non-Federal entity fails to comply with the terms and conditions of the award", or separately, "for cause." The end of the pandemic provides cause to terminate COVID-related grants and cooperative agreements. These grants and cooperative agreements were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grants and cooperative agreements are no longer necessary as their limited purpose has run out. Termination of [this award] is effective as of the date set out in your Notice of Award.

*See*, *e.g.*, Ex. 40, Fehrenbach Decl. Attach. A at 5.

Other than this boilerplate language, the CDC terminations provided no other information or explanation as to why the funding was terminated. *E.g.*, Ex. 10, Bookman Decl. ¶ 36; Ex. 7, Philip Decl. ¶ 59; Ex. 15, Clark Decl. ¶ 15. Additionally, prior to termination, the CDC had not provided notice to Plaintiff States that the grants were being administered in an unsatisfactory

---

[2] Plaintiff States received numerous terminations across programs and some of the notices have minor, non-substantive variations from this text.

manner. *E.g.*, Ex. 3, Fanelli Decl. ¶¶ 19, 45; Ex. 8, Rudman Decl. ¶ 18; Ex. 7, Philip Decl. ¶¶ 31, 43; Ex. 9, Saruwatari Decl. ¶¶ 30, 67; Ex. 5, Kasirye Decl. ¶¶ 14, 18, 23; Ex. 34, Drum 1 Decl. ¶ 20; Ex. 32, Morne Decl. ¶ 21. And contrary to the CDC's state rationale, many of the terminated grants supported important public health efforts beyond responding to COVID-19, including research labs investigating a multi-state foodborne listeria outbreak, Ex. 21, Kalyanaraman Decl. ¶ 27; preparation for potential outbreaks of avian influenza and other infectious diseases, Ex. 24, Gresczyk Decl. ¶ 45; Ex. 4, Ferrer Decl. ¶¶ 7, 20; Ex. 7, Philip Decl. ¶ 46; Ex.89, Rudman Decl. ¶¶ 37, 43, 54; and dispatching Community Health Workers to support communities impacted by major disasters, Ex. 25, Williams-Devane Decl. ¶ 27.

Similarly, without any advance notice, on March 24, 2025, SAMHSA sent notices terminating block grants effective immediately to Plaintiff States. *E.g.*, Ex. 6, Perez Decl. ¶ 11; Ex. 41, Kirschbaum Decl. Attach. C at 1. These notices also cited the end of the pandemic as the basis for termination; did not cite any authority for these terminations other than the President's Executive Order 14222, Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative; and did not provide an opportunity for a hearing. *Id.* A few days later, SAMHSA sent the following "superseding" notices:

> The termination of this award is for cause. The block grant provisions at 42 U.S.C. §300x-55 permit termination if the state "has materially failed to comply with the agreements or other conditions required for the receipt of a grant under the program involved." The end of the pandemic provides cause to terminate COVID-related grants and cooperative agreements. These grants and cooperative agreements were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grants and cooperative agreements are no longer necessary as their limited purpose has run out.

*E.g.*, Ex. 6, Perez Decl. ¶ 12; Ex. 41, Kirschbaum Decl. Attach. D at 1.

Like the CDC terminations, the SAMHSA notices failed to provide any details, factual information, or explanation for the terminations other than this boilerplate language. *E.g.*, Ex. 17, Rollinson Decl. ¶ 12; Ex. 6, Perez Decl. ¶ 12. As with the CDC terminations, SAMHSA had not provided Plaintiff States with any notice that the terminated grants were being administered in an unsatisfactory manner. *E.g.*, Ex. 11, Maurice Decl. ¶ 20; Ex. 6, Perez Decl. ¶ 12. And again contrary to Defendants' stated rationale, the terminated SAMHSA grants supported critical mental health and substance abuse treatment programs that surpass the end of the COVID-19 pandemic, including: bolstering the 988 Suicide and Crisis Lifeline system, Ex. 26, Adelman Decl. ¶ 14; providing Naloxone to prevent overdoses, Ex. 41, Kirschbaum Decl. ¶ 33; expanding access to behavioral health services in rural areas, Ex. 28, Boukus Decl. ¶ 5; serving foster youth with co-occurring substance use and mental health needs, Ex. 6, Perez Decl. ¶ 40; behavioral health crisis intervention training and programs for law enforcement and other first responders, *id.* ¶ 41; and training and technical assistance to crisis counselors to serve persons and populations affected by natural disasters, *id.* ¶ 50.

## V. Plaintiff States Have Suffered and Will Suffer Substantial Harm.

Plaintiff States and their local health jurisdictions rely on the terminated federal financial assistance to provide critical aspects of their public health programs. The result of the illegal terminations will be that Plaintiff States' residents will lose access to critical health care programs and services and Plaintiff States' abilities to respond to health crises will be severely compromised—ultimately leading to increased morbidity and mortality. Plaintiff States' public health programs are crippled in three important ways: (1) impairment of Plaintiffs' larger public health missions due to the immediate and unexpected elimination of $11 billion in public health funding, including through the abrupt and involuntary layoffs of a highly trained workforce; (2) elimination of critical health care services, many of which are for Plaintiffs' most vulnerable

residents; and (3) the cessation of important public health infrastructure projects. Representative examples from each category are given below.

*First*, the terminations undermine Plaintiff States' abilities to fulfill their mission of protecting public health by combatting the spread of contagious disease, preventing substance abuse, and expanding access to mental health treatment. *E.g.*, Ex. 15, Clark Decl. ¶ 17; Ex. 40, Fehrenbach Decl. ¶ 11; Ex. 41, Kirschbaum Decl. ¶ 3; Ex. 6, Perez Decl. ¶¶ 4-7; Ex. 3, Fanelli Decl. ¶ 6. Plaintiff States have relied on this promised funding to carry out their duty to "guard and protect" the "safety and the health of the people." *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905). Already, the terminations have impeded planning, caused wasted resources as Plaintiff States and their local health jurisdictions attempt to mitigate potential impacts, and have unnecessarily interrupted important public health work. Without this critical public health funding, Plaintiff States will be unable to provide essential public health services for residents, be unable to pay critical public health employees, be unable to satisfy obligations to public and private health partners, and be unable to carry out important government business.

The terminations are forcing Plaintiff States to furlough or even terminate vital public health staff whose salaries are funded entirely or partially through illegally terminated funding. The Minnesota Department of Health expects that the terminations will require it to layoff approximately 200 employees, or 12% of its staff. Ex. 24, Grescyzk Decl. ¶ 41. In Delaware, the termination of a community health worker grant will end support for "33.5 [Community Health Worker] positions across six organizations, including federally qualified health centers and community-based organizations." Ex. 14, Manning Decl. ¶ 25. More generally, the staff cuts forced by the terminations will impact a wide range of critical roles, including epidemiologists, research scientists, community health workers, programmatic staff, and more. *Id.* ¶ 31; Ex. 10,

Bookman Decl. ¶ 20; Ex. 3, Fanelli Decl. ¶¶ 32, 38; Ex. 8, Rudman Decl. ¶¶ 23, 26, 31-37, 44, 54; Ex. 7, Philip Decl. ¶¶ 12-13, 42, 46, 54; Ex. 9, Saruwatari Decl. ¶¶ 49-50, 53, 56, 59-60, 80-81, 108; Ex. 4, Ferrer Decl. ¶¶ 17, 19; Ex. 5, Kasirye Decl. ¶ 26; Ex. 24, Grescyzk Decl. ¶ 41. All told, the terminations will result in massive layoffs of health care workers who provide critical health care services to Plaintiff States' residents.

*Second*, the terminations will eliminate a wide range of health care services provided by Plaintiff States. The termination of a wide swath of mental health care grants, for example, will inflict substantial harm on Plaintiff States' vulnerable communities who rely on the services these grants support. *See, e.g.*, Ex. 41, Kirschbaum Decl. ¶¶ 12, 31, 39. The SAMHSA grant terminations will deprive individuals suffering from mental health crises, including suicidal ideation, of potentially life-saving care. For instance, the termination of the Connecticut Department of Mental Health and Addiction Services' SAMHSA grants will eliminate "housing and employment supports, regional suicide advisory boards, harm reduction, perinatal screening, early-stage treatments, and increased access to medication assisted treatment." Ex. 12, Navaretta Decl. ¶¶ 16, 29. And in Illinois, the termination of mental health block grants will mean that providers will be unable to provide services through Illinois' "mobile crisis response units that assist people at risk of suicide." Ex. 17, Rollinson Decl. ¶ 16. The termination of New Mexico's mental health care block grants will mean as many as fifty-four providers will lose funding to provide critical behavioral and mental health services to upwards of 64,000 people. Ex. 28, Boukus Decl. ¶ 14. And in California, substance use disorder prevention and early intervention services for youth could be terminated in at least 18 of its counties, resulting in increased substance use among youth and adolescents. Ex. 6, Perez Decl. ¶ 61.

The effect of the illegal terminations is not limited to mental health services and will affect services across Plaintiff States' public health programs. Washington's Department of Health has already had to cancel its Care-A-Van mobile health clinics that provide health care, including vaccinations and health education, to historically underserved communities. The program prioritizes rural areas, BIPOC communities, immigrants and refugees, unhoused populations, children and schools, and other vulnerable populations. Ex. 40, Fehrenbach Decl. ¶ 21. Without this program, these communities bear increased exposure to contagious diseases and negative health consequences. *Id.* at ¶ 27. The termination of Delaware's community health worker program, mentioned above, will destabilize the delivery of vital health services and erode trust in healthcare systems in vulnerable communities. Ex. 14, Manning Decl. ¶ 31. In Minnesota, the terminations caused a local public health agency to immediately cease work supporting vaccination clinics and education. The affected local agencies in Minnesota serve its most vulnerable communities and work in settings such as schools, public housing locations, and jails. Ex. 24, Gresczyk Decl. ¶¶ 43, 47. California's Immunization and Vaccines for Children program will no longer be able to provide important vaccines, including vaccines for measles, influenza, and COVID-19 to approximately 4.5 million children, roughly half of California's youth population. Ex. 3, Fanelli Decl. ¶ 17. In Los Angeles County, most of the staff on the public health department's infectious diseases outbreak team will be terminated as a result of the funding loss, meaning the County will not be able to respond in a timely manner, if at all, to outbreaks in jails, shelters, assisted living facilities and worksites. Ex. 4, Ferrer Decl. ¶ 7.

*Finally*, the terminations imperil Plaintiff States' public health infrastructure projects. Plaintiff States and their local health jurisdictions have long relied on the CDC's ELC support for infectious disease programs and projects. *E.g.*, Ex. 32, Morne Decl. ¶ 9; Ex. 3, Fanelli Decl.

¶¶ 20-38; Ex. 2, Cutler Decl. ¶¶ 4-13; Ex. 4, Ferrer Decl. ¶ 7. During the COVID-19 Pandemic, the CDC awarded additional ELC grants. Ex. 32, Morne Decl. ¶ 9; Ex. 3, Fanelli Decl. ¶¶ 22; Ex. 4, Ferrer Decl. ¶ 9. While these funds were initially awarded to help with the ongoing pandemic, the CDC recognized that most states lacked the necessary disease surveillance and laboratory infrastructure, so it encouraged and allowed states to invest these funds in strengthening these capacities. *E.g.*, Ex. 3, Fanelli Decl. ¶¶ 22-23, 32; Ex. 4, Ferrer Decl. ¶¶ 7, 9; Ex. 13, Orefice Decl. ¶ 8-10; Ex. 32, Morne Decl. ¶ 22. These grants provide significant sums of money. Illinois, for example, stands to lose $380 million. Ex. 15, Clark Decl. ¶ 11.

Without additional funds, Plaintiff States will lose investments in updating aging data management systems and aging laboratories. Ex. 15, Clark Decl. ¶¶ 10, 17 (updating electronic disease surveillance system and $14 million laboratory remodeling project); Ex. 40, Fehrenbach Decl. ¶ 13 (investing more than $12 million in laboratory information management system); Ex. 13, Orefice Decl. ¶ 20 ("tens of millions of dollars spent to date [in updating data systems] will be wasted"); Ex. 3, Fanelli Decl. ¶¶ 28-30 (developing and maintaining new software surveillance system to ensure comprehensive statewide data reporting and analysis and more timely response to disease trends). Planned projects will go unrealized. Connecticut, for example, will lose its planned electronic birth and death registry and an upgrade that would enable real time data exchanges with CDC systems. Ex. 13, Orefice Decl. ¶¶ 21-22. And, of course, ongoing projects will be adversely impacted, such as New York's Health Electronic Response Data System, which monitors various health care providers' bed capacity to ensure continued ability to access care. Ex. 32, Morne Decl. ¶ 26.

Investments in localized public health resources, a crucial piece of public health infrastructure, would also be eliminated. For example, Rhode Island used CDC funding to invest

in 14 "Health Equity Zones," which help communities address the unique local health issues. Terminating these funds "threatens to reverse progress made in building local public health infrastructure and improving response capabilities." Ex. 38. Campagna Decl. ¶¶ 17, 19. In Riverside, California, the non-data surveillance team members, which serves as a liaison between the county's public health department and hospitals, skilled nursing facilities, schools, and workplaces, will be eliminated, further impacting disease investigation and mitigation capabilities. Ex. 9, Saruwatari Decl. ¶ 50.

The terminations will have a devastating effect across Plaintiff States' public health programs. Ex. 32, Morne ¶ 24 ("These impacts will be long-lasting, cutting across all communities – geographically and demographically – and will be deeply felt by all New Yorkers for generations to come."); Ex. 3, Fanelli Decl. ¶ 49 ("[T]he unexpected termination leaves California unprepared for future pandemics and risks exacerbating the spread of otherwise preventable disease."). From the wide-ranging budget implications of the sudden and unexpected elimination of $11 billion in funding, to the elimination of services, to the shuttering of public health infrastructure projects, it is hard to overstate the harm that Plaintiff States and their residents are about to suffer.

## LEGAL STANDARD

The legal standard for a temporary restraining order "mirrors that for a preliminary injunction." *Schnitzer Steel Industries, Inc. v. Dingman*, 639 F. Supp. 3d 222, 226 (D.R.I. 2022) (citing *Harris v. Wall*, 217 F. Supp. 3d 541, 552 (D.R.I. 2016)). Under that standard, "[t]he district court must consider 'the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships [and equities]; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest.'" *U.S. Ghost*

*Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (quoting *Ryan v. U.S. Immigration and Customs Enforcement*, 974 F.3d 9, 18 (1st Cir. 2020)); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The final two factors—the balance of equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996). However, a "district court is required only to make an estimation of likelihood of success and 'need not predict the eventual outcome on the merits with absolute assurance.'" *Schnitzer Steel Industries, Inc.*, 639 F. Supp. 3d at 226 (quoting *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013)).

Finally, the Administrative Procedure Act provides authority for a reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

## ARGUMENT

### I.  This Court Has Jurisdiction over Plaintiff States' Claims.

#### A.  Plaintiff States Have Standing to Assert Their Claims.

Plaintiff States have standing to challenge the terminations because they will suffer an "injury in fact" that is "fairly traceable" to the terminations and "may be redressed by" a judicial order enjoining its implementation. *McBreairty v. Miller*, 93 F.4th 513, 518 (1st Cir. 2024). "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). "Monetary harms are obviously concrete" for Article III standing purposes. *Webb v. Injured Workers Pharmacy, LLC*, 72 F.4th 365, 372 (1st Cir. 2023)

(internal citations omitted) (quoting *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021)). Plaintiff States "los[ing] out on federal funds . . . is a sufficiently concrete and imminent injury to satisfy Article III." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019).

The on-the-ground impacts from this loss in federal funding reinforce that concrete harm. As thoroughly detailed in Background Section V, Plaintiff States stand to lose grants worth billions of dollars that will severely impact public health programs and cause the termination of large numbers of public health employees or contractors. The loss of these public health officials, infrastructure, and programs will have repercussions for many years to come.

Finally, traceability and redressability are easily satisfied. Defendants are the sole cause of the harms. *See In re Evenflo Co., Inc., Marketing, Sales Practices and Prods. Liab. Litig.*, 54 F.4th 28, 34 (1st Cir. 2022). If the grant terminations were vacated and set aside, that would redress the injury caused by Defendants.

### B. The Tucker Act Does Not Apply to the Claims in the Complaint.

Defendants will likely argue—as the federal government has in other matters—that because this case relates to federal grants, the Court of Federal Claims has exclusive jurisdiction under the Tucker Act as a breach of contract claim. The First Circuit has soundly rejected this argument under identical circumstances. *California v. U.S. Dep't of Educ.*, --- F.4th ----, 2025 WL 878431, at *2 (1st Cir. Mar. 21, 2025), *application for stay pending*, No. 24A910 (U.S. Mar. 26, 2025). Where, as here, "the States challenge the Department's actions as insufficiently explained, insufficiently reasoned, and otherwise contrary to law—arguments derived from the Administrative Procedure Act (APA)," those claims are not breach of contract claims covered by the Tucker Act and are instead properly heard in the district court under the APA's waiver of sovereign immunity. *Id.*

Nor would there be any merit to Defendants' anticipated assertion that the claims involve "money damages" and thus fall outside the APA's waiver of sovereign immunity under 5 U.S.C. § 702. As in *California v. U.S. Department of Education*, Plaintiff States do not seek payment of money damages for past wrongs. Rather, Plaintiff States seek to vacate and set aside unlawful terminations under the APA to "once again make available already-appropriated federal funds for existing grant recipients." *Id.* at *2. As the First Circuit held in identical circumstances, that Plaintiff States may later receive money through these awards is of no import: "'[t]he fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Id.* (quoting *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988)).

## II.     Plaintiff States Have Established a Likelihood of Success on the Merits.

Plaintiff States have a strong likelihood of success on the merits. As detailed below, HHS's mass termination of grants and cooperative agreements funded by COVID-related appropriations violates the APA because these final agency actions are contrary to law and arbitrary and capricious.

### A.     HHS's Mass Termination of Grants Constitutes Final Agency Action Subject to Judicial Review.

As a threshold matter, the challenged public health funding terminations, and the decision to issue those terminations, constitute final agency action subject to the APA. Final agency actions "mark the consummation of the agency's decision-making process" and are those "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citation omitted). The terminations here clearly meet both prongs. First, the terminations "mark[] the consummation" of Defendants' decision-making process because they announce the agency's decision to terminate, with

immediate effect, each award. *See*, *e.g.*, Ex. 40, Fehrenbach Decl. Attach. A at 5; Ex. 41, Kirschbaum Decl. Attach. C. Second, the terminations have clear legal consequences: the immediate loss of funding. *See*, *e.g.*, Ex. 40, Fehrenbach Decl. Attach. A at 5; Ex. 41, Kirschbaum Decl. Attach. C. Moreover, Plaintiff States are permitted to bring this challenge in a single action. *New York v. Trump*, --- F.4th ----, 2025 WL 914788, at *13 (1st Cir. Mar. 26, 2025) ("[W]e are not aware of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once.").

Furthermore, these discrete termination decisions evidently emerged from an underlying decision adopting a common approach and legal interpretation extending to all the affected grants. That common approach and legal interpretation qualifies as reviewable final agency action itself, as it had immediate effect within the agency even before the issuance of the agency termination letters. *See U.S. Army Corps of Eng'rs v. Hawkes Co.*, 578 U.S. 590, 599–600 (2016) (calling for a "'pragmatic' approach" in analyzing finality); *Biden v. Texas*, 142 S. Ct. 2528, 2545 (2022) (holding agency memoranda were final agency action, noting that they "bound [agency] staff").

Nor are these terminations part of the narrow class of agency actions that are "committed to agency discretion by law" and unreviewable in federal court. *See* 5 U.S.C. § 701(a)(2). Again, as the First Circuit held in identical circumstances, where, as here, there are applicable statutory or regulatory standards that cabin agency discretion, there are "meaningful standard[s] by which to judge the [agency]'s action," and the actions are reviewable. *California v. U.S. Dep't of Educ.*, 2025 WL 878431, at *3 (quoting *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019)). In the termination notices, Defendants themselves claim to have applied a "for cause" standard based in statute and regulation. Evaluating "for cause" terminations "involve[s] the type of legal analysis

20

that courts routinely perform," not unreviewable agency discretion. *Pol'y & Rsch., LLC v. United States Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 83 (D.D.C. 2018). In sum, the terminations, and the decision to issue those terminations, are final agency actions subject to review under the APA.

### B. The Terminations Are Contrary to Law.

Plaintiff States are likely to succeed on the merits of their claims that the terminations are contrary to law. *See* Compl. Counts I and II. HHS claimed that the terminations "for cause." But there is no dispute that Plaintiffs have complied with the terms and conditions of their awards. Ex. 3, Fanelli Decl. ¶ 45; Ex. 23, Hertel, ¶ 7. As detailed below, the end of the pandemic nearly two years ago is not a lawful basis to terminate this funding "for cause."

**SAMHSA Terminations.** With respect to the SAMHSA terminations, Defendants acted contrary to law and in excess of statutory authority by unlawfully applying the "for cause" provision in 42 U.S.C. § 300x-55 to terminate the grants. Pursuant to 42 U.S.C. § 300x-55(a), the Secretary may "terminate the grant for cause" only "if the Secretary determines that a State has materially failed to comply with the agreements or other conditions required for the receipt of a grant." *Id.* But Defendants never identified any material failure to comply with agreements or other required conditions. *E.g.*, Ex. 41, Kirschbaum Decl. ¶ 42; Ex. 6, Perez Decl. ¶ 12. Instead, the terminations notices state: "The end of the pandemic provides cause to terminate COVID-related grants. Now that the pandemic is over, the grants are no longer necessary." *E.g.*, Ex. 6, Perez Decl. ¶ 11; Ex. 41, Kirschbaum Decl. Attach. D. This is not a lawful basis to terminate a grant "for cause" under 42 U.S.C. § 300x-55(a).

Moreover, Defendants acted contrary to law because 42 U.S.C. § 300x-55(e) requires: "*Before* taking action against a State . . . , the Secretary shall provide to the State involved adequate notice and an opportunity for a hearing." 42 U.S.C. § 300x-55(e) (emphasis added). But

Defendants provided no notice or opportunity for a hearing *before* immediately taking action to terminate the grants. *See, e.g.*, Ex. 41, Kirschbaum Decl. Attach. C. Similarly, 42 U.S.C. § 300x-55(g) bars HHS from withholding any funds unless it has first "conducted an investigation concerning whether the State has expended payments under the program involved in accordance with the agreements required under the program." 42 U.S.C. § 300x-55(g). Defendants again violated the law by withholding funds without conducting any investigation.

In sum, Defendants acted contrary to law and in excess of statutory authority by illegally applying the "for cause" termination provision, illegally terminating the grants without any prior notice or opportunity to be heard, and illegally withholding funds without any investigation.

**CDC Terminations.** With respect to the CDC terminations, Defendants claim to have terminated this public health funding "for cause" based on "HHS regulations"—presumably, 45 C.F.R. § 75.372(a)(2). *See, e.g.*, Ex. 40, Fehrenbach Decl. Attach. A at 5. But there is nothing in that regulation's text, history, or subsequent interpretation to support the notion that the "end of the pandemic" nearly two years ago could support a "for cause" termination.

When HHS has examined "for cause" terminations of its grant agreements in the past, it has explained that those terminations involve a failure to comply with terms and conditions. *R.I. Substance Abuse Task Force Ass'n*, DAB No. 1642 (1998), 1998 WL 42538 at *1 (H.H.S. January 15, 1998) ("When a grantee has materially failed to comply with the terms and conditions of the grant, [the Public Health Service] may . . . terminate the grant for cause."); *Child Care Ass'n of Wichita/Sedgwick Cnty.*, DAB No. 308 (1982), 1982 WL 189587 at *2 (H.H.S. June 8, 1982) ("'For cause' means a grantee has materially failed to comply with the terms of the grant."). This is consistent with the standard application of "for cause" terminations

of grants and other federal funding. *See, e.g.*, 42 U.S.C. § 300x-55(a); 10 C.F.R § 600.25 (allowing "for cause" award termination on the basis of noncompliance or debarment).

The federal government has likewise understood this "for cause" provision to be substantially the same as the "failure to comply." The Office of Management and Budget ("OMB") eliminated the "for cause" termination provision from the Official Guidance for Grants and Agreement specifically because it concluded that the "for clause" provision "is not substantially different than the" provision allowing termination for failure to comply with terms and conditions. OMB, Guidance for Grants and Agreements, 85 Fed. Reg. 49506,49508 (Aug. 13, 2020). HHS has, in turn, indicated it will adopt the Official Guidance and eliminate the "for cause" provision entirely from its regulations. HHS, Health and Human Services Adoption of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 89 Fed. Reg. 80055, 80055 (Oct. 2, 2024) (effective October 2025). In other words, HHS is following OMB's Official Guidance and eliminating the "for cause" provision because it is substantially *duplicative* of the "failure to comply" provision.

Even OMB's 2014 commentary, which appears to draw some distinction between "for cause" and "failure to comply," is no help to HHS. There, OMB suggested "for cause" could apply to outside events that "require" the awards to be terminated. OMB, Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards; Final Rule, 78 Fed. Reg. 78590, 78599 (Dec. 26, 2013). The examples provided involved changes in governing law, such as changes in "congressional mandates" or "appropriated amounts," that may *require* termination. *Id.* But here, the foreseeable end of the pandemic nearly two years ago does not "require" termination when the relevant appropriations statutes extend funding to purposes beyond the pandemic and in no way "require" terminating the funding at the

end of the pandemic. Indeed, *after* the pandemic ended, Congress reviewed all the COVID-9 related laws, identified $27 billion in funds to be rescinded, but determined not to rescind any of the public health funding at issue here. Accordingly, even assuming a broader definition of "for cause" than HHS has applied in the past, Defendants' "for cause" terminations are contrary to law because they point to nothing that would *require* termination.

Simply put, HHS had no legal basis to terminate the funding at issue here "for cause" based on the end of the pandemic nearly two years ago. Defendants acted contrary to law.

### C. The Terminations Are Arbitrary and Capricious.

An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citation omitted). Further, an agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

Here, Plaintiff States will likely prevail on their claim that HHS's mass termination of grants and cooperative agreements funded by COVID-related appropriations is arbitrary and capricious, for at least five independently sufficient reasons.

*First*, Defendants did not provide a rational basis for the terminations. As noted above, Defendants were required to provide a reasoned explanation, "including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. The terminations all contain nearly identical conclusory, boilerplate language stating the same basis (with slight

variation): now that the pandemic is over, the grants or cooperative agreements are no longer

necessary. *See* Background Section IV. The terminations assume without explanation that all

funding related to COVID-19 appropriations was only intended for use during the pandemic

stage. Defendants point to no facts supporting this assumption and no reasoned analysis of the

specific statutory appropriations or grants at issue. In fact, Congress directed many of the

appropriations beyond the pandemic to other pathogens or future emergencies, for example to

expand and sustain a public health workforce, for genome sequencing and surveillance, and for

data modernization and forecasting. ARPA, §§ 2402, 2404, 2501, 135 Stat. at 41-42; *see also*

Background Section I.

Moreover, where Congress intended to limit programs or appropriations to the end of the

pandemic, it did so directly in the COVID-19 laws. *See, e.g.*, ARPA § 9401, 135 Stat. at 127

("during the emergency period . . . and the 1-year period immediately following the end of such

emergency period"); *id.* § 9811(hh), 135 Stat. at 210-11 ("ends on the last day of the first quarter

that begins one year after the last day of the emergency period"); CARES Act § 1109(h), 134

Stat. at 306 ("until the date on which the national emergency . . . expires"). "[W]here Congress

includes particular language in one section of a statute but omits it in another section of the same

Act, it is generally presumed that Congress acts intentionally and purposely in the disparate

inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). Furthermore, in June

2023, *after* the end of the pandemic, Congress passed the Fiscal Responsibility of Act of 2023.

Pub. Law 118-5 (June 3, 2023). Through this Act, Congress went through the COVID-19

appropriations and rescinded $27 billion of appropriations that it deemed no longer necessary

after the pandemic was over. *Id.* Div. B, Title I. Yet, Congress chose to keep all the

appropriations at issue, notwithstanding that the COVID-19 national emergency had ended.

Defendants failed to consider or provide any explanation as to any of these inconsistencies and appear simply to desire to overrule Congress' spending judgment and authority.

*Second*, and relatedly, Defendants' actions are arbitrary and capricious because they conducted no individualized assessment of any grant or cooperative agreement, including any analysis of the benefits from those grants or cooperative agreements. The terminations contain no acknowledgment of the public health purposes for which the grants actually have been and are being used, much less an explanation of why those uses are no longer necessary. Defendants thus "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. When the purported basis for termination is that a grant or cooperative agreement is "no longer necessary," an important consideration requires an individualized assessment of the uses and benefits of the funding to determine whether it is no longer necessary. But Defendants wholly ignored this key aspect of the analysis and simply terminated any funding that happened to be funded by a COVID-related appropriation.

*Third*, Defendants' actions are arbitrary and capricious because they provided no reasoned explanation (or even acknowledgment) as to how the agency suddenly changed its position and determined that the public health funding is no longer necessary based on the end of the COVID-19 pandemic nearly two years ago. Since the pandemic ended nearly two years ago, and up until a few days ago, Defendants consistently took the opposite position that these grants and cooperative agreements were necessary beyond the pandemic stage. "[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio*...." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "And of course the agency must show that there are good reasons for the new policy." *Id.*; *see also Smiley*

*v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) ("[s]udden and unexplained change" may be arbitrary and capricious). Here, Defendants failed to acknowledge the sudden change in position and failed to explain the good reasons for the new policy.

*Fourth*, Defendants' actions are arbitrary and capricious because they failed to take into consideration the substantial reliance interests of the Plaintiff States and the tremendously harmful impact of immediately terminating, without any warning, billions of dollars in congressionally appropriated funds. "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) (internal quotation marks and citation omitted); *see also Fox Television Stations*, 556 U.S. at 515 (holding it "would be arbitrary or capricious to ignore" when a "prior policy has engendered serious reliance interests"); *Nat'l Council of Nonprofits v. Office of Mgmt. and Budget*, No. 25-239 (LLA), --- F. Supp. 3d ---, 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025) (concluding that a freeze on federal funds implicates reliance interests that "are all too real").

Here, Plaintiff States and their local health jurisdictions have relied on the availability of billions of dollars in grants and cooperative agreements for key aspects of their public health programs and initiatives. They had no reason to suspect that HHS would suddenly and immediately change position and terminate this funding. The harm from this abrupt change is drastic. As explained fully in Background Section V, critical public health programs and initiatives will have to be cut, large numbers of public health employees and contractors will have to be terminated, and all these cuts will result in substantial repercussions for public health in Plaintiff States for many years. Yet, Defendants arbitrarily and capriciously failed to consider any of these reliance interests.

*Fifth*, Defendants' actions are arbitrary and capricious because, as explained more fully in Section II, HHS arbitrarily and without explanation applied "for cause" termination provisions based on the end of the COVID-19 pandemic nearly two years ago. This application is contrary to statute and regulation because Defendants have identified no failure on the part of Plaintiff States to comply with the terms and conditions of funding. Defendants further fail to provide a rational explanation as to why the end of the pandemic requires termination, given that the applicable appropriations statutes extend beyond the pandemic and do not limit funding to the duration of the pandemic, HHS's prior longstanding position was that the end of the pandemic did not require termination, and Congress's decision to leave these funds available when it rescinded *other* COVID-19 funds as no longer necessary.

In sum, Defendants have not explained their actions, have not engaged in reasoned decision-making, failed to consider important aspects of the problem, and failed to consider significant reliance interests. Defendants' actions are thus arbitrary and capricious. 5 U.S.C. § 706(2)(A).

### III. Plaintiff States Will Be Irreparably Harmed Absent a Temporary Restraining Order.

HHS's termination of previously awarded public health grants has irreparably harmed, and will continue to irreparably harm, Plaintiff States. Preliminary relief is necessary to avoid such harm and protect the equities and public interest. *See, e.g.*, *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005) (asking if challengers would suffer "irreparable harm" because injuries "cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy"). "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K-Mart Corp. v. Oriental Plaza, Inc.*,

875 F.2d 907, 915 (1st Cir. 1989) (cleaned up). As explained fully in Background Section V, the abrupt terminations have caused—and will continue to cause—substantial operational burdens for Plaintiff States' institutions. *See City & Cnty. of S.F. v. USCIS*, 408 F. Supp. 3d 1057, 1123 (N.D. Cal. 2019) (recognizing "burdens on . . . ongoing operations" for public entities, including administrative costs caused by changes in federal policy, constitute irreparable harm); *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (same). These sudden and inexplicable terminations have resulted in chaos across Plaintiff States' institutions, particularly because the terminations were effective immediately. *See generally* Ex. 16, Ige Decl. ¶¶ 7, 21.

The Court may also find irreparable harm because, contrary to the mission of public health agencies, these abrupt terminations and their lasting effects threaten grave harm to public health and safety. *See Cigar Masters Providence, Inc. v. Omni Rhode Island, LLC*, No. CV 16-471-WES, 2017 WL 4081899, at *14 (D.R.I. Sept. 14, 2017) ("Threats to public health and safety constitute irreparable harm that will support an injunction."); *Sierra Club v. U.S. Dep't of Agric., Rural Utilities Serv.*, 841 F. Supp. 2d 349, 358 (D.D.C. 2012) (threats to public health establish irreparable harm); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (finding irreparable harm where "organizational plaintiffs have shown ongoing harms to their organizational missions"). Again, as detailed in Background Section V and 44 accompanying declarations, Exs. 1-44, there can be no doubt that these unlawful terminations are causing serious and irreparable harm to Plaintiff States' public health programs, their local health jurisdictions, and the health and safety of their residents.

Even recoverable costs, "may constitute irreparable harm . . . where the loss threatens the very existence" of an organization or programs. *Packard Elevator v. ICC*, 782 F. 2d 112, 115 (8th Cir. 1986); *see Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, No. 1:25-CV-00702-

*JRR*, --- F. Supp. 3d ---, 2025 WL 833917, at *23 (D. Md. Mar. 17, 2025) (holding that the immediate termination of grants affecting the existence of programs and the livelihoods of individuals within those programs constituted irreparable harm); *California v. U.S. Dep't of Educ.*, No. CV 25-10548-MJJ, --- F. Supp. 3d ---, 2025 WL 760825, at *4 (D. Mass. Mar. 10, 2025) (same). The terminations of billions of dollars in grants existentially threatens key programs and initiatives with Plaintiff States' public health agencies, and ultimately, will worsen public health outcomes by inhibiting public health agencies' critical duties such as combatting the spread of contagious disease, preventing substance abuse, and ensuring access to mental health treatment. *See, e.g.*, Ex 3, Fanelli Decl., ¶¶ 33, 47, 49; Ex. 6, Perez Decl. ¶¶ 9-10, 62.

Finally, absent relief from this Court, Plaintiff States, including their state and local public health agencies and the communities they serve, have suffered, and will continue to suffer, immediate and irreparable harm through the irredeemable loss of federal funding. *See, e.g., Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs.*, 743 F. Supp. 3d 325, 363 (D.N.H. 2024) (unrecoverable economic loss is "'more than sufficient'") (quoting *Tex. Child.'s Hosp. v. Burwell*, 76 F. Supp. 3d 224, 242 (D.D.C. 2014)); *see also California v. Azar*, 911 F.3d 558, 581 (9th Cir. 2018) (economic harm considered irreparable harm for APA claims where money damages are not recoverable).

## IV.   The Public Interest and the Balance of Equities Strongly Favor Entry of a Temporary Restraining Order.

The equities and public interest also favor preliminary relief. *See, e.g., Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (the balance of equities and the public interest "merge when the [g]overnment is the opposing party"). Plaintiff States have a substantial interest in the successful operation of their public health systems. *Jacobson*, 197 U.S. at 38 ("The safety and the health of the people . . . are, in the first instance, for [the State] to guard and protect."). Plaintiff States

have detailed the devastating consequences of the fundings terminations, and the many ways that the terminations will impair the functioning of key public health programs and initiatives. *See* Background Section V. Given the abrupt terminations, Plaintiff States cannot make up for the lost funding and will have to take immediate action to curtail their public health programs and undergo massive layoffs of highly trained employees and contractors. *See, e.g.*, Ex. 3, Fanelli Decl. ¶ 32; Ex. 6, Perez Decl. ¶¶ 30, 61; Ex. 10, Bookman Decl. ¶ 21. As a result, the equities and public interest strongly favor preliminary relief.

This is especially so because Plaintiff States have also established a likelihood of success on the merits. *See supra* Sections II and III. Plaintiff States have shown that the HHS's abrupt termination of public health grants violated the APA in myriad ways. The "extremely high likelihood of success on the merits" here shows that preliminary relief "would serve the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Relatedly, "the public has an important interest in making sure government agencies follow the law." *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005); *see also League of Women Voters*, 838 F.3d at 12 (same). Courts routinely observe that "there is generally no public interest in the perpetuation of unlawful agency action." *Planned Parenthood of N.Y.C., Inc. v. HHS*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) (quoting *League of Women Voters*, 838 F.3d at 12). There is a strong public interest in restraining HHS's unlawful actions. *See, e.g., Me. Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 64 (D. Maine 2022). Thus, in addition to the public interest in avoiding public health harms, the public also has an interest in ensuring HHS follows the law.

On the other side of the ledger, the federal government faces no "harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F.

Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)); *see also Planned Parenthood of N.Y.C., Inc.*, 337 F. Supp. 3d at 343. Because the terminations are unlawful, Defendants have no cognizable interest in their enforcement.

The public interest and the equities clearly favor Plaintiff States. A temporary restraining order is necessary to protect a vital source of funding for essential government functions.

## V.    Requested Relief.

Plaintiff States respectfully request that the Court enter a temporary restraining order that restrains Defendants from implementing or enforcing funding terminations that were issued on or after March 24, 2025, for reasons related to the end of the COVID-19 pandemic, or from issuing new funding terminations for the same or similar reasons. More specifically, the restraints should be applicable to funding terminations for Plaintiff States, including their local health jurisdictions.

## CONCLUSION

For these reasons, Plaintiff States respectfully request a temporary restraining order as this case proceeds or immediate preliminary relief.

Respectfully submitted,

**PHILIP J. WEISER**
Attorney General of Colorado

By: */s/ David Moskowitz*
David Moskowitz*
*Deputy Solicitor General*
Sam Wolter*
*Assistant Attorney General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov
Samuel.Wolter@coag.gov

*Counsel for the State of Colorado*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: /s/ Sarah W. Rice
Sarah W. Rice (RI Bar No. 10465)
*Deputy Chief, Public Protection Bureau*
*Assistant Attorney General*
Keith Hoffmann (RI Bar No. 9874)
*Chief of Policy*
*Assistant Attorney General*
Julia Harvey (RI Bar No. 10529)
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2054
srice@riag.ri.gov
khoffmann@riag.ri.gov
jharvey@riag.ri.gov

*Counsel for the State of Rhode Island*

**ROB BONTA**
Attorney General of California

By: /s/ Crystal Adams
Neli Palma*
*Senior Assistant Attorney General*
Crystal Adams*
Anna Rich*
Heidi Lehrman*
*Deputy Attorneys General*
1300 I Street
Sacramento, CA 95814
(916) 210-7522

*Counsel for the State of California*

**KEITH ELLISON**
Attorney General of Minnesota

By: */s/ Brian S. Carter*
Brian S. Carter*
Jennifer Moreau*
*Assistant Attorneys General*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-7403
Brian.Carter@ag.state.mn.us
Jennifer.Moreau@ag.state.mn.us

*Counsel for the State of Minnesota*

**NICHOLAS W. BROWN**
Attorney General of Washington

By: _s/ Ellen Range_
Ellen Range*
_Assistant Attorney General_
Office of the Washington State Attorney General
7141 Cleanwater Drive SW
P.O. Box 40111
Olympia, WA 98504-0111
(360) 709-6470
Ellen.Range@atg.wa.gov

Cristina Sepe*
_Deputy Solicitor General_
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200
Cristina.Sepe@atg.wa.gov

_Counsel for the State of Washington_

**KRISTIN K. MAYES**
Attorney General of Arizona

By: _/s/ Mary M. Curtin_
Mary M. Curtin*
_Senior Litigation Counsel_
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Mary.Curtin@azag.gov

_Counsel for the State of Arizona_

**WILLIAM TONG**
Attorney General of Connecticut

_/s/ Andrew Ammirati_
Andrew Ammirati*
_Assistant Attorney General_
165 Capitol Avenue
Hartford, CT 06106
Phone: (860) 808 5090
Andrew.Ammirati@ct.gov

_Counsel for the State of Connecticut_

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: _/s/ Vanessa L. Kassab_
Ian R. Liston*
_Director of Impact Litigation_
Vanessa L. Kassab*
_Deputy Attorney General_
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

_Counsel for the State of Delaware_

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

/s/ Samantha Miyahara Hall
Samantha Miyahara Hall*
*Assistant Attorney General*
Public Advocacy Division
Office of the Attorney General for the District
of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
(202) 788-2081
Samantha.hall@dc.gov

*Counsel for the District of Columbia*


**KWAME RAOUL**
Attorney General of Illinois

By: /s/ John Hazinski
John Hazinski*
*Assistant Attorney General*
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(773) 590-6944
john.hazinski@ilag.gov

*Counsel for the State of Illinois*


**ANNE E. LOPEZ**
Attorney General of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
*Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*


**OFFICE OF THE GOVERNOR** *ex rel.*
**ANDY BESHEAR**
in his official capacity as Governor of the
Commonwealth of Kentucky

*/s/ Travis Mayo*
S. Travis Mayo*
*General Counsel*
Taylor Payne*
*Chief Deputy General Counsel*
Laura C. Tipton*
*Deputy General Counsel*
Kentucky Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

**AARON M. FREY**
Attorney General of Maine

By: /s/ Margaret Machaiek
Margaret Machaiek*
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME 04333-0006
Tel.: 207-626-8800
Fax: 207-287-3145

*Counsel for the State of Maine*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ Katherine B. Dirks*
Katherine B. Dirks*
*Chief State Trial Counsel*
Phoebe Lockhart*
Assistant Attorney General
1 Ashburton Pl.
Boston, MA 02108
(617.963.2277)
katherine.dirks@mass.gov
phoebe.lockhart@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**ANTHONY G. BROWN**
Attorney General for the State of Maryland

By: /s James C. Luh*
James C. Luh
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us

*Counsel for the State of Maryland*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Jennifer M. Jackson*
Jennifer M. Jackson (P67126)*
Carl Hammaker (P81203)*
Assistant Attorneys General
Michigan Department of Attorney General
Attorneys for State of Michigan
525 W. Ottawa St.
Lansing, MI 48933-1067
517.335.7573
jacksonj5@michigan.gov
hammakerc@michigan.gov

*Counsel for the State of Michigan*

**AARON D. FORD**
Attorney General of Nevada

By: /s/ Heidi Parry Stern
Heidi Parry Stern (Bar. No. 8873)*
*Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Counsel for the State of Nevada*


**RAÚL TORREZ**
Attorney General of New Mexico

By: /s/ Anjana Samant
Anjana Samant*
*Deputy Counsel*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
asamant@nmdoj.gov
(505) 270-4332

*Counsel for the State of New Mexico*

**JEFF JACKSON**
Attorney General of North Carolina

By /s/ Daniel P. Mosteller
Daniel P. Mosteller*
*Associate Deputy Attorney General*
Laura Howard
*Chief Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

*Counsel for State of North Carolina*


**MATTHEW J. PLATKIN**
Attorney General of New Jersey

*/s/ Jessica L. Palmer*
Jessica L. Palmer*
Anaiis Gonzales*
*Deputy Attorneys General*
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-4607
Jessica.Palmer@law.njoag.gov
Anaiis.Gonzales@law.njoag.gov

*Counsel for the State of New Jersey*


**LETITIA JAMES**
Attorney General of New York

By: */s/ Gina Bull*
Gina Bull*
*Assistant Attorney General*
28 Liberty St.
New York, NY 10005
(646) 574-2180
gina.bull@ag.ny.gov

*Counsel for the State of New York*


**DAN RAYFIELD**
Attorney General of Oregon

By: /s Deanna J. Chang
Deanna J. Chang*
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Deanna.J.Chang@doj.oregon.gov

*Counsel for the State of Oregon*

**JOSH SHAPIRO**
in his official capacity as Governor of the
Commonwealth of Pennsylvania

Jennifer Selber
*General Counsel*

*/s/ Aimee D. Thomson*
Aimee D. Thomson*
Jonathan D. Koltash*
*Deputy General Counsel*
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(223) 234-4986
aimeethomson@pa.gov
jokoltash@pa.gov

*Counsel for Governor Josh Shapiro*

  *Pending pro hac vice applications to be filed.*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: */s/ Lynn K. Lodahl*
Lynn K. Lodahl*
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 264-6219
lodahllk@doj.state.wi.us

*Counsel for the State of Wisconsin*

## INDEX OF EXHIBITS

| Exhibit | State | Declarant Name | Declarant Title |
|---|---|---|---|
| 1 | Arizona | Sjolander, Sheila | Deputy Director of Health Services, Arizona Dept. of Health Services |
| 2 | California | Cutler, Dr. Blayne | CEO, Public Health Foundation Enterprises |
| 3 | California | Fanelli, Susan | Chief Deputy Director of Health Quality and Emergency Response, California Dept. of Health |
| 4 | California | Ferrer, Dr. Barbara | Director, Los Angeles County Dept. of Public Health |
| 5 | California | Kasirye, Dr. Olivia | Public Officer for the County of Sacramento |
| 6 | California | Perez, Marlies | Division Chief of the Community Services Division of Behavioral Health, California Department of Healthcare Services |
| 7 | California | Philip, Dr. Susan | Health Officer for the City and County of San Francisco; Director of the Population Health Division of the San Francisco Dept. of Health |
| 8 | California | Rudman, Dr. Susan | County of Santa Clara Deputy Health Officer; Director of the Infectious Disease and Response Branch of the Public Health Dept. |
| 9 | California | Saruwatari, Kimberly | Riverside County Director of the Dept. of Public Health |
| 10 | Colorado | Bookman, Scott | Senior Director of Public Health Readiness and Response, Colorado Dept. of Public Health and Environment |
| 11 | Colorado | Maurice, Monique | Chief Financial Officer, Colorado Behavioral Health Administration |
| 12 | Connecticut | Navarretta, Nancy | Commissioner, Department of Mental Health and Addiction Services |
| 13 | Connecticut | Orefice, Adelita | Deputy Commissioner and Acting Chief Operating Officer, State of Connecticut Dept. of Public Health |

| 14 | Delaware | Manning, Josette D. | Cabinet Secretary, Delaware Dept. of Health and Social Services |
|----|----------|---------------------|-----------------------------------------------------------------|
| 15 | Illinois | Clark, Heidi | Division Chief, Division of Infectious Diseases, Illinois Dept. of Public Health |
| 16 | Illinois | Ige, Dr. Olusimbo | Commissioner, Chicago Dept. of Public Health |
| 17 | Illinois | Rollinson, Ryan | Chief of Staff, Division of Mental Health, Illinois Dept. of Human Services |
| 18 | Kentucky | Friedlander, Eric | Secretary, Kentucky Cabinet for Health and Family Services |
| 19 | Massachusetts | Doyle, Brooke | Commissioner, Massachusetts Dept. of Mental Health |
| 20 | Massachusetts | Sullivan, Eileen | Chief Operating Officer, Massachusetts Dept. of Public Health |
| 21 | Maryland | Kalyanaraman, Dr. Nilesh | Deputy Director for Public Health Services, Maryland Dept. of Health |
| 22 | Maine | Gagne-Holmes, Sara | Commissioner, State of Maine Dept. of Health and Human Services |
| 23 | Michigan | Hertel, Elizabeth | Director, Michigan Dept. of Health and Human Services |
| 24 | Minnesota | Gresczyk, Melissa | Chief Operating Officer and Assistant Commissioner for Health Operations, Minnesota Dept. of Health |
| 25 | North Carolina | Williams-Devane, Dr. ClarLynda | Chief Deputy Secretary and Deputy Secretary for Operational Excellence, North Carolina Dept. of Health and Human Services |
| 26 | New Jersey | Adelman, Sarah | Commissioner, New Jersey Dept. of Human Services |
| 27 | New Jersey | Baston, Dr. Kaitlan | Commissioner, New Jersey Dept. of Health |
| 28 | New Mexico | Boukas, Nicholas | Director of the Behavioral Health Services Division, New Mexico Health Care Authority |
| 29 | New Mexico | DeBlassie, Gina | Cabinet Secretary, New Mexico Dept. of Health |

| 30 | New Mexico | Garcia, Susan | Director of the Office of Health Equity, New Mexico Dept. of Health |
|----|-----------|---------------|---------------------------------------------------------------------|
| 31 | New Mexico | Romero, Andrea | Immunization Program Section Manager, New Mexico Dept. of Health |
| 32 | New York | Morne, Johanne | Executive Deputy Commissioner, New York State Dept. of Health |
| 33 | New York | Morse, Dr. Michelle E. | Acting Commissioner and Chief Medical Officer of the New York City Dept. of Health and Mental Hygiene |
| 34 | Oregon | Drum, Danna (Drum 1) | Interim Deputy Director of the Public Health Division, Oregon Health Authority |
| 35 | Oregon | Drum, Danna (Drum 2) | Interim Deputy Director of the Public Health Division, Oregon Health Authority |
| 36 | Oregon | Jones, Christa | Deputy Director of Service Delivery, Behavioral Health Division, Oregon Health Authority |
| 37 | Oregon | Sutton, Dr. Melissa | Medical Director, Respiratory Viral Pathogens and Epidemiology and Laboratory Capacity Project Director, Oregon Health Authority |
| 38 | Rhode Island | Campagna, Kristine | Associate Director for Community and Health Equity |
| 39 | Rhode Island | Goulette, Christine | Associate Director, Division of Emergency Preparedness and Infectious Disease, Rhode Island Dept. of Health |
| 40 | Washington | Fehrenbach-Marosfalvy, Lacy | Chief of Prevention, Safety, and Health, Washington Dept. of Health |
| 41 | Washington | Kirschbaum, Teesha | Director, Division of Behavioral Health and Recovery, Washington Health Care Authority |
| 42 | Wisconsin | Grejner-Brzezinska, Dorota | Vice Chancellor for Research, University of Wisconsin-Madison |
| 43 | Wisconsin | Standridge, Debra | Deputy Secretary, Wisconsin Dept. of Health Services |
| 44 | Pennsylvania | Rodack, Kristen | Executive Deputy Secretary, Pennsylvania Dept. of Health |

<u>**CERTIFICATE OF SERVICE**</u>

I, Kathryn M. Sabatini, certify that on April 1, 2025, I provided a copy of the forgoing document to individuals at the U.S. Department of Justice by electronic mail:

Alex Haas
Co-Director, Federal Programs Branch
U.S. Department of Justice
alex.haas@usdoj.gov

Diane Kelleher
Co-Director, Federal Programs Branch
U.S. Department of Justice
diane.kelleher@usdoj.gov

Daniel S. Schwei
Special Counsel
U.S. Department of Justice
Daniel.S.Schwei@usdoj.gov

Kevin Hubbard
Civil Division Chief
United States Attorney's Office, District of Rhode Island
Kevin.Hubbard@usdoj.gov

/s/ Kathryn M. Sabatini
*Chief of the Civil Division*
*Assistant Attorney General*