# Exhibit C

| | |
|---|---|
| **From:** | Mailing list for eRA system alerts to users on behalf of eRA Communications Office |
| **To:** | ERA-ALERT@LIST.NIH.GOV |
| **Subject:** | Notice of Court Order |
| **Date:** | Monday, April 7, 2025 12:08:27 PM |
| **Attachments:** | 16112337483.pdf |

HHS Grant Recipients:

Please review the attached Temporary Restraining Order (TRO). Please note, this action only applies to the 23 Plaintiff States listed in the TRO.

To unsubscribe from the ERA-ALERT list, click the following link:
http://list.nih.gov/cgi-bin/wa.exe?SUBED1=ERA-ALERT&A=1

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF COLORADO; STATE OF RHODE ISLAND; STATE OF CALIFORNIA; STATE OF MINNESOTA; STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF CONNECTICUT; STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR *EX REL.* ANDY BESHEAR, in his official capacity as Governor of the Commonwealth of Kentucky; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF WISCONSIN; JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania, <br><br> Plaintiffs, <br><br> v. <br><br> U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the U.S. Department of Health and Human Services, <br><br> Defendants. | C.A. No. 1:25-cv-00121-MSM-LDA |

## TEMPORARY RESTRAINING ORDER

Mary S. McElroy, United States District Judge.

This matter came before the Court on the Plaintiff States' Motion for a Temporary Restraining Order ("TRO") (ECF No. 4). The States ask the Court to temporarily restrain the U.S. Department of Health and Human Services ("HHS") from immediately and summarily terminating $11 billion in public health grants appropriated by Congress to fund various public health programs. These programs include tracking infectious diseases, ensuring access to immunizations, fortifying emergency preparedness, providing mental health and substances abuse services, and modernizing critical public health infrastructure.

During a hearing held on April 3, 2025, the Court heard from attorneys representing the States and HHS.[1] At the hearing's conclusion, the Court GRANTED the States' Motion for a TRO (ECF No. 4). Below, the Court explains its reasoning and details the TRO's scope.

"The basic four-factor legal standard for a TRO mirrors that for a preliminary injunction." *Schnitzer Steel Indus. v. Dingman*, 639 F. Supp. 3d 222, 226 (D.R.I. 2022). "As with a preliminary injunction, the movant must demonstrate that weighing the following four factors favors the granting of a TRO: (1) likelihood of success on the merits; (2) potential for irreparable injury; (3) balance of the relevant equities; (4) effect on the public interest if the TRO is granted or denied." *Id.* A

---

[1] HHS' attorney appeared and objected to the issuance of a TRO but did not make substantive arguments because the record involved several thousand pages and she had not yet had the opportunity to review the filings.

2

"district court is required only to make an estimation of likelihood of success and 'need not predict the eventual outcome on the merits with absolute assurance.'" *Id.* (quoting *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013)). The Court is also fully aware of both its limited role and the limited role that TROs play in civil practice. "The order is designed to preserve the status quo until there is an opportunity to hold a hearing on the application for a preliminary injunction." 4 Charles Alan Wright & Arthur R. Miller, Federal Practice and Procedure § 2951 (3d ed.).

### Likelihood of Success on the Merits

The analysis begins with the weightiest of the four factors: the likelihood of success on the merits. According to the States, the only basis that the HHS provided for its decision to terminate $11 billion in public health funding was that the funding was appropriated through one or more COVID-19 related laws. The notices given to the states indicate that HHS terminated the funding because, in HHS' view, it was no longer necessary after the end of the COVID-19 pandemic. (ECF No. 1 ¶ 2). The States argue that HHS unilaterally terminated these grants without following the required procedures set forth by law. They bring three claims under the Administrative Procedure Act ("APA").

### Count I: SAMHSA Termination Notices

The States first argue that HHS terminated grants to their agencies' Substance Abuse and Mental Health Services Administration ("SAMHSA") programs without following the procedure set forth by Congress in 42 U.S.C. § 300x-55(a)-(e).

3

Section 300x-55(a) provides that the Secretary of HHS may "terminate the grant for cause" only "if [he] determines that a State has materially failed to comply with the agreements or other conditions required for the receipt of a grant." And under § 300x-55(e), HHS must provide "adequate notice and an opportunity for a hearing" before taking any action against a state's funding. The States also direct the Court to § 300x-55(g), which bars HHS from withholding any funds unless it has first investigated whether the State has expended payments under the program involved.

The States argue that the SAMSHA terminations—executed without any notice and without explanation of the States' "material failure to comply" with the agreements and other necessary conditions—violated § 300-55(a) and § 300-55(e). The States further contend that these termination notices were issued without the opportunity for a hearing and an investigation as required by § 300x-55(g).

On this record, the Court agrees. These statutes show that, to terminate SAMSHA funding, HHS must do far more than what it did here: simply terminating the funding "for cause" due to the end of the pandemic. *See, e.g.*, ECF No. 4-41, Kirschbaum Decl. ¶ 42 (explaining that "HHS SAMHSA has never provided HCA with notice, written or otherwise, that the grant administered by HCA was in any way unsatisfactory"); ECF No. 4-41 at 54, Kirschbaum Decl., Attach. D ("The end of the pandemic provides cause to terminate COVID-related grants and cooperative agreements."). The States thus have shown a strong likelihood of success that HHS' sudden termination of SAMHSA grants was contrary to law in violation of 5 U.S.C. § 706(2).

### Count II: CDC Termination Notices

The States further claim that HHS suddenly terminated grants related to the Center for Disease Control and Prevention's ("CDC") agreements with state and local health departments to detect, prevent, and respond to infectious disease outbreaks. These terminations, like the SAMSHA terminations, occurred without any notice or an opportunity for a hearing. The States primarily argue that this termination violates HHS' own regulations, which permit the termination of grants only "for cause" or a failure to comply with the grant agreements.[2] And the States convincingly argue that HHS has previously only interpreted its "for cause" termination power to be like a "failure to comply with the terms of the grant agreements" termination. The States contend that HHS erred in expanding its interpretation of "for cause" to include the end of the pandemic.

On this record, the Court agrees. The Court struggles to see how, based on HHS' past interpretation of "for cause," the end of the pandemic qualifies. So again, the States have demonstrated a strong likelihood of successfully showing that HHS' sudden termination of CDC grants was contrary to law—in particular, its own regulations—in violation of 5 U.S.C. § 706(2).

---

[2] HHS has construed "for cause" to mean that a grantee has materially failed to comply with the grant. *Child Care Ass'n of Wichita/Sedgwick Cnty.*, DAB No. 308 (1982), 1982 WL 189587, at 2 (HHS June 8, 1982) ("'For cause means a grantee has materially failed to comply with the terms of the grant."). And HHS has acknowledged that "for cause" is not substantially different from "failure to comply" and its own regulations are being amended to reflect exactly that fact. *See* HHS, Health and Human Services Adoption of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 89 Fed. Reg. 80055, 80055 (Oct. 2, 2024) (effective October 2025).

5

### Count III: Other Public Health Termination Notices

Finally, the States allege that HHS' mass termination of other grants and cooperative agreements was "arbitrary and capricious" in violation of the APA. The States claim that HHS improperly decided—despite clear statutory language to the contrary—that all pandemic-era public health appropriations were COVID-19-related and thus only intended for use during the pandemic. HHS, they continue, failed to make individualized assessments of grants or agreements, ignored the States' reliance interests on congressionally appropriated money, failed to explain its sudden change in position, and misapplied the "for cause" termination provision. (ECF No. 1 ¶ 122).

An agency action is arbitrary and capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins.*, 463 U.S. 29, 43 (1983). On the record before the Court at the April 3, 2025, hearing, the States made a strong showing that the sudden, blanket termination of $11 billion—likely based on misinterpretations of federal law—was neither reasonable nor reasonably explained.

For starters, the mass termination of funding was likely not substantively reasonable. *Multicultural Media, Telecom & Internet Council v. Fed. Commc'ns Comm'n*, 873 F.3d 932, 936 (D.C. Cir. 2017) (Kavanaugh, J.) ("A substantive unreasonableness claim ordinarily is an argument that, given the facts, the agency

6

exercised its discretion unreasonably.") As the States explain, Congress had already rescinded plenty of COVID-era public health spending in 2023. (ECF No. 4 at 10.) But "Congress chose not to rescind the funding for the grants and cooperatives agreements at issue in this case." *Id.*

It is well-established that in the interpretation of statutes, the express mention of one thing is the exclusion of others. *See, e.g.*, *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) ("If a sign at the entrance to a zoo says 'come see the elephant, lion, hippo, and giraffe,' and a temporary sign is added saying 'the giraffe is sick,' you would reasonably assume that the others are in good health.") So Congress's decision to eliminate some COVID-era public health measures but leave alone the funding at issue here presumably signals its intent to continue that funding. *See id.* With that in mind, the Court struggles to see how HHS, an agent of the Executive, can exercise discretion to eliminate ten billion dollars' worth of it summarily. *See Biden v. Nebraska*, 600 U.S. 477, 514 (2023) (Barrett, J., concurring) (explaining that Supreme Court precedent requires that Congress must "speak clearly" if "it wishes to assign to an agency decisions of vast economic and political significance" (cleaned up)).

Nor does it seem that the mass terminations were reasonably explained. The Court struggles to see the requisite "rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43. And the impact on the States of HHS' sudden termination of billions of dollars in congressionally appropriated funds is substantial. "When an agency changes course," it needs to "be cognizant that longstanding policies may have engendered serious reliance interests that must be

7

taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020). The States had no reason to expect that the already-allocated grant money would suddenly be terminated, and they relied on this funding to support their public health programs and initiatives. Of course, agencies "are free to change their existing policies," but they must "provide a reasoned explanation for the change," "display awareness that [they are] changing position," and consider "serious reliance interests." *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221–22 (cleaned up). The termination notices provided to the States on March 24 and 25 failed to provide a reasoned explanation for the sudden change in its position or consider the States' reliance interests, which are substantial under the circumstances.

The States have thus demonstrated a strong likelihood of success on their claim that these terminations were arbitrary and capricious in violation of the APA.

## Irreparable Harm

The States have also demonstrated that they stand to suffer irreparable harm absent the issuance of a TRO. The States submitted numerous examples of the irreparable harm they stand to suffer without judicial action. First, the terminations were effective immediately, causing chaos and uncertainty for the funding of public health initiatives in the States. For instance, the State of Minnesota has laid off approximately 200 workers in the immediate aftermath, representing 12% of the Minnesota Department of Health's current workforce, and up to 700 more have been given notice that their jobs were in danger. (ECF No. 4-24 ¶ 41.) In Delaware, the termination of a community health worker grant will end support for at least thirty-

8

three community health worker "positions across six organizations, including federally qualified health centers and community-based organizations." (ECF No. 4-14 ¶ 25.)

Second, at this point, the record is clear that without continued funding, there is a significant threat to public health and safety. "Threats to public health and safety constitute irreparable harm that will support an injunction." *Cigar Masters Providence, Inc. v. Omni Rhode Island, LLC*, No. CV 16-471-WES, 2017 WL 4081899, at *14 (D.R.I. 2017). Without the necessary funding, the States face a significant threat to public health, including the spread of infectious diseases, substance abuse prevention efforts, and access to mental health treatment. Some examples to consider:

- In Minnesota, the funding was being used to address "gaps in infection control practices, training, and resources, identified during the COVID-19 pandemic as a major concern of the operators of long-term care facilities serving older adults." (ECF No. 4-24 ¶ 48.) Because of the termination, the Minnesota Department of Health had to cancel grants that would have provided infection prevention and control training to more than sixty skilled nursing facilities across the state, potentially exposing over 3,000 long-term care residents to a greater risk of infection. *Id.* Likewise, the terminations forced the cancellation of infection prevention and control training programs for 150 nursing and

9

- assisted living facilities, "potentially impacting 7,000 long-term care residents." *Id.*

- In Connecticut, the termination of the Department of Mental Health and Addiction Services' SAMHSA grants will eliminate "housing and employment supports, regional suicide advisory boards, harm reduction, perinatal screening, early-stage treatments, and increased access to medication assisted treatment." (ECF No. 4-12 ¶¶ 16, 29.)

- In Illinois, the termination of mental health block grants means that providers will be unable to provide services through the state's "mobile crisis response units that assist people at risk of suicide." (ECF No. 4-17 ¶ 16.) And without that funding, "providers will simply be unable to help people in suicidal crisis." *Id.*

- In New Mexico, the terminated mental health care block grants will cut funding to fifty-four providers who treat over 64,000 people for critical behavioral and mental health services. (ECF No. 4-28 ¶ 14.)

- In California, the termination of the substance use disorder prevention and early intervention services for youth in at least eighteen of its counties risk increased substance use among young people. (ECF No. 4-6 ¶ 61). And without the funding, California's Immunization and Vaccines for Children program will not be able to provide vaccines for measles, influenza, and COVID-19 to approximately 4.5 million

10

- children, roughly half of California's youth population. (ECF No. 4-3 ¶ 17.)

- In Rhode Island, the loss of the Health Disparities grant will curtail efforts to support "community education, mitigation, and response efforts in the state's hardest hit communities" including preparedness and response capacity to the state's designated rural community, Block Island. (ECF No. 4-38 ¶ 17(a).) The loss of COVID-19 vaccination supplemental funding will impact a planned vaccination clinic for vulnerable populations in Rhode Island, including those living in nursing homes and assisted living communities. *Id.* ¶ 25. The loss of Epidemiology and Laboratory Capacity Enhancing Detection Expansion funds will impact the staffing of nurses, epidemiologists, and disease intervention specialists, and the funding of equipment and support software. (ECF No. 4-39 ¶¶ 31-32, 38-39.)

All that is to say, the immediate, unilateral termination of these public health grants has disrupted the States' public health systems and caused direct and irreparable harm to public health.

### Balance of the Equities and Public Interest

Finally, the Court must balance the equities and consider the public interest. Of course, the States have a substantial interest in the successful operation of their public health systems and initiatives. The States maintain that the immediate loss of funding will disrupt—and really, has already disrupted—their public health

11

programs and will cause—and has already caused—mass layoffs of highly trained employees and contractors. The balancing of the equities strongly favors the States because, on the record before the Court they have established a strong likelihood of success on the merits and preliminary relief here would serve the public's interest.

Practical consequences make this point clear. If HHS is prevented from enforcing these terminations, it merely would have to disburse funds that Congress already allocated to the States. But if the Court denies the TRO, the funding that the States are presumably due under law would be terminated without process—an outcome in conflict with past congressional action and a hardship worsened by the fact that the States had little notice to act in anticipation of the funding terminations.

And the fact that the States have shown a likelihood of success on the merits strongly suggests that a TRO would serve the public interest. On the other hand, the government "generally [has] no public interest in the perpetuation of unlawful agency action." *Planned Parenthood of N.Y.C., Inc. v. HHS*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018).

The public interest further favors a TRO because, absent one, there is a substantial risk that the States and their citizens will face a significant disruption in integral, expansive, and important public health programs. And there is a strong public interest in curtailing HHS' unlawful termination of congressionally allocated funding to public health programs, particularly in a case like this one where the only evidence before the Court is that the termination was done in violation of the law.

## Bond

Rule 65(c) makes clear that the Court can issue a TRO "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). At the April 3, 2025, hearing, HHS asked the Court to impose a bond equivalent to the full costs of the terminated funds—approximately $11,000,000,000. The Court declined. The Court does not consider that amount or any security "proper" for this case under Rule 65(c).

## CONCLUSION

For these reasons, the Court has found that the States have established a strong likelihood of success on the merits, irreparable harm, and that the balance of equities and public interest favor the States. The Court made these findings based on their Motion for Temporary Restraining Order (ECF No. 4) and accompanying declarations attached. Therefore, for good cause shown, the Court GRANTED the States' Motion for TRO (ECF No. 4) on April 3, 2025.

To maintain the status quo until the Court may rule on the States' forthcoming motion for preliminary injunction, the Court ORDERED that a TEMPORARY RESTRAINING ORDER is entered in this case until this Court decides the States' motion for a preliminary injunction. That order requires the following:

1. During the pendency of the Temporary Restraining Order, Defendants and all their respective officers, agents, servants, employees, and attorneys, and any persons in active concert or participation with them who receive actual

13

notice of this order are hereby fully restrained from implementing or enforcing funding terminations that were issued to Plaintiff States, including their local health jurisdictions and any bona fide fiscal agents of Plaintiff States or their local health jurisdictions, on or after March 24, 2025, for reasons related to the end of the COVID-19 pandemic, the "Public Health Terminations" as defined in Plaintiffs' Complaint, or from issuing new funding terminations to Plaintiff States, their local health jurisdictions, and any bona fide fiscal agents of Plaintiff States or their local health jurisdictions, for the same or similar reasons.

2. The Defendants shall immediately cease withholding any funds based on the Public Health Terminations and shall make such funds available and process all payments as if the Public Health Terminations had not been issued. The Defendants must immediately take every step necessary to carry out this Temporary Restraining Order, including clearing any administrative, operational, or technical hurdles to implementation.

3. The Defendants' counsel shall provide written notice of this order to all Defendants and agencies and their employees, and contractors by April 7, 2025, at 5:00 p.m. EDT. The Defendants shall provide written notice to grantees by April 7, 2025, at 5:00 p.m. EDT.

4. On or before April 7, 2025, at 5:00 p.m. EDT, the Restrained Defendants SHALL FILE on the Court's electronic docket a Status Report documenting

the actions that they have taken to comply with this Order, including a copy of the notice and an explanation as to whom the notice was sent.

5. For the reasons stated on the record, the Court found that a bond is not mandatory under these circumstances and exercises its discretion not to require one at this time.

IT IS SO ORDERED.

_____
Mary S. McElroy,
United States District Judge

Date: April 5, 2025