# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF COLORADO; STATE OF RHODE ISLAND; STATE OF CALIFORNIA; STATE OF MINNESOTA; STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAIʻI; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR *ex rel.* Andy Beshear, in his official capacity as Governor of the COMMONWEALTH OF KENTUCKY; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; JOSH SHAPIRO, in his official capacity as Governor of the COMMONWEALTH OF PENNSYLVANIA; and STATE OF WISCONSIN, | Case No. 1:25-cv-00121<br><br>**MOTION FOR PRELIMINARY INJUNCTION** |
|         Plaintiffs, | |
|     v. | |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, | |
|         Defendants. | |

## MOTION FOR PRELIMINARY INJUNCTION

# TABLE OF CONTENTS

Introduction ................................................................................................................. 1

Background ................................................................................................................... 3

    I.    Congress Appropriated Critical Funds Strengthening Public Health Programs to Address Emerging Threats and Increase Preparedness. ........ 3

    II.    Consistent With Congress's Intent, HHS Utilized the Appropriations to Fund Wide-Ranging Public Health Programs Beyond COVID-19 and the Pandemic. ..................................................................................... 5

    III.    HHS and Congress Continued to Make These Public Health Programs and Funds Available After the End of the Pandemic. ............... 8

    IV.    HHS Abruptly Decided to Terminate $11 Billion for Public Health Programs Funded by Appropriations From COVID-19 Related Laws. ...................................................................................................... 9

    V.    Plaintiff States Have Suffered and Will Suffer Substantial Harm. .......... 12

Legal Standard ........................................................................................................... 19

Argument ................................................................................................................... 20

    I.    This Court Has Jurisdiction over Plaintiff States' Claims. ...................... 20

        A.    Plaintiff States Have Standing to Assert Their Claims. ............... 20

        B.    The Tucker Act Does Not Apply to the Claims in the Complaint ..................................................................................... 21

    II.    Plaintiff States Have Established a Likelihood of Success on the Merits. .................................................................................................... 23

        A.    HHS's Public Health Funding Decision and Its Implementation Constitutes Final Agency Action Subject to Judicial Review. .......................................................................... 23

        B.    The Challenged Actions Are Contrary to Law. ........................... 25

        C.    The Challenged Actions Are Arbitrary and Capricious. .............. 30

        D.    The Challenged Actions Violates the Separation of Powers. ...... 34

    III.    Plaintiff States Will Be Irreparably Harmed Absent a Preliminary Injunction. ............................................................................................... 37

    IV.    The Public Interest and the Balance of Equities Strongly Favor Entry of a Preliminary Injunction. ................................................................... 39

    V.    Requested Relief. .................................................................................... 41

Conclusion ................................................................................................................. 42

Index of Exhibits ....................................................................................................... 48

**INTRODUCTION**

On March 24, with no advance notice or warning, the U.S. Department of Health and Human Services ("HHS") unlawfully decided that numerous health programs and appropriations responsible for $11 billion of critical federal financial assistance were "no longer necessary" because the "COVID-19 pandemic is over" (the "Public Health Funding Decision"). HHS explained that it would "no longer waste billions of taxpayer dollars responding to a non-existent pandemic that Americans moved on from years ago." Nathaniel Weixel, *Trump Administration Revokes State and Local Health Funding*, The Hill (Mar. 26, 2025), https://thehill.com/policy/healthcare/5216704-trump-administration-revokes-state-local-health-funding/. It was as if HHS was not even aware of the programs that it cut. In fact, these programs address a wide range of urgent public health needs, such as identifying, tracking, and addressing infectious diseases; ensuring access to immunizations; fortifying emergency preparedness; providing mental health and substance abuse services; and modernizing critical public health infrastructure. Despite the critical importance of these programs and funding, HHS terminated them with the stroke of a pen and for the flimsiest of reasons.[1]

HHS's decision has caused immediate chaos and irreparable harm for Plaintiff States and their local health jurisdictions. Key public health programs and initiatives will have to be dissolved or disbanded because the Plaintiff States do not have the wherewithal to run these programs with alternate funding midcycle—in some cases, HHS's decision cuts more than 10% of the agency budget, *e.g.*, Ex. 24, Grescyzk Decl. ¶ 41. Large numbers of public health employees and contractors have been, or may soon be, terminated. These programs and

---

[1] An index of exhibits is located at the end of this motion, beginning on page 48. Because the first 44 exhibits are identical to the TRO, Plaintiff States have not refiled those exhibits.

initiatives address urgent ongoing and emerging public health needs of Plaintiff States, including preventing collapse of the health system in the face of emerging threats like measles and H5N1 (avian influenza).

Both the Public Health Funding Decision and its implementation through termination notices are contrary to law and in excess of statutory authority. HHS has been unable to point to any statutory authority allowing the agency to determine that $11 billion in critical public health funding and associated programs are "no longer necessary" because the pandemic ended. This is especially so where Congress: (1) expressly identified funds and programs in the COVID-19 appropriations laws that would no longer be available after the end of the public health emergency; and (2) *after* the public health emergency ended, reviewed all of the COVID-19 appropriations laws, rescinded $27 billion of funds that were no longer necessary, but left in place *all* the programs and funding at issue. This legislative action demonstrates clearly that Congress did not delegate authority such broad authority to HHS. To compound this error, HHS then unlawfully applied "for cause" terminations that, as a matter of law, do not apply here. *See, e.g.*, 42 U.S.C. § 300x-55(a) (allowing "for cause" terminations only for "material failure" to comply with the agreement).

HHS's actions are also arbitrary and capricious. HHS failed to provide a rational explanation and merely assumed, with no factual support, that all appropriations in COVID-19 related laws were only intended for use during the pandemic. HHS failed to undertake any individualized assessments, including any analysis of the public health uses and benefits of these formula funds, grants, and cooperative agreements (collectively, "public health funding") or why they are no longer necessary. HHS failed to explain the agency's sudden determination that these programs and public health funding were no longer necessary based on the end of the

pandemic—which occurred almost two years ago—when HHS has consistently and repeatedly recognized the continued need for this funding until a few days prior. HHS failed to consider the substantial reliance interests and the tremendously harmful impact of immediately terminating, with no warning, billions of dollars in public health funds. Simply put, the Administrative Procedure Act ("APA") prohibits exactly this kind of erratic decision-making. Plaintiff States are highly likely to succeed on the merits.

Finally, HHS's actions violate the Constitution. The Constitution makes clear that, "[a]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018). Here, HHS has unilaterally decided that billions of dollars of congressionally appropriated funds are "no longer necessary" without any lawful authority. Consequently, HHS has violated separation-of-powers principles.

Pursuant to Federal Rule of Civil Procedure 65(d), Plaintiff States move for a preliminary injunction to avoid the grave harm to their public health systems and massive layoffs that will be inflicted without relief from the Court. Plaintiff States request an injunction that enjoins Defendants from enforcing or implementing the Public Health Funding Decision for Plaintiff States and their local health jurisdictions.

## BACKGROUND

### I.    Congress Appropriated Critical Funds Strengthening Public Health Programs to Address Emerging Threats and Increase Preparedness.

During the COVID-19 pandemic, Congress enacted numerous major appropriations laws to strengthen public health programs and to respond to the nationwide health crisis and economic devastation, place the nation on a path to recovery once the pandemic had ended, and ensure that

the nation was better prepared for future public health threats. These programs and appropriations laws included:

- Coronavirus Preparedness and Response Supplemental Appropriations Act, 2020 ("2020 Supplemental Act"), Pub. L. No. 116-123, 134 Stat. 146 (2020) ($8 billion);

- Families First Coronavirus Response Act, Pub. L. No. 116–127, 134 Stat. 178 (2020) ($15 billion);

- The Coronavirus Aid, Relief, and Economic Security Act ("CARES Act"), Pub. L. No. 116-136, 134 Stat. 281 (2020) ($2.1 trillion);

- Paycheck Protection Program and Health Care Enhancement Act ("Paycheck Protection Act"), Pub. L. No. 116-139, 134 Stat. 620 (2020) ($483 billion);

- The Coronavirus Response and Relief Supplemental Appropriations Act ("2021 Supplemental Act"), 2021 (Div. M of the Consolidated Appropriations Act, 2021), Pub. L. No. 116-260, 134 Stat. 1182 (2020) ($900 billion); and

- The American Rescue Plan Act of 2021 ("ARPA") Pub. L. No. 117-2, 135 Stat. 4 (2021) ($1.9 trillion).

In addition to directing funds toward amelioration of the immediate effects of the COVID-19 emergency, these wide-ranging appropriations sought to address challenges facing American society in COVID-19's wake, including gaps in the public health system. These critical public health investments were not tied to the duration of the public health emergency.

For example, ARPA contains many investments in public health that were not limited to the COVID-19 public health emergency and could be expected to extend to other pathogens or future emergencies, including funding for genome sequencing and surveillance; data modernization and forecasting; and public health workforce development. ARPA, §§ 2402, 2404, 2501, 135 Stat. at 41-42. ARPA also included funds to supplement state vaccination programs and efforts, including $1 billion to "strengthen vaccine confidence in the United States," and "to improve rates of vaccination throughout the United States." *Id.* § 2302, 135 Stat. at 39. Congress likewise appropriated $3 billion dollars in block grants to support state

governments' efforts to promote mental health and prevent substance abuse to be spent over the course of five years. *Id.* §§ 2701-2702, 135 Stat. at 45.

Similarly, in the CARES Act and the 2020 Supplemental Act, Congress appropriated $1.5 billion and $950 million, respectively, for HHS to administer grant-in-aid programs with States and local jurisdictions to carry out surveillance, epidemiology, laboratory capacity, infection control, mitigation, communications, and other preparedness and response activities. CARES Act, Title VIII, 134 Stat. at 554; 2020 Supplemental Act, Title III, 134 Stat. at 147.

These examples are but a small subset of Congress's wide-ranging public health investments made during the COVID-19 pandemic. None of this important funding was limited to the duration of the COVID-19 public health emergency.

In contrast, where Congress intended to limit the application of programs or appropriations in COVID-19 related laws, it did so expressly within these statutes. *See, e.g.*, ARPA § 9401, 135 Stat. at 127 ("during the emergency period . . . and the 1-year period immediately following the end of such emergency period"); *id.* § 9811(hh), 135 Stat. at 210-11 ("ends on the last day of the first quarter that begins one year after the last day of the emergency period"); CARES Act § 1109(h), 134 Stat. at 306 ("until the date on which the national emergency . . . expires").

## II.    Consistent With Congress's Intent, HHS Utilized the Appropriations to Fund Wide-Ranging Public Health Programs Beyond COVID-19 and the Pandemic.

HHS utilized these appropriations, as Congress intended, to administer grant-in-aid programs that provide wide-ranging grants and cooperative agreements to States and their local jurisdictions, many of which are the subject of this action. Some of this public health funding involved additional funding to existing programs while others represented new programs.

For example, long before the 2020 public health emergency, the Centers for Disease Control and Prevention ("CDC") established the Epidemiology and Laboratory Capacity for

Prevention and Control of Emerging Infectious Diseases ("ELC") Cooperative Agreement as a mechanism to fund the nation's state and local health departments to detect, prevent, and respond to infectious disease outbreaks. *See, e.g.*, Ex. 21, Kalyanaraman Decl. ¶ 22; Ex. 13, Orefice Decl. ¶ 8; Ex. 4, Ferrer Decl. ¶ 7. These agreements have funded local responses to pathogen threats like H1N1, Zika, and Ebola. The program provides financial and technical resources to: (1) strengthen epidemiologic capacity; (2) enhance laboratory capacity; (3) improve health information systems; and (4) enhance collaboration among epidemiology, laboratory, and information systems components of public health departments. *See, e.g.*, Ex. 10, Bookman Decl. ¶ 62; Ex. 15, Clark Decl. ¶ 10; Ex. 13, Orefice Decl. ¶ 13; Ex. 3, Fanelli Decl. ¶ 22; Ex. 7, Philip Decl. ¶¶ 20-21, 33. During the 2020 public health emergency, the CDC used the ELC funding mechanism to provide supplemental support to the States and their local health jurisdictions. *See, e.g.*, Ex. 10, Bookman Decl. ¶ 64; Ex. 13, Orefice, ¶ 9; Ex. 3, Fanelli Decl. ¶ 22; Ex. 7, Philip Decl. ¶¶ 20-21, 33; Ex. 9, Saruwatari Decl. ¶¶ 37-38.

In California, Sacramento County is a subgrantee of the California Department of Public Health's ELC grant and uses grant monies of nearly $60 million to investigate outbreaks of foodborne diseases, COVID-19, mpox, and any other yet to be identified communicable diseases. Ex. 5, Kasirye Decl. ¶ 25. Riverside County likewise uses its ELC funding in the amount of $101 million in part to implement and conduct wastewater surveillance to detect the early presence of COVID, mpox, and other communicable diseases. Ex. 9, Saruwatari Decl. ¶¶ 39, 51.

The Immunization and Vaccines for Children program is another long-standing CDC program to which new appropriations were added. These appropriations provide funds to support broad-based distribution, access, and vaccine coverage. Ex. 10, Bookman Decl. ¶ 40; Ex. 3,

Fanelli Decl. ¶ 10. These resources supported the COVID-19 vaccine program, and in 2023 the CDC issued guidance recognizing that COVID-19 vaccination was increasingly integrated into the administration of other routine vaccinations. Ex. 38, Campagna Decl. ¶ 23; Ex. 3, Fanelli Decl. ¶ 10.

Through the National Initiative to Address COVID-19 Health Disparities Among Populations at High-Risk and Underserved, Including Racial and Ethnic Minority Populations and Rural Communities, the CDC provided funding to expand state and local health departments' capacity to better serve the most vulnerable and underserved communities, including establishing new state and local partnerships. Ex. 34, Drum 1 Decl. ¶ 7; Ex. 3, Fanelli Decl. ¶ 40; Ex. 7, Philip Decl. ¶ 50; Ex. 9, Saruwatari Decl. ¶ 6. For example, in Rhode Island, the grant allowed for new partnerships with Block Island, its designated rural community. Ex. 38, Campagna Decl. ¶ 17. In California, the City and County of San Francisco uses its over $4.6 million grant approved through May 30, 2026, to identify and serve especially marginalized communities that are underrepresented in routine public health surveys or services delivery, and to educate residents about infectious disease prevention (including COVID-19) and the opioid epidemic. Ex. 7, Philip Decl. ¶¶ 51-52, 55.

HHS's Substance Abuse and Mental Health Services Administration ("SAMHSA") administers a longstanding program to provide annual block grants—the Substance Abuse Prevention and Treatment Block Grant and the Community Mental Health Services Block Grant— for each State to address mental health and substance abuse. 42 U.S.C.A. § 300x(a). Ex. 26, Adelman Decl. ¶ 9; Ex. 6, Perez Decl. ¶¶ 9-10. Block grants are a common method of providing federal funding to state and local governments to assist them in addressing broad purposes, such as public health, that generally provide recipients with more control over the use

of the funds. Through ARPA, Congress added $3 billion in additional funds to these block grants to be expended within five years to address mental health and substance use crises. ARPA, §§ 2701-2702, 135 Stat. at 45. These funds are critical to address the currently ongoing mental health crisis caused by COVID disruptions, particularly affecting our youth. Ex. 41, Kirschbaum Decl. ¶¶ 30-33.

Again, these are just a few of the voluminous examples of how the public health funding provided by HHS to Plaintiff States and their local health jurisdictions extends far beyond the end of the pandemic and to diseases beyond COVID-19. *See* Exs. 1-48.

### III.    HHS and Congress Continued to Make These Public Health Programs and Funds Available After the End of the Pandemic.

Since the declared end of the COVID-19 public health emergency in May 2023, HHS has consistently recognized that the public health program and funds at issue remain authorized by Congress. HHS was aware of, and expressly approved, the continued use of this funding for Plaintiff States' public health program activities, including substance use disorder prevention and treatment and mental health services, improvements to infectious disease monitoring and response, and modernizing and improving critical public health infrastructure. *See, e.g.*, Ex. 13, Orefice Decl. ¶ 10; Ex. 6, Perez Decl. ¶¶ 40-50; Ex. 27, Baston Decl. ¶ 18. In fact, HHS granted numerous extensions to the performance period of many grants issued to Plaintiff States and their local health jurisdictions, some of which were scheduled to end as late as June 2027. *See, e.g.*, Ex. 24, Gresczyk Decl. ¶¶ 11, 22; Ex. 32, Morne Decl. ¶ 19; Ex. 3, Fanelli Decl. ¶¶ 13, 21, 41; Ex. 9, Saruwatari Decl. ¶¶ 61, 83; Ex. 4, Ferrer Decl. ¶ 9; Ex. 7, Philip Decl. ¶ 57. HHS likewise issued guidance for how these funds could be used beyond the COVID-19 pandemic. Ex. 3, Fanelli Decl. ¶¶ 10, 22, 48.

Congress similarly has taken legislative action indicating that these programs and funds were to remain available after the end of the pandemic. In June 2023, after the end of the COVID-19 public health emergency, Congress canceled $27 billion in appropriations through the Fiscal Responsibility of Act of 2023, Pub. L. 118–5, Div. B (June 3, 2023). Through this Act, Congress went through the COVID-19 related laws and rescinded certain funds that it determined were no longer necessary. *Id.* at Div. B Sec. 1-81. These recissions included funds that had been appropriated under, among other laws, the 2020 Supplemental Act, Pub. L. No. 116-123, the Families First Coronavirus Response Act, Pub. L. No. 116-127, the CARES Act, Pub. L. No. 116-136, the Paycheck Protection Act, Pub. L. No. 116-139, the 2021 Supplemental Act, Pub. L. No. 116-260, and ARPA, Pub. L. No. 117-2. *Id.* Congress specifically chose not to rescind the funding at issue in this case. Thus, *after* the pandemic ended, Congress reviewed the funding in COVID-19 related laws, identified funds to be rescinded, but determined not to revoke the public health funding at issue here.

## IV. HHS Abruptly Decided to Terminate $11 Billion for Public Health Programs Funded by Appropriations From COVID-19 Related Laws.

On March 24, 2025, HHS abruptly, with no advance notice or warning, changed its position and implemented a policy based on a unilateral determination that critical public health programs and funding to States are no longer necessary because the pandemic is over. To explain its Public Health Funding Decision, HHS asserted: "The COVID-19 pandemic is over, and HHS will no longer waste billions of taxpayer dollars responding to a non-existent pandemic that Americans moved on from years ago." Nathaniel Weixel, *Trump Administration Revokes State and Local Health Funding*, The Hill (Mar. 26, 2025), https://thehill.com/policy/healthcare/5216704-trump-administration-revokes-state-local-health-funding/.

HHS implemented this Public Health Funding Decision through coordinated mass notices across numerous programs and agencies, reflecting the same basic features:

- The Public Health Funding Decision was implemented through termination notices all issued at roughly the same time (March 24-25, 2025).

- Plaintiff States received no advanced warning.

- The sole stated basis for each termination was that the funding was being terminated "for cause."

- Defendants relied upon the same conclusory, boilerplate explanation: "The end of the pandemic provides cause to terminate COVID-related grants. Now that the pandemic is over, the grants are no longer necessary."

- Defendants did not provide any individualized assessment or explanation as to why the funding was no longer necessary or why the agency had suddenly changed its longstanding position that the end of the pandemic did not limit the availability of this public health funding.

- The Public Health Funding Decision was implemented effective immediately with no assessment or explanation accounting for reliance interests.

*See*, *e.g.*, Ex. 40, Fehrenbach Decl. Attach. A-E; Ex. 41, Kirschbaum Decl. Attach. C-D; Ex. 27, Baston Decl. Attach. D, F, H, J.

Specifically, without any advanced notice or warning, starting on March 24, 2025, the CDC sent Plaintiffs termination notices (generally through amended Notices of Awards) to implement the Public Health Funding Decision. These notices each state in relevant part[2]:

> The termination of this award is for cause. HHS regulations permit termination if "the non-Federal entity fails to comply with the terms and conditions of the award", or separately, "for cause." The end of the pandemic provides cause to terminate COVID-related grants and cooperative agreements. These grants and cooperative agreements were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grants and cooperative agreements are no longer necessary as their limited purpose has run out. Termination of [this award] is effective as of the date set out in your Notice of Award.

---

[2] Plaintiff States received numerous terminations across programs and some of the notices have minor, non-substantive variations from this text.

*See*, *e.g.*, Ex. 40, Fehrenbach Decl. Attach. A at 5.

Other than this boilerplate language, the CDC terminations provided no other information or explanation as to why the funding was terminated. *E.g.*, Ex. 10, Bookman Decl. ¶ 36; Ex. 7, Philip Decl. ¶ 59; Ex. 15, Clark Decl. ¶ 15. Additionally, prior to termination, the CDC had not provided notice to Plaintiff States that the grants were being administered in an unsatisfactory manner. *E.g.*, Ex. 3, Fanelli Decl. ¶¶ 19, 45; Ex. 8, Rudman Decl. ¶ 18; Ex. 7, Philip Decl. ¶¶ 31, 43; Ex. 9, Saruwatari Decl. ¶¶ 30, 67; Ex. 5, Kasirye Decl. ¶¶ 14, 18, 23; Ex. 34, Drum 1 Decl. ¶ 20; Ex. 32, Morne Decl. ¶ 21. And contrary to the CDC's stated rationale, many of the terminated grants supported important public health efforts beyond responding to COVID-19, such as research labs investigating a multi-state foodborne listeria outbreak, Ex. 21, Kalyanaraman Decl. ¶ 27; preparation for potential outbreaks of avian influenza and other infectious diseases, Ex. 24, Gresczyk Decl. ¶ 45; Ex. 4, Ferrer Decl. ¶¶ 7, 20; Ex. 7, Philip Decl. ¶ 46; Ex.89, Rudman Decl. ¶¶ 37, 43, 54; and dispatching Community Health Workers to support communities impacted by major disasters, Ex. 25, Williams-Devane Decl. ¶ 27.

Similarly, without any advance notice, on March 24, 2025, SAMHSA implemented the Public Health Funding Decision through notices terminating block grants effective immediately. *E.g.*, Ex. 6, Perez Decl. ¶ 11; Ex. 41, Kirschbaum Decl. Attach. C at 1. These notices also cited the end of the pandemic as the basis for termination; did not cite any authority for these terminations other than the President's Executive Order 14222, Implementing the President's "Department of Government Efficiency" Cost Efficiency Initiative; and did not provide an opportunity for a hearing. *Id.* A few days later, SAMHSA sent the following "superseding" notices:

> The termination of this award is for cause. The block grant provisions at 42 U.S.C. §300x-55 permit termination if the state "has materially failed to comply with the agreements or other conditions required for the receipt of a grant under the program involved." The end of the pandemic provides cause to terminate COVID-related grants and cooperative agreements. These grants and cooperative agreements were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grants and cooperative agreements are no longer necessary as their limited purpose has run out.

*E.g.*, Ex. 6, Perez Decl. ¶ 12; Ex. 41, Kirschbaum Decl. Attach. D at 1.

Like the CDC terminations, the SAMHSA notices failed to provide any details, factual information, or explanation for the terminations other than this boilerplate language. *E.g.*, Ex. 17, Rollinson Decl. ¶ 12; Ex. 6, Perez Decl. ¶ 12. As with the CDC terminations, SAMHSA had not provided Plaintiff States with any notice that the terminated grants were being administered in an unsatisfactory manner. *E.g.*, Ex. 11, Maurice Decl. ¶ 20; Ex. 6, Perez Decl. ¶ 12. And again, contrary to Defendants' stated rationale, the terminated SAMHSA grants supported critical mental health and substance abuse treatment programs that surpass the end of the COVID-19 pandemic, including: bolstering the 988 Suicide and Crisis Lifeline system, Ex. 26, Adelman Decl. ¶ 14; providing Naloxone to prevent overdoses, Ex. 41, Kirschbaum Decl. ¶ 33; expanding access to behavioral health services in rural areas, Ex. 28, Boukus Decl. ¶ 5; serving foster youth with co-occurring substance use and mental health needs, Ex. 6, Perez Decl. ¶ 40; behavioral health crisis intervention training and programs for law enforcement and other first responders, *id*. ¶ 41; and training and technical assistance to crisis counselors to serve persons and populations affected by natural disasters, *id*. ¶ 50.

## V.    Plaintiff States Have Suffered and Will Suffer Substantial Harm.

Plaintiff States and their local health jurisdictions rely on the terminated federal financial assistance to provide critical aspects of their public health programs. The Plaintiff States

incorporated the now-terminated funds into approved budgets for the 2024-2025 fiscal year, and in some cases the 2025-2026 fiscal year. *See, e.g.*, Ex. 6, Perez Decl. ¶ 29; Ex. 11, Maurice Decl. ¶¶ 48, 64; Ex. 27, Baston Decl. ¶ 24. With the terminated funds cut off midcycle, the Plaintiff States will not be able to find alternate funding to sustain many of their public health programs and services. *See, e.g.*, Ex. 4, Ferrer Decl. ¶ 13; Ex. 6, Perez Decl. ¶ 30; Ex. 8, Rudman Decl. ¶ 57; Ex. 10, Bookman Decl. ¶ 21; Ex. 25, Williams-Devane Decl. ¶¶ 5, 7; Ex. 24, Gresczyk Decl. ¶ 46. The result of HHS's illegal actions will be that Plaintiff States' residents will lose access to critical health care programs and services and Plaintiff States' abilities to respond to health crises will be severely compromised—ultimately leading to increased morbidity and mortality. Plaintiff States' public health programs are crippled in three important ways: (1) impairment of Plaintiffs' larger public health missions due to the immediate and unexpected elimination of $11 billion in public health funding, including through the abrupt and involuntary layoffs of a highly trained workforce; (2) elimination of critical health care services, many of which are for Plaintiffs' most vulnerable residents; and (3) the cessation of important public health infrastructure projects. Representative examples from each category are given below.

*First*, HHS's illegal actions undermine Plaintiff States' abilities to fulfill their mission of protecting public health by combatting the spread of contagious disease, preventing substance abuse, and expanding access to mental health treatment. *E.g.*, Ex. 15, Clark Decl. ¶ 17; Ex. 40, Fehrenbach Decl. ¶ 11; Ex. 41, Kirschbaum Decl. ¶ 3; Ex. 6, Perez Decl. ¶¶ 4-7; Ex. 3, Fanelli Decl. ¶ 48. Plaintiff States have relied on this promised funding to carry out their duty to "guard and protect" the "safety and the health of the people." *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905). Already, the Public Health Funding Decision has interrupted vital healthcare services for vulnerable populations, including children, residents of nursing homes, and individuals who

had been receiving treatment for mental health and/or substance use disorders. It has impeded planning, caused wasted resources as Plaintiff States and their local health jurisdictions attempt to mitigate potential impacts, and has unnecessarily interrupted important public health work. Without this critical public health funding, Plaintiff States will be unable to provide essential public health services for residents, be unable to pay critical public health employees, unable to satisfy obligations to public and private health partners, and unable to carry out important government business.

The Public Health Funding Decision is forcing Plaintiff States to terminate or furlough vital public health staff whose salaries are funded entirely or partially through illegally terminated funding. The Minnesota Department of Health expects this will require it to layoff approximately 200 employees, or 12% of its staff. Ex. 24, Grescyzk Decl. ¶ 41. Washington also expects to lose 200 employees, including 150 full-time employees responsible for planning and responding to communicable disease cases and outbreaks and related laboratory testing and disease surveillance. Ex. 40, Fehrenbach Decl. ¶¶ 5, 8-9. Colorado will lose all but one of the employees in its Immunization Program. Decl. 10, Bookman Decl. ¶ 53. In Delaware, the termination of a community health worker grant will end support for "33.5 [Community Health Worker] positions across six organizations, including federally qualified health centers and community-based organizations." Ex. 14, Manning Decl. ¶ 25. Rhode Island will have to dismantle its Project Firstline team, which would stop the state's Department of Health from providing infection control education to healthcare facilities to prevent outbreaks. Ex. 39, Goulette Decl. ¶ 34. And the City and County of San Francisco's Communicable Disease Program will lose half of its front-line staff, which will cause delays in information dissemination and outbreak detection related to bird flu and other diseases. Ex. 7, Philip Decl.

¶¶ 13, 46. More generally, the staff cuts will impact a wide range of critical roles, including epidemiologists, research scientists, registered nurses, community health workers, programmatic staff, and more. Ex. 14, Manning Decl. ¶ 31; Ex. 10, Bookman Decl. ¶ 20; Ex. 3, Fanelli Decl. ¶ 38; Ex. 8, Rudman Decl. ¶¶ 23, 26, 31-37, 44, 54; Ex. 7, Philip Decl. ¶¶ 12-13, 30, 42, 46, 54; Ex. 9, Saruwatari Decl. ¶¶ 49-50, 53, 56, 59-60, 80-81, 108; Ex. 4, Ferrer Decl. ¶¶ 17, 19; Ex. 5, Kasirye Decl. ¶¶ 20, 26; Ex. 24, Grescyzk Decl. ¶ 41. All told, HHS's illegal actions will result in massive layoffs of health care workers who provide critical health care services to Plaintiff States' residents. It will likely take Plaintiff States and their local health jurisdictions years to recruit and retain highly trained staff to recover from the losses caused by HHS's decision to mass terminate this critical funding with no warning. *See, e.g.*, Ex. 40, Fehrenbach Decl. ¶ 16; Ex. 24, Gresczyk Decl. ¶ 41.

*Second*, the Public Health Funding Decision will eliminate a wide range of health care services provided by Plaintiff States. The termination of a wide swath of mental health care grants, for example, will inflict substantial harm on Plaintiff States' vulnerable communities who rely on the services these grants support. *See, e.g.*, Ex. 41, Kirschbaum Decl. ¶¶ 12, 31, 39. The SAMHSA grant terminations will deprive individuals suffering from mental health crises, including suicidal ideation, of potentially life-saving care. For instance, the termination of the Connecticut Department of Mental Health and Addiction Services' SAMHSA grants will eliminate "housing and employment supports, regional suicide advisory boards, harm reduction, perinatal screening, early-stage treatments, and increased access to medication assisted treatment." Ex. 12, Navaretta Decl. ¶¶ 16, 29. And in Illinois, the termination of mental health block grants will mean that providers will be unable to provide services through Illinois' "mobile crisis response units that assist people at risk of suicide." Ex. 17, Rollinson Decl. ¶ 16. The

termination of New Mexico's mental health care block grants will mean as many as fifty-four providers will lose funding to provide critical behavioral and mental health services to upwards of 64,000 people. Ex. 28, Boukus Decl. ¶ 14. New Jersey will be forced to halt funding that supports approximately 45 direct care treatment and preventative programs, which will place patients' lives at significant risk. Ex. 26, Adelman Decl. ¶ 7. Coloradans will have significantly reduced access to life-saving naloxone which is used to reduce/prevent death from opioid overdose. Ex. 11, Maurice Decl. ¶ 34. And in California, substance use disorder prevention and early intervention services for youth could be terminated in at least 18 of its counties, resulting in increased substance use among youth and adolescents. Ex. 6, Perez Decl. ¶ 61.

The effect is not limited to mental health services and will affect services across Plaintiff States' public health programs. Washington's Department of Health has already had to cancel its Care-A-Van mobile health clinics that provide health care, including vaccinations and health education, to historically underserved communities. The program prioritizes rural areas, BIPOC communities, immigrants and refugees, unhoused populations, children and schools, and other vulnerable populations. Ex. 40, Fehrenbach Decl. ¶ 21. Without this program, these communities bear increased exposure to contagious diseases and negative health consequences. *Id.* at ¶ 27. The termination of Delaware's community health worker program, mentioned above, will destabilize the delivery of vital health services and erode trust in healthcare systems in vulnerable communities. Ex. 14, Manning Decl. ¶ 31. In Minnesota, the terminations caused a local public health agency to immediately cease work supporting vaccination clinics and education. The affected local agencies in Minnesota serve its most vulnerable communities and work in settings such as schools, public housing locations, and jails. Ex. 24, Gresczyk Decl. ¶¶ 43, 47. California's Immunization and Vaccines for Children program will no longer be able

to provide important vaccines, including vaccines for measles, influenza, and COVID-19 to approximately 4.5 million children, roughly half of California's youth population. Ex. 3, Fanelli Decl. ¶ 17. In Los Angeles County, most of the staff on the public health department's infectious diseases outbreak team will be terminated as a result of the funding loss, meaning the County will not be able to respond in a timely manner to outbreaks in jails, shelters, assisted living facilities and worksites. Ex. 4, Ferrer Decl. ¶ 7. And Connecticut will not be able to maintain its Family Bridge Program, which funds visits from healthcare practitioners for new mothers. Ex. 13, Orefice Decl. ¶ 37.

*Finally*, the Public Health Funding Decision imperils Plaintiff States' public health infrastructure projects. Plaintiff States and their local health jurisdictions have long relied on the CDC's ELC support for infectious disease programs and projects. *E.g.*, Ex. 32, Morne Decl. ¶ 9; Ex. 3, Fanelli Decl. ¶¶ 20-38; Ex. 2, Cutler Decl. ¶¶ 4-13; Ex. 4, Ferrer Decl. ¶ 7. During the COVID-19 Pandemic, the CDC awarded additional ELC grants. Ex. 32, Morne Decl. ¶ 9; Ex. 3, Fanelli Decl. ¶ 22; Ex. 4, Ferrer Decl. ¶ 9. While these funds were initially awarded to help with the ongoing pandemic, the CDC recognized that most states lacked the necessary disease surveillance and laboratory infrastructure, so it encouraged and allowed states to invest these funds in strengthening these capacities. *E.g.*, Ex. 3, Fanelli Decl. ¶¶ 22-23, 32; Ex. 4, Ferrer Decl. ¶¶ 7, 9; Ex. 13, Orefice Decl. ¶¶ 8-10; Ex. 32, Morne Decl. ¶ 22. These grants provide significant sums of money. Illinois, for example, stands to lose $380 million. Ex. 15, Clark Decl. ¶ 11.

Without additional funds, Plaintiff States will lose investments in updating aging data management systems and aging laboratories. Ex. 15, Clark Decl. ¶¶ 10, 17 (updating electronic disease surveillance system and $14 million laboratory remodeling project); Ex. 40, Fehrenbach

Decl. ¶ 13 (investing more than $12 million in laboratory information management system); Ex. 13, Orefice Decl. ¶ 20 ("tens of millions of dollars spent to date [in updating data systems] will be wasted"); Ex. 3, Fanelli Decl. ¶¶ 28-30 (developing and maintaining new software surveillance system to ensure comprehensive statewide data reporting and analysis and more timely response to disease trends); Ex. 27, Baston Decl. ¶ 24 (New Jersey will not be able to keep its Communicable Disease Reporting and Surveillance System operational past June 2025); Ex. 45, Fink Decl. ¶¶ 15-17 (Hawai'i's inability to complete critically needed upgrades to two health information systems "will result in a tremendous waste of government resources"). Planned projects will go unrealized. Connecticut, for example, will lose its planned electronic birth and death registry and an upgrade that would enable real time data exchanges with CDC systems. Ex. 13, Orefice Decl. ¶¶ 21-22. And, of course, ongoing projects will be adversely impacted, such as New York's Health Electronic Response Data System, which monitors various health care providers' bed capacity to ensure continued ability to access care. Ex. 32, Morne Decl. ¶ 26.

Investments in localized public health resources, a crucial piece of public health infrastructure, would also be eliminated. For example, Rhode Island uses CDC funding to invest in 14 "Health Equity Zones," which help communities address the unique local health issues. Terminating these funds "threatens to reverse progress made in building local public health infrastructure and improving response capabilities." Ex. 38. Campagna Decl. ¶¶ 17, 19. Riverside County, California will lose members of its non-data surveillance team, which serves as a liaison between the county's public health department and hospitals, skilled nursing facilities, schools, and workplaces, further impacting disease investigation and mitigation capabilities. Ex. 9, Saruwatari Decl. ¶ 50.

In sum, HHS's illegal actions will have a devastating effect across Plaintiff States' public health programs. Ex. 32, Morne ¶ 24 ("These impacts will be long-lasting, cutting across all communities – geographically and demographically – and will be deeply felt by all New Yorkers for generations to come."); Ex. 3, Fanelli Decl. ¶ 49 ("[T]he unexpected termination leaves California unprepared for future pandemics and risks exacerbating the spread of otherwise preventable disease."). From the wide-ranging budget implications of the sudden and unexpected elimination of $11 billion in funding, to the elimination of services, to the shuttering of public health infrastructure projects, it is hard to overstate the harm that Plaintiff States and their residents are about to suffer.

## LEGAL STANDARD

In order to issue a preliminary injunction, "[t]he district court must consider 'the movant's likelihood of success on the merits; whether and to what extent the movant will suffer irreparable harm in the absence of preliminary injunctive relief; the balance of relative hardships [and equities]; and the effect, if any, that either a preliminary injunction or the absence of one will have on the public interest.'" *U.S. Ghost Adventures, LLC v. Miss Lizzie's Coffee LLC*, 121 F.4th 339, 347 (1st Cir. 2024) (quoting *Ryan v. U.S. Immigration and Customs Enforcement*, 974 F.3d 9, 18 (1st Cir. 2020)); *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). The final two factors—the balance of equities and the public interest—"merge when the Government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009). "Likelihood of success is the main bearing wall of the four-factor framework." *Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 102 F.3d 12, 16 (1st Cir. 1996). However, a "district court is required only to make an estimation of likelihood of success and 'need not predict the eventual outcome on the merits with absolute assurance.'" *Corp. Techs., Inc. v. Harnett*, 731 F.3d 6, 10 (1st Cir. 2013).

Finally, the Administrative Procedure Act provides authority for a reviewing court to "issue all necessary and appropriate process to postpone the effective date of an agency action or to preserve status or rights pending conclusion of the review proceedings." 5 U.S.C. § 705.

## ARGUMENT

## I.    This Court Has Jurisdiction over Plaintiff States' Claims.

### A.    Plaintiff States Have Standing to Assert Their Claims.

Plaintiff States have standing to challenge the terminations because they will suffer an "injury in fact" that is "fairly traceable" to the terminations and "may be redressed by" a judicial order enjoining its implementation. *McBreairty v. Miller*, 93 F.4th 513, 518 (1st Cir. 2024). "[T]o establish standing, a plaintiff must show (i) that he suffered an injury in fact that is concrete, particularized, and actual or imminent; (ii) that the injury was likely caused by the defendant; and (iii) that the injury would likely be redressed by judicial relief." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 423 (2021). Plaintiff States "los[ing] out on federal funds . . . is a sufficiently concrete and imminent injury to satisfy Article III." *Dep't of Com. v. New York*, 588 U.S. 752, 767 (2019).

The on-the-ground impacts from these program cuts and loss in federal funding reinforce that concrete harm. As thoroughly detailed in Background Section V, Plaintiff States not only stand to lose grants worth billions of dollars, but the losses will severely impact public health programs and initiatives and cause the termination of large numbers of public health employees or contractors. The loss of these public health officials, infrastructure, and programs will have repercussions for many years to come.

Finally, traceability and redressability are easily satisfied. Defendants are the sole cause of the harms. *See In re Evenflo Co., Inc., Marketing, Sales Practices and Prods. Liab. Litig.*, 54

F.4th 28, 34 (1st Cir. 2022). If the Public Health Funding Decision and its implementation were vacated and set aside, that would redress the injury caused by Defendants.

## B.    The Tucker Act Does Not Apply to the Claims in the Complaint.

Defendants argued in their motion for reconsideration that the Court of Federal Claims has exclusive jurisdiction under the Tucker Act as a breach of contract claim. Defendants' argument contravenes the general rule that district courts have jurisdiction over challenges to final agency action under § 702 of the APA, even when a remedial order "may result in the disbursement of funds." *Bowen v. Massachusetts*, 487 U.S. 879, 910 (1988); *Linea Area Nacional de Chile S.A. v. Meissner*, 65 F.3d 1034, 1042 (2d Cir. 1995) (citing *Bowen* in rejecting argument that agency's refusal to allow reimbursement under statutory entitlement was a claim for money damages that was outside the scope of the APA's waiver of sovereign immunity under § 702). Where, as here, states seek prospective relief and challenge agency actions—here the Public Health Funding Decision and its implementation—as arbitrary, capricious, and contrary to regulatory, statutory and constitutional law, district courts have jurisdiction. *Bowen*, 487 U.S. at 905; *Linea Area Nacional de Chile S.A.,* 65 F.3d at 1039, 1043. This challenge to the Public Health Funding Decision does not arise from the breach of a contractual obligation and does not belong in the Court of Federal Claims.

Nor would there be any merit to Defendants' assertion that the claims involve "money damages" and thus fall outside the APA's waiver of sovereign immunity under 5 U.S.C. § 702. As in *Bowen*, Plaintiff States do not seek compensatory relief for past harms. 487 U.S. at 895. Put another way, Plaintiff States are not seeking money as a substitute for a suffered loss, rather they are seeking "the very thing to which [they were] entitled." *Id.*; *see also Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 262 (1999). They seek a specific equitable, prospective remedy— setting aside the agency actions to cut critical public health programs as "no longer necessary"

21

by eliminating congressionally appropriated funds. *See* Am. Compl. at 44. It does not matter that this equitable relief may later result in the payment of money: "The fact that a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages." *Bowen*, 487 U.S. at 893.

This case is distinguishable from *U.S. Dep't of Educ. v. California,* No. 24A910, --- S. Ct. ----, 2025 WL 1008354 (April 4, 2025). As stated before, Plaintiff States are not seeking monetary damages. Rather, as in *Bowen*, the Plaintiff States are seeking purely prospective relief under the APA regarding their ongoing financial relationship with the federal government. Plaintiff States do not seek "orders 'to enforce a contractual obligation to pay money." *Id.* at *1 (citing *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 212 (2002)). Instead, Plaintiff States seek to enforce statutory and regulatory rights that are distinct from any contractual obligation or other obligation arising from the terms or conditions of any individual grant. Indeed, *Bowen* recognized that one specific types of review that Congress authorized through sovereign immunity waiver in § 702 was to obtain specific relief for issuing arising from the "administration of Federal grant-in-aid programs." *Id.* at 898.

The relief sought in the complaint reflects that distinction. Plaintiff States asks the Court to vacate and set aside the agency-wide Public Health Funding Decision and its implementation, and implementing actions, as well as a declaration that the Public Health Funding Decision and its implementation violated the APA and the Constitution. Am. Compl. at 44. In short, State Plaintiffs seek to vacate Defendants' determination that dozens of different programs and associated funding should be cut or eliminated as "no longer necessary" due to the end of the pandemic. Reversal of that precursor final agency action from which all of the individual terminations flowed is relief traditionally available under the APA—it is not a request for

compensatory damages. *See Maine Community Health Options v. United States*, 590 U.S. 296, 326-27 (2020) (noting that federal district court jurisdiction is more appropriate than the Court of Federal Claims where plaintiffs seek prospective declaratory and injunctive relief to clarify future obligations, as well as "managing the relationships between States and the Federal government that occur over time"). For that reason, the Court of Federal Claims has rejected jurisdiction over claims regarding prospective relief for cooperative agreements and block grants, similar to the ones Plaintiff States bring here. *Cf. Am. Near E. Refugee Aid v. U.S. Agency for Int'l Dev.*, 703 F. Supp. 3d 126, 133 (D.D.C. 2023) (holding USAID cooperative agreement is not a contract absent tangible benefits to the federal agency); *Lummi Tribe of the Lummi Rsrv., Wash. v. United States*, 870 F.3d 1313, 1317–19 (Fed. Cir. 2017) (holding block grant statutes did not mandate damages and therefore the Court of Federal Claims lacks jurisdiction).

At bottom, this case is not about retrospective money damages or enforcing individual contractual obligations to pay money. Instead, Plaintiff States seek review of unlawful agency action based on violations of statute, regulation, and the U.S. Constitution, and they seek purely prospective relief concerning their ongoing relationship with the federal government. This Court, and the not the Court of Federal Claims, has jurisdiction for these claims.

## II.    Plaintiff States Have Established a Likelihood of Success on the Merits.

Plaintiff States have a strong likelihood of success on the merits. As detailed below, HHS's Public Health Funding Decision and the implementation of that decision violate the APA because this final agency action is contrary to law and arbitrary and capricious.

### A.    HHS's Public Health Funding Decision and Its Implementation Constitutes Final Agency Action Subject to Judicial Review.

As a threshold matter, HHS's Public Health Funding Decision and implementation of that decision constitute final agency action subject to the APA. *See U.S. Army Corps of Eng'rs v.*

*Hawkes Co.*, 578 U.S. 590, 599–600 (2016) (calling for a "'pragmatic' approach" in analyzing finality); *Biden v. Texas*, 142 S. Ct. 2528, 2545 (2022) (holding agency memoranda were final agency action, noting that they "bound [agency] staff"). Final agency actions "mark the consummation of the agency's decision-making process" and are those "by which rights or obligations have been determined, or from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177-78 (1997) (internal citation omitted). The actions here clearly meet both prongs. First, the actions "mark[] the consummation" of Defendants' decision-making process because they announce the agency's final decision on the matter. *See*, *e.g.*, Ex. 40, Fehrenbach Decl. Attach. A at 5; Ex. 41, Kirschbaum Decl. Attach. C. Second, the actions have clear legal consequences: the immediate loss of funding. *See*, *e.g.*, Ex. 40, Fehrenbach Decl. Attach. A at 5; Ex. 41, Kirschbaum Decl. Attach. C. Moreover, Plaintiff States are permitted to bring this challenge in a single action. *New York v. Trump*, --- F.4th ----, 2025 WL 914788, at *13 (1st Cir. Mar. 26, 2025) ("[W]e are not aware of any supporting authority for the proposition that the APA bars a plaintiff from challenging a number of discrete final agency actions all at once.").

Nor are these actions part of the narrow class of agency actions that are "committed to agency discretion by law" and unreviewable in federal court. *See* 5 U.S.C. § 701(a)(2). Where, as here, there are applicable statutory or regulatory standards that cabin agency discretion, there are "meaningful standard[s] by which to judge the [agency]'s action," and the actions are reviewable. *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019). Whether Defendants had statutory or constitutional authority to issue and implement the Public Health Funding Decision involves the exact type of statutory and constitutional question that courts address on a daily basis. Likewise, Defendants themselves claim to have applied a "for cause" standard based in

statute and regulation. Evaluating "for cause" terminations "involve[s] the type of legal analysis that courts routinely perform," not unreviewable agency discretion. *Pol'y & Rsch., LLC v. United States Dep't of Health & Hum. Servs.*, 313 F. Supp. 3d 62, 83 (D.D.C. 2018). In sum, HHS's Public Health Funding Decision and its implementation are final agency action subject to review under the APA.

### B.    The Challenged Actions Are Contrary to Law.

Plaintiff States are likely to succeed on the merits of their claims that the Public Health Funding Decision and its implementation are contrary to law. *See* Am. Compl. Counts I–III. First, HHS lacked statutory authority to mass terminate programs and funding based on its unilateral determination that these congressionally appropriated funds are "no longer necessary." Second, HHS compounded this error, and acted contrary to law, by terminating "for cause." There is no dispute that Plaintiffs have complied with the terms and conditions of their awards. Ex. 3, Fanelli Decl. ¶ 45; Ex. 23, Hertel, ¶ 7. As a matter of law, neither the relevant statute nor regulation allow termination "for cause" based end of the pandemic nearly two years ago.

**Public Health Funding Decision.** At the outset, HHS's Public Health Funding Decision to mass terminate these programs and funds as "no longer necessary" based on the end of the pandemic nearly two years ago is contrary to law and in excess of statutory authority. When Congress appropriated these funds for grant-in-aid programs, it did so with specific purposes and instructions. None of the appropriations provisions at issue grant HHS authority or discretion to cut off programs or funding based on the agency's unilateral determination that all appropriations in COVID-related laws are "no longer necessary" at the end of the pandemic, especially on a random day with no advance warning.

To the contrary, where Congress sought to tie programs and funding in these laws to the end of the pandemic, it did so expressly. *See, e.g.*, ARPA § 9401, 135 Stat. at 127 ("during the

emergency period . . . and the 1-year period immediately following the end of such emergency period"); *id.* § 9811(hh), 135 Stat. at 210-11 ("ends on the last day of the first quarter that begins one year after the last day of the emergency period"); CARES Act § 1109(h), 134 Stat. at 306 ("until the date on which the national emergency . . . expires"). And when Congress reviewed each of the COVID-related appropriations laws *after* the end of the pandemic, Congress rescinded $27 billion of appropriations as no longer necessary but determined not to revoke *any* of the funding at issue. Indeed, even in circumstances where funds were unobligated at the time of the Fiscal Responsibility Act, Congress still determined that many of these programs and funds remained necessary. *See, e.g.*, Fiscal Responsibility Act, Div. B, § 2(3) (rescinding certain unobligated funds "with the exception of $2,127,000,000 and—(A) any funds that were transferred and merged with the Covered Countermeasure Process Fund"). Thus, when directly addressing the question at issue, Congress determined that the end of the pandemic did not mean that the programs and appropriated funds were no longer necessary. Most importantly, Congress in no way delegated authority to HHS to make such a monumental decision affecting the states' ability to address critical public health needs. *See West Virginia v. EPA*, 597 U.S. 697, 724-25 (2022) (considering history of Congressional action on a subject in discerning the scope of authority delegated to the agency and citing cases).

At a minimum, whether the agency had discretion to mass terminate more than $10 billion dollars in appropriated public health funding as "no longer necessary" falls under the major questions doctrine. This doctrine focuses on a simple question: "whether Congress in fact meant to confer the power the agency has asserted." *West Virginia v. EPA*, 597 U.S. 697, 721 (2022). As the Supreme Court has repeatedly held, "[w]e expect Congress to speak clearly when authorizing an agency to exercise powers of vast economic and political significance." *Alabama*

*Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764, (2021) (cleaned up). And "[w]e presume that Congress intends to make major policy decisions itself, not leave those decisions to agencies.'" *West Virginia v. EPA*, 597 U.S. at 723; *see also King v. Burwell*, 576 U.S. 473, 486 (2015) (holding the availability of tax credits was a question of deep "economic and political significance" and not one delegated to the agency). Where the Constitution grants Congress the power to control appropriations, including through recission, and it has exercised that authority, courts require Congress to speak clearly when authorizing an executive agency not to spend vast sums of appropriated funds as "no longer necessary," especially in the critical public health arena.  Because Congress did not "speak clearly" to authorize HHS's actions here, HHS acted in excess of statutory authority.

In sum, because Congress did not grant HHS the authority it has claimed, and certainly did not speak clearly to authorize such significant action, the agency's decision is contrary to law and in excess of statutory authority.

**SAMHSA.** HHS also acted illegally when it implemented the Public Health Funding Decision. With respect to SAMHSA, Defendants acted contrary to law and in excess of statutory authority by departing from the statutory requirements governing the program, including 42 U.S.C. § 300x-55. Pursuant to 42 U.S.C. § 300x-55(a), the Secretary may "terminate the grant for cause" only "if the Secretary determines that a State has materially failed to comply with the agreements or other conditions required for the receipt of a grant." *Id.* But Defendants have never asserted that any grantee materially failed to comply with agreements or other required conditions. *E.g.*, Ex. 41, Kirschbaum Decl. ¶ 42; Ex. 6, Perez Decl. ¶ 12. Instead, the terminations notices state: "The end of the pandemic provides cause to terminate COVID-related grants. Now that the pandemic is over, the grants are no longer necessary." *E.g.*, Ex. 6, Perez

Decl. ¶ 11; Ex. 41, Kirschbaum Decl. Attach. D. Moreover, Defendants acted contrary to law because 42 U.S.C. § 300x-55(e) requires: "*Before* taking action against a State . . . , the Secretary shall provide to the State involved adequate notice and an opportunity for a hearing." 42 U.S.C. § 300x-55(e) (emphasis added). But Defendants provided no notice or opportunity for a hearing *before* immediately taking action to terminate the grants. *See, e.g.*, Ex. 41, Kirschbaum Decl. Attach. C. Similarly, 42 U.S.C. § 300x-55(g) bars HHS from withholding any funds unless it has first "conducted an investigation concerning whether the State has expended payments under the program involved in accordance with the agreements required under the program." 42 U.S.C. § 300x-55(g). For at least these three reasons, HHS acted unlawfully in implementing the Public Health Funding Decision by ignoring the statutory requirements governing the block grant program. 42 U.S.C. § 300x-55.

**CDC.** Similarly, with respect to the CDC, Defendants claim to have terminated this public health funding "for cause" based on "HHS regulations"—they cite none, but refer, presumably, to 45 C.F.R. § 75.372(a)(2). *See, e.g.*, Ex. 40, Fehrenbach Decl. Attach. A at 5. But there is nothing in that regulation's text, history, or subsequent interpretation to support the notion that the "end of the pandemic" nearly two years ago could provide a lawful basis for the Public Health Funding Decision.

When HHS has examined what "for cause" means in the past, it has explained that it generally involves a failure to comply with terms and conditions. *R.I. Substance Abuse Task Force Ass'n*, DAB No. 1642 (1998), 1998 WL 42538 at *1 (H.H.S. January 15, 1998) ("When a grantee has materially failed to comply with the terms and conditions of the grant, [the Public Health Service] may . . . terminate the grant for cause."); *Child Care Ass'n of Wichita/Sedgwick Cnty.*, DAB No. 308 (1982), 1982 WL 189587 at *2 (H.H.S. June 8, 1982) ("'For cause' means a

grantee has materially failed to comply with the terms of the grant."). This is consistent with the standard application of "for cause" terminations in statute and regulation. *See, e.g.*, 42 U.S.C. § 300x-55(a); 10 C.F.R § 600.25 (allowing "for cause" award termination on the basis of noncompliance or debarment).

The federal government has likewise understood this "for cause" regulation to be substantially the same as the "failure to comply." The Office of Management and Budget ("OMB") eliminated the "for cause" regulation from the Official Guidance for Grants and Agreement specifically because it concluded that the "for cause" provision "is not substantially different than the" provision allowing termination for failure to comply with terms and conditions. OMB, Guidance for Grants and Agreements, 85 Fed. Reg. 49506,49508 (Aug. 13, 2020). HHS has, in turn, indicated it will adopt the Official Guidance and eliminate "for cause" entirely from its regulations. HHS, Health and Human Services Adoption of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 89 Fed. Reg. 80055, 80055 (Oct. 2, 2024) (effective October 2025). In other words, HHS is following OMB's Official Guidance and eliminating the "for cause" regulation because it is substantially *duplicative* of the "failure to comply" regulation.

Even OMB's 2014 commentary, which appears to draw some distinction between "for cause" and "failure to comply," is no help to HHS. There, OMB suggested its regulation could apply to outside events that "require" the awards to be terminated. OMB, Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards; Final Rule, 78 Fed. Reg. 78590, 78599 (Dec. 26, 2013). The examples provided involved changes in governing law, such as changes in "congressional mandates" or "appropriated amounts," that may *require* termination. *Id.* But here, the foreseeable end of the pandemic nearly

two years ago does not "require" termination when the relevant appropriations statutes extend funding to purposes beyond the pandemic and in no way "require" terminating the funding at the end of the pandemic. Indeed, *after* the pandemic ended, Congress reviewed all the COVID-9 related laws, identified $27 billion in funds to be rescinded, but determined not to rescind any of the public health funding at issue here. Accordingly, the Public Health Funding Decision has no valid basis in statute or regulation.

Simply put, HHS had no legal basis for its actions because of the end of the pandemic nearly two years ago. Defendants acted contrary to law and in excess of statutory authority.

## C.    The Challenged Actions Are Arbitrary and Capricious.

An agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). An agency must provide "a satisfactory explanation for its action[,] including a rational connection between the facts found and the choice made." *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983) (internal citation omitted). Further, an agency action is arbitrary and capricious if the agency has "relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise." *Id.*

Here, Plaintiff States will likely prevail on their claim that the Public Health Funding Decision and its implementation are arbitrary and capricious, for at least five independently sufficient reasons.

*First*, Defendants did not provide a rational basis for the Public Health Funding Decision. As noted above, Defendants were required to provide a reasoned explanation, "including a rational connection between the facts found and the choice made." *State Farm*, 463 U.S. at 43.

Defendants instead relied on nearly identical conclusory, boilerplate language stating the same explanation (with slight variation): now that the pandemic is over, the grants or cooperative agreements are no longer necessary. *See* Background Section IV. Defendants assume without explanation that all funding related to COVID-19 appropriations was only intended for use during the pandemic stage. Defendants point to no facts supporting this assumption and no reasoned analysis of the specific statutory appropriations or grants at issue. In fact, Congress directed many of the appropriations beyond the pandemic to other pathogens or future emergencies, for example to expand and sustain a public health workforce, for genome sequencing and surveillance, and for data modernization and forecasting. ARPA, §§ 2402, 2404, 2501, 135 Stat. at 41-42; *see also* Background Section I.

Moreover, where Congress intended to limit programs or appropriations to the end of the pandemic, it did so directly in the COVID-19 laws. *See supra* p.5 (listing examples). "[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion." *Russello v. United States*, 464 U.S. 16, 23 (1983). Furthermore, in June 2023, *after* the end of the pandemic, Congress passed the Fiscal Responsibility of Act of 2023. Pub. Law 118-5 (June 3, 2023). Through this Act, Congress went through the COVID-19 appropriations and rescinded $27 billion of appropriations that it deemed no longer necessary after the pandemic was over. *Id.* Div. B, Title I. Yet, Congress chose to keep all the appropriations at issue, notwithstanding that the COVID-19 national emergency had ended. Defendants failed to consider or provide any explanation as to these inconsistencies and appear simply to desire to overrule Congress' spending judgment and authority.

*Second*, and relatedly, Defendants' actions are arbitrary and capricious because they conducted no individualized assessment and failed to acknowledge the public health purposes for which the grants actually have been and are being used, much less an explanation of why those uses are no longer necessary. Defendants thus "entirely failed to consider an important aspect of the problem." *State Farm*, 463 U.S. at 43. When the purported basis for termination is that funds or programs are "no longer necessary," an important consideration requires an individualized assessment of the uses and benefits of the funding to determine whether it is no longer necessary. But Defendants wholly ignored this key aspect of the analysis and simply terminated any program funding that happened to be funded by a COVID-related appropriation.

*Third*, Defendants' actions are arbitrary and capricious because they provided no reasoned explanation (or even acknowledgment) as to how the agency suddenly changed its position and determined that the public health funding is no longer necessary based on the end of the COVID-19 pandemic nearly two years ago. Since the pandemic ended nearly two years ago, and up until a few days ago, Defendants consistently took the opposite position that these programs and public health funding were necessary beyond the pandemic stage. "[T]he requirement that an agency provide reasoned explanation for its action would ordinarily demand that it display awareness that it *is* changing position. An agency may not, for example, depart from a prior policy *sub silentio.*…" *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). "And of course the agency must show that there are good reasons for the new policy." *Id.*; *see also Smiley v. Citibank (S. Dakota), N.A.*, 517 U.S. 735, 742 (1996) ("[s]udden and unexplained change" may be arbitrary and capricious). Here, Defendants failed to acknowledge the sudden change in position and failed to explain the good reasons for the new policy.

*Fourth*, Defendants' actions are arbitrary and capricious because they failed to take into consideration the substantial reliance interests of the Plaintiff States and the tremendously harmful impact of the Public Health Funding Decision and its implementation. "When an agency changes course, . . . it must be cognizant that longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec. v. Regents of the Univ. of California*, 591 U.S. 1, 30 (2020) (internal quotation marks and citation omitted); *see also Fox Television Stations*, 556 U.S. at 515 (holding it "would be arbitrary or capricious to ignore" when a "prior policy has engendered serious reliance interests"); *Nat'l Council of Nonprofits v. Office of Mgmt. and Budget*, No. 25-239 (LLA), --- F. Supp. 3d ---, 2025 WL 368852, at *11 (D.D.C. Feb. 3, 2025) (concluding that a freeze on federal funds implicates reliance interests that "are all too real").

Here, Plaintiff States and their local health jurisdictions have relied on the availability of billions of dollars from these grant-in-aid programs for key aspects of their public health programs and initiatives. They had no reason to suspect that HHS would suddenly and immediately change position. The harm from this abrupt change is drastic. As explained fully in Background Section V, critical public health programs and initiatives will have to be cut, large numbers of public health employees and contractors will have to be terminated, and all these cuts will result in substantial repercussions for public health in Plaintiff States for many years. Yet, Defendants arbitrarily and capriciously failed to consider any of these reliance interests.

*Fifth*, Defendants' actions are arbitrary and capricious because, as explained more fully in Section II, HHS arbitrarily and without explanation applied "for cause" termination provisions based on the end of the COVID-19 pandemic nearly two years ago. This application is contrary to statute and regulation because Defendants have never asserted any failure on the part of

Plaintiff States to comply with the terms and conditions of funding. Defendants further fail to provide a rational explanation as to why the end of the pandemic requires termination, given that the applicable appropriations statutes extend beyond the pandemic and do not limit funding to the duration of the pandemic, HHS's prior longstanding position was that the end of the pandemic did not require termination, and Congress's decision to leave these funds available when it rescinded *other* COVID-19 funds as no longer necessary.

In sum, Defendants have not explained their actions, have not engaged in reasoned decision-making, failed to consider important aspects of the problem, and failed to consider significant reliance interests. Defendants' actions are thus arbitrary and capricious. 5 U.S.C. § 706(2)(A).

### D.    The Challenged Actions Violates the Separation of Powers.

Finally, the Plaintiff States are likely to succeed on the merits of their claim that Defendants' Public Health Funding Decision and its implementation contravene separation-of-powers principles. The President's authority to act, "[n]o matter the context," "necessarily 'stem[s] either from an act of Congress or from the Constitution itself." *Trump v. United States*, 603 U.S. 593, 607 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 585 (1952)). As set out by the tripartite framework set out in Justice Jackson's seminal concurring opinion in *Youngstown*, Defendants are operating at its "lowest ebb," because no constitutional or statutory provision authorizes the Executive to cut a vast swath of funding appropriated by Congress. Instead, the Executive has taken measures that are incompatible with the express will of Congress related to public health appropriations. *See supra* pp. 3-5, 8-9; *Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. CV 25-00400 (AHA), 2025 WL 752378, at *14 (D.D.C. Mar. 10, 2025), *appeal filed*, No. 25-5098 (D.C. Cir. Apr. 2, 2025) (Congress had expressly appropriated foreign aid funds for specified purposes).

The Constitution does not authorize the Executive Branch's conduct here. The Constitution makes clear that, "[a]bsent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018). That principle follows from Congress's authority over spending: the Constitution "exclusively grants the power of the purse to Congress, not the President," and that spending power is "directly linked to [Congress's] power to legislate." *Id.* at 1231-32; *see* U.S. Const. art. I, §9, cl. 7 (Appropriations Clause); U.S. Const. art. I, §8, cl. 1 (Spending Clause). Thus, the Constitution vests Congress with the "exclusive power to Congress to impose conditions on federal grants," *id.* at 1231, and limits the President's role in lawmaking to proposing laws he thinks wise and vetoing those he thinks unwise. *See INS v. Chadha*, 462 U.S. 919, 951 (1983) (describing "single, finely wrought and exclusively considered[] procedure" for enacting legislation); U.S. Const. art. I, §7, cls. 2, 3. Indeed, rather than allow the Executive to unilaterally modify duly enacted laws, the Constitution imposes on the President a duty to "take care that the laws be faithfully executed." U.S. Const. art. II, §3. The Constitution declines to grant the Executive "unilateral authority to refuse to spend" vast swaths of duly authorized and appropriated funding. *See City & Cnty. of S.F.*, 897 F.3d at 1231 (quoting *In re Aiken County*, 725 F.3d 225, 261 n.1 (D.C. Cir. 2013)); *see also Clinton v. City of New York*, 524 U.S. 417, 438 (1998) ("There is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes."); *New York v. Trump*, No. 25-CV-39-JJM-PAS, 2025 WL 715621, at *1 (D.R.I. Mar. 6, 2025), *denying stay pending appeal*, 2025 WL 914788 (1st Cir. Mar. 26, 2025) ("Federal agencies and departments can spend, award, or suspend money based only on the power Congress has given to them—they have no other spending power.").

As discussed above, no statute authorizes the Executive's actions here. Instead, Congress consistently appropriated critical funds strengthening public health programs. *See supra* pp. 3-5. This so even after the declared state of emergency, where Congress made clear that these funds were to remain available. *See supra* pp. 8-9. Accordingly, the public health funds were duly authorized and appropriated by Congress, and the Defendants may not refuse to spend it en masse.

Congress has further asserted its spending power by establishing a comprehensive statutory regime that governs when and how the Executive Branch can decline to spend duly appropriated funds through the Congressional Budget and Impoundment Control Act of 1974, 2 U.S.C. § 681 et seq. ("ICA"). The ICA sets forth the procedure by which the Executive may propose either rescission (i.e., cancellation) of appropriated funding or deferral (i.e., delay) of obligation of such funding. *Id.* §§ 683, 684(b). Rather than enabling unilateral Executive action, the ICA requires that the President must "propose[]" any rescission to Congress (which Congress must then affirmatively approve) and may not defer funding for the policy reasons defendants explicitly invoke here. *Id.* §§683, 684(a). Yet here, Defendants seek to rescind funds Congress has appropriated and have not followed the ICA procedures.

Accordingly, no statute authorizes the Executive to implement the Public Health Funding Decision, which has the effect of preventing the expenditure of vast swaths of appropriated funding.

Because the public health grant terminations are not authorized by the Constitution or by statute, the President's authority is at "its lowest ebb." *See City & Cnty. of S.F.*, 897 F.3d at 1233 (quoting *Youngstown*, 343 U.S. at 637 (Jackson, J., concurring)); *see also Aids Vaccine Advoc.*

36

*Coal.*, 2025 WL 752378, at *15. The Plaintiff States are likely to succeed on their claim that the Public Health Funding Decision and its implementation violate separation-of-powers principles.

## III.    Plaintiff States Will Be Irreparably Harmed Absent a Preliminary Injunction.

The Public Health Funding Decision and its implementation have irreparably harmed, and will continue to irreparably harm, Plaintiff States. Preliminary relief is necessary to avoid such harm and protect the equities and public interest. *See, e.g.*, *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005) (asking if challengers would suffer "irreparable harm" because injuries "cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy"). "District courts have broad discretion to evaluate the irreparability of alleged harm and to make determinations regarding the propriety of injunctive relief." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 915 (1st Cir. 1989) (cleaned up).

The Court may find irreparable harm because, contrary to the mission of public health agencies, the Public Health Funding Decision and its implementation threaten grave harm to public health and safety. *See Cigar Masters Providence, Inc. v. Omni Rhode Island, LLC*, No. CV 16-471-WES, 2017 WL 4081899, at *14 (D.R.I. Sept. 14, 2017) ("Threats to public health and safety constitute irreparable harm that will support an injunction."); *Sierra Club v. U.S. Dep't of Agric., Rural Utilities Serv.*, 841 F. Supp. 2d 349, 358 (D.D.C. 2012) (threats to public health establish irreparable harm); *Valle del Sol Inc. v. Whiting*, 732 F.3d 1006, 1029 (9th Cir. 2013) (finding irreparable harm where "organizational plaintiffs have shown ongoing harms to their organizational missions"). Again, as detailed in Background Section V and 48 accompanying declarations, Exs. 1-48, there can be no doubt that the Public Health Funding Decision is causing serious and irreparable harm to Plaintiff States' public health programs, their local health jurisdictions, and the health and safety of their residents.

The simple fact is that Plaintiff States do not have the resources to make up for the sudden loss in funding. See, e.g., Ex. 4, Ferrer Decl. ¶ 13; Ex. 6, Perez Decl. ¶ 30; Ex. 8, Rudman Decl. ¶ 57; Ex. 10, Bookman Decl. ¶ 21; Ex. 25, Williams-Devane Decl. ¶¶ 5, 7; Ex. 24, Gresczyk Decl. ¶ 46. This has left Plaintiff States with no choice but to begin shuttering programs and laying off personnel. Critically, because the staff cuts that Plaintiff States are already making include highly trained and specialized employees who will be difficult to hire back, this loss of staff itself is irreparable harm. *Id.* ¶ 31; Ex. 10, Bookman Decl. ¶ 20; Ex. 3, Fanelli Decl. ¶ 38; Ex. 8, Rudman Decl. ¶¶ 23, 26, 31-37, 44, 54; Ex. 7, Philip Decl. ¶¶ 12-13, 42, 46, 54; Ex. 9, Saruwatari Decl. ¶¶ 49-50, 53, 56, 59-60, 80-81, 108; Ex. 4, Ferrer Decl. ¶¶ 17, 19; Ex. 5, Kasirye Decl. ¶ 26; Ex. 24, Grescyzk Decl. ¶ 41.

In addition to cutting staff, Plaintiff States have already begun ending important public health programs. Washington's Department of Health has already been forced to end its mobile health clinics. Ex. 40, Fehrenbach Decl. ¶ 21. And Minnesota has already ordered a local health agency to cease its work on vaccination clinics. Ex. 24, Gresczyk Decl. ¶¶ 43, 47. Life-saving mental health and substance abuse programs will disappear. *See, e.g.,* Ex. 6, Perez Decl. ¶ 61; Ex. 17, Rollinson Decl. ¶ 16; Ex. 28, Boukus Decl. ¶ 14; Ex. 41, Kirschbaum Decl. ¶¶ 12, 31, 39. Simply put, the Public Health Funding Decision is causing substantial immediate irreparable harm. Plaintiff States are not interested in money damages, which will not compensate for the harms to their public health programs from Defendants' unlawful actions.

Moreover, even recoverable costs, "may constitute irreparable harm . . . where the loss threatens the very existence" of an organization or programs. *Packard Elevator v. ICC*, 782 F. 2d 112, 115 (8th Cir. 1986); *see Am. Ass'n of Colleges for Tchr. Educ. v. McMahon*, No. 1:25-CV-00702-JRR, --- F. Supp. 3d ---, 2025 WL 833917, at *23 (D. Md. Mar. 17, 2025) (holding that

38

the immediate termination of grants affecting the existence of programs and the livelihoods of individuals within those programs constituted irreparable harm); *California v. U.S. Dep't of Educ.*, No. CV 25-10548-MJJ, --- F. Supp. 3d ---, 2025 WL 760825, at *4 (D. Mass. Mar. 10, 2025) (same). The Public Health Funding Decision existentially threatens key programs and initiatives with Plaintiff States' public health agencies, and ultimately, will worsen public health outcomes by inhibiting public health agencies' critical duties such as combatting the spread of contagious disease, preventing substance abuse, and ensuring access to mental health treatment. *See, e.g.*, Ex 3, Fanelli Decl., ¶¶ 33, 47, 49; Ex. 6, Perez Decl. ¶¶ 9-10, 62.

Finally, as explained in Background Section V, Defendants' illegal action have caused—and will continue to cause—substantial operational burdens for Plaintiff States' institutions. *See City & Cnty. of S.F. v. USCIS*, 408 F. Supp. 3d 1057, 1123 (N.D. Cal. 2019) (recognizing "burdens on . . . ongoing operations" for public entities, including administrative costs caused by changes in federal policy, constitute irreparable harm); *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (same). The Public Health Funding Decision has resulted in chaos across Plaintiff States' institutions, particularly because the funding loss was immediate. *See generally* Ex. 16, Ige Decl. ¶¶ 7, 21. Plaintiff States have already spent, and will continue to spend, substantial administrative costs trying to address to these unlawful actions. None of these costs are recoverable from the United States.

## IV. The Public Interest and the Balance of Equities Strongly Favor Entry of a Preliminary Injunction.

The equities and public interest also favor preliminary relief. *See, e.g., Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (the balance of equities and the public interest "merge when the [g]overnment is the opposing party"). Plaintiff States have a substantial interest in the successful operation of their public health systems. *Jacobson*, 197 U.S. at 38 ("The safety and the health of

the people . . . are, in the first instance, for [the State] to guard and protect."). Plaintiff States have detailed the devastating consequences the Public Health Funding Decision, and the many ways that the terminations implementing the Public Health Funding Decision will impair the functioning of key public health programs and initiatives. *See* Background Section V. Given the abrupt terminations, Plaintiff States cannot make up for the lost funding and will have to take immediate action to curtail their public health programs and undergo massive layoffs of highly trained employees and contractors. *See, e.g.*, Ex. 6, Perez Decl. ¶¶ 30, 61; Ex. 10, Bookman Decl. ¶ 21; Ex. 24, Grescyzk Decl. ¶ 41. As a result, the equities and public interest strongly favor preliminary relief.

This is especially so because Plaintiff States have also established a likelihood of success on the merits. *See supra* Sections II and III. Plaintiff States have shown that the Public Health Funding Decision and its implementation violated the APA, statutory authority, and the Constitution in myriad ways. The "extremely high likelihood of success on the merits" shows that preliminary relief "would serve the public interest." *League of Women Voters of U.S. v. Newby*, 838 F.3d 1, 12 (D.C. Cir. 2016). Relatedly, "the public has an important interest in making sure government agencies follow the law." *Neighborhood Ass'n of the Back Bay, Inc. v. Fed. Transit Admin.*, 407 F. Supp. 2d 323, 343 (D. Mass. 2005); *see also League of Women Voters*, 838 F.3d at 12 (same). Courts routinely observe that "there is generally no public interest in the perpetuation of unlawful agency action." *Planned Parenthood of N.Y.C., Inc. v. HHS*, 337 F. Supp. 3d 308, 343 (S.D.N.Y. 2018) (quoting *League of Women Voters*, 838 F.3d at 12). There is a strong public interest in enjoining HHS's unlawful actions. *See, e.g., Me. Forest Prods. Council v. Cormier*, 586 F. Supp. 3d 22, 64 (D. Maine 2022). Thus, in addition to the public

interest in avoiding public health harms, the public also has an interest in ensuring HHS follows the law.

On the other side of the ledger, the federal government faces no "harm from an injunction that merely ends an unlawful practice or reads a statute as required." *R.I.L-R v. Johnson*, 80 F. Supp. 3d 164, 191 (D.D.C. 2015) (quoting *Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013)); *see also Planned Parenthood of N.Y.C., Inc.*, 337 F. Supp. 3d at 343. Because the Public Health Funding Decision is unlawful, Defendants have no cognizable interest in its implementation.

The public interest and the equities clearly favor Plaintiff States.

## V.    Requested Relief.

Plaintiff States respectfully request that the Court enter a preliminary injunction that:

(1) enjoins Defendants from implementing or enforcing through any means the Public Health Funding Decision;

(3) enjoins Defendants from reinstituting the Public Health Funding Decision based on the same or similar reasons;

(4) is applicable only with respect to Plaintiff States, including their local health jurisdictions, and any bona fide fiscal agents of Plaintiff States or their local health jurisdictions;

(5) requires Defendants to provide written notice of the order within 24 hours to all Defendants and agencies, and their employees, contractors, and grantees;

(6) requires Defendants to provide a status report within 24 hours, documenting the actions that they have taken to comply with this order, including a copy of the notice and an explanation as to whom the notice was sent.

## CONCLUSION

For these reasons, Plaintiff States respectfully request a preliminary injunction order as this case proceeds.

Respectfully submitted,

**PHILIP J. WEISER**
Attorney General of Colorado

By: */s/ David Moskowitz*
David Moskowitz*
*Deputy Solicitor General*
Sam Wolter*
*Assistant Attorney General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov
Samuel.Wolter@coag.gov

*Counsel for the State of Colorado*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Sarah W. Rice*
Sarah W. Rice (RI Bar No. 10465)
*Deputy Chief, Public Protection Bureau*
*Assistant Attorney General*
Keith Hoffmann (RI Bar No. 9874)
*Chief of Policy*
*Assistant Attorney General*
Julia Harvey (RI Bar No. 10529)
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2054
srice@riag.ri.gov
khoffmann@riag.ri.gov
jharvey@riag.ri.gov

*Counsel for the State of Rhode Island*

**ROB BONTA**
Attorney General of California

By: */s/ Crystal Adams*
Neli Palma*
*Senior Assistant Attorney General*
Crystal Adams*
Anna Rich**
*Deputy Attorneys General*
1300 I Street
Sacramento, CA 95814
(916) 210-7522

*Counsel for the State of California*

**KEITH ELLISON**
Attorney General of Minnesota

By: */s/ Brian S. Carter*
Brian S. Carter*
Jennifer Moreau*
*Assistant Attorneys General*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-7403
Brian.Carter@ag.state.mn.us
Jennifer.Moreau@ag.state.mn.us

*Counsel for the State of Minnesota*

**NICHOLAS W. BROWN**
Attorney General of Washington

By: */s/ Ellen Range*
Ellen Range*
*Assistant Attorney General*
Office of the Washington State Attorney General
7141 Cleanwater Drive SW
P.O. Box 40111
Olympia, WA 98504-0111
(360) 709-6470
Ellen.Range@atg.wa.gov

Cristina Sepe*
*Deputy Solicitor General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200
Cristina.Sepe@atg.wa.gov

*Counsel for the State of Washington*

**KRISTIN K. MAYES**
Attorney General of Arizona

By: */s/ Mary M. Curtin*
Mary M. Curtin*
*Senior Litigation Counsel*
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Mary.Curtin@azag.gov

*Counsel for the State of Arizona*

**WILLIAM TONG**
Attorney General of Connecticut

*/s/ Andrew Ammirati*
Andrew Ammirati*
*Assistant Attorney General*
165 Capitol Avenue
Hartford, CT 06106
Phone: (860) 808 5090
Andrew.Ammirati@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: */s/ Vanessa L. Kassab*
Ian R. Liston**
*Director of Impact Litigation*
Vanessa L. Kassab**
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**BRIAN L. SCHWALB**
Attorney General for the District of
Columbia

*/s/ Samantha Miyahara Hall*
Samantha Miyahara Hall*
*Assistant Attorney General*
Public Advocacy Division
Office of the Attorney General for the
District of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
(202) 788-2081
Samantha.hall@dc.gov

*Counsel for the District of Columbia*

**KWAME RAOUL**
Attorney General of Illinois

By: /s/ John Hazinski
John Hazinski*
*Assistant Attorney General*
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(773) 590-6944
john.hazinski@ilag.gov

*Counsel for the State of Illinois*

**ANNE E. LOPEZ**
Attorney General of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
*Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**OFFICE OF THE GOVERNOR *ex rel.*
ANDY BESHEAR**
in his official capacity as Governor of the
Commonwealth of Kentucky

*/s/ Travis Mayo*
S. Travis Mayo*
*General Counsel*
Taylor Payne*
*Chief Deputy General Counsel*
Laura C. Tipton*
*Deputy General Counsel*
Kentucky Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

**AARON M. FREY**
Attorney General of Maine

By: */s/ Margaret Machaiek*
Margaret Machaiek*
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
Fax:  207-287-3145

*Counsel for the State of Maine*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ Katherine B. Dirks*
Katherine B. Dirks*
*Chief State Trial Counsel*
Phoebe Lockhart*
Assistant Attorney General
1 Ashburton Pl.
Boston, MA  02108
(617.963.2277)
katherine.dirks@mass.gov
phoebe.lockhart@mass.gov

*Counsel for the Commonwealth of
Massachusetts*

**ANTHONY G. BROWN**
Attorney General of Maryland

By: */s/ James C. Luh*
James C. Luh*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us

*Counsel for the State of Maryland*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Jennifer M. Jackson*
Jennifer M. Jackson (P67126)*
Carl Hammaker (P81203)*
Assistant Attorneys General
Michigan Department of Attorney General
Attorneys for State of Michigan
525 W. Ottawa St.
Lansing, MI 48933-1067
517.335.7573
jacksonj5@michigan.gov
hammakerc@michigan.gov

*Counsel for the State of Michigan*

**AARON D. FORD**
Attorney General of Nevada

By: */s/ Heidi Parry Stern*
Heidi Parry Stern (Bar. No. 8873)*
*Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Counsel for the State of Nevada*

**MATTHEW J. PLATKIN**
Attorney General of New Jersey

*/s/ Jessica L. Palmer*
Jessica L. Palmer*
Anaiis Gonzales*
*Deputy Attorneys General*
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-4607
Jessica.Palmer@law.njoag.gov
Anaiis.Gonzales@law.njoag.gov

*Counsel for the State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ Anjana Samant*
Anjana Samant*
*Deputy Counsel*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
asamant@nmdoj.gov
(505) 270-4332

*Counsel for the State of New Mexico*

**LETITIA JAMES**
Attorney General of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam*
Special Counsel for Federal Initiatives
Gina Bull*
*Assistant Attorney General*
28 Liberty St.
New York, NY 10005
(929) 638-0447 rabia.muqaddam@ag.ny.gov
gina.bull@ag.ny.gov

*Counsel for the State of New York*

**JEFF JACKSON**
Attorney General of North Carolina

By */s/ Daniel P. Mosteller*
Daniel P. Mosteller*
*Associate Deputy Attorney General*
Laura Howard
*Chief Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

*Counsel for State of North Carolina*

**DAN RAYFIELD**
Attorney General of Oregon

By: */s/ Deanna J. Chang*
Deanna J. Chang*
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Deanna.J.Chang@doj.oregon.gov

*Counsel for the State of Oregon*

**JOSH SHAPIRO**
in his official capacity as Governor of the
Commonwealth of Pennsylvania

Jennifer Selber
*General Counsel*

*/s/ Aimee D. Thomson*
Aimee D. Thomson*
Jonathan D. Koltash*
*Deputy General Counsel*
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(223) 234-4986
aimeethomson@pa.gov
jokoltash@pa.gov

*Counsel for Governor Josh Shapiro*

*Admitted pro hac vice
**Pending pro hac vice applications to be filed*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: */s/ Lynn K. Lodahl*
Lynn K. Lodahl*
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 264-6219
lodahllk@doj.state.wi.us

*Counsel for the State of Wisconsin*

## INDEX OF EXHIBITS

| Exhibit | State | Declarant Name | Declarant Title |
|---|---|---|---|
| 1 | Arizona | Sjolander, Sheila | Deputy Director of Health Services, Arizona Dept. of Health Services |
| 2 | California | Cutler, Dr. Blayne | CEO, Public Health Foundation Enterprises |
| 3 | California | Fanelli, Susan | Chief Deputy Director of Health Quality and Emergency Response, California Dept. of Health |
| 4 | California | Ferrer, Dr. Barbara | Director, Los Angeles County Dept. of Public Health |
| 5 | California | Kasirye, Dr. Olivia | Public Officer for the County of Sacramento |
| 6 | California | Perez, Marlies | Division Chief of the Community Services Division of Behavioral Health, California Department of Healthcare Services |
| 7 | California | Philip, Dr. Susan | Health Officer for the City and County of San Francisco; Director of the Population Health Division of the San Francisco Dept. of Health |
| 8 | California | Rudman, Dr. Susan | County of Santa Clara Deputy Health Officer; Director of the Infectious Disease and Response Branch of the Public Health Dept. |
| 9 | California | Saruwatari, Kimberly | Riverside County Director of the Dept. of Public Health |
| 10 | Colorado | Bookman, Scott | Senior Director of Public Health Readiness and Response, Colorado Dept. of Public Health and Environment |
| 11 | Colorado | Maurice, Monique | Chief Financial Officer, Colorado Behavioral Health Administration |
| 12 | Connecticut | Navarretta, Nancy | Commissioner, Department of Mental Health and Addiction Services |
| 13 | Connecticut | Orefice, Adelita | Deputy Commissioner and Acting Chief Operating Officer, State of Connecticut Dept. of Public Health |

| 14 | Delaware | Manning, Josette D. | Cabinet Secretary, Delaware Dept. of Health and Social Services |
| 15 | Illinois | Clark, Heidi | Division Chief, Division of Infectious Diseases, Illinois Dept. of Public Health |
| 16 | Illinois | Ige, Dr. Olusimbo | Commissioner, Chicago Dept. of Public Health |
| 17 | Illinois | Rollinson, Ryan | Chief of Staff, Division of Mental Health, Illinois Dept. of Human Services |
| 18 | Kentucky | Friedlander, Eric | Secretary, Kentucky Cabinet for Health and Family Services |
| 19 | Massachusetts | Doyle, Brooke | Commissioner, Massachusetts Dept. of Mental Health |
| 20 | Massachusetts | Sullivan, Eileen | Chief Operating Officer, Massachusetts Dept. of Public Health |
| 21 | Maryland | Kalyanaraman, Dr. Nilesh | Deputy Director for Public Health Services, Maryland Dept. of Health |
| 22 | Maine | Gagne-Holmes, Sara | Commissioner, State of Maine Dept. of Health and Human Services |
| 23 | Michigan | Hertel, Elizabeth | Director, Michigan Dept. of Health and Human Services |
| 24 | Minnesota | Gresczyk, Melissa | Chief Operating Officer and Assistant Commissioner for Health Operations, Minnesota Dept. of Health |
| 25 | North Carolina | Williams-Devane, Dr. ClarLynda | Chief Deputy Secretary and Deputy Secretary for Operational Excellence, North Carolina Dept. of Health and Human Services |
| 26 | New Jersey | Adelman, Sarah | Commissioner, New Jersey Dept. of Human Services |
| 27 | New Jersey | Baston, Dr. Kaitlan | Commissioner, New Jersey Dept. of Health |
| 28 | New Mexico | Boukas, Nicholas | Director of the Behavioral Health Services Division, New Mexico Health Care Authority |
| 29 | New Mexico | DeBlassie, Gina | Cabinet Secretary, New Mexico Dept. of Health |

| 30 | New Mexico | Garcia, Susan | Director of the Office of Health Equity, New Mexico Dept. of Health |
| 31 | New Mexico | Romero, Andrea | Immunization Program Section Manager, New Mexico Dept. of Health |
| 32 | New York | Morne, Johanne | Executive Deputy Commissioner, New York State Dept. of Health |
| 33 | New York | Morse, Dr. Michelle E. | Acting Commissioner and Chief Medical Officer of the New York City Dept. of Health and Mental Hygiene |
| 34 | Oregon | Drum, Danna (Drum 1) | Interim Deputy Director of the Public Health Division, Oregon Health Authority |
| 35 | Oregon | Drum, Danna (Drum 2) | Interim Deputy Director of the Public Health Division, Oregon Health Authority |
| 36 | Oregon | Jones, Christa | Deputy Director of Service Delivery, Behavioral Health Division, Oregon Health Authority |
| 37 | Oregon | Sutton, Dr. Melissa | Medical Director, Respiratory Viral Pathogens and Epidemiology and Laboratory Capacity Project Director, Oregon Health Authority |
| 38 | Rhode Island | Campagna, Kristine | Associate Director for Community and Health Equity |
| 39 | Rhode Island | Goulette, Christine | Associate Director, Division of Emergency Preparedness and Infectious Disease, Rhode Island Dept. of Health |
| 40 | Washington | Fehrenbach-Marosfalvy, Lacy | Chief of Prevention, Safety, and Health, Washington Dept. of Health |
| 41 | Washington | Kirschbaum, Teesha | Director, Division of Behavioral Health and Recovery, Washington Health Care Authority |
| 42 | Wisconsin | Grejner-Brzezinska, Dorota | Vice Chancellor for Research, University of Wisconsin-Madison |
| 43 | Wisconsin | Standridge, Debra | Deputy Secretary, Wisconsin Dept. of Health Services |
| 44 | Pennsylvania | Rodack, Kristen | Executive Deputy Secretary, Pennsylvania Dept. of Health |

| 45 | Hawaiʻi | Fink, Kenny | Director of Health, Hawaiʻi Dept. of Health |
| 46 | Minnesota | Steinmetz, Teresa | Assistant Commissioner of the Behavioral Health Administration, Minnesota Dept. of Human Services |
| 47 | Arizona | Randall, Alisa | Mental Health Commissioner for the State of Arizona; Assistant Deputy Director of Clinical Operations, Arizona Health Care Cost Containment System Administration |
| 48 | Rhode Island | Martin, Thomas G. | Director of the Division of Behavioral Healthcare, Rhode Island Dept. of Behavioral Healthcare, Developmental Disabilities & Hospitals |

## <u>CERTIFICATE OF SERVICE</u>

     I hereby certify that, on April 8, 2025, I filed the foregoing document through this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rules Gen 304.


<u>/s/ David Moskowitz</u>
*Deputy Solicitor General*