# In the Supreme Court of the United States

_____

UNITED STATES DEPARTMENT OF EDUCATION, ET AL., APPLICANTS

*v.*

STATE OF CALIFORNIA, ET AL.

_____

**REPLY IN SUPPORT OF APPLICATION TO VACATE
THE ORDER ISSUED BY THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF MASSACHUSETTS**

_____

SARAH M. HARRIS
  *Acting Solicitor General*
    *Counsel of Record*
  *Department of Justice*
  *Washington, D.C. 20530-0001*
  *SupremeCtBriefs@usdoj.gov*
  *(202) 514-2217*

**TABLE OF CONTENTS**

A.    This Putative TRO Is Appealable ............................................. 3

B.    The District Court Lacked Jurisdiction To Force the Government To Pay Out Money On Grants The Court Ordered Restored ...................... 6

C.    Other Defects In The Court's Order Warrant Intervention ................. 11

D.    The Other Stay Factors Strongly Favor The Government ................... 13

# In the Supreme Court of the United States

———

No. 24A910

UNITED STATES DEPARTMENT OF EDUCATION, ET AL., APPLICANTS

*v.*

STATE OF CALIFORNIA, ET AL.

———

**REPLY IN SUPPORT OF APPLICATION TO VACATE
THE ORDER ISSUED BY THE UNITED STATES DISTRICT
COURT FOR THE DISTRICT OF MASSACHUSETTS**

———

In a deluge of temporary restraining orders (TROs) and preliminary injunctions issued in the last two months, district courts have repeatedly blocked the Executive Branch's constitutional and statutory functions, going so far as to compel government expenditures, reinstate employees, and even assume broad control of the management of federal agencies. See Appl. 1-2 & n.1. Indeed, since the government filed its application in this case on March 26, district courts have issued or extended six more TROs enjoining the Executive Branch from performing core functions and initiatives.* In a seventh case, another court issued a preliminary injunction requir-

---

    * See *Massachusetts Fair Hous. Ctr.* v. *Department of Hous. & Urban Dev.*, No. 25-30041, 2025 WL 941380 (D. Mass. Mar. 26, 2025) (TRO reinstating housing grants); *Maryland* v. *United States Dep't of Agric.*, No. 25-cv-748 (D. Md. Mar. 26, 2025) (extending TRO against federal agencies' reductions-in-force); *Chicago Women in Trades* v. *Trump*, No. 25 C 2005, 2025 WL 933871 (N.D. Ill. Mar. 27, 2025) (TRO against termination of DEI-related federal contracts); *Widakuswara* v. *Lake*, No. 25-cv-2390, 2025 WL 945869 (S.D.N.Y. Mar. 28, 2025) (TRO enjoining termination of global-media grants and contracts); *D.V.D.* v. *United States Dep't of Homeland Sec.*, No. 25-10676, 2025 WL 942948 (D. Mass. Mar. 28, 2025) (TRO barring removal of aliens); *J.G.G.* v. *Trump*, No. 25-766, 2025 WL 940412 (D.D.C. Mar. 28, 2025) (extending TROs barring removals of aliens).

ing the Consumer Financial Protection Bureau to reinstate and resume paying terminated contracts, in the course of seizing control over Bureau hiring, firing, and managerial decisions, including employees' access to particular computer programs. D. Ct. Doc. 88, *National Treasury Emps. Union* v. *Vought*, No. 25-381 (D.D.C. Mar. 28, 2025).

Respondents—eight States—effectively shrug. They insist (Opp. 2, 4, 15, 18, 40) that TROs are unappealable so long as they putatively "preserve the status quo" before the Executive Branch acted and are "time-limited." They contend (at 3-4) that this TRO—which forces continued payment of terminated grants that the government determined were contrary to United States interests—is too insignificant to worry about. And they portray (Opp. 4) as problems for another day the copycat TROs and injunctions in which district courts without jurisdiction have allowed plaintiffs to leverage breach-of-contract claims belonging in the Court of Federal Claims into broad Administrative Procedure Act (APA) injunctions ordering payments of billions more dollars that the government would be hard-pressed to ultimately recover.

As unlawful as this order is, the stakes are far higher than federal funding for Teacher Quality Partnership (TQP) and Supporting Effective Educator Development (SEED) grant program recipients. The broader challenge facing the government is that district courts without jurisdiction are issuing orders forcing the Executive Branch to resurrect and keep paying out terminated grants and contracts, micromanaging how and when the Executive Branch pays—then insisting that no appellate review is available because their orders are TROs. This Court should grant the application, hold that this TRO is reviewable because of its mandatory, potentially irreversible commands, and hold that federal district courts lack jurisdiction to order the government to pay out on contracts or grants when the suits are (like this one) basic

breach-of-contract claims.

### A.   This Putative TRO Is Appealable

1.   Though the First Circuit assumed the district court's order was appealable, App. 24a, respondents insist (Opp. 16-20) that TROs are unappealable so long as they are limited in time and purport to maintain the status quo.  That approach would wrongly grant district judges blank checks to enjoin the Executive Branch without appellate scrutiny—and hence, with impunity.

Of course, not all TROs need be appealable.  But when plaintiffs wait a month to sue; obtain an adversarial hearing; obtain 27 pages of decisions on the merits, App. 1a-10a, 20a-36a; and obtain a 28-day order "enjoin[ing]" the government to undo grant terminations and turn back on the flow of funds to all relevant grantees in respondents' States, that is an appealable injunction.  *Id.* at 9a-10a; see *Department of State* v. *AIDS Vaccine Advocacy Coal.*, 145 S. Ct. 753, 754 (2025) (Alito, J., dissenting from denial of application to vacate order).  By virtue of those characteristics, this order—like many of the others that have been issued against the government since the presidential transition—was no ordinary TRO.

And this question of TRO appealability warrants this Court's intervention even more today than it did weeks ago, when the Court considered the *AIDS Vaccine* application and four Members of the Court deemed that question worthy of "this Court's attention at the present time."  145 S. Ct. at 755 n.* (Alito, J., dissenting from denial of application to vacate order).  Although some lower-court judges have perceived the urgent need to provide judicial review in this context, others have not, and the rapid pace of TROs continues.  Compare, *e.g.*, *J.G.G.* v. *Trump*, No. 25-5067, 2025 WL 914682, at *33 (D.C. Cir. Mar. 26, 2025) (Walker, J., dissenting), with *Dellinger* v. *Bessent*, No. 25-5028, 2025 WL 559669 (D.C. Cir. Feb. 15, 2025) (per curiam) (finding

unappealable a TRO keeping the Special Counsel in office), and App. 16a-17a (district court order below denying stay pending appeal).

Respondents' contrary proposal to treat TROs as unappealable whenever they are limited in time (Opp. 17) would mechanically deny review simply because the district court did not impose the TRO indefinitely. The TRO here is set to last up to 28 days. Barring appellate review of TROs as long as they come with *some* time limit is no real limiting principle at all.

Respondents next downplay this order as a run-of-the-mill TRO entered to "preserve the status quo and prevent irreparable harm." Opp. 16 (brackets and citation omitted). That is hard to credit when respondents allowed the status quo ante to elapse for a month before suing. The district court's order thus mandated a state of affairs that no longer existed—hence the court's order that the Department "immediately restore [respondents] to the *pre-existing* status quo prior to the [grant] termination[s]." App. 9a (emphasis added). Further, the order—in service of preventing purported irreparable harm to respondents—inflicted and continues to inflict "irretrievable" injury upon the government. *J.G.G.*, 2025 WL 914682, at *33 (Walker, J., dissenting) (citation omitted) (explaining such a TRO's appealability); see *id.* at *4 (Henderson, J., concurring). The order interferes with the Executive Branch's functions for an extended period and compels the government to disburse funds with no reliable means of recovery. See pp. 14-15, *infra*. And if plaintiffs could evade review whenever the Executive Branch has started doing something new, then almost no TROs against the government would be appealable.

Finally, respondents try to insulate the district court's order from review by claiming (Opp. 2-3, 15-16) that the TRO will soon become moot and presumably ripen into a preliminary injunction. That too is a maneuver to make all TROs unreviewa-

ble.  Obtaining immediate judicial review of TROs that inflict ongoing, irreparable, and massive harm on the operations of the Executive Branch is already difficult given the pace of court decisions as orders make their way up the appellate chain.  For respondents to turn around and say that this Court should do nothing on reams of emergency filings and await mootness when the district court took days and the First Circuit took a week to rule would just invite more gamesmanship.  The order is still in effect potentially through at least April 7, and the government continues to incur irreparable harm.  These circumstances cry out for immediate review, not for appellate courts that wait out the clock and rest on mootness because—at some stage *after* the government's request for review—the TRO would expire.  The availability of even interim review is an essential safety valve to enable the government to perform its constitutional and statutory functions.

Besides, the matters at issue—including whether a district court has jurisdiction under the APA to order via TRO the government's resumption of contract payments—qualify for the "exception to the mootness doctrine for a controversy that is capable of repetition, yet evading review."  *United States* v. *Sanchez-Gomez*, 584 U.S. 381, 391 (2018) (citation omitted); see *AIDS Vaccine*, 145 S. Ct. at 755 n.* (Alito, J., dissenting from denial of application to vacate order); Appl. 1-2 & n.1 (collecting cases implicating the same issues).  The critical question here is demonstrably "capable of repetition" because district courts keep entering materially similar injunctions against the government as agencies terminate contracts or grants.  See Appl. 1-2 & n.1.  Yet, if respondents get their way, district courts' lack of jurisdiction to issue such orders against the United States will always evade review simply because TROs are, by definition, temporary.  If nothing else, this Court should resolve this application by making clear that orders like the district court's here are appealable.  See also

Appl. 23-24 (alternatively seeking mandamus).

2. Respondents invoke (Opp. 13-14) other hurdles to vacating this order, but none has merit. They argue that a higher bar should apply when the decisions below denied stays pending appeal. Not only has this Court never embraced that theory of "upside-down precedent." *Labrador* v. *Poe*, 144 S. Ct. 921, 924 (2024) (Gorsuch, J., concurring in grant of stay). But doing so would be particularly perverse when, as here, respondents are simultaneously arguing that the lower courts should summarily deny stays on the ground that TROs are flatly unappealable.

Respondents also mistakenly compare requests to vacate district-court TROs with requests for summary reversal of decisions *on the merits*. Opp. 14 (citing *Spears* v. *United States*, 555 U.S. 261 (2009), and *Pavan* v. *Smith*, 582 U.S. 563 (2017), respectively involving the application of the U.S. Sentencing Guidelines and the constitutionality of an Arkansas marriage statute). But requests to "stay" or "vacate" TROs like this one have the same "practical effect," and thus should be subject to the same familiar standard. Appl. at 11 n.4, *Bessent* v. *Dellinger* (No. 24A790).

## B. The District Court Lacked Jurisdiction To Force the Government To Pay Out Money On Grants The Court Ordered Restored

Vacatur of the district court's order is warranted first and foremost because the district court lacked jurisdiction to order the government to pay out grant funding; those claims belong in the Court of Federal Claims, the only place where the United States has waived sovereign immunity from such claims. See Appl. 12-17. This question has assumed great significance for operations across federal agencies because numerous district courts have committed the same basic error as the courts below and asserted supposed power under the APA to invoke essentially contractual theories of obligation as grounds to force the federal government to keep paying on

terminated contracts or grants.  See Appl. 1-2 & n.1.

1.     Like the court of appeals, App. 25a-26a, respondents purport to accept the principle that a claim falls within the jurisdiction of the Court of Federal Claims under the Tucker Act, see 28 U.S.C. 1491(a), 1346(a)(2), when "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought" show the claim to be "at its essence a contract claim."  Opp. 21 (quoting *Megapulse, Inc.* v. *Lewis*, 672 F.2d 959, 967-968 (D.C. Cir. 1982)).  More specifically, a suit belongs in the Claims Court when the source of the plaintiff's asserted right is a contract and what the plaintiff seeks amounts to contractual remedies.

Under that longstanding principle, this case has no place in district court.  The sources of respondents' asserted rights are contracts—the TQP and SEED grant agreements between the government and the relevant grantees.  Respondents do not dispute that those grants are contracts for jurisdictional purposes, see Opp. 22-23, and rightly so.  See *Bennett* v. *New Jersey*, 470 U.S. 632, 638 (1985) (noting that "many * * * federal grant programs" are "'much in the nature of a contract'") (citation omitted).  And the grants are the source of respondents' asserted rights.  The whole premise of their suit is that the grants were wrongfully terminated.  Without the alleged violation of the grant agreements, they would have no claim.  See *A & S Council Oil Co.* v. *Lader*, 56 F.3d 234, 241 (D.C. Cir. 1995); *Spectrum Leasing Corp.* v. *United States*, 764 F.2d 891, 894 (D.C. Cir. 1985).

Furthermore, the object of respondents' suit is to obtain an order compelling the government to pay money, namely the remainder of the funds that the relevant TQP and SEED grantees would have received but for the grant terminations.  As respondents themselves put it (Opp. 25), their goal is to reinstate a federal "funding stream."  Or, as the district court put it when rejecting the government's assertions

of irreparable harm, the government "merely would have to disburse funds." App. 9a (citation omitted). Or, as another district court put it when denying an injunction: Respondents "want[] the Government to keep paying up"—"to cancel the termination[s], pay money due, and reinstate the contracts." *United States Conference of Catholic Bishops* v. *United States Dep't of State*, No. 25-cv-465, 2025 WL 763738, at *5-*6 (D.D.C. Mar. 11, 2025), injunction pending appeal denied (D.C. Cir. Mar. 28, 2025) (per curiam). That is equivalent to the "classic contractual remedy of specific performance." *Id.* at *5 (citation omitted). Such complaints "must be heard in Claims Court." *Id.* at *7.

In short, a contract claim for moneys allegedly owed is "the alpha and omega of this dispute," which means the district court lacked jurisdiction under the APA. *United States* v. *J & E Salvage Co.*, 55 F.3d 985, 989 (4th Cir. 1995). And at the very least, the court's jurisdiction was so uncertain that its entry of a TRO, premised on a finding that respondents' APA claim was likely to succeed, App. 2a-3a, was unjustified under the well-worn standards for injunctive relief that the district court recited. "A difficult question as to jurisdiction" "says nothing about the 'likelihood of success on the merits,' other than making such success more *unlikely* due to potential impediments to even reaching the merits." *Munaf* v. *Geren*, 553 U.S. 674, 690 (2008).

2.     Respondents' counterarguments are flawed. Echoing the court of appeals, see App. 25a-26a, respondents portray themselves (Opp. 22-24) as bringing APA claims, not contractual ones, because they invoke the statutes authorizing the TQP and SEED grant programs and Department regulations concerning grant terminations. Tellingly, however, respondents decline to say why those statutory or regulatory provisions provide the "source of the rights" they assert. *Megapulse*, 672 F.2d at 968; see *Ingersoll-Rand Co.* v. *United States*, 780 F.2d 74, 77-78 (D.C. Cir. 1985).

That is because those statutes simply authorize TQP and SEED grants in the first place, and the statutes and regulations vest the Department with broad discretion to issue grants and terminate them in accordance with the terms and conditions. See Appl. 5-6. Respondents underscore the point by quoting (Opp. 22) the relevant regulatory language, which gives the agency discretion to terminate grants that "no longer effectuate[] the program goals or agency priorities." 2 C.F.R. 200.340(a)(4). And while respondents insist (Opp. 23) that they invoke the terms and conditions only in response to the government's "regulation-based arguments," the termination regulation circles back to the terms and conditions, see 2 C.F.R. 200.340(a)(4) (authorizing termination "pursuant to the terms and conditions of the Federal award"), confirming the inescapably contractual nature of the dispute. The rights being asserted do not "exist prior to and apart from rights created under the contract." *Crowley Gov't Servs., Inc.* v. *General Servs. Admin.*, 38 F.4th 1099, 1107 (D.C. Cir. 2022) (brackets and citation omitted).

Indeed, the district court never relied on those provisions in finding respondents likely to succeed on the merits; the court instead held that the agency's reasoning was arbitrary and capricious under the APA. See App. 4a-6a. It would be circular to allow plaintiffs to assume the conclusion and superimpose the APA's procedural requirements on contracting so that plaintiffs could convert any contractual breach into an instance of arbitrary agency decisionmaking. Congress's jurisdictional design cannot be evaded through such "transparent reformulations of the contract dispute." *J & E Salvage*, 55 F.3d at 989; see *Megapulse*, 672 F.2d at 967 n.34; *Kidwell* v. *Department of the Army*, 56 F.3d 279, 284 (D.C. Cir. 1995).

As for remedy, the payment of money is no mere "by-product" of the relief respondents seek. Contra Opp. 26 (quoting *Bowen* v. *Massachusetts*, 487 U.S. 879, 910

(1988)). Making the government pay out grant money promised under the grant instruments is the whole point. Respondents are expressly seeking declaratory and injunctive relief to force the government to restore and thus pay out grants. See, *e.g.*, D. Ct. Doc. 1, at 40 (Mar. 6, 2025) ("Through the termination of these programs, the States now face the loss of tens of millions of dollars in funding that would have been directed to teacher recruitment, teacher residencies, teacher training, and school leadership training."); *id.* at 41 ("The public institutions of Plaintiff States now face abrupt shortfalls to their current year budgets collectively exceeding ten million dollars."); see also *id.* at 51-52 (prayer for relief from the grant terminations). And the payment of money—that is, specific performance of the government's contractual promises—is the only cure that respondents seek for the harms they attribute to the government's actions. See Opp. 39-40; *Maine Cmty. Health Options* v. *United States*, 590 U.S. 296, 326-327 (2020). The harms respondents invoke—being "forced to halt their programs," Opp. 25—are the byproduct of not being funded. Elsewhere, respondents candidly acknowledge (Opp. 4) that "the dispute here is * * * over" the portion "of the $65 million in total remaining grant funds * * * that would be paid out" under the TRO.

Respondents' view would allow any government contractor with a quintessential breach-of-contract claim to plead its way into district court and APA review by requesting an "injunction" for the government to pay up instead of asserting money damages. Respondents contend (Opp. 25-26) that the Court of Federal Claims cannot grant the injunctive relief they want. Whether or not that is correct, Congress, while undoubtedly aware of many contractors' and grantees' dependence on government funds, chose to foreclose APA relief on breach-of-contract claims and to direct such claims to the Court of Federal Claims, subject to the remedies available there. Ex-

posing the government to district-court suits for disguised breach-of-contract claims ignores the statutory design and "discards" the United States' "'sovereign dignity.'" *AIDS Vaccine*, 145 S. Ct. at 756 (Alito, J., dissenting from denial of application to vacate order) (citation omitted).

Finally, respondents notably concede (Opp. 26 n.3) that a Tucker Act claim might have been proper here for "certain grant-related expenses already incurred but not yet reimbursed." But their complaint draws no such distinction between incurred-but-unreimbursed expenses and yet-to-be-incurred expenses. For good reason: the APA does not support claims that the government owes money on a contract, whether those amounts are for past work or are advances.

### C. Other Defects In The Court's Order Warrant Intervention

1. Respondents devote (Opp. 31-35) considerable attention to the merits of their APA claims, but that misses the point: if they wish to press versions of those arguments as contract claims, they need to do so in the Court of Federal Claims, not district court. Cf. *Lujan* v. *G & G Fire Sprinklers, Inc.*, 532 U.S. 189 (2001) (holding that a state-law contract claim could not be litigated as a due-process claim under 42 U.S.C. 1983). Regardless, respondents' APA claims falter. For one thing, those claims would not be cognizable under the APA, because the "agency action"—the termination of TQP and SEED grants—"is committed to agency discretion by law." 5 U.S.C. 701(a)(2); see Appl. 17-20. Respondents again cite (Opp. 28) the statutes governing TQP and SEED grantmaking (*e.g.*, 20 U.S.C. 6672(a)(1)) and grantmaking regulations, but the statutory provisions do not speak to grant *termination* at all. And while regulations "provide[] enumerated grounds on which an agency may terminate a grant award," Opp. 28, those grounds include the agency's judgments as to whether "an award no longer effectuates the program goals or agency priorities."

2 C.F.R. 200.340(a)(4). Those discretionary judgments are not the stuff of APA review. See *Heckler* v. *Chaney*, 470 U.S. 821, 831, 835 (1985); *Southern Research Inst.* v. *Griffin Corp.*, 938 F.2d 1249, 1254 (11th Cir. 1991). Respondents' own authority (Opp. 29), in which a regulation more narrowly circumscribed the agency's termination authority, *Policy & Research, LLC* v. *United States Dep't of Health & Human Services*, 313 F. Supp. 3d 62, 76 (D.D.C. 2018) (Jackson, J.), is distinguishable on that basis.

Nor can respondents invoke any tradition of judicial review of such grant-termination decisions. Cf. *Department of Commerce* v. *New York*, 588 U.S. 752, 772 (2019). To the contrary, this Court has long recognized the acute dangers of installing judges to superintend the discretionary judgments of the Executive Branch officials charged with the control of public funds. See *Decatur* v. *Paulding*, 39 U.S. (14 Pet.) 497 (1840); see also *id.* at 521 (Catron, J., concurring) (deeming such claims to be "an invitation to all needy expectants, with pretensions of claim on the government, to * * * invoke [the courts'] aid to force their hands into the treasury, contrary to the better judgment of the guardians of the public money").

The courts below accordingly erred by applying arbitrary-and-capricious APA review to the Department's termination of the TQP and SEED grants. See *Lincoln* v. *Vigil*, 508 U.S. 182, 193 (1993). And respondents do not help their cause by insisting (Opp. 31-35) that their APA claims have merit. Although we have not pressed that issue for purposes of this application, see Appl. 22 n.2, the district court's APA analysis rested on basic misunderstandings of fact and law, see Gov't C.A. Stay Mot. 15-17, and provides no support for the order at issue.

2. The district court's order also vastly exceeds permissible equitable bounds by granting relief to nonparties and going well beyond the identified legal

problem (that the agency purportedly inadequately explained the terminations). Appl. 20-22. The First Circuit did not address that aspect of the order. See App. 36a ("we think it premature to address the adequacy of the district court's explanation on this point now"). And respondents now concede (Opp. 35) that the district court's order provided relief to TQP and SEED grantees who are not plaintiff States or instrumentalities thereof. Respondents' explanation that nonparty grant recipients provide "a pipeline of qualified teachers for local schools within the eight plaintiff States" (*ibid.*), just underscores the problem with their case. States cannot obtain Article III standing by asserting speculative downstream effects from grant terminations on their local schools. See *Murthy* v. *Missouri*, 603 U.S. 43, 76 (2024). And courts cannot bridge the gap by granting overbroad relief tied to nonparties' speculative harms. See *id.* at 61; *United States* v. *Texas*, 599 U.S. 670, 703 (2023) (Gorsuch, J., concurring in the judgment). Nor do respondents explain how the district court could lawfully order reinstatement of the TQP and SEED grants when a remand to the Department for further explanation of the terminations would have sufficed to remedy the supposed APA problem. See Appl. 21-22. The court's purported authority under the APA to set aside the terminations altogether (Opp. 36) is no reason to order drastic relief as a first resort when more tailored equitable relief was available.

**D. The Other Stay Factors Strongly Favor The Government**

The remaining stay factors also overwhelmingly support vacatur.

1. Respondents' contention (Opp. 15) that there is no "reasonable possibility" that this Court would grant certiorari, see *Hollingsworth* v. *Perry*, 558 U.S. 183, 190 (2010) (per curiam), blinks reality. Four Justices recently agreed that the appealability of TROs and the scope of the APA's waiver of sovereign immunity "deserve[] this Court's attention at the present time." *AIDS Vaccine*, 145 S. Ct. at 755

n.* (Alito, J., dissenting from denial of application to vacate order). The certworthiness of both issues has only intensified over the past month. The D.C. Circuit just sharpened the conflict with the First Circuit's reasoning below by denying, by a 2-1 vote, an injunction pending appeal in a materially identical case where the district court refused to provide injunctive relief on the ground that district courts lack jurisdiction under the Tucker Act to hear grant-termination challenges like these. See *Catholic Bishops*, 2025 WL 763738, at *7-*8, injunction pending appeal denied, No. 25-5066 (D.C. Cir. Mar. 28, 2025) (per curiam); Appl. 4, 12, 15.

2.     The district court's order also inflicts ongoing and irreparable harm upon the government. Beyond the systemic, irreparable constitutional harm to the Executive Branch from judicial arrogation of executive functions as to how and when agencies will disburse or cancel grants, even the court of appeals acknowledged that the government "may incur some irreparable harm if it cannot recoup this money." App. 34a. That monetary harm is irreparable because "[o]nce funds leave the Department and go to grantees, the Department has limited ability to recover those disbursed funds." *Id.* at 15a. While respondents refer (Opp. 8) to the possibility of recovering costs that are found to be "not allowable *under th*[e] *grant*," 20 U.S.C. 1234a(a)(1) (emphasis added), they do not explain how the grants the Department wishes to terminate would qualify. If forcing the government to make $1.3 million in improper payments per month supports a stay, see *Heckler* v. *Turner*, 468 U.S. 1305, 1307-1308 (1984) (Rehnquist, J., in chambers), so do the expenditures ordered here.

Respondents state (Opp. 1, 7-8, 37-38) that the Department can monitor grantees for suspicious or excessive drawdowns of TQP and SEED grant funds, conduct audits, and take other remedial measures as appropriate. But their observation (Opp. 8) that remedies for government audits that reveal abuse include "withholding

future funds" or "suspending an award" is cold comfort when the government's over-riding aim is already to cancel grants inimical to federal interests.

3.     Respondents' asserted harms do not outweigh the government's.  Respondents are States, whose annual budgets run into the billions of dollars, not individual institutions of the kind they highlight (Opp. 39) in their discussion of the equities.  Below, respondents suggested that they could advance the funds necessary to maintain programs currently funded by TQP and SEED grants.  Resp. C.A. Opp. 20.  And respondents brush past (Opp. 25) the possibility of effective relief from the Court of Federal Claims, see *Catholic Bishops*, 2025 WL 763738, at *7 n.6, particularly if that court can grant consequential damages for breach of contract.  This overbroad, jurisdictionally unsound TRO should not stand, and allowing it to survive invites countless copycat orders.  This Court should stop the deluge.

*   *   *   *   *

For the foregoing reasons and those stated in the government's application, this Court should vacate the district court's March 10, 2025 order, as extended by that court on March 24.

Respectfully submitted.

SARAH M. HARRIS
*Acting Solicitor General*

MARCH 2025