UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | |
|---|---|
| STATE OF COLORADO; STATE OF RHODE ISLAND; STATE OF CALIFORNIA; STATE OF MINNESOTA; STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF CONNECTICUT; STATE OF DELAWARE; DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR *ex rel.* Andy Beshear, in his official capacity as Governor of the COMMONWEALTH OF KENTUCKY; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; JOSH SHAPIRO, in his official capacity as Governor of the COMMONWEALTH OF PENNSYLVANIA; and STATE OF WISCONSIN, | |
|       Plaintiffs, | |
|       v. | Civil Action No. 25-cv-121-MSM-LDA |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of Health and Human Services, | |
|       Defendants. | |

**THE UNITED STATES OF AMERICA'S RESPONSE IN OPPOSITION TO PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

# TABLE OF CONTENTS

INTRODUCTION ........................................................................................................ 1

BACKGROUND ......................................................................................................... 3

STANDARDS OF REVIEW ...................................................................................... 6

I.      SUBJECT MATTER JURISDICTION ......................................................... 6

II.     PRELIMINARY INJUNCTION ................................................................... 7

ARGUMENT ............................................................................................................. 9

I.      THE COURT LACKS JURISDICTION OVER PLAINTIFFS'
        CLAIMS ....................................................................................................... 9

        A.      Only the Court of Federal Claims has jurisdiction to hear
                claims seeking compulsion of payments of federal grants. ............... 9

        B.      The Supreme Court recently stayed injunctive relief
                compelling payment of federal grants given the district
                court's likely lack of jurisdiction. ..................................................... 10

        C.      Plaintiffs' changes in the Amended Complaint do not
                avoid their jurisdictional hurdles. .................................................... 14

        D.      Even if the APA were applicable, the APA would
                independently bar review. ................................................................. 18

II.     PLAINTIFFS HAVE NOT ESTABLISHED A LIKELIHOOD OF
        SUCCESS ON THE MERITS .................................................................... 21

        A.      The termination of grants was not contrary to law. ....................... 21

                1.      The applicable CDC regulations allow HHS to
                        terminate grants for cause, including changed
                        priorities. ................................................................................ 21

                2.      The SAMHSA grants were terminated in
                        compliance with the applicable regulations. ......................... 27

        B.      The Agency's decision to terminate the COVID funding
                grants was not arbitrary and capricious. .......................................... 30

III.    PLAINTIFFS HAVE NOT PROVEN IRREPARABLE HARM ................ 35

        A.      Monetary damages do not establish irreparable harm. ................... 36

        B.      If the Court enters a preliminary injunction, the harm to
                the federal government cannot be remedied. ................................... 39

IV.   THE BALANCE OF THE EQUITIES AND THE PUBLIC
      INTEREST WEIGH IN THE FEDERAL GOVERNMENT'S
      FAVOR ......................................................................................................39

V.    THE COURT SHOULD LIMIT ANY INJUNCTIVE RELIEF TO
      THE GRANTS PLAINTIFFS SPECIFICALLY CITE................................41

VI.   ANY INJUNCTIVE RELIEF SHOULD BE STAYED PENDING
      APPEAL AND BE ACCOMPANIED BY A BOND......................................42

## INTRODUCTION

Twenty-three States and the District of Columbia (the "Plaintiffs" or "Plaintiff states") seek to compel the United States Department of Health and Human Services ("HHS") to pay billions of federal dollars in grants for programs and activities 1) that were originally funded in response to the COVID-19 pandemic; 2) where most of the allocated funding has already been spent by the recipient states; 3) where significant amounts of the funding Plaintiffs now claim is critical had been available but left unspent, for years in some cases; and 4) where the terminations permit payment for any expenses the states had validly incurred at the time of termination.

Critically, the Supreme Court made clear less than two weeks ago that this Court does not have jurisdiction to hear these claims where, as here, a group of plaintiff states seek a court order to compel government payments under awarded grants. In addition, this Court does not have jurisdiction to review—let alone countermand—an agency's discretionary decision on how to allocate funds. Nor does the Court have jurisdiction over claims seeking to compel the payment of money allegedly due under a contract, which is exactly what Plaintiffs seek here. And, even if the Court could review the agency's termination decisions, because the relevant regulations provide HHS with the authority to terminate these grants, HHS did not act contrary to law, nor were its actions arbitrary and capricious.

The Court may issue preliminary injunctive relief only in rare and drastic circumstances where, unlike here, plaintiffs meet the heavy burden of establishing both that they are likely to succeed on the merits and that they will suffer immediate and

irreparable harm. In this case, Plaintiffs are not likely to succeed in this Court because the Court lacks jurisdiction over Plaintiffs' claims and because HHS acted within its authority. And Plaintiffs will not suffer any immediate harm apart from a delay in payment—a classic form of *reparable* injury. By contrast, interim relief will inflict irremediable harm on the federal government by forcing it to support activities that contravene Executive Branch priorities, and with funds that it likely cannot recoup should Defendants ultimately win this case, as they are likely to do.

Nonetheless, Plaintiffs demand a restart to this funding *now*, even though every dollar of the money that they seek would remain available to them *later* as money damages should they ultimately prove their entitlement to the funds. They do so without concrete evidence that their own governments could not absorb the costs of the grants in the interim, and with a universal request to require continued payment for every grant terminated by HHS. Plaintiffs expansively assert that "[k]ey health programs and initiatives will have to be dissolved or disbanded because the Plaintiff States do not have the wherewithal to run these programs with alternate funding midcycle . . . ," ECF No. 60 at 1, without differentiating between the hundreds of grants they demand the Court order the federal government to fund.

Plaintiffs know full well that, if the Court enters preliminary relief requiring Defendants to release funds pursuant to the terminated grants, HHS will likely be unable to recover those funds once disbursed. Once the money is released it will be spent. And it will be spent on activities that the agency has deemed inconsistent with Congress's intent and the public interest—thus inflicting an antidemocratic harm on

2

the Executive Branch and the public. Defendants—not Plaintiffs—will suffer significant harm that cannot be undone at the conclusion of the case.

Rather than take the extraordinary step of issuing a preliminary injunction and essentially commandeering federal funds, the Court should chart a more cautious and prudent path and keep the funds with the agency for now. For these reasons and those explained below, the Court should deny Plaintiffs' motion.

## BACKGROUND

This case involves grants awarded or supplemented by HHS with funding appropriated by Congress to address issues related to the onset of the COVID-19 public health emergency ("PHE"). In response to the coronavirus PHE, the federal government took unprecedented action to address the public health threat posed by COVID-19. To that end, Congress provided supplemental funds through six acts: Coronavirus Preparedness and Response Supplemental Appropriations Act, 2020, Pub. L. No. 116-123, 134 Stat. 146 (2020); Families First Coronavirus Response Act, Pub. L. No. 116–127, 134 Stat. 178 (2020); The Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ("CARES"); The Paycheck Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620 (2020); The Coronavirus Response and Relief Supplemental Appropriations Act ("CRRSAA"), (2021) Pub. L. No. 116-260, 134 Stat. 1182; and The American Rescue Plan Act of 2021 ("ARPA") Pub. L. No. 117-2, 135 Stat. 4 (2021). The grants at issue in this case fall under two sub-agencies of HHS: the Substance Abuse and Mental Health Services Administration ("SAMHSA") and the Centers for Disease Control And Prevention

("CDC"). These federal agencies expeditiously provided the Plaintiff states with critical funding through a variety of grant programs intended to timely respond to the crisis caused by the COVID-19 PHE.

CDC and SAMHSA either added these dollars to existing, open awards to quickly get money to states, or provided new grant funds to make sure states could respond quickly to the COVID-19 PHE. Those funds were used by many states, but in many cases, there was simply too much money to spend at one time, so funding could not readily or timely be used by recipients. The agencies therefore allowed, upon request by a recipient and consideration by the respective agency, no-cost extensions of the grant awards.

Over the past five years, HHS has, where appropriate, approved no-cost extensions or allowed carryover of funding through these grant programs, extending deadlines during which the funding could be spent as set out above. In the interim, the period of performance for several of the grants have also expired, frequently with remaining funds that had not been drawn down by the states, despite the availability of those funds. *See* Declaration of Jamie Legier ("Legier Decl.") and Declaration of Kurt John ("John Decl."). At the time of the grant terminations on March 24, 2025, approximately 70% of the allocated funding for the grants at issue in this case had either been spent by the Plaintiff states or had expired. Legier Decl. ¶ 8; John Decl. ¶ 7. With respect to grants where the period of performance had ended before March 24, 2025, the Plaintiff states had not even sought to draw down over $160 million in

available funding before the grant terminations. Legier Decl. ¶ 9; John Decl. ¶ 8. [1]

On March 24, 2025, HHS provided notification to the Plaintiff states that the remaining, active grants or funding lines under broader grants with COVID-19 supplemental funding were being terminated. The COVID-19 PHE is over. Yet, in many cases, there was still substantial grant funding remaining that the states had not drawn down for years. Pursuant to the underlying CDC and SAMHSA statutes and regulations, for the agencies to terminate future use of those funds. After the termination, Plaintiffs could continue to draw down grant funds for costs they already had incurred, but could no longer access federal grant funds for new expenditures.

On April 1, 2025, Plaintiffs sued HHS in the District of Rhode Island, claiming that the terminations of the grants violated the Administrative Procedure Act ("APA"). 5 U.S.C. §706(2)(A). ECF No. 1. The Complaint included the following causes of action: Violation of the APA – Contrary to Law SAMHSA Termination Notices (Count I); Violation of the APA – Contrary to Law CDC Termination Notices (Count II); and Substantive Violation of the APA – Arbitrary & Capricious All Public Health Terminations (Count III). Plaintiffs also filed a Motion for a Temporary Restraining

---

[1] In an effort to provide the Court with context for Plaintiffs' claims, the government provides this preliminary data summary of the grants that it believes to be at issue based on Plaintiffs' filings. Given the short timeframe for the government to file this Opposition, these and other calculations presented in the Opposition are based on a preliminary review of the currently-available raw data provided by the agency and undersigned counsel's understanding of Plaintiffs' claims. While the government believes, to the best of its knowledge and understanding, that these preliminary calculations are accurate, they are subject to further review and confirmation by the agency.

Order ("TRO") the same day. (ECF No. 4). On April 3, 2025, the Court granted Plaintiffs' Motion for a TRO by Text Order. On April 5, 2025, the Court issued an opinion granting Plaintiffs' TRO. ECF No. 54. On April 7, 2025, HHS filed a Notice of Compliance with the TRO. ECF No. 55. That same day, HHS filed a Motion for Reconsideration of the TRO, based on the United States Supreme Court's decision in *Dep't of Educ. v. California*, 604 U.S. ---, --- S. Ct. ---, No. 24A910, 2025 WL 1008354, at *1-2 (Apr. 4, 2025) (per curiam). ECF No. 56. That Motion remains pending. On April 8, 2025, Plaintiffs filed an Amended Complaint, adding constitutional claims in addition to the APA claims, presumably in response to the Supreme Court's decision and HHS's Motion for Reconsideration. ECF No. 59.

## STANDARDS OF REVIEW

### I.    <u>Subject Matter Jurisdiction</u>

To proceed on its claims, the Plaintiff states must first establish subject-matter jurisdiction in this Court—specifically, by showing whether Congress has waived sovereign immunity and, if so, whether this Court may hear their claims. *See, e.g., Hanley v. United States*, No. 94-1315, 1994 WL 723678, at *2 (1st Cir. Oct. 5, 1994) (per curiam) (affirming R. 12(b)(1) dismissal) ("A plaintiff has the burden of showing a waiver of sovereign immunity."). "Absent a waiver, sovereign immunity shields the Federal Government and its agencies from suit." *F.D.I.C. v. Meyer*, 510 U.S. 471, 475 (1994) (citing cases); *United States v. Mitchell*, 463 U.S. 206, 212 (1983) ("It is axiomatic that the United States may not be sued without its consent and that the existence of consent is a prerequisite for jurisdiction."); *Griffith v. Bowen*, 678 F. Supp.

942, 944 (D. Mass. 1988) ("[T]his Court must decide whether it has jurisdiction over the subject matter of the dispute before it may proceed any further.").

Federal courts "presume [they] lack jurisdiction unless the contrary appears affirmatively from the record." *Renne v. Geary*, 501 U.S. 312, 316 (1991) (cleaned up). The test for deciding whether sovereign immunity has been waived is "stringent," the waiver must be "unmistakably clear," and the Court must "indulge every reasonable presumption against" waiver. *Coll. Sav. Bank v. Fla. Prepaid Postsecondary Educ. Expense Bd.*, 527 U.S. 666, 675, 678, 682 (1999) (cleaned up); *FAA v. Cooper*, 566 U.S. 284, 290 (2012) ("A waiver of sovereign immunity must be unequivocally expressed in statutory text.").

Thus, the Plaintiff states have the burden of alleging facts sufficient to establish the Court's subject matter jurisdiction. *See Aversa v. United States*, 99 F.3d 1200, 1209 (1st Cir. 1996); *see also Padilla-Mangual v. Pavía Hosp.*, 516 F.3d 29, 31 (1st Cir. 2008) ("Once challenged, the party invoking subject matter jurisdiction ... has the burden of proving by a preponderance of the evidence the facts supporting jurisdiction").

## II.    **Preliminary Injunction**

"A preliminary injunction is an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008); *see also Cushing v. Packard*, 30 F.4th 27, 35 (1st Cir. 2022). A plaintiff must establish that: (i) it is likely to succeed on the merits; (ii) absent preliminary relief, it likely will suffer irreparable harm; (iii) the balance of the equities tips in its favor; and (iv) an injunction is in the public interest. *New Jersey v. Trump*, 131 F. 4th 27, 33 (1st Cir. 2025) (citing

*Winter*, 555 U.S. at 20). The third and fourth factors "merge when the government is the opposing party." *Nken v. Holder*, 556 U.S. 418, 435 (2009); *see also Weinberger v. Romero-Barcelo*, 456 U.S. 305, 312 (1982) ("In exercising their sound discretion, courts of equity should pay particular regard for the public consequences in employing the extraordinary remedy of injunction."). "In each case, a court must balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief." *Amoco Prod. Co. v. Village of Gambell*, 480 U.S. 531, 542 (1987)). "The party seeking the preliminary injunction bears the burden of establishing that these four factors weigh in its favor[,]" using evidence to support its conclusions. *Esso Standard Oil Co. (Puerto Rico) v. Monroig-Zayas*, 445 F.3d 13, 18 (1st Cir. 2006).

To evaluate whether the Plaintiffs have met the most important requirement—likelihood of success on the merits—the Court must keep in mind that the merits need not be "conclusively determine[d]"; instead, at this stage, decisions "are to be understood as statements of probable outcomes only." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 93 (1st Cir. 2020) (partially quoting *Narragansett Indian Tribe v. Guilbert*, 934 F.2d 4, 6 (1st Cir. 1991)). "To demonstrate likelihood of success on the merits, plaintiffs must show 'more than mere possibility' of success–rather, they must establish a 'strong likelihood' that they will ultimately prevail." *Sindicato Puertorriqueño de Trabajadores v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (quoting *Respect Maine PAC v. McKee*, 622 F.3d 13, 15 (1st Cir. 2010)).

## ARGUMENT

I.    <u>The Court Lacks Jurisdiction Over Plaintiffs' Claims</u>

**A. Only the Court of Federal Claims has jurisdiction to hear claims seeking compulsion of payments of federal grants.**

When a party seeks to compel funding that it believes the government is obligated to pay under a contract or grant, the proper remedy is suit under the Tucker Act, not the APA. The Tucker Act provides that the "United States Court of Federal Claims shall have jurisdiction to render judgment upon any claim against the United States founded" on "any express or implied contract with the United States." 28 U.S.C. § 1491(a); *see, e.g.*, *Burgos v. Milton*, 709 F.2d 1, 3 (1st Cir. 1987) (vacating district court judgment; concluding district court lacked jurisdiction under 5 U.S.C. § 702 to award money judgment); *id.* ("[E]ven if we agreed with [claimant] that the award was equitable and did not constitute 'money damages,' we would still find that section 702 did not remove the defense of sovereign immunity."); *Am. Sci. & Eng'g, Inc. v. Califano*, 571 F.2d 58, 62-63 (1st Cir. 1978) (no district court jurisdiction under APA even where plaintiff alleged violations of the agency's regulations and due process of law because the Court of Claims provided "an adequate remedy" for the claims, which were grounded in contract).

And, under these circumstances, courts have routinely held that "grant agreements [are] contracts when the standard conditions for a contract are satisfied." *See, e.g.*, *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338 (Fed. Cir. 2021); *see also San Juan City Coll. v. United States*, 391 F.3d 1357, 1360-62 (Fed. Cir. 2004)

(treating a "Program Participation Agreement" and related grants under the Higher Education Act as a contract).

In determining whether "a particular action" is "at its essence" a contract action that is subject to the Tucker Act or, instead, is a challenge properly brought under the APA, courts have looked at both "the source of the rights upon which the plaintiff bases its claims" and "the type of relief sought (or appropriate)." *Megapulse, Inc. v. Lewis*, 672 F.2d 959, 968 (D.C. Cir. 1982); *see also, e.g.*, *Cohen v. Postal Holdings, LLC*, 873 F.3d 394, 403 (2d Cir. 2017) (applying *Megapulse* test); *Califano*, 571 F.2d at 63 (evaluating whether "the essence of the action is in contract").

In short, "an injunction to compel the payment of money past due under a contract" is an action at law—not equity. *Great-W. Life & Annuity Ins. Co. v. Knudson*, 534 U.S. 204, 210 (2002); *see Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 3 (1st Cir. 1989) ("Federal courts do not have the power to order specific performance by the United States of its alleged contractual obligations."). As the First Circuit has explained, the APA's waiver of sovereign immunity for claims seeking relief other than money damages does not extend to "specific performance for breach of contract." *Id*. Thus, this Court lacks jurisdiction to order HHS to pay money allegedly owed under the grants.

## B. The Supreme Court recently stayed injunctive relief compelling payment of federal grants given the district court's likely lack of jurisdiction.

The Supreme Court has embraced the preceding analysis in a case decided within the last two weeks in which, like here, a group of plaintiff states sought a court order to compel government payments under awarded grants.

In *California v. United States Department of Education*, several States sued the Department of Education under the APA to try to compel such payments. No. CV 25-10548-MJJ, 2025 WL 760825, at *1 (D. Mass. Mar. 10, 2025). In the district court, the federal government argued that the APA's limited waiver of sovereign immunity, 5 U.S.C. § 702, does not extend to the termination of grant funding because challenges to such agency decision-making arise under contract—subject matter that Congress determined was the exclusive jurisdiction of the Court of Federal Claims pursuant to the Tucker Act. 28 U.S.C. § 1491. The district court rejected that argument, temporarily restrained the defendants, and more specifically ordered them to "immediately restore Plaintiff States to the pre-existing status quo prior to the termination under all previously awarded [ ] grants for recipients in Plaintiff States." 2025 WL 760825, at *5.

The United States appealed that order to the First Circuit, where the government presented the same jurisdictional challenge under the Tucker Act. The First Circuit refused to stay the district court's order. *California v. U.S. Dep't of Educ.*, No. 25-1244, 2025 WL 878431, at *1 (1st Cir. Mar. 21, 2025); *id*. at *2 (evaluating Tucker Act arguments).[2]

───────────────

[2] The Plaintiffs in this case described the First Circuit's *California* decision as follows:

> The First Circuit has soundly rejected this argument **under identical circumstances**. *California v. U.S. Dep't of Educ.*, --- F.4th ----, 2025 WL 878431, at *2 (1st Cir. Mar. 21, 2025), *application for stay pending*, No. 24A910 (U.S. Mar. 26, 2025). Where, **as here**, 'the States challenge the Department's actions as insufficiently explained, insufficiently reasoned, and otherwise

The United States, however, appealed the First Circuit's decision to the Supreme Court, which granted the stay that the government had sought. 2025 WL 1008354, at *2. In doing so, the Supreme Court explained that the government is "likely to succeed in showing the District Court lacked jurisdiction to order the payment of money under the APA." *Id*. at *1. Instead, the Supreme Court explained, suits seeking relief like that sought by the *California* plaintiff states—namely, restoration of funding from allegedly improperly terminated grants—likely belong in the Court of Federal Claims. *See id*. The Supreme Court reasoned:

> The APA's waiver of sovereign immunity does not apply "if any other statute that grants consent to suit expressly or impliedly forbids the relief which is sought." 5 U. S. C. § 702. Nor does the waiver apply to claims seeking "money damages." *Ibid*. True, a district court's jurisdiction "is not barred by the possibility" that an order setting aside an agency's action may result in the disbursement of funds. *Bowen v. Massachusetts*, 487 U. S. 879, 910 (1988). But, as we have recognized, the APA's limited waiver of immunity does not extend to orders "to enforce a contractual obligation to pay money" along the lines of what the District Court ordered here. *Great-West Life & Annuity Ins. Co. v. Knudson*, 534 U. S. 204, 212 (2002). Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over suits based on "any express or implied contract with the United States." 28 U. S. C. §1491(a)(1).

*Id*.; *see also U.S. Conference of Catholic Bishops v. U.S. Dep't of State*, No. 1:25-cv-465, 2025 WL 763738, at *2-4, (D.D.C. Mar. 11, 2025) (concluding the court lacked jurisdiction under APA to assess claims contesting State Department's termination

---

> contrary to law—arguments derived from the Administrative Procedure Act (APA),' [the First Circuit held] those claims are not breach of contract claims covered by the Tucker Act and are instead properly heard in the district court under the APA's waiver of sovereign immunity. *Id*."

ECF No. 4 at 18 (emphases added).

of contracts funding plaintiffs' refugee resettlement) (injunction pending appeal denied, No. 25-5066 (D.C. Cir. March 28, 2025); *id.* at *5 ("A request for an order that the government must perform on its contract is one that must be resolved by the Claims Court.") (cleaned up); *cf. Diaz v. Johnson*, No. 19-1501, 2020 WL 9437887, at *2 (1st Cir. Nov. 12, 2020) (although "Diaz attempts to couch his claims in the language of equitable and declaratory relief," such as seeking "an order directing that his proposal be funded," a plaintiff "cannot manufacture an APA claim by asking the court to declare that the failure to fund his proposal was an arbitrary or capricious act"); *Dep't of State v. AIDS Vaccine Advoc. Coal.*, 145 S. Ct. 753, No. 24A831, 2025 WL 698083, at *2 (U.S. Mar. 5, 2025) (Alito, J., dissenting from denial of application to vacate order) (explaining that "the relief here more closely resembles a compensatory money judgment rather than an order for specific relief that might have been available in equity," and "[s]overeign immunity thus appears to bar the sort of compensatory relief that the District Court ordered here").

Importantly, in its recent *California* opinion, the Supreme Court also went beyond the jurisdictional question to assess the elements of a stay. 2025 WL 1008354, at *1. Those elements are the same for preliminary relief under Federal Rule of Civil Procedure 65, on which the Plaintiff states have the burden. *See also New York v. Trump*, No. 25-1236, 2025 WL 914788, at *10 (1st Cir. Mar. 26, 2025) (identifying elements for stay pending appeal).

In *California*, the Supreme Court concluded that the remaining stay factors were met, because the government will be harmed if it is unable to "recover the grant

funds once they are disbursed." 2025 WL 1008354, at *1. That harm to the federal government was likely because, the Supreme Court noted, "[n]o grantee 'promised to return withdrawn funds should its grant termination be reinstated,' and the District Court declined to impose bond." By contrast, grant recipients "would not suffer irreparable harm while the TRO is stayed" because if the Plaintiff states ultimately prevail, "they can recover any wrongfully withheld funds through suit in an appropriate forum." *Id*. The Court then stayed the district court's relief pending not only the outcome of any First Circuit appeal but also "disposition of petition for a writ of certiorari, if such writ is timely sought." *Id*. at *2.

The preceding authorities preclude preliminary relief because this Court lacks the jurisdiction to enter it. The Plaintiffs do not claim that any statute or regulation entitles them, in particular, to these grants; instead, their relief is purely a matter of contract. And, twice, the Plaintiffs characterized the facts of this case as indistinguishable from those in *California*, where the Supreme Court has stayed (and, thus, effectively denied) preliminary relief through the exhaustion of post-trial appeals.

Because the circumstances of the *California* matter are indistinguishable from those presented here, the same result should obtain in both: the Court should not order the government to pay out canceled grants.

### C.  Plaintiffs' changes in the Amended Complaint do not avoid their jurisdictional hurdles.

In an effort to circumvent the Tucker Act and the recent Supreme Court decision that claims for grant-specific relief belong in the Court of Federal Claims as a

14

breach of contract claim, Plaintiffs filed an Amended Complaint, attempting to re-frame their argument by adding Constitutional claims and removing many of the terms used in the Complaint. For example, Plaintiffs originally asserted throughout the Complaint that HHS "abruptly and arbitrarily terminated $11 billion of critical public health funding. . . .[,]" argued they were challenging "Defendants' unlawful withholding of funds," and used terms such as grants, cooperative agreements, ter-minations notices, and "Public Health Terminations." *See*, *e.g.*, ECF. No 1, ¶¶ 1-6. Yet in the Amended Compliant, Plaintiffs removed most of those references including changing "funding" to a "policy shift" and "federal financial assistance," changing "Public Health Terminations" to "Public Health Funding Decisions," changing ""De-fendants' unlawful withholding of funds" to "Defendants' unlawful actions,"  and re-placing the terms "grants" and "cooperative agreements" with "programs." ECF No. 50, ¶¶ 1-6.

Plaintiffs' decision to change the language it uses to describe the grants and HHS's funding decisions merely serves to highlight that, underneath the veneer, what Plaintiffs are, in fact, seeking is for this Court to mandate continued payment of grants by HHS, precisely as in *California. See also Catholic Bishops*, 2025 WL 763738, at *5, ("Stripped of its equitable flair, the requested relief seeks one thing: The Conference wants the Court to order the Government to stop withholding the money due under the Cooperative Agreements. In even plainer English: The Con-ference wants the Government to keep paying up… But this Court cannot order the Government to pay money due on a contract."); *Diaz v. Johnson*, No. 19-1501,

2020 WL 9437887, at *2 (1st Cir. Nov. 12, 2020) (although "[plaintiff] attempts to couch his claims in the language of equitable and declaratory relief," a plaintiff "cannot manufacture an APA claim by asking the court to declare that the failure to fund his proposal was an arbitrary or capricious act").

Similarly, simply adding Constitutional claims in an attempt to recharacterize a claim for money neither alters the relief being sought nor this Court's jurisdiction. As the Federal Circuit has recognized, after *Bowen v. Massachusetts*, 487 U.S. 879 (1988), where the Supreme Court understood the term "money damages" to mean "*compensation* for the damage sustained by the failure of the Federal Government to pay as mandated," there has arisen a "cottage industry among lawyers attempting to craft suits, ultimately seeking money from the Government, as suits for declaratory or injunctive relief without mentioning the money." *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 480 F.3d 1116, 1124 (Fed. Cir. 2007). Plaintiffs' reliance on *Bowen*, 487 U.S. 879, is therefore misplaced. As noted above, in *California*, 2025 WL 1008354, the Supreme Court specifically considered *Bowen* in determining that the Tucker Act applied to the circumstances identical to this case.

The Federal Circuit has thus emphasized, in order to "thwart" "forum shopping" by attorneys who are "ultimately seeking money from the Government," that "in determining whether a plaintiff's suit is to be heard in district court or the Court of Federal Claims, we must look beyond the form of the pleadings to the substance of the claim. We have cautioned litigants that dressing up a claim

for money as one for equitable relief will not remove the claim from Tucker Act jurisdiction to make it an APA case." *Suburban Mortg. Assocs.*, 480 F.3d at 1124; *see also Christopher Vill., L.P. v. United States*, 360 F.3d 1319, 1328 (Fed. Cir. 2004) ("[A] party may not circumvent the Claims Court's exclusive jurisdiction by framing a complaint in the district court as one seeking injunctive, declaratory or mandatory relief where the thrust of the suit is to obtain money from the United States.") (citation omitted); *Consol. Edison Co. of New York, Inc. v. U.S. Dep't of Energy*, 247 F.3d 1378 (Fed. Cir. 2001) ("This court and its sister circuits will not tolerate a litigant's attempt to artfully recast its complaint to circumvent the jurisdiction of the Court of Federal Claims."); *Village West Assocs. v. Rhode Island Hous. & Mortg. Fin. Corp.*, 618 F.Supp.2d 134, 139-40 (D.R.I. 2009) (rejecting as "without merit" the "familiar argument" that by seeking a prospective declaration regarding future agency actions, the Court of Federal Claims could not provide adequate relief in cases where the Tucker Act applies).

The real question, then, is not how Plaintiffs have characterized their claims, but "whether the cause is one over which the Court of Federal Claims has jurisdiction under the Tucker Act" and thus whether there is an adequate remedy in a court other than the district court, precluding APA jurisdiction under 5 U.S.C. § 704. *Suburban Mortg. Assocs.*, 480 F.3d at 1125. "If the suit is at base a claim for money, and the relief available through the Court of Federal Claims under the Tucker Act—a money judgment—will provide an adequate remedy, the inquiry is at an end." *Id.*

Here, Plaintiffs state that they are seeking injunctive and equitable relief and have sought to evade the Tucker Act by adding Constitutional claims, but as made clear in both their original and amended pleadings, the relief they seek is for a court to order the government to keep paying them money. The equitable relief they seek is plainly "incident of and collateral to" the requested monetary relief in the form of ongoing grant funding, and thus can be part of any review by the Court of Federal Claims. *See* 28 U.S.C. § 1491(a)(2). Plaintiffs' own argument in their added counts is essentially that the defendants are required to pay them—that the Constitution requires monetary payments. Regardless of Plaintiffs' attempts at artful recasting, the Supreme Court has clarified that there is an adequate remedy for their cause—continued payment of grant funds—in the Court of Federal Claims, which has exclusive jurisdiction over their cause. Accordingly, by statute and per the Supreme Court, there is no APA jurisdiction over Plaintiff States' Complaint in federal district court.

### D. Even if the APA were applicable, the APA would independently bar review.

Plaintiffs now assert that they are seeking "purely prospective relief under the APA . . . ." ECF No. 60 at 22. But Plaintiffs' attempt to reframe this case as "agency actions to cut critical public health funding" still fails to establish that this Court has jurisdiction over this case. Because HHS's terminations were consistent with the applicable statutory and regulatory provisions, no further review under the APA is available. Even were these claims reviewable under the APA, not the Tucker Act, the APA itself would have precluded review of grant terminations. Such terminations are

quintessential agency actions "committed to agency discretion by law," for which the APA does not provide an avenue for review. 5 U.S.C. § 701(a)(2). An agency's determination of how to allot appropriated funds among competing priorities and recipients is classic discretionary agency action that is not susceptible to APA review.

In *Lincoln v. Vigil*, the Supreme Court held that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs was committed to agency discretion by law and thus not reviewable under the APA's reasoned-decision-making standards. 508 U.S. 182, 185-88 (1993). The Supreme Court explained that the "allocation of funds from a lump-sum appropriation is" an "administrative decision traditionally regarded as committed to agency discretion," because the "very point of a lump-sum appropriation is to give an agency the capacity to adapt to changing circumstances and meet its statutory responsibilities in what it sees as the most effective or desirable way." *Id*. at 192.

Indeed, "an agency's allocation of funds from a lump-sum appropriation requires 'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'" *Id*. at 193 (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)). "Congress may always circumscribe

19

agency discretion to allocate resources by putting restrictions in the operative statutes." *Id*. But as long as the agency abides by the relevant statutes (and whatever self-imposed obligations may arise from regulations or grant instruments), the APA "gives the courts no leave to intrude." *Id*.; *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit.")

Although *Lincoln* involved lump-sum appropriations, its logic extends to funding programs that leave to the agency "the decision about how the moneys" for a particular program "could best be distributed consistent with" the statute. *Milk Train, Inc.* v. *Veneman*, 310 F.3d 747, 751 (D.C. Cir. 2002). Such decisions—like decisions regarding how best to allocate lump-sum appropriations—"clearly require[] 'a complicated balancing of a number of factors which are peculiarly within [the agency's] expertise.'" *Id.* at 752 (citation omitted); see *Policy & Research, LLC* v. *U.S. Dep't of Health & Human Servs.*, 313 F. Supp. 3d 62, 75-76 (D.D.C. 2018) (Jackson, J.); *Cmty. Action of Laramie Cnty., Inc. v. Bowen*, 866 F.2d 347, 354 (10th Cir. 1989) ("Funding determinations are 'notoriously unsuitable for judicial review, for they involve the inherently subjective weighing of the large number of varied priorities which combine to dictate the wisest dissemination of an agency's limited budget.'" (quoting *Alan Guttmacher Inst. v. McPherson*, 597 F. Supp. 1530, 1536-37 (S.D.N.Y. 1984))).

In this case, where the agency explained the reasons for its actions and followed its own regulations, as explained in more detail in Section II below. Thus, no further review under the APA is available, and the Court does not have jurisdiction to review and impede HHS's discretionary funding decisions.

## II.  Plaintiffs Have Not Established a Likelihood of Success on the Merits

Because this Court lacks jurisdiction over Plaintiffs' claims, Plaintiffs cannot succeed on the merits. As the First Circuit has often recognized, proving likelihood of success on the merits is the "*sine qua non*" of a preliminary injunction." *New Comm Wireless Servs., Inc. v. SprintCom, Inc.*, 287 F.3d 1, 9 (1st Cir. 2002) Therefore, "[i]f the moving party cannot demonstrate that [it] is likely to succeed in [its] quest, the remaining factors become matters of idle curiosity." *Id.* Even apart from the jurisdictional obstacles, Plaintiffs have not shown a likelihood of success on the merits because the agency's actions were not contrary to law or arbitrary and capricious, nor did they violate the Constitution.

### A.  The termination of grants was not contrary to law.[3]

#### 1.  The applicable CDC regulations allow HHS to terminate grants for cause, including changed priorities.

Plaintiffs argue that HHS exceeded its statutory authority, in violation of the APA, by terminating the CDC's COVID-related grants. However, there is no

---

[3] On April 10, 2025, the Court entered a text order directing the Defendants to "address, in their response to Plaintiffs' motion for a preliminary injunction, all legal and factual bases upon which the Defendants relied, could have relied, or might in the future might rely to terminate the grant funds at issue in this litigation." *See* April 10, 2025 Text Order. In addition to the bases discussed elsewhere in this Opposition, HHS' bases for the termination of grants included,

question that HHS has the express authority to terminate grants "for cause," as described in more detail by the applicable regulations.

Congress appropriated funding for the particular purpose of providing support to address the public health and economic crises caused by the global COVID-19 pandemic. *See* Executive Order 14002 (January 22, 2021); White House OMB Statement of Administration Policy, H.R. 1319 – American Rescue Plan Act of 2021 (February 26, 2021). CDC expeditiously provided funding to the Plaintiff states through many different types of grants specifically for the purpose of addressing the COVID-19 pandemic. For example, CDC provided grant funding that included a "National Initiative to Address COVID-19 Health Disparities Among Populations at High-Risk and Underserved, Including Racial and Ethnic Minority Populations and Rural Communities." CDC National Initiative to Address COVID-19 Health Disparities Among Populations at High-Risk and Underserved, Including Racial and Ethnic Minority Populations and Rural Communities, attached hereto as **Exhibit A**. Another set of CDC grants was designed with

---

could have included, or could in the future include the provisions of 2 C.F.R. § 200 *et. seq.*; 42 C.F.R. § 75.300, *et. seq.*; 42 U.S.C. § 300x, *et. seq.*, as interpreted by any current or future caselaw; the bases listed in the notices of awards to the Plaintiff states, including all statutes, regulations, or guidance refenced in those notices; changes in Congressional funding or statutory authority; emergency circumstances; and violations of federal criminal or civil laws by grant recipients that may not yet be known to the Defendants, including all applicable fraud laws. Defendants provide this list in an attempt to respond to the Court's direction, but do not intend to waive their ability to raise additional bases in future litigation or to terminate any grant based on facts not yet known to the Defendants.

the goal of "preventing COVID-19 and protecting the American people from re-lated public health impacts . . . through training and deployment of community health workers (CHWs) to response efforts and by building and strengthening community resilience to fight COVID-19 through addressing existing health dis-parities." CDC Community Health Workers for COVID Response and Resilient Communities, attached hereto as **Exhibit B**. Another group of CDC grants was provided "to rapidly establish and monitor key activities related to COVID-19 in the areas of epidemiology, laboratory, and informatics." ELC CARES 2020 Emerging Issues Project funding for adjusting community mitigation in response to COVID-19, April 21, 2020, attached hereto as **Exhibit C**.

With respect to the CDC, as Plaintiffs admit, the regulations governing the grants at issue specifically allow HHS to terminate these grants "for cause" 42 C.F.R. § 75.372(a)(2). Separately, the regulation expressly contemplates and per-mits termination when a grant recipient "fails to comply with the terms and con-ditions of the award" as a basis for termination. 42 C.F.R. § 75.372(a)(1). Thus, a common-sense reading of the regulation makes clear that "for cause" is something distinct from non-compliance, and that the agency is permitted to terminate grants for reasons other than non-compliance. The agency exercised its authority to terminate the funding for cause after determining that the purpose for which the grants were awarded was superseded by the end of the public health emer-gency (the termination notices reflected this interpretation by stating that the pandemic was over).

In addition, HHS's Grants Policy Statement confirm the understanding that "for cause" includes reasons other than non-compliance, such as for "public health or welfare concerns." *See* HHS Grants Policy Statement, at 59 (effective Oct. 1, 2024), *available at* https://www.hhs.gov/sites/default/files/hhs-grants-pol-icy-statement-october-2024.pdf (last visited April 14, 2024) ("The HHS awarding agency may terminate without first suspending the federal award if the problem is serious enough or if the public health or welfare concerns require immediate action. Termination for cause may be appealed under the HHS awarding agency and HHS's federal award appeals procedures.")

Plaintiffs attempt to sidestep the regulatory language by pointing to the fact that HHS has indicated that it will adopt the Office of Management and Budget ("OMB") Uniform Administrative Requirements, Cost Principles, and Au-dit Requirements for Federal Awards in October of this year. *See* 89 Fed. Reg. 80055, 2024 WL 4360439 (Oct. 2, 2024) (effective October 2025); 89 Fed. Reg. 30046, 2024 WL 1702101 (April 22, 2024). The OMB regulations have not in-cluded "for cause" as an independent basis of termination of a federal award since August 2020. *Compare* 2 C.F.R. § 200.340 (effective October 1, 2024), *with* 2 C.F.R. § 200.339 (effective July 30, 2015 to August 12, 2020). But the OMB regu-lations are irrelevant because they do not yet apply to HHS and do not constrain HHS's current authority to terminate grants "for cause."

Nor do OMB's regulations support Plaintiffs' reading of HHS's regulations. If it is ever appropriate to use one agency's regulations to interpret another

agency's regulations, it certainly is not appropriate here. HHS has, for years, maintained grant regulations independent of OMB's regulations. If anything, that suggests that HHS consciously departed from the OMB regime. And a plain-text reading of HHS's regulations confirms that the agency may terminate grants for cause, as distinct from violation of the grant terms and conditions. Here, the CDC grant terminations comported with that regulatory regime.

At the time of the grant terminations, approximately 74% of the original $22 billion in CDC funding for COVID grants to the Plaintiff states had either been spent or had expired, with a remaining balance of approximately $5.8 billion.[4] Legier Decl., ¶ 8. The period of performance for many of the original grants had already ended, with remaining balances—totaling nearly $79 million—that the Plaintiff states never drew down from available funds. *Id* ¶ 9. Plaintiffs contend that all the funding from these grants is essential, and that HHS's termination of them will cause immediate, irreparable harm. Their actions, however, confirm that in fact, the termination of these grants did not create emergencies for the Plaintiff states, as the Plaintiffs themselves chose to leave millions of these funds unspent while they were available.

In their Amended Complaint, although not in their preliminary injunction motion, Plaintiffs also allege that HHS "failed to follow the processes required by applicable law" citing to 45 C.F.R. § 75.374(a), which states that "[u]pon taking

---

[4] It is possible that, for a subset of grants that expired within 90 days prior to March 24, 2025, not all submissions for expenses incurred prior to March 24, 2025, were complete. CDC is not withholding payment of any expenses incurred during the period of performance for these grants.

any remedy for non-compliance, the HHS awarding agency must provide the non-Federal entity an opportunity to object and provide information and documentation challenging the suspension or termination action, in accordance with written processes and procedures published by the HHS awarding agency." As noted above, HHS terminated the CDC grants at issue "for cause," as distinct from non-compliance, and thus this provision does not apply. Regardless, any administrative appeal of the grant terminations would have been fruitless because Plaintiffs could not reasonably challenge the end of the COVID-19 PHE. HHS fully complied with its own regulations and did not act contrary to law.

Moreover, the agency's "for cause" determination is supported by the fact over half of the Plaintiff states requested extensions of time to allow them to access funds they had not yet obligated or appeared to have a clear plan to spend. *See* Legier Decl., ¶ 7. The states' inability to use the funds in a timely manner, for the purpose for which they were awarded, is an independent "cause" for which the grants were terminated. Given the end of the public health emergency caused by COVID-19, the agency therefore determined that it was no longer consistent with HHS's priorities to allow the funds to remain with the grantees. In an effort to remain a good steward of federal tax dollars, the agency exercised its discretion, well within the bounds of the applicable regulations, to require the states to return grant money they could not spend. Nothing about the agency's actions prevents the Plaintiffs from drawing down funds for already-incurred obligations; they simply cannot no longer access funds for new obligations.

## 2. The SAMHSA grants were terminated in compliance with the applicable regulations.

As with the CDC, SAMHSA appropriately provided funding to the Plaintiff states through the Community Mental Health Services Block grants and Substance Abuse Prevention and Treatment Block grants "to assist in response to the COVID-19 pandemic." SAMHSA letter to State Mental Health Commissioner, March 11, 2021, attached hereto as **Exhibit D**. SAMHSA provided "supplemental COVID-19 Relief funding" to the states and instructed that they be used "to prevent, prepare for, and respond to [serious mental illness] and [serious emotional disturbance] needs and gaps due to the on-going COVID-19 pandemic." *Id*. SAMHSA also made funds available for states to develop a "COVID-19 Mitigation Funding Plan," instructing that the states' activities funded by the grants "must be directly related to COVID-19 testing and mitigation." SAMHSA letter to Single State Authority Directors and State Mental Health Authority Commissioners, August 10, 2021, attached hereto to **Exhibit E**.

To begin, this provision does not apply at all to the SAMHSA grant terminations. The trigger for that provision is a determination "that a State has materially failed to comply" with the grant terms or other conditions. *Id.* As explained, the cause HHS identified was wholly distinct from the States' compliance, or lack thereof, with grant terms: HHS cited the end of the COVID-19 pandemic. So, just as the regulations governing non-compliance do not apply to these terminations, the SAMHSA statutory requirements governing non-compliance do not apply.

27

The fact that the statute uses the words "for cause" does not change this conclusion. The statute merely provides one example of a for-cause termination—material non-compliance with the terms of the grant. The statute never says this is the only type of for-cause termination permitted, however. External factors, like the end of a pandemic or lack of appropriations by Congress, would likewise supply cause to terminate. But because any such terminations would not be for material non-compliance with grant terms, section 300x-55 would be irrelevant.

Even if section 300x-55 applied, however, Plaintiffs' argument still fails. Plaintiffs argue that the SAMHSA terminations did not provide an explanation of the States' "material failure to comply" with the agreements and other necessary conditions. However, HHS did provide an explanation of why the Plaintiffs could no longer comply with the necessary conditions for the disbursement of these funds: they were no longer necessary because of the end of the pandemic. The fact that the Plaintiff states were in fact not spending the money that had been allocated for COVID-19 relief purposes also represents a material failure to comply.

SAMHSA awarded funds under ARPA and CRRSA for the express purpose of implementing a behavioral health response to the COVID-19 pandemic by addressing the effects of the pandemic on Americans with mental illness or substance use disorders and to carry out COVID-19 testing and mitigation activities. *See* Exhibits D and E.

The agency exercised its authority on March 24, 2025, to terminate the funding after determining that the purpose for which the grants were awarded was superseded by the end of the public health emergency (the termination notices reflected this interpretation by stating that the pandemic was over) and demonstrated the lack of necessity. The agency's determination is supported by the fact that over half of the Plaintiff states requested and received extensions of time in which to expend unobligated CRRSA funds. *See* John Decl. ¶ 6. The Plaintiff states' inability to use the funds, in a timely manner, for the purpose for which they were awarded constituted a failure to materially comply with the requirement to expend the funds to prevent, prepare for, and respond to the COVID-19 public health emergency. In addition, a number of the SAMHSA COVID grants expired on March 14, 2025, which also ended the period of performance, and the grantees have 90 days from that date to close out the grants. So, for the grants under which the performance period ended on or before March 14, 2025, the terminations were inconsequential because the grants had already expired.

At the time of the grant terminations, approximately 74% of the $2.7 billion in SAMHSA funding for COVID grants to the Plaintiff states had either been spent or had expired, with a remaining balance of approximately $702 million.[5] John Decl., ¶ 7. The period of performance for many of the grants had already ended, along with a remaining balance of over $86 million that the Plaintiff states never drew down

---

[5] It is possible for a subset of grants that expired on March 14, 2025, not all submissions for expenses incurred prior to March 14, 2025, were complete. SAMHSA is not withholding payment of any expenses incurred during the period of performance for these grants.

from available funds. *Id*. at ¶ 8. Although Plaintiffs claim that all the funding from these grants is essential, the termination of which they argue will cause immediate, irreparable harm, their actions confirm HHS's view that in fact, the necessary conditions for the disbursement of the funding no longer existed.

The States further contend that these termination notices were issued without the opportunity for a hearing and an investigation as required by § 300x-55(g). However, as shown in the exhibits to Plaintiffs' filings, Plaintiffs were given notice shortly after termination, and an opportunity to challenge the termination and receive a hearing. *See, e.g.*, ECF 4-26 at 16, 22; ECF 4-41 at 54, 412, 440, 443. Plaintiffs do not allege or argue that they have requested such a hearing in response to the notice that was provided, nor that such a hearing was denied. Thus, Plaintiffs cannot contend that they suffered any concrete harm from the allegedly deficient notice.

### B. The Agency's decision to terminate the COVID funding grants was not arbitrary and capricious.

For the reasons discussed above, the APA does not provide an avenue for review of the agency's action in this case. 5 U.S.C. § 701(a)(2). Even if arbitrary-and-capricious review were available, however, HHS's actions pass muster. The APA provides that a reviewing court shall "hold unlawful and set aside agency action, findings, and conclusions found to be . . . arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. § 706(2)(A). The scope of review under the "arbitrary and capricious" standard under § 706 is "narrow and a court is not to

substitute its judgment for that of the agency." *Motor Vehicle Mfrs. Ass'n v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983).

This standard "deems the agency action presumptively valid provided the action meets a minimum rationality standard." *Sierra Club v. EPA*, 353 F.3d 976, 978 (D.C. Cir. 2004) (citation omitted); *see also Atieh v. Riordan*, 797 F.3d 135, 138 (1st Cir. 2015) (noting narrowness of arbitrary-and-capricious standard and that "a reviewing court 'may not substitute its judgment for that of the agency, even if it disagrees with the agency's conclusions.'") (citing *River St. Donuts, LLC v. Napolitano*, 558 F.3d 111, 114 (1st Cir. 2009)). At bottom, this deferential standard requires only that "agency action be reasonable and reasonably explained." *F.C.C. v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021). The explanation need only be clear enough for "the agency's path [to] reasonably be discerned" and to facilitate effective review, not an explanation of "ideal clarity." *Bowman Transp., Inc. v. Ark.-Best Freight Sys., Inc.*, 419 U.S. 281, 286 (1974).

Plaintiffs contend that the agency's actions were arbitrary and capricious because they contend HHS "did not provide a rational basis" for its decision, even as Plaintiffs acknowledge, as they must, that the agency explained it "changed its position and determined that the public health funding is no longer necessary based on the end of the COVID-19 pandemic. . . ." ECF No. 60 at 30, 32. HHS's determination that COVID-19 grant funding should no longer be a focus in light of the end of the pandemic was regular and lawful. *See Dep't of Commerce v. New York*, 588 U.S. 752,

781 (2019) ("[A] court may not set aside an agency's policymaking decision solely because it might have been influenced by political considerations or prompted by an Administration's priorities. . . .Such decisions are routinely informed by unstated considerations of politics, the legislative process, public relaetions, interest group relations, foreign relations, and national security concerns (among others)"). And because the agency's determinations about how it allocates funding are matters of policy discretion and not of "factual findings," such a shift does not require any additional explanation under the APA. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). The agency "need not demonstrate to a court's satisfaction that the reasons for the new policy are *better* than the reasons for the old one; it suffices that the new policy is permissible under the statute, that there are good reasons for it, and that the agency *believes* it to be better, which the conscious change of course adequately indicates." *Id.*

Much of Plaintiffs' arbitrary and capricious argument boils down to their contention that the agency should not have provided the same explanation to all recipients for its termination of COIVD-19-related grants. But Plaintiffs cite no authority to suggest that it is arbitrary and capricious for an agency to provide the same explanation across multiple decisions if, as here, those decisions are all made for the same basic reason and with respect to funding Congress appropriated for similar purposes tied to one global pandemic. The agency, in fact, had the same reason for terminating the grants at issue and communicated that clearly to recipients.

Plaintiffs alternatively suggest that HHS failed to consider "the substantial reliance interests of the Plaintiff States and the tremendously harmful impact of the Public Health Funding Decision and its implementation" and that "longstanding policies may have engendered serious reliance interests that must be taken into account." *Id.* at 33. But that is an incorrect premise. HHS concluded that some grants—specifically, those related to the now-ended COVID-19 PHE—should be terminated, and that some should be retained. HHS also identified over $86 million in SAMHSA funding and nearly $79 million in CDC grant funding that the states had not obligated or drawn down while the funds were available. For the same reasons, Plaintiffs' arguments about their reliance on the availability of grants from the federal government are unavailing. They ignore the fact that the states failed to draw down over $160 million of the funds while they were available, and that HHS continued to fund other grants that were consistent with the agency's priorities.

Plaintiffs' remaining arbitrary-and-capricious arguments fare no better. For example, they argue that the agency's decision to terminate certain grants fail to consider that Congress chose to keep funding some of the grants after the pandemic was over, and "appear simply to desire to overrule Congress' spending and judgment authority." ECF No. 60 at 3. But Plaintiffs' argument ignores the broad discretion that agencies have in creating, awarding, and terminating specific grants. *See generally*, *Lincoln v. Vigil*, 508 U.S. at 185-88, 192-93 (finding that the Indian Health Service's decision to discontinue a program it had previously funded and to instead reallocate those funds to other programs consistent with the agency's statutory responsibilities

was committed to agency discretion by law and thus not reviewable under the APA's reasoned-decision-making standards, noting that an agency's allocation of funds requires "'a complicated balancing of a number of factors which are peculiarly within its expertise': whether its 'resources are best spent' on one program or another; whether it 'is likely to succeed' in fulfilling its statutory mandate; whether a particular program 'best fits the agency's overall policies'; and, 'indeed, whether the agency has enough resources' to fund a program 'at all.'") (quoting *Heckler v. Chaney*, 470 U.S. 821, 831 (1985)); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.) ("A lump-sum appropriation leaves it to the recipient agency (as a matter of law, at least) to distribute the funds among some or all of the permissible objects as it sees fit.")

While Plaintiffs point generally to the sections of the Fiscal Responsibility Act of 2023 that rescinded some, but not all, of the funding that had been appropriated in the wake of COVID-19, they overlook that this occurred in part because HHS had not yet distributed all of the money appropriated by Congress. When Congress considered the fact that HHS had not distributed all of the money it had appropriated for COVID-19 relief, Congress did not mandate spending of all of the previously allocated funds or provide more specific requirements for the funding. Instead, Congress chose to take some portion of the funds back.

Two years later, the money had still not been spent. Plaintiffs do not argue that HHS exceeded its authority in allowing grants to expire, or by allowing Plaintiffs

34

to use funding for purposes no longer directly tied to COVID-19, such as the prevention of other infectious diseases. Plaintiffs did not take issue with HHS's ongoing adjustments, as long as the Plaintiffs were still receiving as much money as they wanted; it was only when HHS acknowledged the reality of the end of the pandemic and the need to stop, any remaining funding tied to COVID-19 that Plaintiffs claimed overreach.

HHS determined that the grants that it had previously determined to be an appropriate use of the remaining COVID-19 funding are no longer an appropriate use. Congress may, as before, decide to take back the funding or appropriate it for a different use. But, as the Supreme Court has acknowledged, it is squarely within HHS's discretion to determine whether to fund any specific program at all, so long as it is consistent with its statutory responsibilities. *See generally, Lincoln*, 508 U.S. at 193.

## III.    <u>Plaintiffs Have Not Proven Irreparable Harm</u>

Plaintiffs' motion should be denied solely on the basis that they have failed to demonstrate irreparable harm. "Preliminary injunctions are strong medicine" and "should not issue except to prevent a real threat of harm." *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004). "A finding of irreparable harm must be grounded on something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004) ("In most cases—and the case at hand is no outlier—irreparable harm constitutes a necessary threshold showing for an award of preliminary injunctive relief."); *see also Narragansett Indian Tribe*,

934 F.2d at 6–7 ("[S]peculative injury does not constitute a showing of irreparable harm." (quoting *Pub. Serv. Co. of N.H. v. Town of W. Newbury*, 835 F.2d 380, 383 (1st Cir. 1987))).

Plaintiffs argue that they "have suffered and will suffer substantial harm," not irreparable harm, the standard for a preliminary injunction. ECF No. 60 at 12. They argue that the termination of funding "undermines [their] ability to fulfill their mission of protecting public health . . . . [,]" "will eliminate a wide range of health care services provided by Plaintiff States[,]" and "imperils Plaintiff States' public health infrastructure projects." *Id.* at 13-17. Plaintiffs' sweeping assertion of harm fails to address the fundamental problem that the relief they seek is monetary damages—the classic example of reparable harm—and that Plaintiffs themselves, along with the other states, failed to draw down over $160 million of the very grant funds they now claim the absence of which would cause irreparable harm.

### A. Monetary damages do not establish irreparable harm.

Plaintiffs' shifting characterization of the claims cannot hide the fact that, at bottom, they seek an order from the Court that would force the federal government to pay them money. Thus, their claims are for money damages. It is "well settled that economic loss does not, in and of itself, constitute irreparable harm." *Wis. Gas Co. v. FERC*, 758 F.2d 669, 674 (D.C. Cir. 1985); *see also, e.g., Akebia Therapeutics, Inc. v. Azar*, 443 F. Supp. 3d 219, 230 (D. Mass. 2020) ("[E]("economic loss alone does not usually rise to the level of irreparable harm which a party must establish to obtain a preliminary injunction") (cleaned up); *Seafreeze Shoreside, Inc v. U.S. Dep't of Inte-*

*rior*, No. 1:22-cv-11091-IT, 2023 WL 3660689, at \*7 (D. Mass. May 25, 2023) ("Plaintiffs have not demonstrated 'irreparable harm,' but at most, economic loss"); *see also e.g., Weinberger*, 456 U.S. at 312 ("The Court has repeatedly held that the basis for injunctive relief in the federal courts has always been irreparable injury and the inadequacy of legal remedies."); *Danielson v. Local 275, Laborers Int'l Union*, 479 F.2d 1033, 1037 (2d Cir. 1973) ("Irreparable injury is suffered where monetary damages are difficult to ascertain or are inadequate.").

Plaintiffs argue that "[p]reliminiary relief is necessary to avoid such harm and protect the equities and public interest[]" citing *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005). ECF 60 at 37. That case, however, defines "irreparable injury" for the purposes of preliminary relief as "an injury that cannot adequately be compensated for either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande*, 397 F.3d at 76. It also involves a suit under § 1983, and not under the APA. *Id*.

The Plaintiffs' purport to be unable to provide certain programming results solely from the loss of funding. But HHS has not taken any actions—other than withholding money—that impede Plaintiffs' ability to carry on with these programs. The only thing that HHS has done is stop footing the bill. That is an economic loss. Otherwise, one could always convert the relevant harm for purposes of a preliminary injunction from (i) an economic loss to (ii) the inability to do things that cost money—thus swallowing the general rule that "economic loss alone does not usually rise to the level of irreparable harm." *Akebia*, 443 F. Supp. 3d at 230. The Plaintiff states

have other open grant awards with HHS and will continue to able to apply for, and receive, new lines of funding from the agency. The Plaintiff states are only prevented from drawing down from the COVID-19-related grant awards for costs they incurred after those awards were terminated.

Finally, even if Plaintiffs were correct that the terminations did not comport with the APA, vindicating that right would involve remanding to the agency for further consideration or explanation. If that is the final relief Plaintiffs would theoretically be entitled to, it makes no sense to grant the broader relief of reinstating the grants in this preliminary posture. *See Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985) ("the proper course, except in rare circumstances, is to remand to the agency for additional investigation or explanation"); *Dist. Hosp. Partners, L.P. v. Burwell*, 786 F.3d 46, 60 (D.C. Cir. 2015) ("bedrock principles of administrative law preclude us from declaring definitively that the Secretary's decision was arbitrary and capricious without first affording her an opportunity to articulate, if possible, a better explanation").

Ultimately, even if Plaintiffs can claim some threat of harm, there is no reason why they cannot vindicate that alleged harm through individualized, specific lawsuits challenging particular funding denials for specific grants. Those suits would be properly brought in the Court of Federal Claims. Plaintiffs' declarations do not establish the need for broad relief in a single lawsuit, particularly because they demonstrate the wide varied grants and programs at issue.

38

## B. If the Court enters a preliminary injunction, the harm to the federal government cannot be remedied.

A federal court may not issue an equitable remedy that is "more burdensome to the defendant than necessary to [redress] the plaintiff's injuries." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979); *see also Gill v. Whitford*, 585 U.S. 48, 68 (2018) ("[A] 'remedy must ... be limited to the inadequacy that produced the injury in fact that the plaintiff has established' "). The "universal injunctive relief" Plaintiffs seek defies foundational and equitable principles. *See Labrador v. Poe*, 601 U. S. ——, ———, No. 23A763 (April 15, 2024) (Gorsuch, J., concurring in grant of stay).

If an injunction is granted, and allows Plaintiffs to use the terminated funds, the government "is unlikely to recover the grant funds once they are dispersed." *California*, Slip Op. 2. As the Supreme Court noted in *California*, '[n]o grantee "promised to return withdrawn funds should its grant termination be reinstated," and the Court did not impose a bond to guarantee recovery of such funds if Defendants later prevail. *Id*. Given the exceptionally broad relief that Plaintiffs seek, the harm to the federal government would be tremendous. Therefore, relief should be denied.

## IV.   The Balance of the Equities and the Public Interest Weigh in the Federal Government's Favor

Even if Plaintiffs could establish irreparable harm, they have not shown that "the balance of equities and consideration of the public interest" favor a preliminary injunction. *Winter*, 555 U.S. at 32. Traditionally, a court first determines whether the movant's likely harm "will outweigh the harm which granting the injunction would inflict on [the defendant]." 7-*Eleven, Inc. v. Grewal*, 60 F. Supp. 3d 272, 283 (D. Mass. 2014). Thus, Plaintiffs must demonstrate that their claimed injury outweighs any

harm that granting the injunctive relief would inflict upon Defendants. *Lancor v. Lebanon Hous. Auth.*, 760 F. 2d 361, 362 (1st Cir. 1985). Next, courts consider whether "[t]he public interest weighs in favor of granting" the preliminary injunction. *7-Eleven, Inc.*, 60 F. Supp. 3d at 285.. But where, as here, the government is the defendant, these factors simply "merge." *Nken*, 556 U.S. at 435.

If the Court does not issue a preliminary injunction, HHS will hold the grant money at issue during the pendency of the case, and the Plaintiffs can still obtain it as money damages at the end of the case if they are ultimately successful. But the opposite is not true—if the grantees are given access now, and draw down the funds throughout the litigation, Defendants will be left with no meaningful recourse even if they prevail. Accordingly, HHS will bear all the risk if the Court enters a preliminary injunction. The Supreme Court recognized precisely that dynamic in *California* when it stayed the TRO granted by the district court in that case. 2025 WL 1008354, at *1.

The relevant harm to the federal government is not merely the forced expenditure of (unrecoverable) money during the pendency of this litigation. The harm is also the forced expenditure of money in support of causes that are inconsistent with Executive Branch's policy objectives. Put another way, it is not just a loss of money, but also a loss of control that has been vested by statute in the Secretary, who in turn answers to the President and thus the public at large. Forcing the government to

financially support causes at odds with its own policies, and Congress's express purpose for the funds, inflicts a distinct and irremediable harm on the public that goes beyond the expenditure of appropriated funds.

**V.    The Court Should Limit Any Injunctive Relief to the Grants Plaintiffs Specifically Cite**

Relief under the APA is limited; courts may either "compel agency action unlawfully withheld or unreasonably delayed" or "hold unlawful and set aside agency action." 5 U.S.C. § 706; *see also Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 66-67 (2004) (explaining how the APA's limits on relief are intended to "protect agencies from undue judicial interference with their lawful discretion, and to avoid judicial entanglement in abstract policy disagreements").

Injunctive relief should not provide "a remedy beyond what [is] necessary to provide relief" to injured parties. *Lewis v. Casey*, 518 U.S. 343, 360 (1996). Accordingly, to the extent the Court intends to grant the Plaintiffs' request for a preliminary injunction, such relief should be narrowly tailored to apply only to the grants identified in Plaintiffs' declarations accompanying their motion for a temporary restraining order. *See Univ. of Tex. v. Camenisch*, 451 U.S. 390, 395 (1981) ("The purpose of a preliminary injunction is merely to preserve the relative positions of the parties until a trial on the merits can be held."); *Dep't of Homeland Sec. v. New York*, 140 S. Ct. 599, 600 (2020) (Gorsuch, J., concurring) ("Universal injunctions have little basis in traditional equitable practice."); *Florida v. Dep't of Health & Hum. Servs.*, 19 F.4th 1271, 1282 (11th Cir. 2021) (noting that the "appropriate circumstances" for issuing a nationwide injunction "are

rare"). Accordingly, the Court should—at a minimum—limit any relief to grant awards about which the Plaintiffs have provided information in their various declarations. And it should clarify that the agency may continue to subject draw down requests to its normal checks and procedures.

## VI.    Any Injunctive Relief Should Be Stayed Pending Appeal and be Accompanied by a Bond

If the Court grants Plaintiffs' Motion for a Preliminary Injunction, it should stay any such order pending any appeal, because Defendants are likely to succeed on appeal and will face irreparable harm absent a stay. *Hilton v. Braunskill*, 481 U.S. 770, 776 (1987) (setting forth the factors "regulating the issuance of a stay"). On the whole, as argued above, a stay is warranted. At a minimum, the Court should administratively stay any injunctive relief it intends to order for a period of seven days to allow the United States to seek an emergency, expedited stay from the Court of Appeals if an appeal is authorized.

The Defendants also respectfully requests that any injunctive relief accompany a bond under Federal Rule of Civil Procedure 65(c), which provides that "[t]he court may issue a preliminary injunction or a temporary restraining order only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." A bond is appropriate here given that any preliminary relief would potentially mandate that HHS spend money that may not be recouped once distributed.

Dated: April 14, 2025

Respectfully submitted,

THE UNITED STATES OF AMERICA,

By its Attorneys,

SARA MIRON BLOOM
Acting United States Attorney

*/s/ Kevin Love Hubbard*
KEVIN LOVE HUBBARD
Assistant United States Attorney
One Financial Plaza, 17th Floor
Providence, RI 02903
(401) 709-5000
Kevin.Hubbard@usdoj.gov

**CERTIFICATION OF SERVICE**

I hereby certify that, on April 14, 2025, I filed the foregoing document through this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rules Gen 304.

*/s/ Kevin Love Hubbard*
KEVIN LOVE HUBBARD
Assistant United States Attorney