## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

STATE OF COLORADO, et al.,

        Plaintiffs,

    v.

U.S. DEPARTMENT OF HEALTH AND
HUMAN SERVICES, et al.,

        Defendants.

Case No. 1:25-cv-00121

## PLAINTIFF STATES' REPLY IN SUPPORT OF THEIR MOTION FOR PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

Introduction .................................................................................................. 1

Argument .................................................................................................... 3

    I.    This Court Has Jurisdiction over Plaintiff States' Claims. ....................... 3

        A.    The Tucker Act Does Not Apply to the Claims at Issue ............... 3

        B.    Plaintiff States' APA Claims are Reviewable. ........................... 10

    II.    Plaintiff States Have Established a Likelihood of Success on the Merits. .................................................................................... 15

        A.    Defendants Did Not Address and Therefore Waived Any Merits Defense to the Claim that the Public Health Funding Decision Exceeded Statutory Authority and Violated the Constitution. .................................................................. 15

        B.    Defendants' Implementation of the Public Health Funding Decision Was Contrary to Law. ................................................ 17

        C.    The Challenged Actions Are Arbitrary and Capricious .............. 24

    III.    Plaintiff States Will Be Irreparably Harmed Absent a Preliminary Injunction. .............................................................................. 27

    IV.    The Public Interest and the Balance of Equities Strongly Favor Entry of a Preliminary Injunction. .................................................... 30

    V.    The Requested Relief Is Directly Tailored to the Scope of the Harm Suffered. .................................................................................. 31

    VI.    The Court Should Set Either a Zero-Dollar Bond or a Nominal Bond .... 32

    VII.    The Court Should Deny a Stay Pending Appeal. .................................. 33

Conclusion ................................................................................................. 34

## INTRODUCTION

The U.S. Department of Health and Human Services ("HHS") violated numerous statutes and regulations, not to mention the Constitution, when it unlawfully decided that it had the unilateral power to eliminate $11 billion in congressionally appropriated public health programs and funding as "no longer necessary" because the "COVID-19 pandemic is over" (the "Public Health Funding Decision"). One would expect a decision of this magnitude would receive careful attention and scrutiny. Apparently not. When asked about these public health cuts, HHS Secretary Robert F. Kennedy, Jr. told CBS News he was "not familiar with those cuts" and believed they were "DEI cuts." CBS News, RFK Jr. Says He's 'Not Familiar' With All Health Program Cuts in Exclusive Interview (Apr. 9, 2025), https://www.cbsnews.com/news/rfk-jr-sweeping-cuts-health-programs-employees-exclusive-interview/. This is emblematic of the problem. The Constitution gives the power of the purse exclusively to Congress, not to the agency, and certainly not to nameless bureaucrats who apparently disagree with Congress's judgment.

At bottom, this is a case about agency authority. When pressed to identify *any* statutory basis to support the authority exercised, Defendants could not. Indeed, Defendants' opposition offers no merits response at all to either the claims that the Public Health Funding Decision was in excess of statutory authority or violated separation-of-powers principles. That HHS cannot identify any such authority is unsurprising. In fact, HHS does not, and cannot, dispute that Congress: (1) expressly identified funds and programs in the COVID-19 appropriations laws that were tied to the end of the public health emergency; and (2) *after* the public health emergency ended, reviewed all of the COVID-19 appropriations laws, rescinded $27 billion of funds that were no longer necessary, but left in place *all* the programs and funding at issue in this case. Without authority, HHS simply tries to avoid accountability by claiming that only the Court of

1

Federal Claims has jurisdiction to review these claims, even though that court is not an appropriate venue for such statutory authority and constitutional claims.

Defendants' arguments all lack merit. The Tucker Act has no application here because the claims do not seek to enforce contractual obligations. Instead, Plaintiff States seek prospective, equitable relief based on statutory, regulatory, and constitutional violations. Whether there are even any contracts here, let alone the terms of any contracts, does not need to be adjudicated in light of the claims asserted. Likewise, the agency's actions are not committed to agency discretion. The agency has no discretion to violate statutory, regulatory, and constitutional commands.

Not only did the agency break the law in making the Public Health Funding Decision, but it also broke the law through its implementation of that decision. HHS purported to apply "for cause" statutory and regulatory provisions that do not apply here. Indeed, HHS cited one provision, 42 U.S.C. § 300x-55, as the source of its authority but now claims "this provision does not apply at all," ECF No. 68 ("Opp.") at 27. Confronted with a clear failure to follow statutory and regulatory procedures, Defendants disclaim any responsibility to do so. Finally, Defendants offer only cursory arguments in response to the arbitrary and capricious nature of their actions.

In the face of this lawless behavior, Plaintiff States have already suffered irreparable harm. Supported by 48 declarations, Plaintiff States have demonstrated through unrebutted evidence that key public health programs and initiatives will have to be dissolved or disbanded because the Plaintiff States do not have the wherewithal to run these programs with alternate funding midcycle. Large numbers of public health employees and contractors have been, or may soon be, terminated. Simply put, these billions of dollars in cuts, made without warning, threaten significant harm to the public health systems of Plaintiff States.

2

In light of the many statutory, regulatory, and constitutional violations and the irreparable

harm suffered, Plaintiff States request that the Court enter a preliminary injunction enjoining

Defendants from implementing or enforcing the Public Health Funding Decision.

**ARGUMENT**

**I.      This Court Has Jurisdiction over Plaintiff States' Claims.**

**A.      The Tucker Act Does Not Apply to the Claims at Issue.**

As Plaintiff States explained in opposing Defendants' motion to reconsider, ECF No. 65,

this Court, and not the Court of Federal Claims, is the right place to bring this case. The central

issues here—whether Defendants could legally make an across-the-board, agency-wide decision

to terminate $11 billion in congressionally appropriated public health funds "for cause" based on

the end of the COVID-19 emergency that occurred nearly two years ago—arise under the

Administrative Procedure Act ("APA") and the U.S. Constitution. As in *Bowen v.*

*Massachusetts*, 487 U.S. 879, 905 (1988), none of the issues here involve the sorts of contractual

theories of obligation that are appropriately dealt with by the Court of Federal Claims. *See also*

*Megapulse, Inc. v. Lewis*, 672 F.2d 959, 967-68 (D.C. Cir. 1982) (rejecting the broad proposition

that "any case requiring some reference to or incorporation of a contract" lies within the Tucker

Act). Indeed, adjudicating these legal questions does not require the Court to interpret individual

grants' funding terms and conditions at all.

While Defendants correctly note that applicability of the Tucker Act depends on whether a

particular lawsuit "at its essence" is an action in contract, Opp. at 10, they do not substantively

engage with that standard or with Plaintiff States' explanations why their claims do not fall into

that category. First, this case involves prospective, equitable relief in order to clarify a "complex

ongoing relationship" that involves "managing the relationships between States and the Federal

Government." *Maine Cmty. Health Options v. United States*, 590 U.S. 296, 327 (2020) (applying

3

*Bowen*) (internal quotations and citations omitted). Indeed, *Bowen* recognized that obtaining such prospective, equitable relief regarding the "administration of Federal grant-in-aid programs" was one of the specific types of judicial review that Congress sought to authorize in amending 5 U.S.C. § 702, the APA's waiver of sovereign immunity.[1] *Bowen*, 487 U.S. at 898. Second, the claims all arise from statutory, regulatory, and constitutional violations. There are no alleged claims arising from the breach of contractual obligations. Third, no party is seeking a judgment for payment of contract damages or past-due obligations, and the proposed relief includes prospective injunctive and declaratory relief against HHS's underlying Public Health Funding Decision. Indeed, Defendants request that HHS "may continue to subject draw down requests to its normal checks and procedures," Opp. at 42, implicitly recognizing that the relief requested will not be an order to pay a particular sum of money. Instead, the requested relief would simply enjoin Defendants from enforcing or implementing their unlawful agency action.

Defendants suggest that State Plaintiffs' equitable and declaratory relief is mere window dressing but never explain why that would be so. In *Bowen*, the Supreme Court explained that "money damages" provide compensation as a substitute for the government's performance of its obligations, whereas specific relief—again, which Plaintiff States seek here—provides plaintiffs "the very thing to which [they are] entitled." *Id.* at 895, 901, 910 (quotation omitted). This is so even if the specific relief ultimately results in the payment of money as part of that entitlement.

---

[1] Given this legislative action, the Supreme Court concluded it was "highly unlikely that Congress intended to designate an Article I court [the Court of Federal Claims] as the primary forum for judicial review of agency action that may involve questions of policy that can arise in cases such as these." *Bowen*, 487 U.S. at 908 n.46 (1988). It then quoted approvingly a district court's conclusion that, in this area, "[t]he policies of the APA take precedence over the purposes of the Tucker Act. In the conflict between two statutes, established principles of statutory construction mandate a broad construction of the APA and a narrow interpretation of the Tucker Act." *Id.* (cleaned up).

4

*Id.* at 893, 897-98 (citation omitted); *see also Dep't of the Army v. Blue Fox, Inc.*, 525 U.S. 255, 262 (1999) (recognizing same as governing consideration under *Bowen* for APA claims under § 702, and explaining that "money damages," which usually "refers to a sum of money used as compensatory relief," are different than specific remedies, which "attempt to give the plaintiff the very thing to which he was entitled" (citations omitted)).

Here, as in *Bowen*, Plaintiffs seek judicial review of an HHS policy decision, the Public Health Funding Decision, applied en masse to its administration of financial assistance. S*ee also New York v. Trump*, No. 1:25-CV-39-JJM-PAS, 2025 WL 1098966, at *2 (D.R.I. Apr. 14, 2025) (applying *Bowen* where court's orders addressed agencies' categorical funding freezes and "were *not* enforcing a contractual obligation to pay money"). An injunction here would not amount to "money damages" because it is not "compensation" to serve as a "substitute" for the government performing as required; at most, future potential releases of congressionally appropriated money are a "by-product" of an injunction preventing Defendants from violating statutory, regulatory, and constitutional authority. *Cf. Bowen*, 487 U.S. at 893-95, 910. And because the Court of Federal Claims is not situated to provide equitable relief, seeking relief there would not yield an adequate remedy for the Plaintiff States. *James v. Caldera*, 159 F.3d 573, 580 (Fed. Cir. 1998) (explaining that any equitable relief available under Tucker Act claims can be only incidental and must be "tied and subordinate to a money judgment") (citation omitted); *see also Nat'l Air Traffic Controllers Ass'n v. United States*, 160 F.3d 714, 716 (Fed. Cir. 1998) (noting "there is no provision" of the Tucker Act that "giv[es] the Court of Federal Claims jurisdiction to grant equitable relief when it is unrelated to a claim for monetary relief pending before the court").

Indeed, numerous Federal Circuit decisions have recognized that federal district courts, and not the Court of Federal Claims, are the appropriate forum for suits challenging alleged

violations of statute or regulation, where the party does not seek compensation for past harms or past due sums. For example, in *Katz v. Cisneros*, 16 F.3d 1204 (Fed. Cir. 1994), the Federal Circuit held that a developer's suit against the U.S. Department of Housing and Urban Development could be brought in district court where, despite an underlying contract, the plaintiff was seeking "payments to which it alleges it is entitled pursuant to federal statute and regulations; it [did] not seek money as compensation for a loss suffered." *Id.* at 1208. Likewise, in *Nat'l Ctr. for Mfg. Sciences v. United States*, 114 F.3d 196, 200 (Fed. Cir. 1997), the Federal Circuit held that, despite an underlying contract, a challenge to the withholding of funds was a proper APA claim. "Like the grant-in-aid applicants referred to in *Bowen v. Massachusetts*, NCMS is seeking funds to which it claims it is entitled under a statute; it is not seeking money in compensation for losses that it has suffered or will suffer as a result of the withholding of those funds." *Id.*

The cases cited by Defendants for the proposition that Court of Federal Claims jurisdiction is proper focus on specific contractual disputes and thus actually reinforce Plaintiff States' position. For example, in *Burgos v. Milton*, 709 F.2d 1, 3 (1st Cir. 1983), the First Circuit vacated a district court judgment because it lacked jurisdiction under the APA, § 702, "to award money judgment." Opp. at 9. But at issue in *Burgos* was $15,000 of money damages the plaintiff tried to recoup as compensation from the IRS under a theory that the government had violated a prior bargain with him by not delivering a valid deed. 709 F.2d at 2-3. That relief is a classic example of what the Supreme Court described in *Bowen* as damages to recompense for past harms to "provide a victim with monetary compensation for an injury to [their] person, property, or reputation," not prospective equitable relief under the APA. 487 U.S. at 893-94.

6

In *Columbus Reg'l Hosp. v. United States*, 990 F.3d 1330, 1338-39 (Fed. Cir. 2021), a disaster assistance agreement resulted in a binding contract, and the hospital's contract claim was properly within the Tucker Act's jurisdiction. In reaching this result, the court specifically evaluated the "four-part test for the existence of a government contract," including mutual intent to contract, offer and acceptance, consideration, and governmental authority to bind the United States. *Id.* at 1339 (citation omitted). That sort of test is not relevant to Plaintiff States' claims because here the core issue is the illegality of Public Health Funding Decision. Nor did the hospital's request for relief in *Columbus* "in any way invoke equitable remedies." *Id.* at 1355. Instead, the relief sought was "best characterized as 'specific sums, already calculated, past due, and designed to compensate for completed labors.'" *Id.* at 1352 (citation omitted).

Other cases similarly involved specific individual government contract disputes. *See Am. Science and Eng'g, Inc. v. Califano*, 571 F.2d 58, 60-63 (1st Cir. 1978) (holding, pre-*Bowen*, that a device manufacturer's dispute with the federal government after entering into a specific authorizing contract and seeking declaratory relief, damages, and an injunction was in essence a breach of contract claim); *San Juan City College v. United States*, 391 F.3d 1357, 1357-58 (Fed. Cir. 2004) (involving a suit for money damages regarding breach of contract between a college and the federal government relating to provision of student aid funds); *Coggeshall Dev. Corp. v. Diamond*, 884 F.2d 1, 4 (1st Cir. 1989) ("*contractual* easement rights").

The Supreme Court's per curiam decision in *U.S. Department of Education v. California* did not alter the analysis or the well-established general principle established by *Bowen* and its progeny. The Supreme Court explained only that "the APA's limited waiver of immunity does not extend to orders 'to enforce a contractual obligation to pay money' along the lines of what the District Court ordered" in that case. *U.S. Dep't of Educ. v. California*, No. 24A910, _ S.Ct._,

2025 WL 1008354, at *1 (Apr. 4, 2025) (citing *Great-West Life & Annuity Ins. Co. v. Knudson,* 34 U.S. 204, 212 (2002)).[2] As explained in the motion for reconsideration, ECF No. 65, that statement appears to have been a reaction to the federal government's repeated arguments that the allegations there "invoke essentially contractual theories of obligation as grounds to force the federal government to keep paying." ECF No. 65-1 ("DOE Reply") at 6; *id.* at 8 ("Without the alleged violation of the grant agreements, they would have no claim."); *id.* at 9 (arguing that the claims all "circle[d] back to the terms and conditions"). In other words, the Supreme Court appears to have preliminarily found that the federal government was likely to prevail in arguing that the claims in that case were breach-of-contract claims. As Defendants implicitly recognize, the Supreme Court's per curiam opinion was not a final ruling on the jurisdictional issue in that case (or any other case). Rather, it involved a brief analysis—conducted in an emergency application posture—of whether the federal argument was "likely" to succeed on this issue. *See* Opp. at 12.

Without an explanation of how the specific claims in this case involve breach of contract, Defendants offer no reason for this Court to depart from *Bowen* and other settled law. This Court should reject Defendants' attempt to extend the limited analysis of the Supreme Court's per curiam stay opinion. *See Maine v. U.S. Dep't of Agric.*, No. 1:25-CV-00131-JAW, 2025 WL 1088946, at *19 n.8 (D. Me. Apr. 11, 2025) ("Absent clear guidance from the Supreme Court that *Bowen* and its progeny are no longer good law, the Court follows this well-established precedent in concluding the APA has waived the United States' sovereign immunity on this case seeking temporary injunctive relief, inclusive of the fact that, in the event the Plaintiff prevails,

---

[2] This case is unlike *Knudson*, which concerned whether an order directing a one-time reimbursement of a specific sum for past medical treatment pursuant to an insurance plan was a form of "equitable relief" permitted under ERISA. 534 U.S. at 208-10.

the requested TRO will likely result in monetary payments."); *Pacito v. Trump*, No. 25-cv-255, 2025 WL 1077401, at *3 (W.D. Wash. Apr. 9, 2025) (rejecting federal government's arguments because plaintiffs "assert rights derived from statutory mandates, not contractual promises, and seek equitable enforcement of statutory obligations, not contractual remedies").

Defendants' attempts to avoid this Court's jurisdiction over Plaintiff States' constitutional claims are similarly unavailing. "[I]t is it is a fundamental proposition of constitutional law that '[i]t is emphatically the province and duty of the judicial department to say what the law is.'" *Nat'l Treasury Emps. Union v. Vought*, No. CV 25-0381 (ABJ), 2025 WL 942772, at *6 (D.D.C. Mar. 28, 2025) (quoting *Marbury v. Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)) (holding court had jurisdiction over plaintiffs' constitutional, statutory, and APA claims); *see also Chicago Women in Trades v. Trump,* No. 1:25-cv-02005, ECF No. 68, at *17-22 (N.D. Ill. Apr. 14, 2025) (declining to apply Supreme Court per curiam stay order to funding termination case raising constitutional claims). Defendants never consider the Court of Federal Claims' limited jurisdiction and whether that court could hear Plaintiff States' constitutional claims. It likely could not. *See LeBlanc v. United States*, 50 F.3d 1025, 1028 (Fed. Cir. 1995) (holding Court of Federal Claims lacked jurisdiction over claims under due process clauses of Fifth and Fourteenth Amendments, equal protection clause of Fourteenth Amendment, and the doctrine of separation of powers because the claims did not mandate payment of money by the government). District courts cannot be so easily deprived of jurisdiction, particularly "when no jurisdiction lies in the Court of Federal Claims." *Tootle v. Sec'y of the Navy*, 446 F.3d 167, 176-177 (D.C. Cir. 2006) ("categorically reject[ing]" such a suggestion because "[t]here cannot be exclusive jurisdiction under the Tucker Act if there is no jurisdiction under the Tucker Act"); *cf. Bowen*, 487 U.S. at 908 ("It would be nothing less than remarkable to conclude that Congress intended judicial

review of these complex questions of federal-state interaction to be reviewed in a specialized forum such as the Court of Claims."). If "Congress intends to preclude judicial review of constitutional claims[,] its intent to do so must be clear." *Webster v. Doe*, 486 U.S. 592, 603 (1988). It has not done so here.

### B.    Plaintiff States' APA Claims are Reviewable.

This Court should also reject Defendants' argument that Plaintiff States' APA claims are unreviewable because they fall within the narrow class of federal agency actions "committed to agency discretion by law" under 5 U.S.C. § 701(a)(2). This exception is to be read "quite narrowly." *Weyerhaeuser Co. v. U.S. Fish and Wildlife Serv.*, 586 U.S. 9, 23 (2018); *accord Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019); *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 17 (2020) (noting that Section 701(a)(2) has been confined to "rare" types of administrative decisions traditionally left to agency discretion).

Where, as here, there are applicable constitutional, statutory, or regulatory standards that cabin agency discretion, there are "meaningful standard[s] by which to judge the [agency]'s action," and that action is reviewable. *Dep't of Com. v. New York*, 588 U.S. 752, 772 (2019); *see also Union of Concerned Scientists v. Wheeler*, 954 F.3d 11, 18 (1st Cir. 2020) (statute limited prior agency discretion in handling advisory committees). Indeed, the central issues presented in this case involve no agency discretion at all. Whether or not the agency exceeded statutory authority or violated the Constitution by eliminating congressionally appropriated funds cannot be committed to agency discretion. These are pure questions of law: Defendants do not have "discretion" to act contrary to regulations, statutes, or the Constitution. *Hondros v. U.S. Civ. Serv. Comm'n*, 720 F.2d 278, 293 (3d Cir. 1983) (courts can always review whether action "violates any constitutional, statutory, or regulatory command"); *Wong v. Warden, FCI Raybrook*, 171 F.3d 148, 149 (2d Cir. 1999) ("well-established that judicial review exists over

allegations of constitutional violations," even where decisions are discretionary); *Cal. Human Dev. Corp. v. Brock*, 762 F.2d 1044, 1048 n.28 (D.C. Cir. 1985) (an agency is bound by its regulations, even if the agency action was discretionary). *See generally Leedom v. Kyne*, 358 U.S. 184 (1958) (district courts have jurisdiction to review whether an agency's action is in excess of its powers).

Defendants' reliance on *Lincoln v. Vigil,* 508 U.S. 182 (1993), is misplaced because this case does not involve the allocation of lump-sum appropriations. Rather, this case concerns whether HHS has authority, as it asserted through the Public Funding Decision, to entirely eliminate congressional appropriations based on its judgment that those appropriations are "no longer necessary" due to the end of COVID pandemic. Whether Congress delegated such authority, or whether HHS simply grabbed authority it never had, is not a question committed to agency discretion. *See In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (Kavanaugh, J.) (executive branch and "the President does not have unilateral authority to refuse to spend the [appropriated] funds"; President "must propose the rescission of funds," at which point Congress can decide whether to approve a rescission bill) (citations omitted); *see also City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1232 (9th Cir. 2018) ("President is without authority to thwart congressional will by cancelling appropriations passed by Congress."). Likewise, HHS's implementation of the Public Health Funding Decision through mass terminations of grants that have already been allocated and awarded is not committed to agency discretion. Those issues focus on the application of statutory and regulatory "for cause" provisions. *Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 83 (D.D.C. 2018) (explaining that evaluating "for cause" terminations "involve[s] the type of legal analysis that courts routinely perform," not unreviewable agency discretion).

Furthermore, the *Lincoln* Court expressly limited its holding, explaining that "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Lincoln*, 508 U.S. at 193. As a result, courts following *Lincoln* have held that Section 701(a)(2) does not apply where (1) the agency's action contravenes appropriation laws; or (2) the agency's implementation of its funding decision contravenes other applicable regulatory and statutory standards. Here, both provide grounds for judicial review.

First, in the context of congressional appropriations, courts routinely hear APA challenges because the appropriations statutes provide standards, such as a stated purpose, by which courts can review agency action. *See, e.g., Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 657 (D. Md. 2018) (holding district court had authority to review question of whether HHS adequately considered purpose in federal appropriations statute); *Mount Evans Co. v. Madigan*, 14 F.3d 1444, 1449 (10th Cir. 1994) (distinguishing *Lincoln* on the ground that Congress statutorily limited the discretion of the agency in expending funds); *Castellini v. Lappin*, 365 F.Supp.2d 197, 201 (D. Mass. 2005) (distinguishing *Lincoln* where Congress enabled and authorized funding for program at issue); *Milk Train, Inc. v. Veneman*, 310 F.3d 747, 752 (D.C. Cir. 2002) (appropriations law directing moneys for "economic losses incurred during 1999" provided standard for review). As in those cases, Congress's intent, expressed in the appropriation laws, cannot be subverted by HHS. Congress statutorily directed HHS to spend the appropriated funds on public health infrastructure and community mental health and substance abuse programs. *See infra* Section II.C; *see also* ECF No. 60 ("PI Mot.") at 4-5 (describing purposes in appropriation laws). Notably, when examining statutory authority for tribal grants under one of the statutes at issue in this case (the CARES Act), the D.C. Circuit concluded that it

12

was "nothing like the statutes at issue in *Lincoln*" and thus not entitled to a presumption of non-reviewability. *Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 100 (D.C. Cir. 2021) (placing conditions on the Secretary's disbursement of funds to the Tribal government). And this is not a case where Congress expressly delegated discretion to the agency, as found in one aspect of the appropriations law in *Milk Train, Inc. See* 310 F.3d at 751 (holding nonreviewable an appropriation provision allowing USDA Secretary to disperse funds "in a manner [she] determined appropriate").

Second, as courts have consistently held, HHS's own regulations provide a reviewable limitation on its discretion to terminate funds. *See, e.g.*, *Pol'y & Rsch., LLC*, 313 F. Supp. 3d at 76 ("[A]gencies themselves frequently cabin their own discretionary funding determinations by generating formal regulations or other binding policies that provide meaningful standards for a court to employ when reviewing agency decisions . . . ."); *Planned Parenthood of Greater Wash. & N. Idaho v. HHS*, 328 F. Supp. 3d 1133, 1147 (E.D. Wash. 2018); *King County v. Azar*, 320 F. Supp. 3d 1167, 1175 (W.D. Wash. 2018); *see generally Beno v. Shalala*, 30 F.3d 1057, 1067 (9th Cir. 1994) (distinguishing *Lincoln* based on HHS's regulations governing a benefits program); and *Union of Concerned Scientists*, 954 F.3d at 18 (distinguishing *Lincoln* on the grounds that a statute limited prior agency discretion in handling advisory committees). Unlike the lump-sum appropriation left to agency discretion in *Lincoln,* courts have held HHS's decisions to terminate financial assistance is reviewable because 45 C.F.R. § 75.372 provides a clear standard against which they may judge this decision. *Pol'y & Rsch., LLC*, 313 F. Supp. 3d at 76-77; *Planned Parenthood of Greater Wash.*, 328 F. Supp. 3d at 1145-49; *King County*, 320 F. Supp. 3d at 1175. Here, as explained below in Section II.B, applicable termination regulations and statutes, 45 C.F.R. § 75.372(a)(2) and 42 U.S.C. § 300x-55(a), allow the Court to review HHS's

implementation of its Public Health Funding Decision. *See infra* Section II.B; *see also* PI Mot. at 33-34; *see also King County*, 320 F. Supp. 3d at 1175.

Fundamentally, Defendants' attempt to characterize the Public Health Funding Decision as a "determination of how to allot appropriated funds among competing priorities and recipients" misapprehends Plaintiff States' claims. Opp. at 19. The First Circuit has repeatedly rejected arguments that federal agency actions are exempt from APA review simply because they involve grant or funding decisions, or other determinations involving some agency discretion. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92, 97-98 (1st Cir. 2025) (rejecting federal government's contention that terminations of teacher grants were unreviewable under Section 701(a)(2) where applicable regulations cabin agency "discretion as to when it can terminate existing grants"), *opinion stayed on other grounds*, No. 24A910, 604 U.S. _ , 2025 WL 1008354 (Apr. 4, 2025); *Union of Concerned Scientists*, 954 F.3d at 18-19 (holding agency action reviewable under Section 701(a)(2) despite some agency discretion to balance competing priorities). And the dispute does not concern how funds are allocated among particular public health priorities and individual recipients, but whether Defendants arbitrarily violated the APA by wholesale terminating congressionally appropriated funds and already allocated grants. *Cf. King County*, 320 F. Supp. 3d at 1176 (mid-performance period grant termination was not "an allocation decision between various grant options"). Nor does HHS's choice to terminate public health awards fall into the category of decisions traditionally left to agency expertise. *Id.* Defendants' Public Health Funding Decision and its implementation are subject to judicial review under the APA.

## II.     Plaintiff States Have Established a Likelihood of Success on the Merits.

Plaintiff States have a strong likelihood of success on the merits. As detailed below, HHS's Public Health Funding Decision and the implementation of that decision violate the Constitution and the APA because this final agency action is contrary to law and arbitrary and capricious.

### A.     Defendants Did Not Address and Therefore Waived Any Merits Defense to the Claim that the Public Health Funding Decision Exceeded Statutory Authority and Violated the Constitution.

Defendants fail to address the merits of Plaintiffs States' arguments that the Public Health Funding Decision exceeds Defendants' statutory authority and violates separation-of-powers principles. Defendants make no argument at all about their statutory authority to issue the Public Health Funding Decision to cut $11 billion in public health programs and congressionally appropriated funds. *Compare* Opp. at 21–35, *with* PI Mot. at 25–30. And Defendants make only a fleeting reference, without any reasoning or analysis, to Plaintiff States' constitutional claims. *Compare* Opp. at 21, *with* PI Mot. at 34-37. By failing to respond meaningfully to Plaintiff States' arguments, Defendants waive them. *See Astro-Med, Inc. v. Nihon Kohden America, Inc.*, 591 F.3d 1, 19 (1st Cir. 2009) ("[I]ssues adverted to . . . in a perfunctory manner, unaccompanied by some developed argumentation, are deemed to have been abandoned." (internal quotation marks omitted)); *see, e.g.*, *New York v. Trump*, No. 25-1236, ---F.4th---, 2025 WL 914788, at *11 n.14 (1st Cir. Mar. 26, 2025) (declining to address federal defendants' arguments where federal defendants failed to address independent basis for preliminary injunction); *Carey & Assocs., P.A. v. Sheriffs and Counties of Cumberland*, 320 F. Supp. 3d 226, 231 (D. Me. 2018) (treating plaintiffs' failure to "respond meaningfully to any of" the defendants' arguments as abandoning those arguments and waiving the right to further challenge on the claims).

Even without Defendants' waiver, the Plaintiff States are likely to succeed on the merits of their claims. Defendants cite *no* statute or constitutional provision authorizing HHS to make

15

the Public Health Funding Decision. This omission is especially damning because this Court specifically ordered Defendants to "address, in their response to Plaintiffs' motion for a preliminary injunction, all legal and factual bases upon which the Defendants relied, could have relied, or might in the future rely to terminate the grant funds at issue in this litigation." Text Order, *Colorado v. HHS*, No. 25-121-MSM-LDA (D.R.I. Apr. 10, 2025).

As Plaintiff States explained in their motion, PI Mot. at 25-27, none of the appropriations provisions at issue grant HHS authority or discretion to cut off programs or funding based on the agency's unilateral determination that all appropriations in COVID-related laws are "no longer necessary" at the end of the pandemic. To the contrary, where Congress intended to tie programs and funding in these laws to the end of the pandemic, it did so expressly. *Id.* at 25-26 (collecting examples). And when Congress reviewed each of the COVID-related appropriations laws *after* the end of the pandemic, Congress rescinded $27 billion of appropriations as no longer necessary but determined not to revoke *any* of the funding at issue. *Id.* at 26 (citing the Fiscal Responsibility of Act of 2023, Pub. L. 118–5, Div. B (June 3, 2023)). Indeed, because terminating more than $10 billion in public health programs and funding encompasses vast economic and political significance, this case falls under the major questions doctrine, requiring that Congress "speak clearly" as to any delegations of authority. *Id.* at 26-27 (citing *West Virginia v. EPA*, 597 U.S. 697, 723 (2022)). In response, Defendants were unable to cite any authority, let alone clear statutory authority, to support their exercise of authority because HHS lacked any such delegation.

For similar reasons, Defendants' actions are unconstitutional because they violate separation-of-powers principles. PI Mot. at 34-37. Defendants again point to no specific grant of authority from Congress or the Constitution permitting their Public Health Funding Decision.

16

*See* Opp. at 24–34; *e.g.*, *Aids Vaccine Advoc. Coal. v. U.S. Dep't of State*, No. CV 25-00400 (AHA), ---F. Supp. 3d---, 2025 WL 752378, at *15 (D.D.C. Mar. 10, 2025) (plaintiffs likely to succeed on the merits of their separation of powers claim, explaining "if the authority to make law and control spending is to mean anything, it means the President may not disregard a statutory mandate to spend funds 'simply because of policy objections'" (quoting *Aiken Cnty.*, 725 F.3d at 259)); *City & Cnty. of S.F.*, 897 F.3d at 1231–32.

For all these reasons and those provided in their motion, Plaintiff States are likely to succeed on the merits of their claims that the Public Health Funding Decision is contrary to law, in excess of statutory authority, and in violation of the Constitution.

### B.    Defendants' Implementation of the Public Health Funding Decision Was Contrary to Law.

Because Defendants acted in excess of statutory authority and in violation of the Constitution in issuing the Public Health Funding Decision, the Court need not go further to establish a likelihood of success on the merits. But Defendants compounded that unlawful action by unlawfully implementing the Public Health Funding Decision as explained below.

**SAMHSA.** When Defendants terminated the SAMHSA block grants, Defendants expressly invoked 42 U.S.C. § 300x-55 as the legal authority permitting them to terminate "for cause." *E.g.*, ECF No. 4-6, Perez Decl. ¶ 12; ECF No. 4-41, Kirschbaum Decl. Attach. D at 1. Shockingly, Defendants now argue "this provision does not apply at all." Opp. at 27; *id.* at 28 (calling § 300x-55 "irrelevant"). Defendants' unwillingness to defend their action based on *the statute they invoked* is unsurprising. As the motion for a preliminary injunction demonstrated, 42 U.S.C. § 300x-55 plainly does not apply because Defendants have never claimed any noncompliance. Instead, Defendants made an unlawful unilateral determination that these

17

congressionally appropriated funds are "no longer necessary." That is not a lawful basis to terminate "for cause" or otherwise.

Defendants' failure to defend these mass actions on the grounds that they invoked is the beginning and the end of the analysis. It is a foundational principle of administrative law that the agency is limited to "the grounds upon which the [agency] itself based its action," *SEC v. Chenery Corp.*, 318 U.S. 80, 88 (1943); "post hoc rationalizations" like HHS now attempts are strictly forbidden, *Regents of the Univ. of Cal.,* 591 U.S. at 20-22. Because Defendants concede that § 300x-55 does not apply, the agency actions are unlawful and should be enjoined.

In any event, Defendants' post hoc rationalizations fail to justify their plainly unlawful actions. The SAMHSA block grants are formula grants. Each State receives a grant based on a statutory formula with no discretion afforded to HHS. 42 U.S.C. § 300x(a) (the Secretary "shall make an allotment each fiscal year for each State in an amount determined in accordance with section 300x–7"); *id.* at 300x-21(a) (the Secretary "shall make an allotment each fiscal year for each State in an amount determined in accordance with section 300x–33"); *cf. City of Providence v. Barr*, 954 F.3d 23, 27 (1st Cir. 2020) (explaining that for a formula grant, the agency "is obliged to distribute funding pursuant to a statutory formula"). As part of this statutory program, Congress expressly specified the limited circumstances in which HHS is authorized not to pay these allocated funds: a grant may be "terminated for cause" when "a State has materially failed to comply with the agreements or other conditions." 42 U.S.C. § 300x-55(a). HHS is not authorized by law to refuse an allotment for any other reason. Indeed, SAMHSA cited 42 U.S.C. § 300x-55(a) as the grounds for its termination because that is the *only* lawful basis to terminate.

HHS's argument that the statute "merely provides one example of a for-cause termination" is baseless. Opp at 28. Nothing in the statute hints that this was just one example of many, or that

HHS retained some broad discretion to terminate the grants for any other reason. HHS was clearly directed to make the allotments, 42 U.S.C. §§ 300x, 300x-21; it lacked authority to refuse to do so except for the specific reason provided by the statute. Notably, HHS itself recognized that it lacked authority to terminate for other reasons. That is why HHS's own regulation makes clear that 45 C.F.R. § 75.372, the regulation regarding termination, does not apply to these block grants or other similar formula grant programs. 45 C.F.R. § 75.101(d)(1).

In one last act of desperation, HHS claims for the first time that a compliance issue exists because it is impossible to spend these funds consistent with the grant. This post hoc rationalization is also baseless. One need only look back at the statutory authorization to recognize the complete lack of merit. Through ARPA, Congress appropriated $1.5 billion "to remain available until expended" for block grants to be used for carrying out services "with respect to mental health" and $1.5 billion "to remain available until expended" for block grants to be used for carrying out services "with respect to substance abuse." American Rescue Plan Act ("ARPA"), Pub. L. No. 117-2, §§ 2701, 2702, 135 Stat. 4, 45-46 (2021). None of these funds were limited in any way to COVID-19 or to the pendency of the public health emergency. *Id.* Instead, the only limitation was that the funds "shall be expended by the State by September 30, 2025." [3] *Id.* Yet again, HHS is attempting to overrule the clear statutory language and blatantly violate Congress's directives.

---

[3] Defendants appear to claim that some of these block grants funds were appropriated in the Coronavirus Response and Relief Supplemental Appropriations Act, 2021 (Div. M of the Consolidated Appropriations Act, 2021), Pub. L. No. 116-260, 134 Stat. 1182 (2020). Those appropriations provided "$1,650,000,000 shall be for grants for the substance abuse prevention and treatment block grant program" and "$1,650,000,000 shall be for grants for the community mental health services block grant program." *Id.* at 134 Stat. 1182, 1913. Like ARPA, these appropriations were not limited to COVID-19 or the pendency of the public health emergency. *Id.*

Finally, Defendants do not offer any substantive defense to their obvious violation of the statutory procedures. As detailed in Plaintiff States' motion, the statute required Defendants to take specific actions—conducting an investigation and providing adequate notice and a hearing—*before* taking any action against Plaintiff States. PI Mot. at 28 (discussing 42 U.S.C. § 300x-55(e), which requires that "[b]efore taking action against a State . . . , the Secretary shall provide to the State involved adequate notice and an opportunity for a hearing," and 42 U.S.C. § 300x-55(g), which bars HHS from withholding any funds unless it has first "conducted an investigation"). Defendants do not dispute that they disregarded these statutes. Accordingly, for that additional reason, Defendants' actions taken without required process are unlawful.

Defendants claim that after immediately cutting funds, they have now offered a hearing. But the law required that HHS follow procedures *before* terminating any grant or cutting off funds. The APA requires holding unlawful and setting aside agency action taken "without observance of procedure required by law." *Campanale & Sons, Inc. v. Evans*, 311 F.3d 109, 116 (1st Cir. 2002) (quotations and citations omitted); *id.* at 116, 120-121 (explaining that this is a narrow but "exacting" review and holding unlawful agency action that failed to comply with "statutorily prescribed procedures"). Indeed, if Defendants' argument were accepted, there would be no incentive for them to ever follow statutory procedures. Agencies must follow the law; they cannot substitute different procedures. And the notion that Plaintiff States suffered no

---

Rather than addressing the lawfulness of their actions under statute, Defendants point to two letters (Exhibits D and E) that they purport to have sent during the pandemic. Opp. at 27. That they may have encouraged uses of small amounts of block grants in certain ways during the pandemic has no relevance. Nor does it permit them to unlawfully terminate block grant funds except for reasons provided by statute.

Finally, Defendants also confusingly discuss that some unidentified tiny amount of funds that were dedicated to specific purposes expired. This is just another attempt to distract from the real issue before the Court. This case is not about any expired funds.

concrete harm by not being afforded the statutorily prescribed notice and an opportunity to be heard is absurd. Had Plaintiff States been afforded their statutory rights, Defendants could not have cut off the funding without first going through a lengthy process, which would have eliminated the chaos the Defendants caused.[4]

In sum, in implementing the Public Health Funding Decision, Defendants violated the law in at least three ways by issuing mass terminations that are in clear contradiction of statutory authority and procedure.

**CDC.** Defendants likewise violated the law with respect to the implementation of the Public Health Funding Decision at the CDC. While claiming express authority, Defendants notably are unable to point to any statutory authority authorizing their actions. Instead, they cite to an HHS regulation that simply does not permit these actions. As Plaintiff States demonstrated in their motion, HHS has long interpreted "for cause" to mean "failure to comply," and nothing in the text, structure, or regulatory history support the application of "for cause" to these circumstances. PI Mot. at 28-30. Indeed, HHS has announced that it is following OMB in eliminating the "for cause" regulation as substantially duplicative of the "failure to comply" regulation. *Id*. at 29. Defendants do not meaningfully challenge those arguments.

Instead, Defendants cite the HHS Grants Policy Statement, but that document only reinforces that HHS equates "for cause" with "noncompliance." Defendants cite a portion of the

---

[4] Notably, the "procedures" Defendants have now "offered" do not apply here. *See* ECF No. 4-19, Doyle Decl. Attach. E at 7. These procedures apply to "noncompliance issues relating to the block grants prior to the Secretary taking final action" and are limited to "the facts relevant to the noncompliance at issue." *Id.* at 7-8. Under these procedures a state can request a hearing "within 15 days of the date of the notice of noncompliance (which will set forth the reasons for the finding of noncompliance)." *Id.* at 7. Given that SAMHSA has never provide a notice of noncompliance, nor the reasons for the finding of noncompliance, there is no procedure with which to engage, and the trigger to request a hearing has yet to occur.

Policy Statement entitled "Suspending Award Activities or Termination." Opp. at 24. But this is a subsection under "Remedies for Noncompliance." *See* HHS Grants Policy Statement at 57-59 (Oct. 1, 2024), https://www.hhs.gov/sites/default/files/hhs-grants-policy-statement-october-2024.pdf. In other words, this entire section governs "Noncompliance" by the grantee and includes the general rule that grantees "usually have an opportunity to correct the deficiencies unless there is a serious threat to public health or welfare concerns." *Id.* at 57.

In the subsection Defendants cite, the Policy Statement first explains that HHS may suspend or terminate an award "if you [the grantee] fail to materially comply with the award terms and conditions." *Id.* at 58. The Policy Statement then explains that, in such circumstances, HHS "generally will suspend, rather than immediately terminate," and describes what happens during suspension. *Id.* at 58-59. The Policy Statement next explains that HHS "may terminate without first suspending the federal award if the problem is serious enough or if public health or welfare concerns require immediate action." *Id.* at 59. By "the problem," the document is clearly referring back to the grantee's failure to comply, the entire subject of this subsection. Finally, in the next sentence, the Policy Statement states: "Termination for cause may be appealed under the HHS awarding agency and HHS's federal award appeals procedures." *Id.* Given the context, termination "for cause," clearly refers to the noncompliance issue, which the entire section is about. Notably, HHS's reference to terminations "for cause" explains that grantees have appeal rights under "HHS's federal award appeals procedures." *Id.* But as Defendants themselves argue, appeal rights under HHS regulations apply only to noncompliance issues, i.e., they apply only if "for cause" means "noncompliance." Opp at 26. Simply put, the Policy Statement yet again shows that HHS uses "for cause" and "failure to comply" to mean the same thing.

As to OMB's regulatory explanations that it deleted the "for cause" regulation from the Official Guidance because that regulation is substantially duplicative with the "failure to comply" regulation, PI Mot. at 29, Defendants recognize that this explanation is entirely inconsistent with their litigation position. So they argue that the Court should just ignore OMB rules. Opp at 24. But that makes no sense. When HHS adopted this regulation, it did so to adopt the OMB's Uniform Guidance. *See* Federal Awarding Agency Regulatory Implementation of Office of Management and Budget's Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 79 Fed. Reg. 75871 (Dec. 19, 2014) (all agencies, including HHS, adopting the OMB Uniform Guidance). And now again, HHS is conforming to the OMB's Uniform Guidance. That HHS is following OMB is no surprise: "OMB has directed agencies to adopt the uniform guidance in part 200 without change, except to the extent that an agency can demonstrate that any conflicting agency requirements are required by statute or regulations, or consistent with longstanding practice and approved by OMB." Health and Human Services Adoption of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 89 Fed. Reg. 80055, 80057 (Oct. 2, 2024). Given that all these regulations were written by OMB, and OMB's authoritative role within the federal government on these issues, there is every reason to rely on OMB's preamble explanation for the changes in rules.

Defendants' remaining arguments are without merit. Defendants claim that the plain text supports their reading, but they offer no authority other than their say-so. Defendants then attempt to explain how prior extensions of certain grants somehow constitute good cause to terminate all funding. Opp. at 25-26. This argument must be rejected because it is a post hoc rationalization. *Chenery Corp.*, 318 U.S. at 88; *Regents of the Univ. of California*, 591 U.S. at

20-22. In any event, this merely demonstrates that HHS is trying to turn "good cause" into termination for convenience or policy whim. HHS's application of a "good cause" regulation to the foreseeable end of the pandemic nearly two years ago is without lawful basis.

### C.    The Challenged Actions Are Arbitrary and Capricious.

Defendants' actions are further unlawful because they are arbitrary and capricious under well-established APA case law. Defendants put forward a handful of half-hearted arguments that the Public Health Funding Decision was not arbitrary and capricious. Each is easily rejoined.

First, Defendants' assertion that they provided a reasoned explanation for the Public Health Funding Decision fails for a variety of reasons. Defendants assert they provided an adequate explanation when they stated that the public health funding was "no longer necessary" "in light of the end of the pandemic." Opp. at 31. But this supposed explanation is no explanation at all—it is just a restatement of the very agency decision challenged by Plaintiff States, namely, the Public Health Funding Decision. In other words, Defendants still provide no explanation whatsoever as to why they now believe that the end of the COVID-19 emergency, which occurred nearly two years ago, renders the public health funding unnecessary. They provide no analysis of the specific statutory appropriations at issue, nor do they address the fact that Congress specifically extended appropriations beyond the COVID-19 emergency so that funding could be used to fight other pathogens, prepare for the next public health emergency, and address a spiraling behavioral health crisis. *See, e.g.*, ARPA, §§ 2402, 2404, 2501, 2701, 2702, 135 Stat. 4, 41-42, 45-46 (2021).

Defendants attempt to rely on *FCC v. Fox Television Stations, Inc.*, to support their argument that they provided a reasoned explanation, but *Fox Television* does just the opposite. 556 U.S. 502, 515 (2009). In *Fox Television*, the Court reiterated fundamental aspects of arbitrary and capricious review: "of course the agency must show that there are good reasons for

the new policy" and "that the new policy is permissible under the statute." *Id.* at 515. Here, Defendants have provided no real reasons whatsoever for the Public Health Funding Decision, let alone good ones. As the *Fox Television* concurrence put it: the question is whether the agency's reasoning "when viewed in light of the data available to it, and when informed by the experience and expertise of the agency, suffice to demonstrate that the new policy rests upon principles that are rational, neutral, and in accord with the agency's proper understanding of its authority." *Id.* at 536. Despite the Court's April 10 order to provide "all legal and factual bases" upon which Defendants relied, the only rationale offered by Defendants is that the funding is no longer necessary because they say so. This "explanation" is nothing if not arbitrary and capricious.

Second, Defendants also fail to overcome Plaintiff States' argument that they "entirely failed to consider an important aspect of the problem" because Defendants did not evaluate whether the affected programs were actually "no longer necessary" because the COVID-19 emergency was over. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43 (1983). Defendants attempt to fill this gaping hole in their analysis by mischaracterizing Plaintiff States' argument as asserting that "the agency should not have provided the same explanation to all recipients for its termination of COIVD-19-related grants." Opp. at 32. The nearly-identical boilerplate terminations used by Defendants are certainly suspicious, but Plaintiff States' argument on this issue goes much farther: had Defendants bothered to even look at the nature of the defunded programs, they would have realized that, far from being unnecessary, they address a wide range of urgent public health needs beyond the COVID-19 emergency, such as identifying, tracking, and addressing infectious diseases;

ensuring access to immunizations; fortifying emergency preparedness; providing mental health and substance abuse services; and modernizing critical public health infrastructure. PI Mot. at 8.

Third, Defendants' sole response to Plaintiff States' substantial reliance interests is that HHS "identified" $160 million in CDC and SAMHSA funds that "the states" were unable to use before unspecified funds became unavailable. Opp. 33. In two declarations, Defendants allege that unspecified CDC and SAMHSA grants had "already expired" before the March 24, 2025, terminations, and that unspecified "states" had left $160 million in these expired grants without drawing them down. It is not entirely clear to Plaintiff States why Defendants believe that an alleged $160 million in expired funding rebuts Plaintiff States' plain reliance on $11 billion in funds that Defendants consistently kept available for years. Nevertheless, the allegations about the $160 million raise more questions than they answer. Which states failed to draw down the funds? What programs were implicated? And, critically, why did the states not draw down the funds—was it because they needed more time to expend them on programs that advanced more slowly than anticipated? Without answers to any of these questions, or details beyond two vague and skeletal declarations, no relevant conclusions can be drawn. Instead, what is clear and unrebutted is that Plaintiff States have relied on the terminated public health funding for key aspects of their public health programs and initiatives. Plaintiff States had no reason to suspect that HHS would suddenly and immediately change its position based on an event that occurred two years ago. The harm from this abrupt change is drastic.

Finally, the only remaining arbitrary and capricious argument that Defendants put forward is that the Executive Branch has "broad discretion" to terminate grants as if terminating an existing grant was equivalent to deciding how to spend a lump sum appropriation. Defendants assert that discretion overrides the directives from Congress pointed out in Plaintiff States'

opening brief. Opp. at 33-35. This argument is, however, nothing more than a rehash of the Defendants' *Lincoln v. Vigil* argument and it fails for the reasons stated above. *See supra*, Section I.B. Additionally, in making this argument, Defendants attempt to recast their "for cause" terminations as ones based on agency priorities (without substantively articulating what those priorities are). This is an impermissible post hoc rationalization. *See, e.g.*, *State Farm Mut. Auto. Ins.*, 463 U.S. at 49-50; *Massachusetts v. Nat'l Insts. of Health*, 25-CV-10338, ---F. Supp. 3d---, 2025 WL 702163, at *21 (D. Mass. March 5, 2025).

Defendants do not even respond to Plaintiff States' change-in-position argument. Defendants provided no acknowledgement, let alone a reasoned explanation, for why HHS changed its position and determined that the public health funding is no longer necessary. Ever since the pandemic emergency ended nearly two years ago, and up until March 2025, HHS consistently took the opposite position and repeatedly extended the public health funding with extensions. When an agency changes its position, the agency must "display awareness" of the change and "must show that there are good reasons for the new policy." *Fox Television*, 556 U.S. at 515. Here, Defendants failed to acknowledge let alone explain *any* reasons whatsoever for the new policy. For this reason and those discussed above, the Public Health Funding Decision was arbitrary and capricious.

## III. Plaintiff States Will Be Irreparably Harmed Absent a Preliminary Injunction.

Plaintiff States have established a voluminous record of irreparable harm. *See* ECF No. 54 ("TRO") at 8-11; Oral Arg. Tr. 22:20-24; 23:6-15; PI Mot. at 12-19, 37-39. Defendants do not dispute the evidence of harm that Plaintiff States submitted. Nor do Defendants argue that Plaintiff States "have the financial wherewithal to keep their programs running" even without the federal public health funding at issue here. *Cf. California*, 2025 WL 1008354, at *1.

Indeed, Plaintiff States have demonstrated that they do not have the financial capacity to independently maintain their public health programs. *See, e.g.*, ECF No. 4-4, Ferrer Decl. ¶ 13; ECF No. 4-6, Perez Decl. ¶ 30; ECF No. 4-8, Rudman Decl. ¶ 57; ECF No. 4-10, Bookman Decl. ¶ 21; ECF No. 4-25, Williams-Devane Decl. ¶¶ 5, 7; ECF No. 4-24, Gresczyk Decl. ¶ 46. The federal public health funding at issue here plays an essential and ongoing role in sustaining services like vaccination clinics, substance use disorder prevention treatments, and efforts to combat infectious disease outbreaks. *See, e.g.*, ECF No. 4-10, Bookman Decl. ¶ 40; ECF No. 4-3, Fanelli Decl. ¶¶ 17, 33; ECF No. 4-4, Ferrer Decl. ¶ 7; ECF No. 4-13, Orefice Decl. ¶ 24; ECF No. 4-6, Perez Decl. ¶¶ 9-10, 40, 45, 61; ECF No. 4-27, Baston Decl. ¶ 17. Plaintiff States thus face imminent harm to public health that no later award of damages could undo—even *if* damages were theoretically available in some forum. *See Massachusetts*, 2025 WL 702163, at *28-31 (identifying irreparable harm based on cuts to indirect costs rates for medical research).

By attempting to frame their actions as only causing "economic loss" that could be remedied by money damages, Defendants fail to acknowledge Plaintiff States' legal claims and requested relief.[5] Opp. at 39. As detailed above, Plaintiff States' claims are rooted in statute, regulation, and the U.S. Constitution. *See supra,* Section II; *see also* ECF No. 65 ("Resp. Mot. Recon.") at 3. This case is "about process, not damages." *New York*, 2025 WL 1098966, at *2. And Plaintiff States seek "prospective equitable relief," including a declaration that Defendants' Public Health Funding Decision violated the law. Resp. Mot. Recon. at 1-2; *see* ECF No. 59 ("Amended Complaint") ¶ 165.

---

[5] Defendants' contention that Plaintiff States "have other open grant awards with HHS and will continue to able [sic] to apply for, and receive, new lines of funding from the agency" is irrelevant and similarly ignores Plaintiff States' legal claims. Opp. at 37-38.

Furthermore, Defendants' accusation that Plaintiff States "failed to draw down" certain funds when they were available, which is based on two skeletal and vague declarations, does not rebut Plaintiff States' claim that they have relied and continue to rely on the public health funding at issue in this case. Defendants offer no specific evidence indicating that Plaintiff States do not need the programs at issue or that they are not harmed by Defendants' decision to terminate the public health funding. The substantial and thorough testimony from Plaintiff States' public health experts underscore just how vital the public health funding is to the health and safety of Plaintiff States' residents. *See e.g.*, ECF. No. 4-6, Perez Decl. ¶ 29; ECF No. 4-11, Maurice Decl. ¶¶ 48-49, 65; ECF No. 4-27, Baston Decl. ¶¶ 17, 24; ECF No. 4-15, Clark Decl. ¶ 17; ECF No. 4-40, Fehrenbach Decl. ¶¶ 11-13; ECF No. 4-41, Kirschbaum Decl. ¶¶ 35, 39-40; ECF No. 4-3, Fanelli Decl. ¶ 48.

Finally, Defendants do not offer any reasonable explanation as to how they would be harmed by a preliminary injunction. They only insist, without any factual basis, that the federal government is unlikely to recover disbursed grant funds, an argument belied by HHS regulations that specifically allow the federal government to offset funds. 45 C.F.R. § 75.391; *see also* HHS Grants Policy Statement at 62, https://www.hhs.gov/sites/default/files/hhs-grants-policy-statement-october-2024.pdf.

The threat of irreparable harm remains as imminent and concrete as it was when this Court issued its temporary restraining order.[6]

---

[6] Defendants suggest that remand to the agency may be an eventual remedy for a violation of the APA. Opp. at 38. Even accepting that general principle, however, the court retains equitable authority to grant provisional relief while it considers the merits of the APA claim. *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 32 (2008). And such a remand would likewise entail vacating and setting aside that action such that Defendants could not implement or enforce it while considering a new action.

IV. **The Public Interest and the Balance of Equities Strongly Favor Entry of a Preliminary Injunction.**

Defendants do not grapple with any of the Plaintiff States' arguments regarding the public interest and the balance of the equities. Plaintiff States will not repeat those arguments here, but for the reasons explained in the motion, those factors strongly favor entry of a preliminary injunction. PI Mot. at 39-41.

Instead, Defendants claim that Plaintiff States will suffer no harm during the pendency of the case. This is just a rehashing of their conclusory denials of Plaintiff States' irreparable harm, only taken to a greater extreme that there will be *no harm at all*. The evidence shown through voluminous unrebutted evidence demonstrates the clear harm to Plaintiff States. Not only that, many of the funds at issue have statutory deadlines by which they must be spent. *See, e.g.*, ARPA, Pub. L. No. 117-2, §§ 2701, 2702, 135 Stat. 4, 45-46 (providing that the appropriated funds must be spent by September 30, 2025). As a result, denying a preliminary injunction functions only to allow Defendants to achieve their unlawful objectives with no possibility of a remedy at the end of the case.

Finally, Defendants claim, without any evidence, that they will be left with no meaningful recourse. In courts, especially trial courts, a party claiming to be harmed must present evidence, generally admissible evidence, to support those claims. Defendants offer nothing but unadorned speculation and argument. As noted in Section III above, HHS regulations specifically allow the federal government to offset excess funds. HHS provides billions of dollars in aid to Plaintiff States every year from which they could offset in the event they ultimately prevail. As such, the Court should find that Defendants have failed to provide any evidence that they face harm.

In sum, the public interest and the balance of the equities heavily favor an injunction.

**V.     The Requested Relief Is Directly Tailored to the Scope of the Harm Suffered.**

The scope of Plaintiff States' requested relief is proper. An injunction "should be no more burdensome to the defendant than to provide *complete relief* to the plaintiffs before the court." *Califano v. Yamasaki*, 442 U.S. 682, 702 (1979) (emphasis added). In crafting equitable relief, courts must consider "what is necessary, what is fair, and what is workable." *North Carolina v. Covingto*n, 581 U.S. 486, 488 (2017) (quotation omitted). The scope of the harm determines the scope of relief for preliminary injunctions. *Compare Massachusetts*, 2025 WL 702163, at *33– 35 (allowing for nationwide injunction based on evidence showing nationwide harm), *with Lewis v. Casey,* 518 U.S. 343, 360 (1996) (systemwide relief improper where evidence showed constitutional violations not statewide). As recognized by the Court at the Temporary Restraining Order hearing, Plaintiff States provided "voluminous" examples of irreparable harm, constituting a significant threat to public health and safety. Oral Arg. Tr. 22:20-24; 23:6-15. These examples provided evidence of system-wide harm resulting from Defendants' Public Health Funding Decision and its implementation through agency-wide mass terminations. TRO at 8-11. Accordingly, Plaintiff States request that the Court enjoin Defendants from implementing this Decision and tailor a preliminary injunction to Plaintiff States so as to offer them complete relief. PI Mot. at 41.

Defendants do not deny that they issued mass terminations, yet they insist "the Court should—at a minimum—limit any relief to grant awards about which the Plaintiffs have provided information in their various declarations." Opp. at 42. Defendants' requested limitation is not necessary, fair, or workable—nor would it provide complete relief to Plaintiff States. *North Carolina*, 581 U.S. at 488; *Califano*, 442 U.S. at 702. It places a near impossible burden on states, requiring a full accounting of every award, before they seek equitable relief. And unlike *Lewis*, Plaintiff States merit system-wide relief from Defendants' Public Health Funding

Decision and its implementing terminations because Plaintiffs have demonstrated system-wide harm. *Contra* 518 U.S. at 360. This Court should grant the PI as to the Plaintiff States.

## VI.    The Court Should Set Either a Zero-Dollar Bond or a Nominal Bond.

The Court should set either a zero-dollar or a nominal bond. The First Circuit has interpreted Rule 65(c) to afford district courts wide discretion in determining whether to impose a bond, including in cases enforcing public interests. *See Crowley v. Loc. No. 82, Furniture & Piano Moving, Furniture Store Drivers, Helpers, Warehousemen, & Packers*, 679 F.2d 978, 1000 (1st Cir. 1982), *rev'd on other grounds*, 467 U.S. 526 (1984). In determining whether to impose a bond in matters of important public interest, the Court should evaluate the following factors: possible loss to the enjoined party; hardship to the plaintiff; and the impact of the bond on the enforcement of the rights in question. *Id.* This Court has previously asserted this discretion by declining to require security in order to avoid hardship and unduly restricting plaintiffs in their efforts to assert federal rights in seeking their TRO. *See da Silva Medeiros v. Martin*, 458 F. Supp. 3d 122, 130 (D.R.I. 2020).

Importantly, courts have found no security to be required in matters brought to enforce important federal rights or "public interests." *Nat'l Council of Nonprofits v. Off. of Mgmt. & Budget*, No. CV 25-239 (LLA), 2025 WL 597959, at *19 (D.D.C. Feb. 25, 2025) ("In a case where the government is alleged to have unlawfully withheld trillions of dollars of previously committed funds to countless recipients, it would defy logic—and contravene the very basis of this opinion—to hold Plaintiffs hostage for the resulting harm."); *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (finding "security is not necessary where requiring security would have the effect of denying the plaintiffs their right to judicial review of administrative action"); *Concord Hosp., Inc. v. NH Dep't of Health & Hum. Servs.*, 743 F. Supp. 3d 325, 364 (D.N.H. 2024) ("[A]n exception for the bond requirement has been crafted for, inter

alia, cases involving the enforcement of public interests arising out of comprehensive federal health and welfare statutes." (citations omitted)); *Bass v. Richardson*, 338 F. Supp. 478, 491 (S.D.N.Y. 1971) ("On the issue of a bond in this case, the allocation of risk for not complying with federal law in a comprehensive program to promote national health, where Congress has firmly spoken, properly rests upon the defendant governmental bodies whose administration of the program is at issue.").

Given the dispute in question, a bond of more than a nominal amount makes little sense. Defendants make no arguments to the contrary and do not specify the bond amount they are seeking. Indeed, Defendants have not offered any estimation of the "costs and damages" it might incur as a result of the preliminary injunction. They will incur none, because the only relief the Plaintiff States seek is an order enjoining Defendants from implementing or enforcing the Public Health Funding Decision. Moreover, Defendants have cited no authority for the proposition that it could not recover any (again, unspecified) costs and damages from the Plaintiff States. As noted earlier, HHS generally can apply offsets to federal financial assistance for amounts owed. 2 C.F.R. § 200.346; 45 C.F.R. § 75.391; *see also* HHS Grants Policy Statement at 62, https://www.hhs.gov/sites/default/files/hhs-grants-policy-statementoctober-2024.pdf. In contrast. the imposition of more than a nominal bond would impose an undue burden on the Plaintiff States and would significantly impair the Plaintiff States' ability to assert their rights in this matter and remove any benefit from an injunction. For these reasons, the Plaintiff States ask that this Court impose a zero-dollar bond in its issuance of a preliminary injunction or otherwise impose a nominal bond.

## VII.  The Court Should Deny a Stay Pending Appeal.

Defendants additionally request that the Court enter a stay pending appeal—without any specific argument explaining why they're entitled to such an extraordinary measure. A "stay is

an 'intrusion into the ordinary processes of administration and judicial review,' and accordingly 'is not a matter of right.'" *Nken v. Holder*, 556 U.S. 418, 427 (2009) (citations omitted). To meet that heavy burden, Defendant must demonstrate that the following factors justify a stay: "(1) [W]hether the stay applicant has made a strong showing that [it] is likely to succeed on the merits; (2) whether the applicant will be irreparably injured absent a stay; (3) whether issuance of the stay will substantially injure the other parties interested in the proceeding; and (4) where the public interest lies." *Id*. at 426.

The Court should deny Defendants' cursory request to stay the preliminary injunction. Defendants cannot meet any stay factor, let alone all of them. Their request fails at the threshold: Defendants cannot meet their burden of showing that they will be irreparably injured absent a stay. *Doe #1 v. Trump*, 957 F.3d 1050, 1058 (9th Cir. 2020). Defendants also cannot make a strong showing that they are likely to succeed on the merits, the stay will substantially injure Plaintiff States, and the public interest lies in enjoining the Public Health Funding Decision and thus maintaining the status quo. *Nken*, 556 U.S. at 434.

## CONCLUSION

For these reasons and those detailed in the motion, Plaintiff States respectfully request a preliminary injunction order as this case proceeds.

Respectfully submitted,

**PHILIP J. WEISER**
Attorney General of Colorado

By: */s/ David Moskowitz*
David Moskowitz*
*Deputy Solicitor General*
Joseph G. Michaels*
*Assistant Solicitor General*
Sam Wolter*
*Assistant Attorney General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov
joseph.michaels@coag.gov
Samuel.Wolter@coag.gov

*Counsel for the State of Colorado*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Sarah W. Rice*
Sarah W. Rice (RI Bar No. 10465)
*Deputy Chief, Public Protection Bureau*
*Assistant Attorney General*
Keith Hoffmann (RI Bar No. 9874)
*Chief of Policy*
*Assistant Attorney General*
Julia Harvey (RI Bar No. 10529)
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2054
srice@riag.ri.gov
khoffmann@riag.ri.gov
jharvey@riag.ri.gov

*Counsel for the State of Rhode Island*

**ROB BONTA**
Attorney General of California

By: */s/ Crystal Adams*
Neli Palma*
*Senior Assistant Attorney General*
Crystal Adams*
Anna Rich*
*Deputy Attorneys General*
1300 I Street
Sacramento, CA 95814
(916) 210-7522

*Counsel for the State of California*

**KEITH ELLISON**
Attorney General of Minnesota

By: */s/ Brian S. Carter*
Brian S. Carter*
Jennifer Moreau*
*Assistant Attorneys General*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-7403
Brian.Carter@ag.state.mn.us
Jennifer.Moreau@ag.state.mn.us

*Counsel for the State of Minnesota*

**NICHOLAS W. BROWN**
Attorney General of Washington

By: *s/ Ellen Range*
Ellen Range*
*Assistant Attorney General*
Office of the Washington State Attorney
General
7141 Cleanwater Drive SW
P.O. Box 40111
Olympia, WA 98504-0111
(360) 709-6470
Ellen.Range@atg.wa.gov

Cristina Sepe*
*Deputy Solicitor General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200
Cristina.Sepe@atg.wa.gov

*Counsel for the State of Washington*

**WILLIAM TONG**
Attorney General of Connecticut

*/s/ Andrew Ammirati*
Andrew Ammirati*
*Assistant Attorney General*
165 Capitol Avenue
Hartford, CT 06106
Phone: (860) 808 5090
Andrew.Ammirati@ct.gov

*Counsel for the State of Connecticut*

**KRISTIN K. MAYES**
Attorney General of Arizona

By: */s/ Mary M. Curtin*
Mary M. Curtin*
*Senior Litigation Counsel*
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Mary.Curtin@azag.gov

*Counsel for the State of Arizona*

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: */s/ Vanessa L. Kassab*
Ian R. Liston**
*Director of Impact Litigation*
Vanessa L. Kassab**
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**BRIAN L. SCHWALB**
Attorney General for the District of
Columbia

*/s/ Samantha Hall*
Samantha Hall*
*Assistant Attorney General*
Public Advocacy Division
Office of the Attorney General for the
District of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
(202) 788-2081
Samantha.hall@dc.gov

*Counsel for the District of Columbia*

**KWAME RAOUL**
Attorney General of Illinois

By: /s/ John Hazinski
John Hazinski*
*Assistant Attorney General*
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(773) 590-6944
john.hazinski@ilag.gov

*Counsel for the State of Illinois*

**ANNE E. LOPEZ**
Attorney General of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
*Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**OFFICE OF THE GOVERNOR *ex rel.*
ANDY BESHEAR**
in his official capacity as Governor of the
Commonwealth of Kentucky

*/s/ Travis Mayo*
S. Travis Mayo*
*General Counsel*
Taylor Payne*
*Chief Deputy General Counsel*
Laura C. Tipton*
*Deputy General Counsel*
Kentucky Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*

**AARON M. FREY**
Attorney General of Maine

By: */s/ Margaret Machaiek**
Margaret Machaiek*
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
Fax:  207-287-3145

*Counsel for the State of Maine*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ Katherine B. Dirks*
Katherine B. Dirks*
*Chief State Trial Counsel*
Phoebe Lockhart*
Assistant Attorney General
1 Ashburton Pl.
Boston, MA  02108
(617.963.2277)
katherine.dirks@mass.gov
phoebe.lockhart@mass.gov

*Counsel for the Commonwealth of Massachusetts*

**AARON D. FORD**
Attorney General of Nevada

By: */s/ Heidi Parry Stern*
Heidi Parry Stern (Bar. No. 8873)*
*Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Counsel for the State of Nevada*

**ANTHONY G. BROWN**
Attorney General of Maryland

By: */s/ James C. Luh*
James C. Luh*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us

*Counsel for the State of Maryland*

**DANA NESSEL**
Attorney General of Michigan

By: */s/ Jennifer M. Jackson*
Jennifer M. Jackson (P67126)*
Carl Hammaker (P81203)*
Assistant Attorneys General
Michigan Department of Attorney General
Attorneys for State of Michigan
525 W. Ottawa St.
Lansing, MI 48933-1067
517.335.7573
jacksonj5@michigan.gov
hammakerc@michigan.gov

*Counsel for the State of Michigan*

**MATTHEW J. PLATKIN**
Attorney General of New Jersey

*/s/ Jessica L. Palmer*
Jessica L. Palmer*
Anaiis Gonzalez*
*Deputy Attorneys General*
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-4607
Jessica.Palmer@law.njoag.gov
Anaiis.Gonzalez@law.njoag.gov

*Counsel for the State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ Anjana Samant*
Anjana Samant*
*Deputy Counsel*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
asamant@nmdoj.gov
(505) 270-4332

*Counsel for the State of New Mexico*


**JEFF JACKSON**
Attorney General of North Carolina

By */s/ Daniel P. Mosteller*
Daniel P. Mosteller*
*Associate Deputy Attorney General*
Laura Howard
*Chief Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

*Counsel for State of North Carolina*


**LETITIA JAMES**
Attorney General of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam*
Special Counsel for Federal Initiatives
Gina Bull*
*Assistant Attorney General*
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov
gina.bull@ag.ny.gov

*Counsel for the State of New York*


**DAN RAYFIELD**
Attorney General of Oregon

By: */s/ Deanna J. Chang*
Deanna J. Chang*
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Deanna.J.Chang@doj.oregon.gov

*Counsel for the State of Oregon*

39

**JOSH SHAPIRO**
in his official capacity as Governor of the
Commonwealth of Pennsylvania

Jennifer Selber
*General Counsel*

*/s/ Aimee D. Thomson*
Aimee D. Thomson*
Jonathan D. Koltash*
*Deputy General Counsel*
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(223) 234-4986
aimeethomson@pa.gov
jokoltash@pa.gov

*Counsel for Governor Josh Shapiro*

*Admitted pro hac vice
**Pending pro hac vice applications to be filed

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: */s/ Lynn K. Lodahl*
Lynn K. Lodahl*
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 264-6219
lodahllk@doj.state.wi.us

*Counsel for the State of Wisconsin*

## <u>CERTIFICATE OF SERVICE</u>

      I hereby certify that, on April 15, 2025, I filed the foregoing document through this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rules Gen 304.


<u>/s/ David Moskowitz</u>
*Deputy Solicitor General*