IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND


* * * * * * * * * * * * * * * * * * 25-CV-121-MSM
                                  *
STATE OF COLORADO; STATE OF RHODE   *
ISLAND; STATE OF CALIFORNIA; STATE  *
OF MINNESOTA; STATE OF WASHINGTON;  *
STATE OF ARIZONA; STATE OF          *
CONNECTICUT; STATE OF DELAWARE;     *
DISTRICT OF COLUMBIA; STATE OF      *
HAWAI'I; STATE OF ILLINOIS; OFFICE  *
OF THE GOVERNOR *ex rel*. Andy      *
Beshear, in his official capacity   *
as Governor of the COMMONWEALTH OF  *
KENTUCKY; STATE OF MAINE, STATE OF  *
MARYLAND; COMMONWEALTH OF           *
MASSACHUSETTS; STATE OF MICHIGAN;   *
STATE OF NEVADA; STATE OF NEW       *
JERSEY; STATE OF NEW MEXICO; STATE  *
OF NEW YORK; STATE OF NORTH         *
CAROLINA; STATE OF OREGON; JOSH     *
SHAPIRO, in his official capacity   *
as Governor of the COMMONWEALTH OF  *
PENNSYLVANIA; and STATE OF          *
WISCONSIN,                          *
          Plaintiffs,               *
                                    *
          vs.                       * APRIL 17, 2025
                                    *
U.S. DEPARTMENT OF HEALTH AND HUMAN *
SERVICES; ROBERT F. KENNEDY, JR.,   *
in his official capacity as         *
Secretary of Health and Human       *
Services,                           *
          Defendants.               * Courtroom 2
                                    * PROVIDENCE, RI
* * * * * * * * * * * * * * * * * * *


BEFORE THE HONORABLE MARY S. McELROY
DISTRICT JUDGE


(Plaintiffs' Motion for Preliminary Injunction)

**APPEARANCES:**

FOR THE PLAINTIFFS:          DAVID MOSKOWITZ, ESQ.
                             Colorado Department of Law
                             Ralph L. Carr Judiciary
                             Building
                             1300 Broadway, 10th Floor
                             Denver, CO  80203

FOR THE DEFENDANTS:          KEVIN LOVE HUBBARD, AUSA
                             U.S. Attorney's Office
                             One Financial Plaza, 17th Floor
                             Providence, RI  02903

Court Reporter:              Denise P. Veitch, RPR
                             One Exchange Terrace
                             Providence, RI  02903

17 April 2025 -- 10:00 A.M.

THE COURT:  Good morning.  We're on the record in civil action 25-121, and we've titled it State of Colorado vs. United States Department of Health and Human Services.  Will counsel identify themselves for the record, identify those who are with you, and tell me who is going to argue on behalf of which party.

MR. HOFFMANN:  Your Honor, Keith Hoffmann, Assistant Attorney General for the State of Rhode Island here with Julia Harvey, Special Assistant Attorney General for the State of Rhode Island, and along with Attorney David Moskowitz from the State of Colorado.  We are the States appearing in person today, and the other Plaintiff States are going to be observing by Zoom, as discussed.  Attorney Moskowitz will be arguing for the States today.

THE COURT:  Thank you, Mr. Hoffmann.

MR. LOVE HUBBARD:  Good morning, your Honor.  For the federal government, Kevin Love Hubbard, and with me is Bethany Wong.  I will be arguing today.

THE COURT:  Okay.  Good morning, Mr. Love Hubbard and Ms. Wong.

I stated I'm going to give you each an hour.  I tend to ask a lot of questions, and so if I eat into your hour and you need a little more time, that's fine;

and then we'll give the States 15 minutes in rebuttal. I think the best way to do it is to go with the States' argument and then take a brief recess to allow the stenographer to rest her fingers and everybody to get a bathroom break if they need it, and then we'll come back and hear from the government; and if we need another break we'll take it then, but if not we'll go right through, okay?

Okay.  Whenever you're ready, Mr. Moskowitz.

MR. MOSKOWITZ:  Thank you, your Honor.

On a random Monday three weeks ago, the Department of Health and Human Services, HHS, suddenly and with no advance warning threw the public health systems of the Plaintiff States into chaos.  HHS cut $11 billion in public health funding that Congress appropriated for critical programs for the States. HHS made these cuts without any statutory authority or other lawful basis.

These programs address a wide range of urgent public health needs, including identifying, tracking, and addressing new and emerging infectious diseases; ensuring access to immunizations; fortifying emergency preparedness; providing mental health and substance abuse services; modernizing critical and public health infrastructure.  These programs help protect us from

emerging threats like measles and the bird flu.

HHS's decision has caused immediate chaos and irreparable harm to the Plaintiff States.  Key public health programs and initiatives will have to be dissolved or disbanded because the Plaintiff States do not have the wherewithal to run these programs without alternate funding mid-cycle.  In some cases these cuts amount to 10 percent of the agency budget.  Large numbers of highly trained and specialized employees and contractors have been or may soon be terminated. HHS claims this funding is, quote, no longer necessary. They say they will, quote, no longer waste billions of taxpayer dollars responding to a nonexistent pandemic.

But these congressional appropriations were not limited to COVID-19, nor are they limited to the duration of the public health emergency.

Apparently HHS cut these funds without even awareness of what Congress appropriated them for, or understanding how these funds are currently being used. In fact, nobody even bothered to tell HHS Secretary Kennedy, who told CBS News that he was not familiar with these cuts and thought they were DEI cuts.

The lack of diligence and reasoned analysis shows HHS broke the law in so many ways.  First and foremost, HHS was not delegated the authority to

unilaterally decide that these congressionally-appropriated funds and programs are no longer necessary.

HHS has been unable to point to any statutory authority to support this decision, which we call, shorthand, the Public Health Funding Decision; and this is especially so because Congress did expressly identify in the appropriation statutes the programs and funding that were tied to the end of the public health emergency.

THE COURT:  And is that -- are you talking about the Fiscal Responsibility Act of 2023?

MR. MOSKOWITZ:  So we're talking about both things.  So the first is in the six acts.

THE COURT:  Right.

MR. MOSKOWITZ:  They identified specifically at the time which particular appropriations were tied to the end of the public health emergency, or in some cases a year after the public health emergency or something along those.

THE COURT:  So in the original.

MR. MOSKOWITZ:  In the original appropriation. And then after the public health emergency ended, Congress again reviewed all of those COVID-related appropriations through the Fiscal Responsibility Act of

2023, and in that it rescinded $27 billion of funds. But left all of the funding at issue here.

THE COURT:  It went through, if my reading of it is correct -- first of all that was, I believe the pandemic was declared over at some point in May of 2023, maybe early May of 2023.

MR. MOSKOWITZ:  Yes, your Honor.

THE COURT:  And then this passed the House on May 31st of 2023, the Senate the next day, and the President signed it on June 3rd.  And they went through each appropriation stream, correct, each funding stream?

MR. MOSKOWITZ:  Yes.  So there were six COVID appropriation bills or bills during the COVID pandemic that were kind of to some degree COVID related, and the Fiscal Responsibility Act covers each of those six laws.

THE COURT:  When we say COVID related, they were passed during COVID or during the pandemic; correct?

MR. MOSKOWITZ:  Yes.

THE COURT:  But everything in them wasn't related to the pandemic; like the farm bill has SNAP benefits.

MR. MOSKOWITZ:  Right.  So it was, you know, to some degree addressing the pandemic, but as we

discussed in our briefs, it had a lot more to it and a lot of other public health investments and so some of it is, you know, directly tied to the pandemic and to COVID-19.  But there were a lot of other things in those bills such as addressing other pathogens, creating other programs and things to help rectify areas of public health that it became clear needed more investment in based on the pandemic, and so Congress provided funding to do that.

THE COURT:  Thank you.

MR. MOSKOWITZ:  So after -- based on both of those actions by Congress, Congress has acted and made clear what funding was or was not necessary.

HHS's unlawful power grab here was in excess of its statutory authority because it was not delegated, this authority, to determine that these appropriations were no longer necessary.  And for similar reasons, HHS violated the Constitution because it does not have a lawful basis to refuse to spend congressionally-appropriated funds.  The power of the purse is exclusively in the hands of Congress; and agencies do not have the constitutional authority to decide not to spend appropriated funds unless delegated by Congress.

THE COURT:  But I think what the Defendants are arguing is that some of this money is just sitting

there, or a lot; a portion of the money has been left unspent.

Do we know how much money of what was allocated by Congress and appropriated by the Agency was spent and which was left there to be spent in the future?

MR. MOSKOWITZ:  So it's a little bit unclear from what they're discussing.  They -- from what we understand, the allegations that they're making is that there were about $160 million that they say some unidentified states did not spend.  It's not clear what those grants were for.  We have never suggested that some of that money was not specifically related to the COVID pandemic; and so it's not clear if that's what they're talking about or if it's something else.

But that $160 million is essentially, you know, pennies compared to the 11 billion that we're talking about; and the overall spend to the States is far, far higher than 11 billion.  11 billion is what was cut in this, you know, --

THE COURT:  Termination.

MR. MOSKOWITZ:  -- termination on March 24th.  So the 160 million is like, you know, far less than 1 percent of what went to the States.

THE COURT:  Can we, before you get into the merits, can we talk about jurisdiction and the Tucker

Act.

MR. MOSKOWITZ:  Sure.

THE COURT:  So the government has argued that this Court doesn't have jurisdiction and that this case belongs in the Court of Federal Claims and that the Tucker Act applies.  So I guess I ask you what precedential value, if any, should this Court give to the Supreme Court's order in the *Department of Education v. California*; and is *Bowen* overruled or distinguishable?

MR. MOSKOWITZ:  I'll take the second question first, which is it's very clear that *Bowen* is the law of the land still; and in the Supreme Court's order itself it recognized that *Bowen* remains the law.

As to the precedential value of the Supreme Court's decision, the Supreme Court itself has recognized that its decisions on the emergency docket carry less weight.  We're not saying it has no value at all, but it's a preliminary decision made on an extraordinarily fast time period with a limited record; and essentially what was at issue there was that the federal government was arguing that the claims were contractually based, that they were all -- I believe the term they used in their briefing was all circled back to violations of the terms and conditions; and the

States were arguing that wasn't true. And it appears that at that preliminary stage the Supreme Court agreed with -- that the federal government's version of what the claims were covering because what it talked about was that the case was to enforce contractual obligations.

THE COURT: And so in that case, and I'm not as familiar with that case as perhaps I wish I was, but it was one discrete sort of contract that they had terminated but that applied to many states. Is that accurate?

MR. MOSKOWITZ: There were two grant programs.

THE COURT: Okay.

MR. MOSKOWITZ: But essentially, you know, very similar. And it was the same, the exact same issue, and, you know, I think the States disagree with the Supreme Court's conclusion on that. But it was a narrow focused argument about was this about a breach of contract or not.

In this case we don't think there's any debate that the claims are all for violations of statute, regulation, and the Constitution, and the terms and conditions haven't been raised by either party that's not what this case is about, it's not a breach of contract enforcing contractual obligations case; and so

for that reason the *California* decision simply doesn't apply.

THE COURT:  So let me just -- in broad strokes the cases are similar; correct?

MR. MOSKOWITZ:  I mean they're similar in the sense that they're about funding termination, so, yes.

THE COURT:  But is the difference here that when HHS terminated these funding streams, they didn't focus on the terms of the contract; instead they just made a complete cut?

MR. MOSKOWITZ:  So I think the difference here is that the, to some degree is based on -- in the other case it was about allocating priorities, and that was the theory, and there was more question because of that that went to the terms and conditions of the contract.

Whereas here, we have these congressionally-appropriated funds that they're simply saying they're no longer necessary; and that's a violation of the statute by refusing to spend the money that Congress has appropriated, and a violation of the Constitution. And then in addition here we have these -- the statutory limitation for the SAMHSA grants that, you know, are required to allocate these funds to the States, and they have only this limited reason that they could terminate that.  And so it has nothing to do

with any terms and conditions; it's purely a violation of statute.  And the last is they pointed to their regulation for the *nonblock grants, saying that they could terminate grants for cause.

THE COURT:  And I want to get into that at some point.  I assume you want to get into that as well like, you know, in the major questions issue.

MR. MOSKOWITZ:  Sure.

THE COURT:  But -- so aren't they ultimately a requirement of payment?  Can't the States go to the Court of Federal Claims and adjudicate these claims there?

MR. MOSKOWITZ:  I don't believe so.

THE COURT:  Okay.

MR. MOSKOWITZ:  And so the issue here, and why this case is really almost identical to *Bowen,* is that we're talking here about these programs and this funding that Congress set up; and we have this complex, ongoing relationship between the States and the federal government for these grant-in-aid programs; and you go to the Court of Federal Claims if you have a breach of contract and you're seeking a naked money judgment, as they refer to it in *Bowen*, so you get this money without any strings attached.

When you're talking about these grant-in-aid

programs, the money has strings attached.  It's reimbursement for doing certain types of things that the government wants for policy reasons, or at least that Congress wanted for policy reasons to improve public health across the country.  The States wouldn't be entitled to a money judgment for $11 billion.  The States get this money over time as they're doing things in grants, to reimburse the States for doing the types of things that Congress wanted done.

So in addition to violating the law in the Public Health Funding Decision itself, which is the central issue in this case, HHS broke the law again when it implemented that decision; and I just mentioned those reasons:  The "for cause" termination notices where the applicable statutes and regulations do not as a matter of law apply.

And the third violation of law was that they violated the Administrative Procedure Act because the decision was arbitrary and capricious in a number of ways, including that they failed to provide a reasoned explanation for the actions; they failed to conduct an individualized analysis as to the use and benefits of this funding, which makes it impossible to consider why it would no longer be necessary.  That's a key aspect of the problem that was just completely ignored.  And

they failed to acknowledge or explain the sudden change in position. Until a few days ago HHS believed that this funding was appropriately used and was necessary, and then this sudden change in position is the opposite. And HHS failed to account, as it is required by law, to address the serious reliance interests and the immense harm from its abrupt decision. And so we thoroughly briefed these issues, and my colleagues here discussed them in great deal two weeks ago, the irreparable harm the States will suffer, and the States continue to face all of that harm and more.

But to avoid retreading too much on that issue today, I plan to start on focusing on the ways in which HHS broke the law and then address their threshold arguments, the irreparable harm, and the scope of relief. But please, along the way, I know you have many questions, so stop me and ask those. I want to address anything that you have concerns about.

THE COURT: Thank you.

MR. MOSKOWITZ: So as I mentioned, the central focus of our complaint and the preliminary injunction motion is the Public Health Funding Decision, that overall, across-the-board decision to cut $11 billion in congressionally-appropriated funds and programs.

Notwithstanding the centrality of these

arguments, HHS failed to respond meaningfully to the constitutional claims and to the overall central argument that they lack statutory authority to issue this broad decision.  We believe and submit that that constitutes waiver under the case law; but, regardless, the lack of response we think is indicative of the lack of merit to their defenses.

When Congress appropriated these funds for grant-in-aid programs, it did so with specific purposes and instructions.  None of the appropriations grant HHS authority to cut off programs or funding based on a unilateral decision that all appropriations in those COVID-related bills are no longer necessary at the end of the pandemic.  As I mentioned, they addressed wide-ranging public health investments beyond COVID-19 and beyond the pandemic.  And, as we pointed out in citing to several specific passages in those laws, where Congress sought to tie programs and funding to the end of the pandemic, it did so expressly.  So, for example, one program was until the date on which the national emergency expires; another was during the emergency period and the one year period immediately following; or, on the last day of the first quarter that begins one year after the last day of the emergency period.

Congress knew how to make programs and funding expire at the end of the public health emergency, it did so many times; but it did not do so with the funding here.

And then, as we discussed, when Congress reviewed each of these bills after the end of the pandemic, it rescinded $27 billion in appropriations as no longer necessary; but it left in place the funding here. And it's noteworthy that at that time some of that funding was not even obligated, and they did withdraw some of the unobligated funds as no longer necessary. But there are numerous places in that Fiscal Responsibility Act where they rescinded unobligated funds with the exception of, quote, $2.127 billion in any funds that were transferred or merged with the COVID Countermeasure Process Fund. There are numerous places where they recognized this funding needs to continue even if it hasn't been obligated by the end of the pandemic. And in the case here, all of these funds were obligated.

At a minimum we submit that whether the Agency had authority to eliminate $11 billion in appropriated funds falls under the major questions doctrine. Under that doctrine the Supreme Court has emphasized that the expectation is that Congress will make the major policy

decisions.  And so the Supreme Court requires that Congress must speak clearly if it is delegating authority over issues of deep economic and political significance, and it said that in a number of cases, including the *West Virginia v. EPA* case.

THE COURT:  Let me ask a question about the major questions doctrine here.  Is the Plaintiffs' argument that when the HHS, when the government uses the "for cause" language to terminate these grants or these funding streams, that they're reading too much -- that they're using it to do too much work?

So, for example, as I understand it, the doctrine applies when an agency asserts too much power from the words of the statute.  And so in *Biden v. Nebraska*, for example, the Supreme Court said that the Secretary of Education's power to waive or modify loans -- waiver modify being the statutory language -- that it was too big a power grab to cancel hundreds of millions of dollars in student loans with that limited language and Congress needs to speak clearly when it wants agencies to do anything big.

In this case what is the specific provision that you're arguing that the Agency overreached?  Is it "for cause" --

(Overlapping speech)

MR. MOSKOWITZ:  So we think the appropriations laws themselves say use this money for these purposes, with instructions how though use them, and they have to follow those instructions.

The for cause provisions, and I'll just start with the statutory one in SAMHSA first, that's dealing with an individual case-by-case situation where somebody is not complying with the contract; and we're not saying that they lack all ability to monitor the use of these funds, but what they don't have is the authority to say, Yeah, Congress, we appreciate that you considered this, thought that this was necessary, but we don't so we're not going to do this and we're going to cancel wholesale all of these.

THE COURT:  But they're saying essentially that the cause, whether it's under the SAMHSA statute or the general APA statute, the "for cause", that they're using that to say the end of the pandemic gives them for cause authority to terminate all of these lines of, streams of funding.

MR. MOSKOWITZ:  And so that is a complete overreach and not what the appropriations laws allow; and if that were true, then they could for cause deny essentially any appropriation that Congress ever appropriated and say for cause we are deciding not to

spend this money because we don't think it's necessary.

THE COURT:  And we're going to get into that because I'm not sure if the government is saying we're deciding not to spend this money or we're deciding to reallocate this money; and I think it said both ways, honestly, in their papers.

MR. MOSKOWITZ:  Yes.

THE COURT:  So, but the issue to bring it into the major questions doctrine is that that "for cause" is trying to do too much work, and that if Congress wanted to grant the authority to terminate huge funding streams they would have done so directly.  Is that the argument?

MR. MOSKOWITZ:  They must speak clearly, right, is the words that they use; and so that appropriations laws, which is I think the focus of this, is that if they, if Congress wanted to in the appropriations laws give them the authority to determine that these billions of dollars of appropriations were no longer necessary, they needed to speak clearly to say you have that authority.

THE COURT:  Is it the States' argument that there is no clear language in the appropriations statutes that grants that authority to the Agency?

MR. MOSKOWITZ:  Correct.

And the "for cause" in the regulations is not even a grant of authority from Congress.  That is a regulatory provision that says on an individual basis we can determine for cause; and, as we explained, it has long been understood to be related to materially failing to comply with the terms and conditions of the particular contract.

And so because there is not a clear statutory delegation of authority, a clear expression that HHS has the authority to decide not to spend these funds, that is both in excess of its statutory authority, and we also believe it violates separations of powers principles.

As the Supreme Court has said, the authority to act, no matter the context for any agency necessarily stems either from an act of Congress or the Constitution itself.  And without a constitutional or statutory authorization here, that is the beginning and the end of the story.

Absent congressional authorization, an agency may not redistribute or withhold properly-appropriated funds in order to effectuate its own policy goals; and that was a decision from the Ninth Circuit in *City & County of San Francisco v. Trump*.  And this all stems back to the Constitution's grant of authority which

exclusively grants the power of the purse to Congress, the appropriations clause and the spending clause that are in Article I. Simply put, as the Ninth Circuit explained, there is no unilateral authority to refuse to spend money; and the D.C. Circuit similarly had that same language in *In Re: Aiken County*. And, furthermore, there is a statutory mechanism that exists if an executive agency wants to rescind funds: The Congressional Budget and Impoundment Control Act.

If HHS did not want to spend that money and wanted to rescind it, it needed to follow the statutory provisions there which cover both rescission and deferral. And in this case, neither of those things were followed. Instead, they abruptly cut these fundings unilaterally, claiming authority that they simply don't have. So in addition to the unlawfulness of that overall decision, the implementation of that decision through mass termination notices was also contrary to law.

THE COURT: Are you moving on? Because I'd like to go back to the Constitutional analysis. How does the Court do the constitutional analysis? And I understand that you've argued that the government didn't engage with the constitutional claims and that they've therefore waived them for purposes of this

hearing.  But is this a *Youngstown* case?  Or what's the analytical structure that you want the Court to look at.

MR. MOSKOWITZ:  So it is a *Youngstown* case in the sense of you look to what the authorities are that have been given, and are they exercising those authorities consistent with the statutory authority, or are they acting contrary to what the authorities state.  And here, there is clear, direct instructions from Congress to spend these funds for these particular purposes; and there is no authority granted telling the Agency they can refuse to spend those funds for any reason, let alone to decide that it's no longer necessary because the pandemic is over.  And so at bottom it's very similar to the excess of statutory authority, and so to some degree the case can be resolved purely on the excess of statutory authority and major questions doctrine.  But we think the same principles apply on the constitutional basis.

And while there have been some statements about reallocating funds, we are not actually aware of anything other than a determination that they are not going to spend this money.  And this is on the list of DOGE grants that they claim is, you know, essentially the money that they saved the government, not that they

are going to reuse this for some other purpose.  This is a DOGE savings, as far as we're aware.

THE COURT:  Does the spending clause give the States a cause of action?

MR. MOSKOWITZ:  Yes.  We believe that the States have through the APA and otherwise and through the waiver of sovereign immunity, when HHS has taken unlawful actions that are contrary to the Constitution, those actions can be set aside as unconstitutional.

Turning to the implementation of the funding decision through the mass termination notices, that too is contrary to law.  Starting with the SAMHSA grants, the Defendants in those notices invoked 42 USC 300x-55 as the legal authority permitting them to terminate for cause.  Now they say this provision does not apply at all, it's irrelevant; and it's not surprising that they're unwilling to defend it because that statute clearly provides that for cause termination is only for failure to comply with the material terms and conditions, and there's never been a claim that Defendants or -- the Defendants have never claimed that the Plaintiff States were not in compliance with their grant terms.

The failure to defend on the grounds that the Agency itself invoked is the end of the analysis.

Under the *Chenery* Doctrine, the Agency is limited to the grounds upon which the Agency itself based its actions, and so post hoc rationalizations of other authorities or reasons are strictly forbidden.

In any event, the post hoc rationalizations lack merit here.  The SAMHSA grants are formula grants.  The statute requires that the Secretary shall make allotments for each state based on a statutory formula; and that's in 42 USC 300x and 300x-21 for the two programs.  The reason HHS cited 300x-55, the "for cause" provision as the basis for the terminations, is that that is the only lawful basis in the statute for terminating or withholding funds.  They are otherwise required by the statute.  It says they shall allocate those funds to the state.

THE COURT:  HHS is now saying, you know, but for cause is because the pandemic ended.

MR. MOSKOWITZ:  Right.  And the statute says "for cause" means material or noncompliance; and HHS doesn't have the authority to come up with additional reasons that they think Congress should have allowed for cause terminations.  And there's nothing in the statute or anywhere that hints that this was, you know, their argument is that this is just an example of one of the reasons that something could be terminated for

cause.

But nothing in the statute suggests that.  It's a -- if you look at 300x-55, it is entirely focused on the material noncompliance, and the goals of it are actually to bring a state into compliance.  There's a lengthy statutory scheme about conducting an investigation, giving the States notice, opportunity to fix these problems.  The goals here are to get the money to the States; it's not a federal government terminate this because you just decided it's no longer necessary.

THE COURT:  To be clear, post *Loper Bright* how much deference do I give to the Agency's interpretation of what Congress meant?

MR. MOSKOWITZ:  So in this case --

THE COURT:  Under *Chevron* I might have had to follow or more closely adhere to what the Agency interpreted; correct?

MR. MOSKOWITZ:  So even under *Chevron* you wouldn't because they did not have, they did not issue regulations or other official statements interpreting this -- this is just purely a litigating position -- and so there wouldn't have been any deference even under *Chevron*.

THE COURT:  Right.

MR. MOSKOWITZ:  But now that we're --

THE COURT:  Putting aside post hoc reasoning and all of that, just straight *Loper Bright, Chevron* --

(Overlapping speech)

MR. MOSKOWITZ:  So under *Chevron* they wouldn't have gotten that deference.  But under *Loper Bright* there's nothing -- you know, *Loper Bright* makes clear that it's only where the statute itself makes clear that they are delegating some specific thing for the federal government to fill in.  That would be the only time you look at that.  But there's no deference here.

THE COURT:  Okay.

MR. MOSKOWITZ:  And so there is no merit to the mere example claim.  This is the only reason that they can terminate these grants, and they didn't meet those. And HHS itself recognized that it didn't have authority to add additional grounds for termination.  Under 45 C.F.R. 75.101(d)(1), it exempts these block grants and other formula funds from all of the regulations that would cover termination because they don't have the authority to terminate for reasons other than what Congress provided.

In addition, now they add another post hoc rationalization that supposedly the States are actually now noncompliant because they say it's impossible to

spend these funds consistently with what they were meant to be spent on.  And of course, this was not the reason that the Agency's ever had; it's purely a litigating position.  *Chenery* says you can't consider it.  But it's also entirely inconsistent with the appropriations themselves which provided very clear authority that these are to be used as part of the block grant programs for mental health services, for substance abuse treatment services.  They were not limited in any way, those appropriations, to COVID or to the pandemic.

And Congress knew what they were doing.  In fact, they put a deadline in there and said the States need to spend these funds by September 30th of 2025. Congress thought about the issues, picked a time period to do it; and HHS decided on its own that it was just going to overrule Congress' judgment.

THE COURT:  So to be clear, the e-mails issued March I think it's 24th and 25th is the only reasoning that this Court can look at to determine if the Agency -- what the Agency decision was based upon.

MR. MOSKOWITZ:  Yes.  And I believe in the SAMHSA case there was an original e-mail, and then there's a second e-mail that purports to rescind the first e-mail and provides the kind of final agency

basis, and so we believe that the second e-mail is the relevant e-mail. And they sometimes put that into the grants themselves, but they're, you know, materially the same reasoning.

So as I alluded to, the HHS also violated statutory procedural requirements, and the statute could not be clearer because Congress was trying to address issues of noncompliance, not find reasons to terminate this money. And so that statute says before taking action HHS was required to conduct an investigation into noncompliance and was required to give adequate notice and a hearing -- and there's no dispute that they did not -- and for that reason alone as well the Agency action should be set aside because it was taken without observance of the procedure required by law. And the First Circuit has made that clear in the case *Campanale & Sons, Inc. v. Evans*.

HHS's arguments here that it could substitute procedures after the fact is just not consistent with the statute. Agencies aren't allowed to offer substitute procedures. They have to follow the laws that Congress has passed. Moreover, the offered procedures clearly do not even apply. They've sent copies of those procedures with the termination notices. That would be the before-action-is-taken

procedures, and those procedures provide that it would only apply before the Secretary has taken action and that it would only apply to issues of noncompliance, and that the hearing would be triggered by a request 15 days after receiving a notice, with a written description of all the ways in which the States supposedly are not complying.  There's been no notice of that, there's nothing to trigger those hearings; and they simply don't apply.

THE COURT:  So the government is saying now that they can make a distinction between failure to comply and for cause; and is the States' argument that (1) under the SAMHSA grants there's a specific procedure outlined, and for the rest of them they're sort of not allowed to change agency course without following the procedures that the courts have outlined and that Congress has outlined for doing that.

MR. MOSKOWITZ:  It's a little unclear what the government's position is because they say 300x-55 no longer applies, and all of these procedures are about 300x-55 and the noncompliance issue.  And so the first argument is correct from us is, I mean 300x-55 is not met procedurally, it's not met substantively.  They didn't follow any of that.  And so I think their primary argument is we're in some other made-up world

of for cause where you can just terminate it for any reason. And that's not authority that the Agency has.

THE COURT: And that gets back into the major questions doctrine.

MR. MOSKOWITZ: Right.

THE COURT: Okay.

MR. MOSKOWITZ: And then with respect to the CDC, HHS terminated those for cause as well, and they said in the notice that it was for cause based on HHS regulations; and we presume that's 45 C.F.R. 75.372(a)(2). And as we explained in our briefing, nothing in that regulation's text, history, or subsequent interpretation supports that the end of the pandemic nearly two years ago could provide a lawful basis for the Public Health Funding Decision. And that's for a number of reasons. First, HHS has long understood "for cause" to be essentially failure to comply; and we cited a number of their past decisions where they equate the two as being the same.

In their opposition they cite the HHS grants policy statement. But that policy statement just reaffirms our point. They're clearly equating for cause with failure to comply in that grant's policy statement. All of this is a section called Noncompliance, and in the specific subsection that they

cite there's a lengthy discussion about what happens if a grantee fails to comply, and then it goes on to discuss generally suspension is the remedy; but, it says, they can be terminated if the problem is serious or there are public health and welfare concerns. And that sentence is clearly referring back to the material failure to comply. If the grantee is doing things that is a serious problem, a serious violation, or the violation is causing public health or welfare concerns, that's what that provision is discussing.

And then the lone statement about "for cause" is in the sentence that follows there, and it says, for cause, if it's terminated for cause, referring back, then you get -- have an opportunity for a hearing. And of course in their briefing here they argue that, well, for cause is a noncompliant, is not a compliance issue so you would never get a hearing because our hearings are only available for compliance issues. That sentence was referring the "for cause" when they talk about the for cause termination is for the compliance issue, and that's why the hearing is offered.

Moreover, the equating "for cause" and "failure to apply" is consistent with the standard application of for cause and terminations of grants and other contracts in many other statutes and regulations.

Obviously the 300x-55 is a great example of that; but there are other regulations such as 10 C.F.R. 600.25 where for cause award termination is basis on -- is based on noncompliance or debarment.

Moreover, HHS has announced that it will follow the OMB official guidance and eliminate the for cause regulation because it is substantially duplicative of the failure to comply regulation.

THE COURT: And the government is arguing, yes, we will in October, but not until then.

MR. MOSKOWITZ: Right. And so we're not saying that it doesn't exist. The point is, is that the statements, the official government interpretations of those statutes are consistent with our interpretation of "for cause", of what it has always meant, and the reason they're getting rid of it is it's not doing any additional work beyond what the "failure to comply" term is doing.

THE COURT: And doesn't that get us into the line of cases that talk about arbitrary and capricious when an agency doesn't act reasonably or reasonably explain its actions? Is that where we get into that because now they're saying we're going to read "for cause" differently and it's because the pandemic is over.

MR. MOSKOWITZ: Yes. I think it's both contrary to law and arbitrary and capricious because (1) it was inconsistent with how that provision actually has ever been applied and what it means, but (2) they didn't announce any change in position, they didn't explain that change in the position; and to the extent they've done anything, they've announced we're getting rid of this because it doesn't add anything, it's essentially -- it's not substantially different than the "failure to comply" term.

So then turning to that arbitrary and capricious analysis, the decision, the Public Health Funding Decision and its implementation, these agency actions are arbitrary and capricious in numerous ways. So first, they did not provide a rational basis, a reasoned decision for what they did. It assumes without explanation that all funding related to the COVID-19 appropriation was only intended for use during the pandemic stage. They point to no facts supporting this. They do no reasoned analysis of the appropriations laws themselves.

It's just an assumption that is not based in fact; when reality is that Congress directed many of the appropriations beyond the pandemic to other pathogens or future emergencies or to simply build up

our public health workforce and public health infrastructure.  They wanted to develop genome sequencing.  They want a data modernization and forecasting.  All of these were programs and investments that Congress was making.

And as I mentioned before, Congress did tie the specific programs and appropriations that it wanted to tie to the end of the public health emergency, but chose not to do so here.  And so the general cannon of statutory interpretation where it includes particular language in one section but omits it in another, it's generally presumed that was done intentionally; and so they intentionally did not limit these appropriations to the end of the public emergency.  And as we've discussed at length, the Fiscal Responsibility Act of 2023 provides additional indicia of Congress' views and its belief that these funds should be spent in this manner.  But none of these actions by Congress were addressed, reasoned, taken into account in any way by the decision.

Second, there's no individualized assessment of the funding.  HHS failed to acknowledge the purposes, the uses and benefits of this funding.  There's no explanation other than they're no longer necessary.

But having not taken an individualized

assessment of each of the funding and each of the grants, it is impossible to come to a conclusion that they're no longer necessary because they failed to consider an important aspect of the problem; and under *State Farm* that is arbitrary and capricious.

Third, there's no reasoned explanation or even acknowledgment as how the Agency suddenly changed its position. Up until a few days ago HHS consistently took the opposite position, that these programs and public health funding were necessary. It issued detailed guidance for the use of these funds after the public emergency ended. It approved specific uses of these funds. They note that they approved extensions at various points in time that they take to mean that the States didn't need it. But, in fact, that is the strongest evidence that HHS was aware of and had the position that these funds were necessary, and approved of every single use of the funds by the States until a few days ago when they abruptly decided they're no longer necessary.

THE COURT: Let me ask you a question. What is your theory of the Agency action at issue here? Is it one action or thousands of individual actions?

MR. MOSKOWITZ: So we believe it is one action overall. There's an agency-wide decision to cut all of

this funding, to remove it, to take it away from use anymore; and then there are large numbers of agency actions implementing that main termination.

THE COURT: Termination.

MR. MOSKOWITZ: Under the *Fox Television* Supreme Court case, an agency must display awareness of the change, must acknowledge it, and then it must show that there are good reasons for the new policy.

But here, there's no acknowledgment of the change in position or an explanation as to why this is a good new policy.

THE COURT: So let me ask you another question on that. Doesn't this get into the *Lincoln v. Vigil* line of cases? Why isn't that controlling?

MR. MOSKOWITZ: Sure. So *Lincoln v. Vigil* does not apply here for a number of reasons, and the first reason and the simplest is that the majority of our case is about violations of statute, regulation, and the Constitution. And agencies don't have any discretion to violate statutory commands, constitutional commands, or binding regulation. They have to follow those. So if there is an allegation that statute, regulation, Constitution is violated, that's not a committed to agency discretion issue.

The only thing here that could ever be subject

to that would be the arbitrary and capricious analysis. But this case is not remotely like *Lincoln v. Vigil*. *Lincoln v. Vigil* was limited to allocation of lump sum appropriations, so where Congress puts a pot of money and says spend it how you think best.  In that case the Supreme Court said, well, if the agency decides to spend it in one way versus the other, that was the discretion they were afforded by Congress and there's no way for a court to apply a meaningful standard to say it should be allocated this way versus that way. This case involves -- oh, and in that case also it was specifically recognized that Congress could cabin that discretion with statutory instructions and purposes, as they've done here.

But this case is further different because it's not about allocating a lump sum appropriation.  It's about already-allocated funds, obligated funds, and whether the agency in the application of that, the "for cause" statutory and regulatory standards, whether they complied with those and whether those decisions were arbitrary and capricious in applying those.

And the case law is clear that when you have a statute or a regulation that cabins discretion to some degree, there is a meaningful standard to apply to judge the agency's action; and the Supreme Court's made

that clear in *Department of Commerce v. New York.*

But in many other cases they've made clear that the "committed to agency discretion by law" is an extremely narrow set of cases where's there's just no law to apply, and there is a strong presumption of reviewability for agency actions.  And your Honor's decision -- I'm sorry.

THE COURT:  Are there other cases where a court has found that agencies violated an appropriations statute?  It seems a bit different than, say, a *Biden v. Nebraska*-type case where it's a direct agency power that goes too far.  Maybe that means this case is clearer or not as clear, but --.

MR. MOSKOWITZ:  So there are many cases where, you know, the courts have said even if the underlying decision is discretionary -- and we're not in that kind of territory -- but even if the underlying decision is discretionary, any claim that the statute or regulation or Constitution was violated, well, they don't have discretion to violate those, and so we can determine whether or not there's something to decide there.  And maybe the court decides the statute, regulation, or Constitution wasn't violated, but it's not because the agency had discretion to violate those things.

THE COURT:  So does that bring us into the

*County of San Francisco v. Trump* kind of analysis?

MR. MOSKOWITZ:  I think so, and -- but we think even the arbitrary and capricious analysis is covered because the "for cause" standard provides a meaningful standard.  And then Judge Jackson has a very well-thought-out decision addressing just this same issue and saying the "for cause" standard is something that courts review every day, it provides a meaningful basis to judge; and so at that point in time there is some law to apply and the court can weigh in, and it is not committed purely to agency discretion.

THE COURT:  Is that the *Policy and Research* vs. the --

MR. MOSKOWITZ:  Yes, your Honor.

THE COURT:  -- *HHS* case?  Thank you.

MR. MOSKOWITZ:  Turning back very quickly to the two last bases for why the decision was arbitrary and capricious.

HHS failed to consider the serious reliance interests.  The States relied on the availability of billions of dollars of these funds for key aspects of their programs.  The terms of the grants provided exactly what -- when the grants were awarded or extended, they were based on specific plans with time periods, amounts of money.  The States knew what they

were getting, and they relied on it to develop all of these programs.  They had no reason to suspect that HHS would suddenly and immediately change position, and that harm from that change is drastic.

The Supreme Court has repeatedly emphasized, including in the *Regents of University of California* case, that when an agency changes course, it must account for serious reliance interest.  And again, in *Fox Television* it said it's arbitrary or capricious to ignore those serious reliance interests.  And that's what HHS did here.

And finally, the decision was arbitrary and capricious because without explanation it applied these "for cause" termination provisions that don't apply.  And this is what we were discussing before.  It's never asserted failure to comply, and based on the end of the pandemic two years ago is just not a lawful basis for doing this, and there was no reasoned explanation as to this change in how these -- the regulation would apply; and obviously the statute can't be changed by HHS itself.

Turning then to the threshold defenses -- to the extent, your Honor, we've discussed the Tucker Act and the committed to agency discretion by law.  I don't know if you have further questions?

THE COURT:  I don't think on that.

MR. MOSKOWITZ:  Okay.  So I can turn then to the irreparable harm.

THE COURT:  Please.

MR. MOSKOWITZ:  As we've addressed at length in our briefs and at the TRO hearing and in 48 declarations, the harm here is grave.  There's a grave threat to the public health and safety and organizational missions.  You can't just cut $11 billion mid-cycle and expect States to be able to recover from that.  Some of these cuts amount to, in one instance, more than 10 percent of the agency's health budget.

THE COURT:  So let me just cut you off there, I'm sorry, and I'll give you extra time.

The government's arguing or HHS is arguing, hey, this is monetary and so, you know, that's not the proper place for injunctive relief, that it's if a monetary harm it's not proper for the Court to, you know, exercise its equitable powers.  So what do you say to that?  What kind of irreparable harm do we have here that goes beyond actual loss of funds?  What do those loss of funds cause, I guess.

MR. MOSKOWITZ:  So, first off we would say obviously *Bowen* makes clear that that's, you know, this

is -- this type of equitable relief is appropriate in a forward-looking prospective way.  But in this case as to the irreparable harm aspect, what we're talking about here is the States aren't looking for money; we're not here to say, you know, we want our profits from some contract that was not complied with and we're at a loss from that.

The States want to protect the public health of their citizens, and they can't do that with the immediate termination of these funds.  There's no way to make up that money mid-cycle; and the amount of money is enormous as a whole.  $11 billion is a gigantic sum of money for the States.  They don't have the resources to make up for that sudden loss of funding and so they have no choice but to begin shuttering the programs and laying off personnel.  And so these staff cuts would include highly-trained and specialized employees who would be difficult to hire back.

THE COURT:  And aren't there cases that talk about layoff of employees, particularly specialized employees, as being irreparable harm --

MR. MOSKOWITZ:  Yes, your Honor.

(Indiscernible crosstalk)

THE COURT:  -- to lay off --

MR. MOSKOWITZ:  Yes, your Honor, because even if money would come in later, we're talking about a lengthy period of time to get these programs up and running.  There are huge costs to that.  None of that is recoverable; and the loss from not having access to these specialized employees in the intervening time period can't be made up.

THE COURT:  And what about things like -- I know California has the measles clinic or (indecipherable) measles immunization clinic and it's a, you know, significant number.  I don't know if it's up to 50 percent of the children in California are depending on this money for measles vaccine; and we're in a measles sort of -- I don't want to call it an outbreak, I don't know what the technical term is, but states have noticed an increase in measles cases.

MR. MOSKOWITZ:  Yes, your Honor, and this is a huge issue that this affecting a lot of states.  In California they estimate that the impact is on 4.5 million children, that the vaccines for children program will be severely impacted by the loss of funding; and there's nothing that can be done other than hoping that this doesn't cause a serious problem. And it's threatening serious public health issues if our children can't be immunized.

THE COURT:  And so is this different than the *California vs. Department of Education* case where the State said we can continue funding these programs?

MR. MOSKOWITZ:  Yes, your Honor.  So at least as to the understanding of the Supreme Court, the Supreme Court believed that there had been representations that the States could just fund those programs, and we're talking there about, you know, real money, but a lot less than $11 billion.  And I think the States would obviously disagree with the Supreme Court's characterization of that.  But that was the underlying basis upon which the Supreme Court found a lack of irreparable harm.

Here, I don't think the record provides anything but extremely strong evidence that the States don't have the wherewithal to continue these programs. They're going to have to cut vaccination programs. There's declarations from Minnesota, Arizona, California, Pennsylvania, Washington, so many different declarations talking about the severe harm to their immunization programs from this sudden loss of funding.

THE COURT:  And so just to play that out a bit, and I don't want to --.  But, so it's not just the harm to the immunization programs; it's a harm to the community where the children have not been immunized.

MR. MOSKOWITZ:  The whole mission of the agency and of the State here is to protect the public health by engaging in services like the immunizations or like, you know, the surveillance activities for infectious diseases; and that's the harm we're caring about.  It's not -- the States don't want money for the sake of money.  They want to be able to carry out their mission; and that's the irreparable harm.

THE COURT:  In the SAMHSA grant context what stuck out to me was the issue of, I think it was in Colorado actually, the mobile treatment teams is what we call them for mental health.  So if those teams don't exist, is it the States' contention that the mentally ill people they serve do not get the medication that they're required to control whatever mental illness they have?

MR. MOSKOWITZ:  Yes.  So we can't say in any particular circumstance whether, like, some patient might find an alternative means.  But we can say as a whole when these mobile clinics -- because a huge part of these programs were designed to give States money to help underserved communities, to help especially rural communities, and so they created these mobile programs, whether it be to give vaccinations or to provide mental health and substance abuse services.  There's going to

be a huge part of that community that losses out, and there's going to be serious consequences to that loss of programming.

THE COURT:  You're talking about untreated mental illness --

MR. MOSKOWITZ:  Yes.

THE COURT:  -- and particularly in rural communities with that?

MR. MOSKOWITZ:  Yes.

THE COURT:  Okay.  Thank you.

MR. MOSKOWITZ:  And we've gone through here and outlined a number of the different ways.  We've talked about, you know, the hundreds, maybe thousands of specialized employees that will have to be terminated who are funded solely or mostly through these grants.  We've talked about disease surveillance programs that were created that will have to go away.

In Colorado, similarly, they've been using this funding on the substance abuse to give wide-ranging access to Naloxone, which is known to be the biggest lifesaver in the opiod crisis.  And so to make that widely available so that people have access to Naloxone, that saves lives.

THE COURT:  Can't states or the public get that somewhere else?

MR. MOSKOWITZ: It will not be as widely distributed, and through this program it has been free to access for these patients; and they often to get access would then need either insurance or to pay out of pocket; and for a lot of the people affected by these crises, that's not a real option. And so it is a public health necessity to make these things available to save lives, and without the funding that's not going to happen.

THE COURT: Let me ask you a question about the government raises irreparable harm and says the government will be irreparably harmed because the States -- they have no mechanism to get the money back from the States if I were to continue, if I were to issue an injunction as requested and issued under the TRO, I guess is what I'm asking.

MR. MOSKOWITZ: The federal government has not submitted any evidence to support that claim. In contrast to the 48 declarations on this point, they submitted zero. There is a specific HHS regulation that allows them to offset funds based on a kind of essentially final determination, so if it is finally determined that they didn't owe some money on a grant, they are allowed to offset on that. And to the states they provide billions of dollars in grants every year,

so there's -- we don't understand how they can credibly say that there will be no way that they couldn't recover these funds.

THE COURT:  Thank you.

MR. MOSKOWITZ:  So in addition to the rural communities, a lot of these are focused on nursing homes and other vulnerable communities.  So, for example, California presented evidence that their staff are responding to over 50 infectious disease outbreaks right now in nursing homes and other types of living facilities; jails, shelters, things like that.  But most of the outbreak staff would have to be terminated because they're funded by these programs, and they don't believe that they would be able to engage and stop these communicable diseases in an effective manner.

Michigan will have to cut 13 contracts with community organizations to address outbreaks for people who are experiencing homelessness, long-term facility residents, the elderly, people with disabilities. These were underserved communities that the COVID funding bills wanted to address long-term; and that harm is going to occur again.

And finally, there will -- the cuts will imperil a number of public health infrastructure projects.

I'll just highlight quickly that in Hawaii they've got programs to upgrade their immunization information system and their electronic disease surveillance systems. These are critical systems both to ensure to help doctors tracking immunizations and to track infectious diseases as they're arriving; and they've spent a huge amount of resources to work to upgrade these systems with the grant funds. But if they stop midstream, they don't have the money to finish completing these systems, and they would then be actually put in a worse place than prior to the pandemic if the funding goes away because they would then need to go back to their pre-COVID systems that have these legacy systems that haven't been maintained now for years.

Connecticut and Michigan and other states have similar stories of spending tens of millions of dollars to upgrade their labs, but they're in the middle of that project and there's no funds to complete it, and there will be, you know, huge losses from that.

And so we think the case law here is clear that threats to public health and safety constitute irreparable harm, and that similar that ongoing harm to the organizations' mission itself is irreparable; and the mission here is to protect the public health, and

we won't be able to do that without these grants in place.

In addition, there are substantial unrecoverable operational costs.  The States have been placed into an absolutely chaotic environment with these abrupt terminations with no warning, and they've spent already substantial administrative costs dealing with that. Those will never be recoverable.  That's irreparable harm.  It's going to continue in the future because they're going to need to try to figure out ways to mitigate harms in some way and that's a, you know, huge administrative cost burden.

And then finally, some of these appropriations themselves are time-limited and will be lost.  So the SAMHSA block grants have to be spent by September 30th. There's a plan in place to spend those funds by September 30th of this year, and if the funds are cut off for a substantial period of time while the case is litigated, they're just going to be lost because neither the States nor the federal government have authority to extend that time period.

THE COURT:  And that was by Congress that the SAMHSA --

MR. MOSKOWITZ:  Right.

THE COURT:  -- was limited to the end of

September, the end of the fiscal year.

MR. MOSKOWITZ: Yes, yes.

THE COURT: Are those funds flowing now to the States?

MR. MOSKOWITZ: So I believe that they've, you know, essentially rescinded the terminations. Whether there's actually been payments yet I'm not -- you know, it's a lengthy process so I don't, I can't speak to whether any funds have been released.

So finally, on the public interest and the balance of the equities, these merge when, you know, the government is involved here. And we believe for similar reasons the irreparable harm and the extreme likelihood of success, that between those two that there are many cases recognizing that the public health interests that are at the core of our case are in the public interest and they weigh heavily in balancing equities. The extremely high likelihood of success on the merits weighs heavily in the public interest, and the public interest has significant important interest in making sure the government follows the law. And similar to what I said, we believe there's no irreparable harm to the government because of the HHS regulations allowing offset and the billions of dollars that they fund to the States each year.

Finally, on the scope of relief, we believe that the relief should be focused on the Public Health Funding Decision, and we've requested that the Court enjoin the Defendants from implementing or enforcing through any means the Public Health Funding Decision or from reinstituting that decision in any form for the same or similar reasons.

THE COURT:  With respect to the Plaintiffs in this case.

MR. MOSKOWITZ:  Yes, your Honor.  So we are not asking for a nationwide injunction.  It's limited to the implementation and enforcement of that decision to the Plaintiff States and their local health jurisdictions.  So that's directly tailored to the scope of the harm that's suffered here, and we believe it's no more burdensome than is required to provide complete relief, to completely undo the wrongdoing of the government with respect to the Plaintiff States, which is the standard the Supreme Court laid out in *Califano v. Yamasaki.*

The Supreme Court has more recently said that, you know, the courts should consider what is necessary, what is fair and what is workable; and we think what we've offered here is fair, tailored to the unlawful action, and it's workable because it is limited

narrowly there where exactly which funding streams go to the Plaintiff States.

And their argument that the relief should be limited to specific grants discussed in the declarations is not a fair or workable solution. The declarations are prepared on a very fast basis. There's no rule that requires that you have to identify every single grant and tie everything to a specific grant. The harms discussed were overall harms from this decision, and we provided these grants as examples of the things that happened and the harms from it. But the harm is to the overall system. It's a systemwide issue because these are across the board decisions, and their declarations acknowledge it. They recognize that this wasn't anything other than we cut these across the board, and that's what that unlawful action should be undone.

THE COURT: Let me ask a question about that. When I'm balancing the equities and the public interest, doesn't the Administration have and HHS have the right to their own policy priorities and how -- if the Executive has an agenda that's inconsistent with congressional intent when it allocated those funds, wouldn't an injunction be forcing the Agency to support causes that are inconsistent with the agenda?

MR. MOSKOWITZ:  So --

(Overlapping speech)

THE COURT:  I didn't say that exactly, but --.

MR. MOSKOWITZ:  Right, so as I -- you know, we're talking about from the beginning the Agency's authority to act in any context flows from authority that it has under statute or the Constitution; and where Congress has appropriated funds under statute to be used for a particular purpose, an Executive agency doesn't have the authority to say we aren't going to spend those funds because we disagree with Congress.

THE COURT:  And that gets into the issue of the public statements that the Secretary of Health and Human Services has made.  How is the Court to look at this.  This is congressionally-appropriated funding, an Agency termination, which the Senate-confirmed head of that Agency, Cabinet Secretary of Health and Human Services has professed to not knowing anything about. So who is making these decisions at an agency level? Is it just career public servants, administrative staff?  Who's making the decision, and does that matter to my analysis?

MR. MOSKOWITZ:  I think my colleagues on the other side would have a better answer to that question. There's a lack of transparency here as to who is making

that decision, but it's extremely concerning that a decision of that magnitude is not even being considered at the level of the individual who is supposed to be heading that agency.

THE COURT:  And it kind of gets back into the powers thing; right?  Congress has certain powers, the Executive has certain powers; but, you know, the Agency's powers come from the Executive, but they flow through the cabinet-level appointment, not through people who have been on staff for 15 years and made a decision.  Am I --

MR. MOSKOWITZ:  For sure; and there are plenty of situations where Congress has allowed the Secretary to delegate authority down, and so I don't want to speak here too much because I don't know who made that decision.  But I think at the end of the day even if the Secretary had made that decision, he didn't have that authority to make that decision, so there's a baseline problem to begin with.  But the fact that the Secretary is not even aware of it goes to show that something, something here has gone very wrong.

So then just quickly addressing the request for a bond, so we believe that the Court should issue a zero dollar or a nominal bond here.  The case law makes clear that in cases enforcing public interest within

the First Circuit there's wide discretion.  The factors to be considered are the possible loss to the enjoined party, the hardship to the Plaintiff, the impact of the bond on the enforcement of the right in question. Numerous courts around the country have found that no bond is necessary in similar cases that we've cited involving public interest and public health; and a bond of more than a nominal amount here makes little sense.

The Defendants don't make an argument to the contrary.  They don't even specify what bond amount they are seeking or offer any estimate of costs and damages.  And we believe ultimately for the reasons I've explained before, they will incur none because its only relief here is to enjoin the Defendants from implementing or enforcing an unlawful decision; and they have general offset authority.  So it's nothing beyond speculative at this stage to suggest that even in the, we believe, not likely event that they will ultimately be found to have had this power to terminate all of these funds, that they will be left with significant damages.  And so we would request that the bond be set at zero dollars or a nominal amount.

THE COURT:  So I mean HHS will counter that and say, look, it's speculative to say that if we win we can claw back this money in other funding streams.  So

don't they have some interest in a guarantee that they'll be repaid?

MR. MOSKOWITZ:  I don't think here, without evidence beyond their own say that they won't get the money, especially when, you know, I mean notwithstanding that we're talking about a lot of money here, the amounts of money that they pay to the States every year is far more than that.  And so, you know, there's a funding stream; they have access to that. And they routinely in many other contexts use their offset authority because they're constantly settling different accounts and use offsetting as a means to do that, and they haven't presented evidence here that they can't.

And we would also point out that's if more than -- you know, it's hard to come up with any other way.  What they I think are asking for would be a bond equal to the amount of whatever money they would pay through, that they would likely pay through later reimbursement requests, which like effectively offsets any purpose of an injunction to begin with, and so it just doesn't make any sense in this context.  And they haven't offered any other thing that they're suggesting is a damage or a cost here that they believe a bond should be paid for.

THE COURT:  Okay.

MR. MOSKOWITZ:  If there are no further questions, thank you, your Honor.

THE COURT:  We're going to take a 15-minute recess, and when we get back I'll hear from the government.

(Recess)

THE COURT:  Good morning.  It's still morning.

MR. LOVE HUBBARD:  Good morning, your Honor.

THE COURT:  Whenever you're ready.

MR. LOVE HUBBARD:  I'd like to start, with the Court's permission, with the Tucker Act and the question of jurisdiction.

THE COURT:  Sure.

MR. LOVE HUBBARD:  I recognize that you and me and everybody in this room have probably thought more about the Tucker Act in the last two weeks than we ever thought we would.  And I also recognize that we're not writing on a blank slate here, so I'm going to try and target my comments to the ways this case is different from the cases that your Honor has already decided in the *Woonasquatucket* matter, that Judge McConnell decided in the *New York v. Trump* matter, and the ways that we think it's nearly identical to the *California v. Department of Education* matter.

These grant awards at issue in this case create essentially a contractual relationship where the federal government is paying money to the States in exchange for their provision of services.  That is why the sole jurisdiction lies in the Court of Federal Claims under the Tucker Act.

The actions that Plaintiffs challenge here are the Agency's decision to terminate certain grant agreements which led to what the Plaintiff described as an unlawful holding of funds.  Those are quintessential contract claims.

Plaintiffs seek this Court to mandate the Agency to continue payment of grants' contract agreements that the agency has made the decision to terminate; precisely as was the situation in the *California* case. And I'm going to say *California* as shorthand; I know there are a lot of states --

THE COURT:  There are a lot of cases.  We call this Colorado.

MR. LOVE HUBBARD:  Okay.  HHS provided notification to the States that the remaining active grants or funding lines under broad grants of the appropriation with COVID-19 supplemental funding were being terminated, and pursuant to the underlying CDC regulations and the SAMHSA statutes, the Agency

terminated those funds for future use only.

THE COURT:  But -- okay, so but that is -- so it's not a collection of past due money; like under a contract you owed me $50 for shoveling your driveway and you didn't pay me.

It's prospective; it's grant money that has been allocated by Congress and prospective.  Doesn't that sort of take us out of the Court of Federal Claims right there?  They can only give back money; correct?

MR. LOVE HUBBARD:  I don't believe so, your Honor, because essentially we're talking about what we would characterize from the Plaintiffs' perspective as an anticipatory breach, which is a, which is a paradigm contract action; that we're talking about there is an agreement that the Agency made the decision to end, and the remedy for that, to the extent that the Plaintiffs can establish they were entitled to some funds, is to be paid for that breach in -- through an action at the Court of Federal Claims.

I would like to say in terms of the way that this is different, the *Woonasquatucket* matter and the *New York v. Trump* matter both dealt with the question of unobligated funds, that the decisions there were funding freezes where the plaintiff states weren't even able to draw down and nonprofits in the *Woonasquatucket*

case weren't able to draw down funds for expenditures they had already made.  And the courts, both your Honor and Judge McConnell put a lot of weight in the fact that those debts had already been incurred.

That's not the case here.  The Plaintiff States could continue to draw down funds for costs they had already incurred, but they could no longer access federal grant funds for new expenditures that were funded by COVID-19 funded sources.  Go ahead.

THE COURT:  If you're right, there are constitutional claims here and the Court of Federal Claims isn't empowered to decide those.  Isn't that correct?

MR. LOVE HUBBARD:  Your Honor, the constitutional claims, I would like to address first the idea of waiver; right?  The Plaintiff States added their constitutional claims in an Amended Complaint that was filed three days before we had to file our opposition to this preliminary injunction.  They have brand new claims and they are designed specifically to evade the jurisdiction of the Court of Federal Claims. The fact that they weren't in the original complaint, the fact that they basically just repeat the APA arguments with a slightly different availance I think is suggestive of the fact that, as we discussed in our

brief, this is part of a strategy that litigants make to avoid the Tucker Act by pleading constitutional claims or injunctive relief claims that really at their heart are for money damages.

And when we get to the constitutional claims in more detail, what I hope to establish is that the constitutional claims are really just questions of agency authority, and that is established by the appropriations from Congress. But as long as the Agency is acting within the limits set by Congress for the use of those appropriated funds, the authority is inherent in the constitutional design for Congress to appropriate the funds and for the agency to decide how to spend them.

THE COURT: So, but am I able to really sort of get in under that and decide what the basis of the constitutional claims? And this isn't as -- to me, it's not as close a Tucker Act APA claim as some of the other cases because there are these other claims, but also because there are these constitutional claims.

MR. LOVE HUBBARD: And I would say, your Honor, that the constitutional claims are not really distinct from the APA claims. The constitutional claims are that the States want the federal government to pay it money it says it's owed. That's a contract claim

and --

THE COURT:  Aren't they saying they want you to stop the freeze?  Not to pay money past due, but a prospective freeze; correct?

MR. LOVE HUBBARD:  Well, your Honor, I would say that's one of the ways that this case is different.  I mean in *Woonasquatucket* there was a funding freeze.  In *New York v. Trump* there was a funding freeze as well.  And as you pointed out in the *Woonasquatucket* decision, the federal government in that case pointed to the fact that *California v. Department of Education* involved contract terminations as the way it was distinguishable before Supreme Court decided.

These are terminations, not a funding freeze.  The Agency made --  I'm sorry.

THE COURT:  That's okay, I don't mean to interrupt you.  But is HHS arguing that these are individual funding terminations, or that this is one funding termination?  Because from the outsider it looks like somebody hit Control Find and anything that said COVID got terminated.

But you're telling me that these were made individually based on individual grant contracts?

MR. LOVE HUBBARD:  Exactly, your Honor.  The terms and conditions of each grant are -- matter here

because the Agency termination was based on the source of the funds. Only those award activities whose funding was specifically tied to COVID-19 funding were terminated. But some of the public health funding, which was provided through the same programs, was not. So I can walk you through a couple of the specific examples if you'd like.

THE COURT: Yes. Please.

MR. LOVE HUBBARD: Okay. Just because it was first alphabetically, looking at the Arizona example which is at ECF 4-1, the declaration involving the grants and contracts at issues there. There are three different grants at issue in that declaration. There is the Epidemiology and Laboratory Capacity for Infectious Disease. That's one category of grants. And as the Plaintiffs characterize, and we agree with, long before the public heath emergency caused by COVID, the CDC established these ELC grants as a mechanism to fund the nation's state and local health departments to detect, prevent, and respond to infectious disease outbreaks. So the ELC grants existed before COVID.

Now, as part of the CARES Act, which involves allocating a lot of money in a hurry for broad purposes, the HHS decided to put out through ELC an award of nearly 631 million to the recipient base

through that existing funding stream.  There was so much money that was made available so quickly to respond to the COVID pandemic that the agencies had to decide how to get it out quickly, and one way they did that was through existing funding streams.

So when we look at the terms and conditions of those ELC grants, if you look at the termination letter issued by CDC, the terminations did not end all funding for ELC grants.  Instead, it was specific to those grant programs that were funded by COVID-19 funding.

THE COURT:  But you keep saying COVID-19 funding, and I understand that is HHS's position.  But isn't it sort of like -- you know, the States make the argument that the pandemic ended, the public emergency was declared over in May of 2023, and Congress went through and assessed each funding pocket, whatever, and left some in place and terminated tremendous amounts; and that is that Fiscal Responsibility Act of 2023.

How am I supposed to look at that?  I mean just because it's in the CARES Act or is part of COVID-19, we get into that whole if it's in the farm bill it doesn't make it farm funding; some of it's SNAP, some of it's other stuff.  You know, it's kind of like if I were to go to the zoo and go to the reptile exhibit I'm going to see reptiles, but in there I'm going to see

small animals, birds, and, you know, amphibians, frogs and stuff.  That doesn't mean they're reptiles; it just means they're part of the exhibit.  I know I'm not being very clear there, but --.

MR. LOVE HUBBARD:  If I understand your Honor's question, it's essentially did Congress direct that these funds be used only for COVID.

THE COURT:  Correct.

MR. LOVE HUBBARD:  And I would say that that is sort of an inquiry that the Court will only get to if it gets past the Tucker Act question -- and I do want to come back to the Tucker Act question -- but I want to respond to that now.  An agency's determination of how to allot appropriated funds among competing priorities is classic discretionary agency action that's not subject to APA review independently.  And that's basically what this is.

When the Plaintiffs were up here they kept saying Congress provided specific instructions about what the Agency should do; and that's not exactly the kind of bills we're talking about here.  So I apologize that these weren't in our brief, we've been trying to get --

THE COURT:  Understood.

MR. LOVE HUBBARD:  So I brought as just as a

demonstrative, these are the actual texts of some of these appropriation bills.  So as you can see on this screen in front of you, this is the CARES Act.

THE COURT:  Are you going to provide these to the Court?

MR. LOVE HUBBARD:  Absolutely.  We can do that.

THE COURT:  Thank you.

MR. LOVE HUBBARD:  This is just the text of the CARES Act Public Law 116-136 Title VIII.  And I have a couple of -- there are six appropriation bills at issue here, but here's what Congress told the Agency, (Reading) For an additional amount for CDC-wide activities and program support, 4.3 billion to remain available until September 30th, 2024, to prevent, prepare for, and respond to coronavirus domestically or internationally.

That's the instruction.

THE COURT:  But then they went back and looked at all of these funding streams two years later and left some of that in place.

MR. LOVE HUBBARD:  And two years from that point on there's still some of the funds that aren't used, and so what I think is baked into the question is that when Congress looked at it in 2023 there were some funds that the agencies hadn't unobligated; right?

There was unobligated funds.  If you look at the Fiscal Responsibility Act, it says line by line unobligated funds are rescinded.  In order for that to have made sense, the agencies must not have obligated some of the money.  And that's exactly the situation we're in now.

THE COURT:  But then that money was rescinded by Congress, not by the Agency, and that's where we get into the action of the agency and the major questions doctrine, right, who gets to decide where the money gets spent.

MR. LOVE HUBBARD:  What's at issue in this case is the termination of certain grants and agreements to the State.  Whether the Agency is using the money as consistent with the basically lump sum appropriations as presented in the CARES Act text here is a separate question that's not before the Court.

THE COURT:  We're in the *Lincoln v. Vigil* line of cases?

MR. LOVE HUBBARD:  Exactly.

THE COURT:  How do you get around HHS issuing guidance on how to use the funds until, some of them through June of 2027?

MR. LOVE HUBBARD:  And that actually brings me back to the Tucker Act argument, if you don't mind, which is that when there are -- essentially the

Plaintiffs' argument is that the, that prospective relief has created a reliance issue and that the termination of these grants; but what they don't account for is the fact that what Congress directed the Agency to do was make these funds available to the States.

And I will say when we get there a little bit further, we are still trying to pin down exactly where -- how this various funding went out to the States. We have some initial information from the Agency that, in fact, more than the 1.5 billion that's required under the CARES Act and we agree, right, what Congress directed --. Thank you. Sorry.

THE COURT: No, that's okay; I do it too, so, but --.

MR. LOVE HUBBARD: I appreciate it.

What Congress required was that the Agency make available $1.5 billion in funds to the States, Localities, Territories, Tribes, Tribal Organizations and Indian Health Organizations. That 1.5 billion is a subset of the 4.3 billion made for CDC-wide activities in the CARES Act. All that Congress instructed is that those funds be made available. That's what the Agency did.

What the Plaintiffs' argument doesn't take into

account is what happens when the Agency has made those things available, and the States don't spend them.  And some of that, as we point to in our brief based on an initial analysis, over -- just for the grants that have already ended where their period of performance has expired, over 160 million of that money was never used.

THE COURT:  But we're not talking about that money.  We're talking about the money that some of it has been extended to the end of September, some of it has been extended into 2027; right?

MR. LOVE HUBBARD:  Those are the ones that were terminated, yes.  And what the government's position is, is that when the Agency made the funding available as directed by Congress, when the States were no longer using it in a timely fashion for the purposes that was intended, it's well within the Agency's discretion to decide to take that money back, hold it, as they were holding it in 2023 when Congress went through and rescinded some of those funds and decide what to do with it later.

THE COURT:  Later when?

MR. LOVE HUBBARD:  I can't tell you what the Agency is going to do tomorrow or the next day.

THE COURT:  I'm asking you who decides?  Is it your position that they hold that money and then they

go back to Congress and say we held this money because we don't think that it complies with your statute any longer, or is it their position that as an agency they can decide where to reallocating the funds?

MR. LOVE HUBBARD:  Our position is to the extent as I believe we, we're literally until the minute that we walked in here we've been trying to figure that out, that once Congress -- that once the Agency provides $1.5 billion to the States as required in the CARES appropriation statute, then the States have no more interest in that money.  To the extent that CDC made more than that available to the States, that was within the Agency's discretion.  They chose to do that.  And within the limits set by Congress, there's nothing more that the statute requires.  It's sort of -- when we talk about the constitutional and separations of powers argument, I think it gets the authority flipped on its head.

THE COURT:  And I don't mean to sort of throw you off by like peppering you with questions, so I'm going to --

MR. LOVE HUBBARD:  That's what I'm here for.

THE COURT:  -- ask one question and then I'll let you argue until I have another question.

What do I do with the Justice Jackson *Policy and*

*Research* case?  Because they say that when Congress or an agency imposes additional regulations on spending, it's out of the realm of agency discretion.  So even if the agency's authority says you have to spend this, that's out of agency discretion to change course without going through the proper procedures.

MR. LOVE HUBBARD:  I mean the first thing I would say about *Policy and Research vs. HHS*, Justice Jackson's decision when she was a district court judge, is that the first thing it makes clear is that *Lincoln v. Vigil* is not limited to lump sum appropriations.  She says that agency decision relating to expenditure of funds that have been specifically appropriated by Congress entail the same considerations that the Supreme Court discussed in *Lincoln*.

So the argument that this isn't *Lincoln* because it's not lump sum, I think *Policy and Research* sets that aside.

The second thing that that case stands for the proposition of is that an agency's discretionary decision to discontinue funding a program was just as unreviewable as the agency's original decision to begin that program.  Now, she does go further and look at the underlying agency action in that case.  And what I think that points to is that when the APA limits the

court's review of an agency action, what the court's role is to look and see whether the agency complied with its own regulations.  Once it's done that, there's no role for the court to look behind that decision.

THE COURT:  And doesn't that get into the "for cause"?

MR. LOVE HUBBARD:  I think in this case it would get into whether the Agency followed the regulations with respect to explaining its decisions and not looking behind it; whether the court is satisfied with that explanation.

THE COURT:  Okay.

MR. LOVE HUBBARD:  Okay.  So going back to the Tucker Act argument -- go ahead.

THE COURT:  Just going back to Justice Jackson's case, doesn't she ultimately conclude that the termination was reviewable from the *Policy and Research* case?

MR. LOVE HUBBARD:  Yes, because she concluded the agency didn't follow its policies.

I talked about the specific ELC grants, and I draw your attention at page 38 of ECF 4-1 where there's the example of the termination decision there.  And what the Agency told the States is that, (Reading) No additional activity can be conducted and no additional

costs may be incurred, as it relates to these funds. Unobligated award balances of COVID-19 funding will be deobligated by CDC.  Award activities under other funding may continue consistent with the terms and conditions of the award.

So the Agency looks specifically at the funding source to decide how and whether to terminate an individual award.  By contrast, the COVID-19 Health Disparities Grant, which is at the same ECF number 4-1 at page 63, those were, came from CARES funding.  The agency decided to allocate a certain amount of CARES funding for this COVID-specific purpose; and because that was COVID specific and didn't merge with other funds like the ELC grants, the termination there was a closeout.  It said there's no further awards.  So the termination is different for each grant depending on the source of the funding.

And because the Court has to look at the terms and conditions of the grants and the way that the agency decided to terminate it, that brings us squarely into the Tucker Act.

And one more example that's not from Arizona. In Delaware, ECF 4-14 at paragraph 21, this was a Community Health Workers for COVID Response and Resilient Communities Grant.  The grant start date was

June 1, 2021 and had an end date of November 30th, 2025.  CDC allocated $9 million for that grant.  As of March 24th there was 4.263 million in remaining funds. So for the first years of that grant program the State had spent barely half of the amount that was available.

The CARES Act, again looking at the allocation text, broadly directs the Agency to spend money to prevent COVID.  It did that.  It made those funds available.  Arizona spent less than half over the course of four years; and because that was COVID-only funding, the termination notice for that grant specifically was a closeout notice.  It said no further -- no additional activities can be conducted and no additional costs may be incurred.

THE COURT:  And when was that sent?  Also in March?

MR. LOVE HUBBARD:  Yes.

THE COURT:  Okay.

MR. LOVE HUBBARD:  So with that as the factual layout of this case, I think we have to look at the *California v. Department of Education* in some detail. That case involves two competitive grant programs that Congress created in response to a shortfall of qualified teachers.  Through those grant programs the Department of Education awarded hundreds of multi-year

grants to public universities and other recipients across the eight Plaintiff States and other states that weren't plaintiffs.  So just as here, there was a broad grant of congressional funding to address a public problem, the agency allocated those funds through hundreds of grants, and decided to terminate them all through one decision.

THE COURT:  Okay.  So putting aside -- well, maybe that gets into the merits; because you're talking about jurisdiction, and I'm thinking why can an agency, and we're going to get into who acted within the Agency, why can an agency decide that their priorities -- that Congress' priorities when allocating funds are no longer applicable?

MR. LOVE HUBBARD:  Well, I don't think that's the case here, your Honor.  I think the appropriated funds, Congress' priorities were that the agencies make 1.5 billion available to the States under the CARES Act.  They did that here.

THE COURT:  I'm sorry; I'm going back to the *Education* case we're talking about.  You're saying that Congress said we have a shortage of teachers and so here's money for teacher training, I guess, is what the grant's for basically.

MR. LOVE HUBBARD:  A multi-year teacher pipeline

which is --

THE COURT:  Teacher pipeline.

MR. LOVE HUBBARD:  Yup.

THE COURT:  Okay.  Putting aside -- why is an agency entitled to say we don't care what Congress intended, we, the agency, are making a different decision?

MR. LOVE HUBBARD:  And I haven't delved as deeply into the *California* case on that specific question, --

THE COURT:  Neither have I.

MR. LOVE HUBBARD:  -- but what I would say is that that same question is sort of the question that the Court has been posing to Plaintiffs' counsel and I expect will pose to me here; and with those questions at issue, the Supreme Court concluded that the Tucker Act applied and the district court didn't have jurisdiction.

THE COURT:  So then I have to ask you is *Bowen* overruled?

MR. LOVE HUBBARD:  No.

THE COURT:  Is it distinguishable?

MR. LOVE HUBBARD:  In fact, the fact that the Supreme Court didn't overrule *Bowen and*, in fact, cited it in its decision in *California* is evidence that this

case, even if *Bowen* is still applicable, is governed by the Tucker Act because they're so similar in circumstances.  The Supreme Court cited *Bowen*, said *California v. Department of Education* isn't like that; it is on the facts presented and with the arguments that the state made, covered by the Tucker Act and jurisdiction solely lies in the Court of Federal Claims.

And I understand that, as the Court eloquently put it in the *Woonasquatucket* order, the line between Tucker Act jurisdiction and APA jurisdiction is a little difficult to pin down and it's hard to say how much precedential value to give to an emergency decision of the Supreme Court of the United States.

THE COURT:  That's a *per curiam* that's intention with the line of cases that is decades old.

MR. LOVE HUBBARD:  But when the case in front of you is in the same procedural posture and presents identical circumstances, I think you have to take into account in order to predict the likelihood of success on the merits, which is what we're doing here, that the Supreme Court looked at those same circumstances, looked at *Bowen*, considered the arguments, and decided that the Tucker Act applies.  I think the Court has to take that into account when it's deciding a likelihood

of the merits here.

THE COURT:  What do I make about the fact that the States don't put this in the posture of the terms of our grants that have already been provided, but these are funds that have been appropriated.  They're not putting that in a contract context.  I mean I think that we -- isn't it true that the Tucker Act has long been construed as authorizing actions for money judgment and not suits for equitable relief, like we have here?

MR. LOVE HUBBARD:  Your Honor, I think to be honest with you, before the Supreme Court issued its decision in *California v. Department of Education* I might have not even made this argument to you because I wouldn't have said, you know, consistent with how the First Circuit decided that maybe that the Tucker Act doesn't apply.  But the Supreme Court has now spoken.

THE COURT:  But have they?  I mean it's a *per curiam*.  It's maybe three pages.  It's limited briefing.  It's on that what they call the emergency docket, you know, it's referred to pejoratively as the shadow docket.  It's been criticized, roundly criticized by everybody depending on where you sit in the power chain at that time.  Is that really something that this Court, don't I have to -- hasn't the Supreme

Court said you don't decide, district court, or circuit courts even, which of our precedents we're going to overturn or undermine; we decide it, and when we do it you have to follow what's already there.  Isn't that essentially what -- that's essentially what I found in the *Woonasquatucket* case, and I'm not sure how I rule otherwise.

MR. LOVE HUBBARD:  Well, the way I think, because whatever limited precedential value the Court decides the Supreme Court's emergency order has, when considering a case that presents identical circumstances and evaluating the likelihood of success on the merits at the end of that case, I think you have to take into account how the Supreme Court is likely to rule.

And so if you would allow me, I'd like to just go through how similar these things are.  So I'm going to now go through the arguments the Plaintiff States here made in their reply brief and compare them to the plaintiff states' arguments in their briefing before the Supreme Court.  So what the Supreme Court had in front of it when it was deciding the *California v. Department of Education* that they considered and decided that the Tucker Act still applies.

Plaintiff States, here, argue this case is different from *California* because they say it involves prospective equitable relief in order to clarify a complex, ongoing relationship that involves managing the relationship between the states and the federal government.

In *California*, the states argued to the Supreme Court the relief sought by the states -- vacatur, declaratory relief and injunction against further unlawful terminations -- would restore the status quo and allow the programs to continue their work in the remaining years of the grants.  That kind of prospective nonmonetary relief to clarify future obligations characterizes an action that belongs in the district court.  They made the same argument, and the Supreme Court decided that the Tucker Act applied.

Here, the States are claiming that these claims arise from statutory, regulatory violations, not from breach of alleged contracts.

In *California,* the states said, quote, the controversy centers around federal statutes and regulations.  It is not a contract dispute even if it were true that the underlying grant awards have characteristics of agreements.  They made the same argument and the Supreme Court concluded that the

Tucker Act applied.

Here, the States have argued that adjudicating these legal questions does not require the Court to interpret individual grant funding terms and conditions because it was a sweeping termination en mass.

In *California,* the plaintiff states argued that the defendants hadn't identified any term or condition of the grant award that would authorize termination and that it was a sweeping singular decision that they were challenging.  They made the same argument, and the Supreme Court conclude Tucker Act applies.

Here, the Plaintiff States say it's like *Bowen*, that the Plaintiffs seek judicial review of HHS policy decisions, not of individual grant terminations applied en mass to administration of financial assistance.

In *California,* the states relying on *Bowen* said, quote, the States' challenge a programmatic decision to terminate all grants.  The Supreme Court considered that argument and concluded that the Tucker Act applies.

Here, the Plaintiff States argue that an injunction doesn't amount to money damages because it's not compensation to serve as a substitute for the federal government performing as required.

In *California,* the states made the argument

that, quote, The primary remedy available in a Tucker Act action, a naked money judgment against the United States, would not undo the irreparable harm the states now face from the threatened closure of their teacher preparation programs.

Here, and in *California*, the States made the argument that the Court of Federal Claims can't provide equitable relief.  The Supreme Court considered that argument and conclude the Tucker Act applied.

The last thing I want to dive into is the irreparable harm question because in *California* whatever -- you might have heard that Plaintiff States here quibble a little bit with the Supreme Court's characterization that the states had said that they were able to cover those costs; because what the states, in fact, argued was that defendants' abrupt termination of virtually all of these grants harms the states by eliminating that future funding stream and imperiling vital programs for years.  They argued that some grant recipients were already forced to, excuse me, forced to halt their programs and that staff had already been laid off.  And they argued that the government did nothing to rebut the states' detailed evidence about the practical impacts of cutting off grants with multi-year terms.

THE COURT:  How do I engage with that?  The Supreme Court made the finding there that the states said they could cover the funds.  Without reading the briefing and second guessing the *per curiam* from the Supreme Court, how do I say, well, it was the same and they made that finding and so therefore I make the same factual finding in this case?  Because that seems to be what you're arguing.

MR. LOVE HUBBARD:  What I'm arguing is that the individual circumstances here in terms of the characterization of the claims, the harms that are alleged, the basis of the claims in statutes and regulations instead of in contracts, all of those are the same.  The circumstances are identical.  And the Supreme Court looked at those and concluded that the Tucker Act applied.

When I look at your Honor's *Woonasquatucket* order, you concluded that the terms and conditions of the grants weren't at issue because it was a funding freeze decision that came from on high that went across multiple agencies so there wasn't an agency decision that you could follow.

THE COURT:  But I think in *Woonasquatucket* I also said each agency action was separate to freeze the funding that had been allocated.  So there was the OMB

Order, there was the Director of the OMB's Memo that effectuated that order, or the other way around, and there were five individual agency actions to comply with that order and freeze funding.

This is like a subset of that; isn't it?  This is termination of funding by HHS -- and I do want to get into who made the decisions.  And I don't want to put you on the spot, but we need to have that conversation.

But -- so how is that not an agency decision? How is that distinguished?  It's not individual grants; right?  They didn't go grant by grant and say yours, you know, we're terminating for cause, yours we're terminating for cause.  They froze them all, right --

MR. LOVE HUBBARD:  In *Woonasquatucket* --

THE COURT:  -- and terminated them all.  I'm sorry.  Here.

MR. LOVE HUBBARD:  Oh, I'm sorry.  Here, they did terminate them all and that is a major distinction; right?  Part of the problem that you and Judge McConnell identified in both of the orders was that the -- is that it was a claim about process, not about damages, that the action, and quoting from Judge McConnell here that the court enjoined was implementation of the categorical freeze, not the

action that breached any specific contract-like agreement.

The fact that this is a termination does make it different because then we're more back in the realm of traditional contracts evaluation that the Court of Federal Claims can handle.

THE COURT:  Right, until we get into the separation of powers issues; correct?

MR. LOVE HUBBARD:  Well, again, I would characterize the separation of powers issues as late editions meant to evade the jurisdiction of the Court of Federal Claims and not actually separate claims.

THE COURT:  Okay.  But aren't they constitutional claims?  Whenever they put them in, whenever they decided they were an important aspect of their argument, isn't it this Court's responsibility to sort of patrol the jurisdiction, to use some of the language from *Woonasquatucket*, between Congress and the Executive?  Isn't that what the court does?  We rule on the implementation of laws.  We -- you know, stuff comes to us.  We don't go out and find cases.  We apply the law to the facts that are brought to us; right?

MR. LOVE HUBBARD:  Your Honor, what I would say in response is that to the extent that the Court has concerns about the constitutional claims -- and I think

we win on the merits, and I'm going to address them. But whatever else they are, they are not the basis for emergency preliminary injunctive relief.

The harm that the States are complaining about here at this stage for the purposes of the preliminary injunction order is not a constitutional violation. It's not a question of separation of powers.  If that were the question we could address that in the ordinary course with full briefing about how the Agency allocated the funds.  I think that -- if the Court is concerned only about the constitutional claims, that should happen in the regular course.  It is not the basis for emergency relief.

THE COURT:  But I can't speculate about anybody's litigation strategy.  You know, if I look at this case and *Woonasquatucket,* everybody changes, you know, as lawyers do and as is their job, they change their position on whether something applies or not based on what the latest ruling in the case is.  The *Department of Education* case is a good example; right? Everybody on one side thought it was great until another court ruled, and then everybody on the other side thought it was great and it applied, where they had said it didn't apply.

So how do I, what right as a judge do I have to

get underneath the hood and decide, oh, well, that was just litigation tragedy.  They've raised a constitutional issue.  Constitutional issues are at times subject to injunctive relief; and I mean maybe now is the time to get into the question.  They respond in their reply brief and they say, you know, the constitutionally -- you know, there's the Executive Branch and there's Congress.  Congress allocated these funds.  Secretary Kennedy was confirmed by the Senate. He did not terminate these funds.  Someone did; we don't know who, where the decision was made.  It could have been at the highest level, it could have been at the lowest level, but there's no decisionmaking apparent and there's none that's been explained.  So how am I supposed to look at that boundary between who's really acting, who's wielding the powers?  Is it the Executive or is it administrative agents within an agency?

MR. LOVE HUBBARD:  Your Honor, with respect to the question of the Secretary's out-of-court statement, I think even the Plaintiffs in their argument didn't contend that anything turns on that, because in order to decide whether that was somehow outside of the authority that Congress provided we'd have to look at each grant to determine whether that grant was a power

that was delegated by the Secretary to one of the sub-agencies. We're talking about -- I don't think it's an issue that we can decide here today.

THE COURT: Okay.

MR. LOVE HUBBARD: But what I do want to say is that Plaintiffs haven't -- basically the crux of Plaintiffs' separation of power claim is that we haven't identified any authority that would allow HHS to terminate these grant agreements. But that has the authority question backwards. The Agency has inherent authority unless it cabins the authority itself by regulation to spend money that Congress allocates consistent with the limits that Congress sets.

In this case the appropriations funds, they're lump sum appropriations. Congress said here's a bunch of money, and the Agency has been in over the course of the last -- and by the way, in the CARES Act with set end dates, right, remain available until September 30, 2024, that's consistent with the Consolidated Appropriations Act of 2021, which is also an appropriations bill at issue here. Those were through September 30th, 2024, so --

THE COURT: But in those original fundings the States argue and I think convincingly Congress said this is tied to the end of the pandemic; this is tied

to one year after of the end of the pandemic; this particular stream funding. And I don't pretend to have read every single stream of funding through the course, but, is tied to, you know, no term. And then they went back in 2023 and they said we're getting rid of this one, we're getting rid of this one, and we're doing it to save taxpayer money.

So where does the Agency get the authority to then undo what Congress did in 2021 and in 2023 by just deciding that it doesn't suit somebody's agenda?

MR. LOVE HUBBARD: I would submit, your Honor, that there's no evidence that that's what happened here. So, for example, looking at the CARES Act again, which is the one I have up on the screen -- and we are loathe to make unverified statements in court, obviously. As I put in the footnote, we have been looking and working with the Agency about spreadsheets, so, and we will absolutely follow up as soon as we have something that we can verify with declarations.

But what I know standing here today is that the CARES Act allocated $4.3 billion total for CDC-wide activities. Of that, 1.5 billion was directed to be sent to the States. Looking at the way that CDC has sent those funds to date, they had allocated $2.1 billion to the States on their books. So they

allocated $2.1 billion as of April 10th.  Now, that doesn't include the terminations because the terminations have been rescinded.  So the 2.1 billion that went to the States under the CARES Act --

THE COURT:  I'm sorry, say that again.  Just walk me through that.

MR. LOVE HUBBARD:  $2.1 billion was allocated under the CARES Act for the States, what the Agency refers to as STLTs, which is States, Localities, Territories, Tribes, Tribal Organizations, Urban Indian Health Organizations or Health Services Providers to Tribes; STLTs.  I'm just going to say STLTs from now on.

They allocated 2.1 billion of the CARES Act funding to STLTs.  The congressional appropriations requires them, the limits Congress set was that they had to allocate 1.5 billion.  So the limits Congress set have been complied with.  Beyond that, how to spend that money, the rest of the 4.3 billion that Congress allocated is squarely within the Agency's direction.  The authority to spend the money that Congress has appropriated is inherent in the Agency under their constitutional design.  That's why I say they have the question of authority backwards.

If the Plaintiffs argue that we violated some

specific statute in exercising our authority, they need to identify that statute.  The fact that with respect to the SAMHSA grants, we're arguing that the agency has the inherent authority to terminate those grants and that the statute provides one example of a subset of that authority, is consistent with the constitutional design.  Congress allocated the money using sweeping broad language, as opposed to the kind of specific instructions that Plaintiffs have characterized it as, and the Agency has to decide what to do with it; and that's what it did here.

If it's the case, as I think standing here that 1.8 billion of that 2.1 billion that had been allocated has already been drawn down by STLTs, they have no claim because we don't have to go further to look at any APA violation because under *Lincoln v. Vigil* the Agency complied with the limits that Congress set, and beyond that it is quintessential agency discretion.

And again, we don't have full information, for which I apologize.  But CPRSA, which is the Coronavirus Preparedness and Response Supplemental Appropriations Act -- do I have that one?

THE COURT:  Is that the 2021 Act?

MR. LOVE HUBBARD:  No; that one is CRRSA.

I don't have the appropriation language, but

I'll represent to you that that one appropriated $2.2 billion to CDC-wide activities, of which 950 million is earmarked for STLTs.

As of this morning, CPRSA had 1.12 billion awarded to STLTs, with 1.1 billion drawn down. So again, under that appropriations statute the Agency has already spent more than Congress required it to spend; and its decision to end additional funding is consistent with the limits Congress set, and that's squarely agency discretion under *Lincoln v. Vigil*.

And so I think when the Court hears from the Plaintiff States that Congress made specific instructions that the Agency is disagreeing with, that's not this case. These are huge appropriations, huge amounts of money that the Congress allocated to respond to a public health emergency, and the Agency had to figure out what to do from there.

THE COURT: So can I just simplify it for those of us who don't have as much of a policy or math brain. So you're saying Congress said, okay, Agency, here's 2.2 billion. You have to spend at least 1.5 billion, or whatever the amount is, and even though the Agency at some point said here's how we're spending 2.2 billion, once they've spent the 1.5 billion we're out of the separation of powers argument and then we're

into agency discretion.

MR. LOVE HUBBARD:  Yes, your Honor.

THE COURT:  Okay.  I get it.  Thank you.

MR. LOVE HUBBARD:  In the Plaintiffs' reply brief and just now they argue that courts routinely hear APA challenges because the appropriations statutes provide standards such as a stated purpose by which courts can review that agency action.

Again, I would submit that the appropriations bills in the cases they're citing are extremely different from the appropriations bills that are at issue here, which are much more akin to the lump sum appropriations that the Supreme Court considered in *Lincoln*.

THE COURT:  One more stupid question, if I may.  Back to my example:  Congress allocates 2.2 billion and says you have to allocate 1.5 billion to whatever, and the agency allocates 1 billion.  Then are we in a constitutional separation of powers issue?

MR. LOVE HUBBARD:  If I understand your hypothetical, it would be a situation where the agency has allocated to the states less money than was required by the appropriations statute.

THE COURT:  Yes.

MR. LOVE HUBBARD:  I think in that situation,

yes, then it would be a situation where it's different where the agency isn't complying with the limits that Congress set.

THE COURT:  Okay.

MR. LOVE HUBBARD:  And it doesn't then -- right, that's precisely the separation of powers setup that I think applies here.  Congress decides to allocate money, agency decides how to spend it within the limits Congress set.

THE COURT:  Right.  Okay.  Thank you.

MR. LOVE HUBBARD:  Looking at the cases that Plaintiffs are citing to say that APA challenges have specific ties to appropriation bills, I think the cases they are considering there illustrate the point. *Mount Evens v. Madigan* is about a specific statute regarding the use of money received in a settlement for necessary improvements on a property damaged by fire in a case where fire had destroyed the facility, but where the fire service received money in a settlement of the destruction but elected not to use it to repair the property.  That kind of specific, directed allocation from Congress is not what's at issue here.  This is a broad appropriation of huge amounts of money that the Agency had to decide what to do with in a hurry.

Similarly, *Castellini v. Lappin*, that statute

had an enabling statute that authorized specific funding for a BOP boot camp program. The court found that Congress had not specifically appropriated funds for the program and so BOP could terminate and reallocate the boot camp resources even in that case with a much more specific appropriations. But the court found APA violation was for not complying with notice and comment requirements. And I don't think anybody argues that notice and comment arguments apply here.

What we take from all of this is that courts are appropriately very reluctant to second-guess agency discretionary decisionmaking with respect to broader appropriations like the one in this case.

In Plaintiffs' brief, in their reply brief they acknowledge the very broad terms of the funding at issue here -- public health infrastructure and community health and substance abuse programs -- and they describe the ways in which the States have used them for non-COVID purposes. That just reflects the extent of the discretion that Congress gave to the agencies here with how to use these large pots of money.

THE COURT: Doesn't that get back into the farm bill includes SNAP benefits? And I know I'm

oversimplifying this; I'm trying to understand it at a higher level and then delve into the specifics.  But just because you call it COVID-era money or designed with the idea of responding to the pandemic, it doesn't mean that that's all that's included in that legislation, and they went back and looked at it in 2023 and went line by line.

MR. LOVE HUBBARD:  And if -- the way I try to think about it is if you put yourself in Congress' position in 2023, right, they went line by line and there was large pots of unobligated money that -- one of the problems in this case is what "obligated" means. And so the way I understand it for this case -- before I get back to your hypothetical, and I promise I will; in this case there are two layers of obligation.  The Agency was appropriated funds from Congress.  They obligated it by awarding it through grants to the States.  But from there, the States then can either obligate the money that has been allocated, or not; right?  So unobligated money from the States' perspective is what they haven't spent yet.  And looking at the math for just the Plaintiff States here, the 23 States and the District of Columbia, on grants that had already expired we found that $160 million had been left sitting there, never spent, because the

States hadn't spent it.

Now, what that means is that the question of whether there's money sitting somewhere with the Agency that hasn't been obligated must have been the case in 2023 when Congress went back and looked at it. Congress said line by line money that has been not obligated -- unobligated, it says, in the Fiscal Responsibility Act -- is rescinded.  In order for that instruction to make any sense, the agencies must have had some money that's unobligated.  And that's exactly the situation we're in today.  The Agency has taken back some of the money that it obligated to the States and it's holding it now as unobligated to decide what to do with it.  What the Agency does with it from here, we've already discussed that.  I'm not prepared to discuss that today, but it's holding it as unobligated, and Congress could now choose to rescind it, as they did in 2023.  Or not.  So the fact that it's unobligated --

THE COURT:  All obligated money has been drawn down.

MR. LOVE HUBBARD:  The States?

THE COURT:  These States.

MR. LOVE HUBBARD:  And to try and be precise I'm going to use the word "expended."  All money, all costs

incurred before the date of the termination the States can draw down, yes.  They may not have yet because, again, the Agency followed its orderly process for terminating these grants so that there's either a 30- or 90, I believe, day closeout period depending on each grant -- again, it depends on each grant -- a 30- or 90-day closeout period, which wouldn't have ended for any of them I don't think because it was March 24th -- where the States can go through their expenditures and submit their receipts.  I'm sure that's not how it actually works, but just as an example; and say before March 24th we spent that money; HHS, you need to pay for it.  And they could do that even before the Court's TRO.  Now, with this Court's TRO, the termination had been rescinded and so they can -- they would be able to draw down for activities that happened between the TRO and now, pending the decision on the preliminary injunction.  Does that make sense?  I'm sorry.

THE COURT:  I think so.

MR. LOVE HUBBARD:  Okay.

THE COURT:  So the Plaintiffs are saying for major questions analysis that it's the "for cause" language that HHS overread and that it's like *Biden v. Nebraska,* you can't cancel $430 million in student loans with the language "modify", or whatever the

language is.

So you're saying that this is different because the "for cause" is only sort of being cabined by the money -- is only cabined to or is only applied to the money over which HHS was granted discretion to spend or not spend.

MR. LOVE HUBBARD:  Correct, your Honor.  And the other reason, you know, the question of the applicability of the major questions doctrine I think, I think it depends on accepting the Plaintiffs' characterization of the separation of powers problem. I think the separation of powers situation here is that Congress allocated money, broad, basically lump sum appropriations, and within that, within the limits Congress set -- again, I will keep saying that because there are limits and they are in the appropriations bill, but they are not limits like you must spend money on X program; they are you must spend X number of dollars with the states.  That's it.

Once the Agency complies with those, then in the constitutional design the Executive Branch has the authority to decide how to spend that money and that's -- you know, again, repeatedly in the Plaintiffs' brief they say they haven't pointed to any authority that allows them to decide what to do with

this money.  It's inherent authority to decide what to do with this money; and if they had a claim that the Agency went beyond that inherent authority, it would have to be a statute that they point to.

THE COURT:  I'm going to oversimplify again for myself, okay; so as a parent, if I give my kid $20 and I say go to the store and you have to spend $10 on milk and bread, whatever.  Inherent in that authority -- but you can spend all 20.  Inherent in that authority is his decision whether to spend the other 10, to keep the other 10, to spend it on candy, to spend it on whatever?  Does that essentially boil down -- I realize it's very simplistic.

MR. LOVE HUBBARD:  I wish I had come up with it myself.  Precisely.

THE COURT:  Thank you.  We don't have these arguments in the briefing.

MR. LOVE HUBBARD:  I appreciate that, your Honor, and what we put in the briefing is that the constitutional claims are merely recasting claims for money damages and that the -- and we did say that the Agency acted within its inherent authority to terminate the grants.  Again, they sort of pointed to the fact that we said in the briefing that the SAMHSA statute didn't apply.  That's because the Agency has authority

outside of that specific statute to decide what to do with the money.

THE COURT:  But in the termination notice sent to the people who received SAMHSA funds, the Agency said -- they cited to the same statutes that they're now saying doesn't apply.  Is that not correct?

MR. LOVE HUBBARD:  That is what the record reflects, yes.  And when we get to the specifics of the SAMHSA program, you know, it's the government's position that they still complied with those things even though that wasn't the only sole basis for the termination.

Just to wrap up the question of reviewability under the APA.  So we have -- the jurisdictional question is layered here.  It's the government's position and I think the Supreme Court's decision that the Tucker Act applies, and so this Court doesn't have jurisdiction.  Beyond that, if the APA applies, only if the APA applies there's the question of discretionary review and things that are barred from review by the APA's discretionary function exception.  To do that analysis the Court can, as you've pointed out and we agree, *Research and Policy* says you can look to see whether the Agency complied with its basic processes and regulations, and that's it.  That's the end of the

analysis because beyond that is committed to agency discretion.

THE COURT:  So did they?

MR. LOVE HUBBARD:  Thank you, your Honor.

Turning to the merits of that, I'm going to break this up, and I would encourage the Court as it goes back to ultimately consider this, that these are quite different programs with quite different requirements, CDC and SAMHSA.  So to the extent the Court is crafting a remedy here, it should treat them separately based on the distinctions that really matter.

For the CDC there's no question and I don't think Plaintiffs dispute that HHS has the express authority to terminate grants for cause, as described in the applicable regulation.  HHS does not and did not need any other statutory authority to authorize it to cancel those grants.  That authority is inherit in its power to spend money that's allocated by Congress within the limits set by Congress.  So we're looking at 45 C.F.R. Part 75.  That regulation supports the Agency's determination that cause must mean something other than material failure to comply.

THE COURT:  But that's not how the Agency has interpreted it and, in fact, they went through

rulemaking, rule changing, whatever, and in October those become one, "for cause" and "failure to comply", and the argument is they've always been one and, in fact, the Agency said so when they changed their rules.

How is it not arbitrary and capricious to apply a different interpretation of "for cause" at this stage without any notice, without any information about how they came to that conclusion?

MR. LOVE HUBBARD:  I think, your Honor, the fact the Agency is adopting different regulations in October must mean that the regulations they have now mean something distinct.

THE COURT:  Well, that's not what they said in their sort of lead up to changing those regulations.

MR. LOVE HUBBARD:  They were changing them in the future, doesn't mean that they don't have the meaning, that the plain meaning that they have now is essentially what I (indecipherable).

The other thing, your Honor, is that once the OMB regulations are adopted, and again they don't apply here, but when they do in October, they demonstrate that CDC currently has the authority to terminate a program for -- if it no longer effectuates the programs or goals or agency priorities.  In other words, even if the Court is to find that OMB, I believe it's 2 C.F.R.

200.340, even if the Court were to find that has some relevance here -- and we say it doesn't because it doesn't apply until October -- then that brings into the, brings into making clear the Agency's discretion to terminate a grant only for a change in Agency priority, and that's "for cause".  It's a different characterization of the same inherent power.  And so I don't think that relying on 2 C.F.R. 200.340 actually helps Plaintiffs because it provides an independent basis for the Agency to do what it did here, which is determine that its priorities are changing and to react to that changing priority.

THE COURT:  So my understanding of the change in regulations under HHS was codifying past behavior, not codifying future behavior.  But the other part of that is like what doesn't qualify for cause, or because I don't like the State of Colorado, because I don't like Rhode Island or because, you know, whatever.  I mean is there a no cause?

MR. LOVE HUBBARD:  I think the first thing I would say, your Honor, is if we're talking about whether the Agency had appropriate cause to terminate a particular agreement, that is the quintessential contract claim.  It's a Tucker Act claim.

The second thing I would say about that is if,

again, we go back to the appropriations statutes here and we look at the reason that this money was allocated -- and I certainly agree and don't contest that later the money was, the CARES Act and PPP, that it went to all sorts of things.  But if we look at the appropriations bills, the reason it was allocated was for coronavirus, and, you know, without precisely defining the contours of what "for cause" could mean, the end of public health emergency that was the reason the funds were provided has to be cause that would qualify.

THE COURT:  Can I ask a question.  So I realize that the Court issued a text order and I wasn't as clear as I could have been, but in your footnote in your briefing you respond to it, and it doesn't seem that responsive.  I realize, like I said, that I could have been more specific.

Agency reasoning is confined to before the decision is made; and the evidence -- we can't get post hoc reasoning, okay, now we've decided that we actually do have cause; and that's the *Chenery* case that the States have cited.

So is the only reasoning we can consider or should consider what's stated in the terminations? Because those terminations are specific.

MR. LOVE HUBBARD:  When we look at CDC, your Honor, and again I think we do have to consider them separately both because the terminations are different and because the applicable agency regulations and statutes are different.

With respect to the CDC, what's in the termination notice is what the Agency did.  In other words, yes, you can look at the termination notices that was the basis for the agency decision.  And, you know, to the extent that Plaintiffs' concern or the basis for their claim is that the Agency wasn't making individualized decisions about each grant, (1) the government's position would be they did because they looked at only those grants that had -- were funded by these COVID funding streams, and, for the ones that had multiple funding streams, left alone the funding streams that weren't COVID-tied.

THE COURT:  But that sort of looks to me like somebody went through and said Control F and found all of the grants that said COVID and just decided to get rid of those without any analysis of the individual. So I know you're arguing that it's an individual grant determination, but it seems like it's a broader agency action, more akin to what we had in the *Woonasquatucket* case than, say, in an individual contact claim case.

MR. LOVE HUBBARD:  The reason I would disagree with that, your Honor, is because the actual cause, I mean the Agency isn't hiding its cause here; right? The actual cause is the end of the public health emergency.  The fact that there wasn't an individualized decision as amongst the grants that are funded by appropriations that are directed at that public health emergency is just a product of the fact that it was an unprecedented global pandemic.  That was the reason for it.  And when that public health emergency ended, the Agency has within its inherent discretion the ability to decide for cause that grants funded to the States that addressed that problem are no longer necessary.  And I don't think that there's anything blanket or mass determination about that because it's a question of specific funding provided for a specific purpose and the Agency's decision about how to allocate that within the limits set by Congress.

How am I doing on time, your Honor?  I want to make sure --

THE COURT:  I've been asking questions, so.

(Judge confers with the Clerk)

THE COURT:  I think technically time is up, but we'll give you a little more time --

(Overlapping speech)

THE COURT: -- if the stenographer needs a short recess before the State's rebuttal, we can take that.

I'd like you to address the monetary damages aspect (indecipherable).

MR. LOVE HUBBARD: With respect to SAMHSA, again, I'll try to keep it brief, but essentially if you look at the policy guidance which Plaintiffs wanted to discuss with you, I don't think their characterization of it is correct; right? It's HHS policy guidance about grants generally. There is a subheading for suspending award activities or termination, and then there's a sentence that begins with, (Reading) Consistent with 45 C.F.R. 75.372 an awarding agency may suspend pending corrective action or terminate all or part of an award activity if you fail to materially comply. End of that sentence.

And then there's a next section that says, (Reading) HHS awarding agencies may terminate without first suspending the federal award if the problem is serious enough or public welfare requires immediate action.

So I think consistent with that and reflecting the inherent authority of the agencies to decide how to spend the funds, there was always anticipated to be a separate inherent authority to decide that there's a

reason other than materially failure to comply.  And so that's the argument that the statute, because the Statute 300x-55 applies only in a situation where a state has materially failed to comply, that's one subset of the way that an agency could terminate an agreement; and that wasn't what was happening here. The Agency did cite that in the termination notices. And so I think it's important to say that even if 300x-55 applied, it's the government's position that the termination provided an explanation:  Plaintiffs could no longer comply with the necessary conditions of these disbursements because they were no longer necessary due to the end of the pandemic.

And if what we're left with is then a question of whether the States have complied with -- excuse me -- whether the Agency has complied with the notice and hearing procedure, that is a quintessential contract claim that belongs in the Court of Federal Claims.  They can address it there.  That doesn't create a kind of immediate emergency harm that would justify a preliminary injunction here.

THE COURT:  Well, is it or isn't it when it -- don't forget, because we also are left with --

(Judge confers with the Clerk)

THE COURT:  I'm sorry.

It's not always a quintessential contract claim because failure to comply with the Agency's own procedures is fundamentally APA, not Tucker Act; right?

MR. LOVE HUBBARD:  I think it's different in this case because the Agency statutes that deal with termination of the agreements and the applicable regulations are literally incorporated into the underlying agreements, the Agency's ability to terminate our part of the terms and conditions of the underlying agreements.

THE COURT:  But you can't incorporate anything into an agreement and then call it a contract.  They can't say, well, we're going to comply with the Fourth Amendment, and then when somebody alleges a violation say, well, no, not a constitutional claim because we incorporated it into our contract so it goes to the Court of Federal Claims; can you?

MR. LOVE HUBBARD:  No --

THE COURT:  I mean that was a very imprecise question, but --.

MR. LOVE HUBBARD:  No, your Honor, I don't think that that -- I don't think they --.

But I don't think that's what the Agency did here; right?  It incorporated the regulations about how the contracts can be terminated into the contracts

themselves, and that is a quintessential contract claim.

I would just note before I go on, because I know we're running short on time, but to the extent the Court is inclined to find the Agency's actions didn't comply with those statutes, didn't comply with the regulations, I would invite the Court to think about the proper remedy with that. If the violation is a process violation, the proper remedy would be for the Court to enter an injunction that stops things where they are now and then invites the Agency to consider undertaking a revised procedure that complies with the Court's opinion, as opposed to just saying this was unlawful from the start. And I think that would better address the separation of powers between the Executive Branch and the Judiciary where your Honor could say, if you find -- and I don't think you should -- that the Agency didn't comply with its process, that the remedy for that is the process; not forcing the federal government to spend huge amounts of money in a way that it doesn't want to.

Okay. With respect to the money damages and irreparable harm, Plaintiffs point to irreparable harm that they say is going to happen with respect to public health and all of the other consequences. I would say

that what we have in front us is a record from *California* where the plaintiff states in *California* argued, just like they do here, that the defendants' abrupt termination of virtually all of these grants harms the states by eliminating future funding streams, and imperiling vital programs for coming years.  They argued that there was detailed evidence in the record about the practical impacts of cutting off grants with multi-year terms, some extending into 2029, that funds programs vital to the education of our youth.

The Supreme Court looked at all of that, looked at the circumstances and concluded that those were really money damages that they were talking about, even though they were dealing with programs that go into the future, some of them for many years, some for more years than are at issue here; and the Supreme Court looked at that and said that's money damages.  And I think your Honor has to take that into account when it's thinking about how to characterize the harms here.

The other thing I would say is even on that record the Supreme Court said it was the federal government who would be harmed because it's going to be unable to recover the funds.

THE COURT:  What do you say to that?  Because the States argue that no, you have -- I forget what

they call it, but basically that you can move money around and so not give the States money on other funding streams if you're found to have been harmed by this, and by "you" I mean the federal government

MR. LOVE HUBBARD:  Right, right.

THE COURT:  And by "harmed" I mean spent money, taxpayer money that they didn't need to spend or didn't believe they needed to spend.

MR. LOVE HUBBARD:  I think the situation is identical to in *California;* where the grantees here aren't promising to return withdrawn funds if the grant termination is (indecipherable).  Presumably they will fight the federal government in every opportunity to draw that down.  And looking at that record, the Supreme Court concluded that the irreparable harm was to the federal government if the injunction were to issue -- a TRO in that case, excuse me.

THE COURT:  The Supreme Court also made a finding that the States had asserted that they could pay that.  Now you're saying that's not as clear from the record, but you're not suggesting I need to go beyond what the Supreme Court said in its *per curiam* and look at the record in that case; correct?

MR. LOVE HUBBARD:  I'm not, your Honor.  But what the Supreme Court found is both the balance of the

equities and the irreparable harm were actually in the federal government's favor in circumstances that are extremely difficult to distinguish from these ones.

THE COURT:  And I don't know enough about that case so I don't want to --.  But we're talking about very different harms downstream; right?  We're talking about the failure to have enough certified or qualified teachers.  That's a harm.  But I don't think you can put that in the same category as unvaccinated children during what appears to be an uptick in measles outbreaks; right?  Those two things are starkly different in the harm that the States have or perceive to have.

MR. LOVE HUBBARD:  And I think, your Honor, in order to engage in that kind of irreparable harm analysis we'd have to have a lot more information than we have here, which is to say, you know, if an agency is saying as the Plaintiffs said here, and I have no reason to doubt it, that 10 percent of its funding is coming from this federal funds, then the question is does that state have the ability to cover that 10 percent and --

THE COURT:  And so then that goes back to the process, that maybe HHS just acted without first engaging in a process that made sense to look at each

funding stream and try to save money, which is a laudable goal of the federal government and, you know, save taxpayer money; but to do it in a way that makes sense without jeopardizing children in California, mentally ill people in rural communities, elderly people in nursing homes.

MR. LOVE HUBBARD:  And I guess I would just say with respect to how to address that alleged irreparable harm is that what -- under the Supreme Court direction in *California,* I think the appropriate way to address that would be for the States who believe that they need the federal funds for that purpose and that they are entitled to them because it goes beyond limits set by Congress, that would be the only way that the States had some entitlement to that is if Congress gave it to them, to go to the Court of Federal Claims and say we're entitled to this money, you need to pay it to us.

THE COURT:  But the irreparable harm here in like, say, there's no do-over for some of this stuff; right?  If we don't vaccinate children for measles and they get the measles and some of them, some percentage, whatever that is, die from the measles, there's no do-over.  If you run out of teachers and you're using uncertified or college students, as a lot of states are using now as substitute teachers, they can hire more

teachers the future, train more teachers in the future. The harm isn't the same. The balance -- those harms don't equate. Am I right? There's a more immediate catastrophic harm the States are positing here than in that *California* case.

MR. LOVE HUBBARD: The only thing I would say, your Honor, is that the way the plaintiff states in *California* characterized it was not about a current teacher shortage, but the program was designed, a multi-year program to create a pipeline of teachers, and that the entire thing would be imperiled by any pause in the funding. And so in that way I think it is analogous because we're talking about, you know, what they characterized as a disruption to the entire system that Congress appropriated money to address. And that's the same thing that the Plaintiff States are saying.

THE COURT: Right; and that gets into the authority to do it. But I'm talking about in the irreparable harm the questions is, is there a do-over, you know, and I think that there's a more clear do-over in the *Department of Education* case and a much less clear or maybe a clear no do-over in some of the harms that the Plaintiffs in this case have put forth. I understand that your argument is we don't even get

there, but personally, I'm sorry.  I didn't mean to --

(Overlapping speech).

MR. LOVE HUBBARD:  No, not at all.

Balance of equities is what it is.  That's in our papers.

If I could just have one minute before to check with my colleague.  Thank you.

THE COURT:  (Indecipherable), yes.

MR. LOVE HUBBARD:  Your Honor, my much more capable colleague suggested that on the separation of powers issue, I just want to make clear so that we aren't waiving it, that your Honor asked whether it would be okay if the Agency gave less than appropriated amounts to the States.  Given the broad language of the statutes here, it's the government's position that the Agency may terminate a grant if the uses of that money is no longer within the original purpose given by Congress and with respect to any of it being spent by the States for that purpose.  So if the Agency allocated that money, but the States haven't drawn it down yet because they for whatever reason haven't been able to spend it, it would be within the Agency's inherent authority to terminate that agreement.

THE COURT:  And even if that's money that Congress specifically said in either 2021 or in their

reaffirmation of these loans -- of these funding streams in 2023, even if it's within the amount that they've said, you know, I think you give an example of 2.2 billion needs to be or given to the HHS for this, and 1.5 billion of that must be allocated to states for whatever.  You're saying even within that 1.5 billion there is no separation of powers issue if the Agency decides to take that back.

MR. LOVE HUBBARD:  What I'm trying to be precise about is the difference between obligated by the Agency and eventually drawn down by the States, by the STLTs; that in this case I think the record will show that the Agency's obligated well more than the amounts required by Congress.  And the question is whether once the purpose for that money has ended and the States haven't spent it, the Agency has authority to terminate those grants, and it's our position that they do.

THE COURT:  Notwithstanding the intent of Congress that they spend it?

MR. LOVE HUBBARD:  Well, I think it's a little unclear that that's the intent of Congress; right?  If we look at the appropriations bill it says, (Reading) Not less of the 1.5 billion amount provided under this heading shall be for grants or cooperative agreements with the states.

And if the Agency makes that money available and the States don't spend it, I don't think it's contrary to Congress' purpose.

THE COURT:  I understand the argument.  Thank you.

MR. LOVE HUBBARD:  Thank you, your Honor.

THE COURT:  I am going to probably ask for more briefing on the constitutional issues that you raise with respect to the allocated and --

MR. LOVE HUBBARD:  We would be very happy to provide it --

(Overlapping speech)

THE COURT:  But the States are going to have 15 minutes for rebuttal.

MR. LOVE HUBBARD:  Thank you, your Honor.

THE COURT:  Thank you.

MR. MOSKOWITZ:  Thank you, your Honor.  I'll try to keep this brief.  With respect to *California* v. *The Department of Education*, I think all that needs to be analyzed is how much going underneath the decision is required for the government to make its arguments.  If you look only at the statements made by the Supreme Court, it just simply doesn't have any effect on this case; and instead the arguments are, well, the States argued something in that case that it's not clear the

Supreme Court agreed with.  That's like -- that type of guesswork is just simply not necessary or appropriate. It's limited to what did the Supreme Court say; and for the reasons we explained before, the *California v. Department of Education* decision doesn't apply.  *Bowen* remains good law.

Second, the claims here as to why this is a contract claim, it essentially would swallow the rule and if the federal agency can simply incorporate every statute and every regulation in and then say everything is a contract issue, we incorporated everything.  *Bowen* could be overruled by the federal government by simply incorporating the particular statutory provision that was issued there as part of the grant.  It probably was.  That doesn't matter.  And *Megapulse* and many others have identified that the incorporating, you know, wide amounts of regulations and statutes, just that's not what changes the character of the case.

And I think the SAMHSA case illustrates this best because under the government's theory where they've now given themselves this inherent authority to terminate for any reason, is that these block grants -- the point of a block grant is to give a formula amount and to give the States wide authority to use these for the particular purposes, so for mental health or for

substance abuse.

Under the government's theory, if they decided tomorrow they didn't really like mental health services, the federal government could allocate all the funds to the states and then immediately terminate all that funding for cause saying it's no longer necessary; and there's nothing -- and they would say absolutely not reviewable decision because we have this inherent authority that's completely discretionary to refuse to spend that money.  That doesn't exist; and they are exercising authority that they've never had.

The statute controls, the statute said when they could terminate or not terminate.

THE COURT:  I guess that gets to what statute we're looking at so, you know --

MR. MOSKOWITZ:  Yes, so --

THE COURT:  -- Code of Federal Regulations.

MR. MOSKOWITZ:  So with respect to the SAMHSA grants, there are two statutes that matter.  The first that we've obviously, and the only one that they've been pointing to is the appropriations statute; but that appropriations statute then points to a specific statutory scheme, this block grant program that's pre-existed, and that lengthy scheme discusses how to allocate the funds, what the formula is, what the rules

are for that program, and it provides the limited time where that money could be terminated, which was for cause for material failure to comply with the terms and conditions.

There's not this, like, I mean there's no point to having that statutory provision if the government had an inherent authority to cancel these, this funding for any other reason that they want.

THE COURT:  And so we're getting back into the major questions doctrine; correct?

MR. MOSKOWITZ:  Correct.

THE COURT:  In order for it to apply there has to be a statutory hook.

MR. MOSKOWITZ:  Correct.

THE COURT:  So what's the statutory hook here? Is it the "for cause" or is it the specific appropriation statutes?

MR. MOSKOWITZ:  So I mean there is no statutory hook in the sense that Congress has not spoken clearly here as to this overall decision that they could just refuse to spend the money.  And I think overall first the Congress did speak with respect to SAMHSA and saying here are the reasons that you can terminate; and the notion that there are all these other reasons that Congress forgot to talk about, but that the Agency's

claiming as inherent authority doesn't exist and they don't have any authority to act there.

With respect to the, you know, they put up obviously this CDC one particular statute applying certain of the funds to the CDC and have made some representations that they're not totally sure about the money; and I think part of the reason that they are having this problem here is one -- first off, this wasn't in any of the briefing, so it's very hard to respond to. But this money was going into overall programs with all these other appropriations that are not COVID appropriations, and so tracking which dollar is which is kind of a little bit of a made-up task; right? Like they don't know, and I don't think they'll ever be able to say when they put in from 50 different appropriations bills into this one program which dollar is which, when it got spent at some point in time; like, it's a little bit made up. But the --

THE COURT: I'm sorry, I'm going to go back to the same thing I've been asking Mr. Love Hubbard. So in the 2.2 billion, States must spend or the Agency must allocate to the States 1.5 billion.

Your argument is just because the States have spent 1.5 billion, it might not be of this money.

MR. MOSKOWITZ: It definitely might not be of

that money, that's one argument.

But moreover, they're assuming our only argument there is that the not less than 1.5 billion is the whole of the argument. But the overall issue is that an overall amount was allocated by Congress, was appropriated by Congress, and they're now deciding not to spend that money. And I know they now say, well, we don't know, maybe we'll do something else with it, or maybe Congress will take it back. But that's -- you go to Congress first if they wanted Congress to rescind that money. That's the way the Impoundment Control Acts works.

THE COURT: Aren't they assuming it because you're not pointing to specific language? Like what's the language that says that they either do or do not have specific authority?

MR. MOSKOWITZ: I mean the language in that appropriation, which is the same language that Congress uses, is to make available on that the top line number; and then they list a whole bunch of different things that they want to be covered.

If the question here is about the allocation of those funds at some earlier point in time and should they or should they not have allocated 1.5 billion or 1.6 billion, that's not this case. That's what they

want this case to be.

But they did allocate that overall top line number to be 4.3 and whatever amount they did give to the States; and now they're deciding, notwithstanding that, they're taking it back not to reallocate it but to just take it back as, quote, no longer necessary; when there's nothing in that statute that remotely suggests that those funds are no longer necessary at the end of the public health pandemic.  And if you look at the things in there that the grants were to be used for --

THE COURT:  When you say "the things in there" --

MR. MOSKOWITZ:  Sorry.  In that appropriations.

THE COURT:  The 2023 appropriations statute?

MR. MOSKOWITZ:  So there's both that 2023, but also the CARES Act that they're relying on.

THE COURT:  Okay.

MR. MOSKOWITZ:  That statute, when they specify what the grants were to be used for, they say it's for grants or cooperative agreements with the States, Localities, to include carrying out surveillance, epidemiology, laboratory capacity, infant infection control, mitigation; all these different things that aren't tied to the end of the pandemic, that apply more

broadly than COVID, that apply more broadly than the pandemic. And they're deciding, no, you can't do those things anymore, they're no longer necessary because the pandemic ended. That's what they don't have authority to do.

With respect to the obligated/unobligated, all of these funds have been obligated until three weeks ago; right? Like when they go to identify where the funds are for, they were obligated to go to the States; and the whole purpose of this is to de-obligate those and to make them so that, you know, DOGE can call that they've saved this money and that they're not going to spend it. That's the fundamental issue here. And I think that their unwillingness to say who made this decision or what the decision is to do, this lack of transparency is indicative that they're not wanting to be forthcoming about what's happening here.

THE COURT: So -- okay. And given the shortened time frame I'm responding to these things, I think that it's understandable the attorneys for the government haven't been able to ascertain that. I know you're not --

MR. MOSKOWITZ: I'm certainly not pointing any fingers at my able counsel, co-counsel.

THE COURT: I understand that. I just wanted to

be clear on that.

MR. MOSKOWITZ:  Yes.

THE COURT:  But if that's the issue -- well, two things.  I'm going to require more briefing on this particular subset of issues from both sides.

But also isn't that then what Mr. Love Hubbard says is a process problem?  And so if any relief I give should be cabined or limited to sending it back to the Agency and saying you need to do this and explain it within the confines of statute and law and justify it the way -- as opposed to just saying we're terminating because the, I believe they called it the nonexistent pandemic is over, or everybody has moved beyond, or something to that effect.

MR. MOSKOWITZ:  So there can for sure be within -- so I don't know that this is necessarily just a process issue overall; but whether remand is appropriate at the end of these proceedings, that may be an appropriate situation that the Court vacates and sets aside the Agency action as unlawful as it was issued and then sends it back to the Agency.  The Agency may in light of the Court's guidance decide, well, we don't have authority to do anything else.

But we're not asking the Court here to rule broadly that there would never ever under any

circumstances be authority to take some type of other action.  Like that's just not the issue before the Court.

THE COURT:  Okay.  Thank you.

MR. MOSKOWITZ:  And can I just, your Honor has suggested more briefing.  Can we orally or in writing then ask to extend the TRO for cause?

THE COURT:  I realize that the government has asked for me to reconsider my decision on the TRO.  I don't think that reconsideration at this point is appropriate, given that we're sort of in the weeds on these issues and that will ultimately be deciding an issue I have to decide on the preliminary injunction anyway; it would just take up time and delay things.

So I'm going to extend the TRO until I issue a decision, but I want to do this in short order.  And I realize that when I say that, that leads us to situations where we don't fully flesh out arguments. It's a problem sort of with some of this stuff.  But we have a done tremendous amount of reading and research on these issues.

And so Mr. Love Hubbard, how long would it take the government to submit a brief on that argument specifically?

MR. LOVE HUBBARD:  Your Honor, we have already

started that process, so I think we can get it to you in seven days.

THE COURT:  Okay.  Thank you.

And how long after you receive it would you like to respond?

MR. MOSKOWITZ:  So recognizing the time limits, we would I think request at least four or five days, but we could --

THE COURT:  Okay.

MR. MOSKOWITZ:  We could work out something to make sure that we give the Court some time to consider.

THE COURT:  And that will allow me to consider the argument, okay?

(Judge confers with Clerk)

THE COURT:  Okay.  So if the government by 5:00 on the 24th would submit those arguments.  And I realize it's not your, it's not the government's attorneys' fault that that wasn't fleshed out in their brief, but now that it's an argument that I don't really have the benefit of, and I don't believe that Mr. Moskowitz has had the benefit of full understanding of the government's argument, I think it bears taking a breath and figuring that part out.

And then that's a Thursday, so by the close of business on -- I'm going to be away.

(Judge confers with Clerk)

THE COURT:  Can you respond by the close of business on the 29th?

MR. MOSKOWITZ:  We can do the 29th.

THE COURT:  And I'd also ask the States to provide a proposed order for what they're looking for this Court to order specifically, and provide it to counsel as well so that they can, you know, respond if they choose, okay?

MR. MOSKOWITZ:  Thank you, your Honor.

THE COURT:  Thank you.

Is there anything else from the States?

MR. MOSKOWITZ:  No, your Honor.

THE COURT:  From the government?

MR. LOVE HUBBARD:  No, your Honor.  Thank you very much.

THE COURT:  Thank you.  We're in recess.

(Adjourned)

C E R T I F I C A T I O N

I, Denise P. Veitch, RPR, do hereby certify that the foregoing pages are a true and accurate transcription of my stenographic notes in the above-entitled case.

/s/ Denise P. Veitch_
Denise P. Veitch, RPR
Federal Official Court Reporter

April 22, 2025
Date