**UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF RHODE ISLAND**

| | |
|---|---|
| STATE OF COLORADO, *et al.*, | |
| Plaintiffs, | |
| v. | Civil Action No. 25-cv-121-MSM-LDA |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, *et al.*, | |
| Defendants. | |

**UNITED STATES' SUPPLEMENTAL BRIEFING**
**IN SUPPORT OF ITS OPPOSITION TO**
**PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION**

As requested by the Court during the April 17, 2025 hearing on Plaintiffs' motion for a preliminary injunction, the United States hereby submits supplemental briefing regarding Plaintiffs' Constitutional claims. The United States Department of Health and Human Services ("HHS") complied with Congress's direction to make allocated amounts available to the Plaintiff states as part of the broad appropriation of funds in response to COVID-19. As a result, HHS's decision to terminate the grants at issue in this case did not violate the Constitution, including any separation of powers principles.

As stated in both its original brief and at argument, the government's position is that this Court does not have jurisdiction to hear Plaintiffs' claims in this case because, as clarified by the Supreme Court less than three weeks ago in a case nearly identical to this one, Plaintiffs' claims are quintessential breach of contract claims.

1

See *California v. United States Department of Education*, 604 U.S. ____ (2025), No. 24A910, 2025 WL 1008354, (April 4, 2025)[1]; ECF 68 at 9-20.

---

[1] At the PI hearing, the Court asked questions about the weight it should give to a *per curium* decision issued by the Supreme Court on an application for injunctive relief. The government submits that the Supreme Court's decision in *California* should be treated as binding precedent on the issue of whether there is a likelihood of success on the merits as to the Court's jurisdiction to hear this case under the Tucker Act.

In *California*, five justices of the Supreme Court considered an issue, reached a conclusion, and provided their reasoning. However short, *California* is a ruling of our highest court and thus binding on all lower courts. If Supreme Court precedent "has direct application in a case" a district court "should follow the case which directly controls, leaving to [the Supreme Court] the prerogative of overruling its own decision." *Mallory v Norfolk Southern Railway Co.*, 600 U.S. 122, 124 (2023) (cleaned up). "This is true even if the lower court thinks the precedent is in tension with some other line of decisions." *Id.*

The Supreme Court has also noted the precedential effect of its own *per curiam* decisions and found lower court decisions erroneous for failing to follow that precedent. *See, e.g.*, *Tandom v. Newsom*, 593 U.S. 61, 62 (2021) (citing *Roman Catholic Diocese of Brooklyn* v. *Cuomo*, 141 S.Ct. 63 (2020) (*per curiam*) (slip opinion)); *see also Gateway City Church v. Newsom*, 141 S.Ct. 1460 (2021) (holding that the Ninth Circuit's "failure to grant relief was erroneous," because the right to injunctive relief was "clearly dictated" by the Supreme Court's prior summary order on an application for injunctive relief in *South Bay United Pentecostal Church v. Newsom*, 592 U.S. _, 141 S. CT. 716 (2021)).

Moreover, even if this Court does not view the Supreme Court's ruling in *California* as strictly binding, it should follow that ruling on the issue of Tucker Act jurisdiction because there is no meaningful distinction between the two cases on that issue. As discussed at oral argument, all of the arguments the Plaintiff states make here about why the Tucker Act does not apply are precisely the arguments made by the Plaintiff states in *California*. A finding of likelihood of success on the merits is a finding necessary to enter a preliminary injunction. Even if, as the Court suggested at oral argument, the Court were to find that this case is distinguishable from *California* as to irreparable harm or other issues, the Court should still follow the ruling of the Supreme Court that, on these facts, there is no likelihood of success on the merits as to the Tucker Act issue and deny the motion for preliminary injunction on that basis.

In *California*, the Supreme Court held that the APA waiver of sovereign immunity does not extend to actions that challenge an agency's termination of a set of grants. Instead, the Tucker Act grants the Court of Federal Claims jurisdiction over those suits. In addition, as numerous courts have held, simply changing the description of claims and adding Constitutional counts in order to recharacterize a claim for money does not alter this Court's jurisdiction. *See id.*; *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urban Dev.*, 480 F.3d 1116, 1124 (Fed. Cir. 2007); *Christopher Vill., L.P. v. United States*, 360 F.3d 1319, 1328 (Fed. Cir. 2004); *Consol. Edison Co. of New York, Inc. v. U.S. Dep't of Energy*, 247 F.3d 1378 (Fed. Cir. 2001); *Village West Assocs. v. Rhode Island Hous. & Mortg. Fin. Corp.*, 618 F.Supp.2d 134, 139-40 (D.R.I. 2009).

However, even if this Court did have jurisdiction to review the Constitutional claims added by Plaintiffs here, they are unlikely to succeed on the merits. Plaintiffs essentially claim, through three counts titled "Separation of Powers, "Spending Clause," and "Equitable Ultra Vires," that HHS exceeded its authority—and usurped Congress's authority—by failing to comply with the direction Congress gave to HHS when it appropriated funding through multiple COIVD-19-related appropriations bills. Part of the difficulty of responding to Plaintiffs' claims, however, is that they never identify which of Congress's specific directions they contend HHS failed to follow.

In fact, with respect to the Plaintiff states, HHS not only abided by Congress's direction, but in multiple instances awarded *more* to the states than the

amounts specified by Congress by the dates specified in the relevant statutes. Therefore, HHS's discretionary decision-making with respect to the remaining funding is unreviewable. See *Lincoln v. Vigil*, 508 U.S. 182, 185-88 (1993); *Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am. v. Donovan*, 746 F.2d 855, 861 (D.C. Cir. 1984) (Scalia, J.)

There are multiple appropriations bills at issue in this case, and the money appropriated by Congress to HHS or its sub-agencies through these bills was distributed to the Plaintiff states by HHS through multiple funding streams. *See* Declaration of J. Legier ("Legier Decl. II"), attached hereto, at ¶¶ 6,8. The six appropriations bills raised by Plaintiffs are listed below, and the sections of each specific bill appropriating money to HHS—directly or through the Centers for Disease Control ("CDC") or the Substance Abuse and Mental Health Services Administration ("SAMHSA")—are attached hereto as Exhibits A-F for the Court's convenience:

- The American Rescue Plan Act of 2021 ("ARPA") Pub. L. No. 117-2, 135 Stat. 4 (2021) ("ARPA"), Ex. A;

- The Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ("CARES"), Ex. B;

- The Coronavirus Preparedness and Response Supplemental Appropriations Act, 2020, Pub. L. No. 116-123, 134 Stat. 146 (2020) ("CPRSA"), Ex. C;

- The Coronavirus Response and Relief Supplemental Appropriations Act, (2021) Pub. L. No. 116-260, 134 Stat. 1182 ("CRRSAA"), Ex. D;

- The Families First Coronavirus Response Act, Pub. L. No. 116–127, 134 Stat. 178 (2020) ("FFCRA"), Ex. E[2]; and

- The Paycheck Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620 (2020) ("PPP"), Ex. F.

## I.     Appropriations to CDC and CDC Allocation to STLTs

The appropriations at issue here are, as in *Policy and Research v. HHS*, 313 F.Supp.3d 62 (D.D.C. 2018), much more like the lump sum appropriations at issue in *Lincoln* than other situations where Congress provided specific instructions about how the funds should be spent. HHS complied with the conditions set by Congress when it allocated, and in fact often exceeded, the amount Congress directed to be provided to the states within the timeframes set by Congress. As recognized in *Lincoln*, when Congress does not impose a statutory restriction on funding, an agency's decision about how to spend that funding is committed to agency discretion, and courts cannot intrude.

With respect to the CDC, some of the appropriations statutes direct, with varied wording, a minimum amount of funding to be provided to state, tribal, local, and territorial entities, commonly referred to by HHS as "STLTs." Legier Decl. II at ¶ 7. Some of these bills also specify the date by which the funding must

---

[2] The FFCRA did not allocate any appropriations directly to CDC or SAMHSA; instead, the only allocations were $1,000,000,000, to HHS as a whole, for the Public Health and Social Services Emergency Fund, and $250,000,000, also to HHS, for Aging and Disability Services Programs. *See* Ex. E. Congress did not direct HHS to provide any of those allocated funds to the states. Therefore, the FFCRA allocation is not relevant to the Plaintiff states' separation of powers claims in this case, and the government has omitted it from the charts below for clarity.

be made available and/or expended. To the extent that Congress provided instructions to the CDC about how it should spend the appropriated money with respect to the Plaintiff states, it is only through these provisos that set the minimum funding to be allocated to the STLTs.

For example, and as discussed during argument, the CARES Act provided $4.3 billion to the CDC, "to remain available until September 30, 2024, to prevent, prepare for, and respond to coronavirus, domestically or internationally: *Provided*, That not less than $1,500,000,000 of the amount provided under this heading in this Act shall be for grants to or cooperative agreements with States, localities, territories, tribes, tribal organizations, or health service providers to tribes . . . ." Pub. L. No. 116-136, 134 Stat. 281, 554-555 (2020).

Thus, although Congress appropriated $4.3 billion in coronavirus funding to the CDC through the CARES Act, it only directed that $1.5 billion of those funds should go to STLTs, to remain available until September 30, 2024. CDC, in its discretion, awarded over $2.1 billion – more than the amount Congressionally be allocated to the states – to STLTs by September 30, 2024. Legier Decl. II at ¶ 10. At that point, HHS had fulfilled Congress's mandate with respect to the Plaintiff states under the CARES Act. As of the date of the termination of the grants, the STLTs had spent over $1.8 billion of the awarded money – more than the amount appropriated to the states by Congress. *Id*.

HHS tracks each of its appropriated funding streams and the expenditure of those funds to each grant recipient. Legier Decl. II at ¶ 8. HHS has reviewed

the funding streams at issue in this case, and the chart below summarizes: 1) the total amount appropriated to CDC through these appropriations bills; 2) the date by which it must be obligated by CDC; 3) the amount designated by the bill for states; 4) the amount provided by the CDC to the states; and 5) the amount spent by the states as of April 14, 2025, under each appropriation. Legier Decl. II at ¶ 9-13.

| Appropriations Bill | Total Amount Appropriated to CDC | Amount Appropriated for CDC to Provide to STLTs | Amount Provided by CDC to STLTs | Amount spent by STLTs |
|---|---|---|---|---|
| CPRSA (134 Stat. at 147) | $2,200,000,000, available until September 30, 2022 | **$950,000,000** | **$1,120,474,306** | $1,099,398,182 |
| CARES (134 Stat. at 554) | $4,300,000,000, available until September 30, 2024 | **$1,500,000,000** | **$2,108,388,501** | $1,812,715,188 |
| PPP (134 Stat. at 623-624) | $25,000,000,000 to HHS, available until expended | **$10,250,000,000**[3] through HHS | **$11,652,785,823** | $10,029,206,313 |
| CRRSAA (134 Stat. at 1911) | $8,750,000,000, available until September 30, 2024 | **$4,290,000,000**[4] | **$5,426,073,054** | $3,811,438,554 |
| ARPA (135 Stat. at 38-39) | $1,000,000,000 for vaccine-related uses; available until expended | **$0** | | |

[3] PPP appropriated $11,000,000,000 to HHS for STLTs without specifying that the appropriation go through CDC. Of this $11 billion, PPP specified $750 million for the Indian Health Service, which is not part of this case and thus removed from the total in the chart above.

[4] CRRSAA appropriated a total of $4.5 billion to STLTs, specifying $210 million for the Indian Health Service, which is not part of this case. 134 Stat. at 1911. Under CRRSAA, in addition to the CDC-specific allocation, Congress appropriated $22.4 billion to HHS, to remain available until September 30, 2022, and directed that money go to the STLTs within 21 days of the date of enactment of the Act. HHS provided that money to CDC to obligate. In total, including both provisions, CDC awarded a total of $26.7 billion to STLTs. As of April 14, 2025, STLTs spent $17.9 billion of the CRRSAA total awarded to them by CDC, leaving a total of more than $8.8 billion unspent. Legier Decl. II at ¶ 12 n. 1.

As shown above, for each appropriation bill, CDC awarded to the states at least the full amount of money Congress directed to go to the STLTs, by the date set by Congress. With respect to both CPRSA and the CARES Act, the states then in fact spent more than the amount appropriated by Congress.[5]

And with respect to CRRSAA, in spite of extensions by the CDC beyond the date limit set by Congress, the states had not drawn down the money awarded by CDC by the time of the termination.[6] For each of these appropriations, therefore, the agency's decision to terminate agreements through which it had agreed to provide the states additional time to spend the appropriated funds, beyond the time frame set by Congress, is entirely consistent with Congress's direction in allocating the funds.

With respect to PPP, of the $25 billion allocated to HHS by Congress in that statute, Congress rescinded all but $243 million of the unobligated funds in the Fiscal Responsibility Act of 2023. *See* PL 118-5, June 3, 2023, 137 Stat at 23.[7]

---

[5] Moreover, Congress decided to rescind all the unobligated balances made available to CDC under CARES, except for $446 million, in the Fiscal Responsibility Act of 2023. *See* PL 118-5, June 3, 2023, 137 Stat at 24.

[6] Similarly, Congress rescinded all the unobligated balances made available to CDC under CRRSAA, except for $177 million, in the Fiscal Responsibility Act of 2023. *See* PL 118-5, June 3, 2023, 137 Stat at 24.

[7] "All of the unobligated balances of funds made available in the second paragraph under the heading "Public Health and Social Services Emergency Fund" in title I of division B of Public Law 116–139, including any funds transferred from such heading that remain unobligated, with the exception of $243,000,000 and any funds that were transferred and merged with funds made available under the heading "Office of the Secretary—Office of Inspector General" pursuant to section 103 of title I of division B of Public Law 116–139."

Congress did not provide any additional instructions to the agency for how the remaining $243 million should be spent. HHS thus had complete discretion whether to leave any of the remaining $243 million with the states, or direct it to another use. Therefore, the agency complied with all limits set by Congress with respect to PPP allocations.

In addition to the above data, though ARPA did not appropriate specific amounts to be given to states, HHS data shows that HHS authorized nearly $19 billion to the states under ARPA in 2021, and that, as of April 14, 2025, states had still not spent over *$6.7 billion* of the funding HHS awarded.[8]

The agency has inherent authority to spend the money that Congress allocates consistent with the limits Congress sets. As set forth above, CDC complied with all of the directions from Congress for the agency's spending of the allocated funds on the states, including Plaintiff states. Therefore, the agency's decision to exercise its discretion within those limits is entirely consistent with separation of powers principles, and is an action "committed to agency discretion by law" for which the APA does not provide an avenue for review. 5 U.S.C. § 701(a)(2).

---

[8] HHS awarded $18,964,597,077 to states under ARPA; states drew down $12,241,082,518 of this funding; and $6,723,514,559 remained unspent. Legier Decl. II at ¶ 13.

## II.    Appropriations to SAMHSA and SAMHSA Allocation Through Block Grants

In a similar way, two of the appropriation bills (CRRSAA and ARPA) also specified an amount of appropriated money to SAMHSA to be designated for community mental health services block grants and substance abuse prevention and treatment block grants – the block grants at issue in Plaintiffs' complaint. The other four appropriations bills (CPRSA, FFCRA, CARES, PPP) did not specify any amount for block grants or otherwise instruct SAMHSA to provide funding to the states. HHS has reviewed the funding streams at issue in this case, and the charts below summarize: 1) the total amount appropriated for SAMHSA to provide through block grants; 2) the amount provided by SAMHSA through block grants to states; and 3) the amount of the block grant funds spent as of April 17, 2025. *See* Declaration of K. John ("John Decl. II), attached hereto, at ¶ 6-12.

| Appropriations Bill | Amount Appropriated for SAMHSA to Provide Through Block Grants | Amount Provided by SAMHSA Through Block Grants | Amount of Block Grant Funds Spent |
|---|---|---|---|
| ARPA (135 Stat. at 45-46)  To be expended by the states by September 30, 2025 | **$1,425,000,000** for substance abuse prevention and treatment block grants | **$1,474,612,375** | $949,188,857 |
|  | **$1,425,000,000**[9] for community mental health services block grants | **$1,474,585,317** | $887,366,456 |
| CRRSAA (134 Stat. at 1913)  The period of performance for all block grants funded under CRRSAA had ended prior to the terminations on March 24, 2025 | **$1,650,000,000** for substance abuse prevention and treatment block grants | **$1,650,000,000** | $1,578,032,707 |
|  | **$825,000,000**[10] for community mental health services block grants | **$825,000,000** | $778,758,668 |

---

[9] Pursuant to 42 U.S.C. §§ 300x-9(b); 300x-35, SAMHSA must obligate 5% of appropriated funding for block grants for technical assistance, data collection, and program evaluation. Thus, the amount shown is the $1,500,000,000 appropriated by ARPA, less the 5% that SAMHSA could hold back for these purposes. In addition to the appropriated funds mentioned above, SAMHSA received an additional $100,000,000 in ARPA funds through an intra-departmental transfer of authority from the HHS Public Health and Social Services Emergency Fund ("PHSSEF"). The funds were evenly distributed between the SAPT and CMHS Block Grants. John Decl. II at ¶ 6-7.

[10] CRRSAA appropriated $1.65 billion total for community mental health services block grants, and directed HHS "to provide no less than 50 percent of funds directly to facilities defined in section 1913(c) of the PHS Act," rather than through the states. *See* 134 Stat. 1182 at 1913.

As with CDC, SAMHSA awarded the full amount appropriated by Congress to the states through block grants. With respect to CRRSAA, the period of performance for all block grants had already ended prior to the terminations on March 24, 2025. The Plaintiff states' ability to spend money under CRRSAA was thus not affected by the terminations. Instead, the states had left over $118 million in obligated funding unspent when the period of performance ended by the terms of those grants.[11] John Decl. II at ¶ 12.

With respect to ARPA, SAMHSA also made the full amount appropriated available to the states. Four years later, the states had not spent $1.1 billion of the awarded block grant funding. For the Plaintiff states in this case, the total amount of unspent block grant funds under ARPA as of April 17, 2025, totaled $625 million. John Decl. II at ¶ 8. To the extent the Court has separation of powers concerns with respect to the fact that HHS terminated the availability of these ARPA block grant funds six months prior to the September 25, 2025 date in the statute, the government respectfully submits that both the amount of funding at issue and the length of time that this money was left unspent by the Plaintiff states should factor into the Court's analysis of whether HHS truly acted contrary to Congress's intent and the extent to which the terminations are causing irreparable harm to the Plaintiff states such that emergency relief is warranted.

---

[11] Funding remains available during the close-out period for states to pay for expenditures made during the performance period.

As noted during argument, although access to remaining COVID-19 funding under current awards was terminated, other awards and annual funding remain available to the Plaintiff states for their regular public health activities. Where, for example, a current, active award depended on a mix of funding streams, HHS terminated access only to the COVID-19 funds and left available the annual appropriation. *See*, *e.g.*, ECF No. 4-1 at 38 (Termination notice for Epidemiology and Laboratory Capacity for Infection Disease Grants awards specified "Unobligated award balances of COVID-19 funding will be de-obligated by CDC. Award activities under other funding may continue consistent with the terms and conditions of the award.") These funds remain available and are intended to support STLTs as they undertake many of these same public health activities.

### III.    HHS Allocated Funds as Directed by Congress

As seen in the above charts, with respect to each appropriation statute, HHS made the full amount appropriated by Congress available to the Plaintiff states by the dates set by Congress, often awarding more than Congress required. In fact, under Plaintiffs' argument, HHS's decision to extend the availability of funding beyond the dates specified by Congress in most of the statutes went beyond the express direction by Congress. Plaintiffs correctly do not argue that this discretionary action violated the separation of powers.

Furthermore, after June 3, 2023, Congress chose not to provide specific instructions for the HHS funding that it left in place in the Fiscal Responsibility Act of 2023. With respect to the Plaintiff states, after that point, HHS's choice to

14

fund or not fund specific grants did not violate, and could not have violated, any separation of powers principles.

To the extent that the Plaintiff states' separation of powers argument turns on an argument that HHS did not follow Congress's directions for spending set forth in other provisions of the COVID appropriations statutes, beyond those directing money to the states through the grant agreements at issue in their Amended Complaint, the Plaintiff states do not have standing to challenge those agency decisions.

Whether the termination of grants that HHS used to provide the Plaintiff states with the amounts appropriated by Congress violated the terms of those agreements – including the applicable regulations – is a question that cannot be addressed by this Court. But HHS complied with the conditions set by Congress for the amount that must go to the STLTS. The states in this case are demanding funds that Congress either did not appropriate to them or that the states chose not to use during the years the funds were made available. HHS's decision to terminate the award of funding that exceeded what Congress appropriated did not violate Congress's direction. Plaintiffs' claims that denial of those funds violated the Constitution therefore cannot succeed.

15

Dated: April 24, 2025       Respectfully submitted,

THE UNITED STATES OF AMERICA,
By its Attorneys,

SARA MIRON BLOOM
Acting United States Attorney

*/s/ Kevin Love Hubbard*
KEVIN LOVE HUBBARD
Assistant United States Attorney
One Financial Plaza, 17th Floor
Providence, RI 02903
(401) 709-5000
Kevin.Hubbard@usdoj.gov

16

## CERTIFICATION OF SERVICE

I hereby certify that, on April 24, 2025, I filed the foregoing document through this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rules Gen 304.

*/s/ Kevin Love Hubbard*

KEVIN LOVE HUBBARD
Assistant United States Attorney