## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

| |
|---|
| STATE OF COLORADO, et al., |
| Plaintiffs, |
| v. |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES, et al., |
| Defendants. |

Case No. 1:25-cv-00121

## PLAINTIFF STATES' SUPPLEMENTAL BRIEFING IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

The Defendants' Supplemental Brief does not identify any new law or evidence addressing the gravamen of Plaintiff States' constitutional claims: that Congress did *not* intend its appropriations of funds to be limited to the duration of the COVID-19 public health emergency. Each of the relevant statutes provides clear directions to HHS, which this Court can and should review to determine whether the agency has acted within its lawful authority. The fact that the States are still in the process of drawing down funds, in accord with previously agreed-upon schedules, simply reflects the long-term programs and investments needed to mitigate mental health and substance use conditions made worse during COVID and to improve the public health system's ability to respond to future infectious disease outbreaks. And HHS's past decisions to allocate, in some cases, more than the statutorily appropriated minimum to the States do not relieve the Executive Branch of its overall obligation to expend appropriated public health funds pursuant to legislative directives. Congress made its directions clear in the original appropriations statutes and did so again when it chose not to rescind the funds at issue in 2023, despite the formal end of the pandemic.

1

HHS's supplemental brief instead serves only to highlight the unlawfulness of its actions. It still refuses to identify who made this unlawful decision. And HHS continues to be unable to identify any legal basis for refusing to spend congressionally appropriated funds based on its unilateral determination that the funds are "no longer necessary" because of the end of the COVID-19 pandemic. Defendants were similarly pressed by members of Congress for answers to these same sorts of questions.[1] Because HHS was directed to spend these congressionally appropriated funds, and HHS has no discretion to refuse to spend them based on the end of the pandemic, HHS has not only acted in excess of its statutory authority, but it has also violated the Constitution.

## I.     HHS Violated Separation of Powers Principles When It Refused to Spend Congressional Appropriations for Public Health.

HHS does not have the lawful power under the Constitution to unilaterally rescind congressionally appropriated funds. The constitutional principles, which HHS does not even acknowledge, are clear: "Absent congressional authorization, the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals." *City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018). That principle follows from Congress's authority over spending: the Constitution "exclusively grants the power of the purse

---

[1] Shortly after Plaintiff States filed their Complaint, members of the Senate Appropriations Committee sent a letter to Defendants, rebuking Defendants' Public Health Funding Decision to terminate $12 billion in supplemental funding that states and communities were "actively putting to use to address urgent needs and protect American's health." Letter from Sen. Patty Murray et al. to Sec'y Robert F. Kennedy, Jr., (Apr. 4, 2025), https://www.appropriations.senate.gov/imo/media/doc/letter_to_hhs_re_supplemental_funding_de-obligations_4-4-25.pdf. As explained, Defendants' stated rationale is fundamentally flawed because "these funds were not appropriated to only be available or used during the pandemic or the COVID-19 public health emergency." *Id.* Rather "[u]nderstanding various needs would go well beyond the specific period of the pandemic, Congress appropriated many of these funds without fiscal year limitation to be available until expended." *Id.*

to Congress, not the President," and that spending power is "directly linked to [Congress's] power to legislate." *Id.* at 1231; *see* U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause); *Biden v. Nebraska*, 600 U.S. 477, 505 (2023) ("Among Congress's most important authorities is its control of the purse."). Simply put, the Constitution does not grant HHS "unilateral authority to refuse to spend" vast swaths of duly authorized and appropriated funding. *See City & Cnty. of S.F.*, 897 F.3d at 1232 (quoting *In re Aiken County*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013)); *New York v. Trump*, No. 25-CV-39-JJM-PAS, 2025 WL 715621, at *1 (D.R.I. Mar. 6, 2025) ("Federal agencies and departments can spend, award, or suspend money based only on the power Congress has given to them—they have no other spending power."), *stay pending appeal denied*, 133 F.4th 51 (1st Cir. 2025) .

As detailed below, Defendants' additional information and argument only serve to show that they are unlawfully refusing to spend congressionally appropriated funds.

## A.    SAMHSA.

With respect to the SAMHSA block grants, Defendants' numerous statutory violations demonstrate a violation of separation of powers.

First, HHS violated the appropriations statute by rescinding funds which Congress directed HHS to obligate to the States. Congress appropriated $1.5 billion "to remain available until expended" for block grants to be used for carrying out services "with respect to mental health" and $1.5 billion "to remain available until expended" for block grants to be used for carrying out services "with respect to substance abuse." American Rescue Plan Act ("ARPA"), Pub. L. No. 117-2, §§ 2701, 2702, 135 Stat. 4, 45-46 (2021).[2] These funds "shall be expended by the State by

---

[2] Defendants now acknowledge that the block grants from the Coronavirus Response and Relief Supplemental Appropriations Act, 2021 (Div. M of the Consolidated Appropriations Act,

September 30, 2025." *Id.* In contravention of these commands, HHS has terminated the State allocations and refused to allow the States to spend these funds through September 30, 2025.

Second, HHS violated the block grant program statutes through its unlawful terminations. As noted previously, the SAMHSA block grants are formula grants. ARPA specifies that these appropriations are to be used as part of the statutory block grant program. *Id.* Each State receives an allocation based on a statutory formula, with no discretion afforded to HHS. 42 U.S.C. § 300x(a); *id.* at 300x-21(a); *cf. City of Providence v. Barr*, 954 F.3d 23, 27 (1st Cir. 2020) (explaining that for a formula grant, the agency "is obliged to distribute funding pursuant to a statutory formula"). Congress expressly specified the limited circumstances in which HHS is authorized not to pay these allocated funds: a grant may be "terminate[d] for cause" when "a State has materially failed to comply with the agreements or other conditions." 42 U.S.C. § 300x-55(a). HHS is not authorized by law to refuse an allotment for any other reason.

Notwithstanding the clear statutory requirements, HHS issued unlawful terminations in violation of the statutes based on its unilateral determination that these appropriations are "no longer necessary." These actions implicate the Constitution because HHS is refusing, without any legal basis, to spend congressionally appropriated funds. At the hearing on this matter, HHS claimed it has "inherent authority" not to spend the funds and to terminate the funding. *E.g.*, ECF No. 77, Tr. of PI Hearing at 90 (claiming the agency "has inherent authority unless it cabins the authority itself"). HHS has still yet to identify any case law supporting this "inherent authority." In fact, it has no "inherent authority." As the First Circuit summarized: "When an executive

---

2021), Pub. L. No. 116-260, 134 Stat. 1182 (2020), are not at issue and were not terminated. ECF No. 80 at 13. They try to suggest some type of impropriety because a tiny amount of funding to unidentified states has not yet been paid. This is a non-sequitur. Indeed, Defendants acknowledge in a footnote that this money may yet be paid out during the close-out period. *Id.* at 13, n.11.

agency administers a federal statute, the agency's power to act is 'authoritatively prescribed by Congress.' It is no exaggeration to say that 'an agency literally has no power to act ... unless and until Congress confers power upon it.'" *City of Providence*, 954 F.3d at 31 (cleaned up).  The Executive Branch's function is to "take care" that the laws be faithfully executed. U.S. Const. art. II, § 3. Instead, HHS grabbed power it does not have from Congress and refused to comply with the statutory commands. HHS's actions violate both the statutes and the Constitution.

Having no actual defense to its unlawful actions, HHS "submits that both the amount of funding at issue and the length of time that this money was left unspent by the Plaintiff states should factor into the Court's analysis of whether HHS truly acted contrary to Congress's intent." ECF No. 80 at 13. HHS cites to no authority for this proposition; and it makes little sense. Congress has already definitively spoken, and it is HHS's obligation to faithfully execute Congress's commands. HHS cannot defend its violations by claiming that it previously followed the law during a prior administration.

Nor is there any basis for HHS's attempts to blame the States for its unlawful conduct. According to HHS's own calculations, the States have already been reimbursed roughly 80% ($4.2 billion) of the $5.4 billion that was appropriated over the course of four and a half years. ECF No. 80 at 12. HHS's focus on the amount reimbursed obscures the higher amount already spent by and owed to the States (i.e., there is a time lag between spending and reimbursement). Simply put, the amounts remaining will fund the services through the end date of September 30, 2025, and demonstrate the States' responsible stewardship of the block grant funds in conformance with Congress's intent. Congress decided that the States have until September 30, 2025, to expend the funds, and HHS has no lawful authority to override Congress's judgment.

**B.    CDC.**

With respect to the CDC grants and cooperative agreements, HHS focuses almost exclusively on an argument that is not at issue: how HHS initially chose to allocate funds. The Plaintiff States are not challenging HHS's authority to make its initial allocation decision. The dispute here is whether HHS may refuse to spend appropriated funds that Congress directed it to spend, based on a unilateral decision that these funds are "no longer necessary" because of the end of the public health emergency. None of the appropriations are limited to the end of the pandemic or the end of the public health emergency. None of the appropriations grant HHS discretion to refuse to spend these funds.  HHS's unlawful power grab is especially egregious in light of Congress's actions through the Fiscal Responsibility Act of 2023, where it went through each of these appropriations laws and determined that $27 billion was no longer necessary, but kept all of the funding at issue here in place.

HHS points as an example to one provision of the CARES Act that appropriated $4.3 billion.[3] ECF No. 80 at 6; CARES Act Title VIII, 134 Stat. 281, 554. This provision directed HHS to spend $4.3 billion, which it now acknowledges it has not done and is refusing to do. As the statute reflects, these appropriations were not tied in any way to end of the public health emergency, nor was HHS granted any discretion to refuse to spend the funds, let alone to deem them "no longer necessary" based on the end of the pandemic. Notably, Congress identified a number of specific purposes for these funds that extend beyond COVID-19 or the pandemic. *Id.*

---

[3] HHS presumably chose this example because it believed it had the strongest argument for this example. HHS does not even attempt to argue its authority to refuse to spend funding on the voluminous other appropriations at issue, including the many appropriations that were "to remain available until expended." *E.g.*, ARPA, §§ 2402(a), 2501(a). That HHS has now failed to identify such authority despite repeated opportunities shows clearly that it acted without any lawful basis and did not even attempt to comply with the law prior to making the Public Health Funding Decision.

(identifying purposes including "public health data surveillance and analytics infrastructure modernization," "global disease detection and emergency response," "surveillance, epidemiology, laboratory capacity, infection control, mitigation, communications, and other preparedness and response activities"). Rather than addressing its refusal to spend the $4.3 billion in funds appropriated, HHS focuses instead on a single proviso requiring that *at least* $1.5 billion be allocated to certain grants to states, localities, and tribal organizations. But whether HHS did or did not meet *one* of the statutory requirements does not address whether HHS had authority to refuse to spend the $4.3 billion because it disagrees with Congress' judgment and believes these funds are "no longer necessary."[4]

HHS also argues that it complied with the law because it was only required to make these funds "available until September 30, 2024," implying that the States are at fault for not spending the funds by that date. This is a gross misunderstanding of appropriations law. The statutory language "to remain available until September 30, 2024" is appropriations jargon that instructs the agency to allocate and obligate the funds by September 30, 2024 (the period of availability), not the deadline by which to spend the funds. Government Accountability Office, *Principles of Federal Appropriations Law* ("GAO Redbook") at 5-3 to 5-4, available at https://www.gao.gov/assets/2019-11/202437.pdf.[5] ("When an appropriation is by its terms made

---

[4] HHS also does not even attempt to show how it met the other provisos. For example, HHS was required to spend $500 million each on "public health data surveillance and analytics infrastructure modernization" and "global disease detection and emergency response." CARES Act Title VIII, 134 Stat. at 554. It was allowed to do so through grants to states and other communities. Through its blanket terminations, HHS very well may be violating these other requirements.

[5] The GAO is the federal government's expert agency with respect to appropriations. GAO's decision with regard to spending appropriated funds are binding on the Executive Branch. *See* 31 U.S.C. §§ 3526(d), 3529; *see also* GAO Redbook, pg. 1-13 (explaining that "a decision regarding an account of the government is binding on the executive branch" and citing

available for a fixed period of time or until a specified date, the general rule is that the availability relates to *the authority to obligate the appropriation*, and does not necessarily prohibit payments after the expiration date . . . ." (emphasis added)). There is an additional five-year period to liquidate (i.e., spend) those funds, until September 2029. 31 U.S.C. §§ 1552(a), 1553(a). But importantly, once the period of availability expires, the funds are no longer available for obligation and thus cannot be allocated for other purposes. In other words, it is *HHS* that had until September 2024 to obligate these funds, which it did by issuing the grants and cooperative agreements at issue. *See id.* § 1501(a)(5). Now that this period of availability has passed, HHS *cannot* allocate these funds elsewhere. Thus, by unilaterally terminating these funds as "no longer necessary," HHS thwarted Congress's will. Far from supporting HHS, the example demonstrates that the *only* reason for terminating these congressionally appropriated funds is to prevent them from ever being spent.

Some additional appropriations law background helps put the supplemental brief into perspective. In general, appropriations are in one of three duration categories:

(1)    annual appropriations for the specific fiscal year;
(2)    multi-year appropriations for a definite period in excess of one fiscal year; or
(3)    no-year appropriations that are available without fiscal year limitation.

GAO Redbook at 5-4 to 5-8. "All appropriations are presumed to be annual appropriations unless the appropriation act expressly provides otherwise." *Id.* at 5-4. No-year appropriations are denoted by the language "to remain available until expended." *Id.* at 5-7. Multi-year appropriations generally use the language "available until" a specific date. *See id.* at 5-7 ("For

---

to 31 U.S.C. § 3526(d)). GAO has collected its decisions into a treatise on appropriations law called the GAO Redbook.

example, if a fiscal year 2005 appropriation act includes an appropriation account that specifies that it shall remain available until September 30, 2006, it is a 2-year appropriation.").

Critically, these durational limits refer to the date by which the appropriations must be obligated (known as the "period of availability"), not the date by which the money must be spent (the "availability for expenditure"). *See, e.g.*, *id.* at 5-7, 31 U.S.C. §§ 1551(a)(3), (b), 1552(a). Thus, the September 30, 2024, date in the CARES Act is important not because the funds must be spent by that date, but rather because that is the end of the "period of availability." Once the "period of availability" ends, the account remains open for up to five additional years. 31 U.S.C. § 1552(a). During that five-year period, obligations incurred during the availability period generally may still be spent. 31 U.S.C. § 1553(a) ("After the end of the period of availability for obligation of a fixed appropriation account and before the closing of that account under section 1552(a) of this title, the account shall retain its fiscal-year identity and *remain available for recording, adjusting, and liquidating obligations properly chargeable to that account*.") (emphasis added). "Thus, a time-limited appropriation is available to incur an obligation only during the period for which it is made. However, it remains available beyond that period, within limits, to make adjustments to the amount of such obligations and to make payments to liquidate such obligations." GAO Redbook at 5-4; *see also Westchester v. U.S. Dep't of Hous. & Urb. Dev.*, 778 F.3d 412, 417 n.8 (2d Cir. 2015). And the government's longstanding policy with respect to grants and cooperative agreements is that they need only be *obligated* during the period of availability and then may be expended in the period beyond. [6] *See, e.g.*, GAO Redbook at 5-48 to 5-49 (discussing the application of the bona fide needs rule, 31 U.S.C. § 1502(a)).

---

[6] HHS previously agreed with these principles, which is why the grants and cooperative agreements were obligated prior to September 30, 2024, for performance periods that extend beyond that date.

To summarize, HHS's example serves to show that it *has* engaged in an unlawful rescission of congressionally appropriated funds. Whereas HHS previously complied with the law and obligated the $4.3 billion in funds, it now identifies no lawful basis to refuse to spend these obligated funds as "no longer necessary." Whatever discretion HHS may have had regarding the initial allocation of these $4.3 billion has been extinguished because the period of availability has ended, and the funds can no longer be reallocated. HHS is simply refusing to spend congressionally appropriated funds in violation of statute and the Constitution.

### C.     Defendants' remaining arguments lack merit.

*First*, Defendants claim that Plaintiff States do not have standing to challenge the constitutionality of HHS's sudden recission of funds and programs. ECF No. 80 at 15. Such assertion is without foundation; there is no doubt that Plaintiff States are harmed, both financially and in the fulfillment of their duty to protect the public health, by the Public Health Funding Decision. This harm is traceable to HHS's flouting of Congress's will by rescinding obligated funds and refusing to spend them for their stated purpose.

*Second*, Defendants present various tables and incomplete data that largely serve to distract from the key legal issue: that HHS is unable to identify any statutory language authorizing HHS to refuse to spend already obligated funds based on its determination that the congressionally authorized appropriations are "no longer necessary" because "the COVID-19 pandemic is over." Indeed, HHS's own declarations and table show that billions of dollars were obligated under these appropriations and would, absent Defendants' unlawful actions, remain available to the States. By Defendants' own accounting, these cancellations would rescind nearly $700 million in PPP and CRRSAA appropriated funds that Congress expressly designated solely for use by the States, localities, and tribal organizations. ECF No. 80 at 8 (depicting nearly $700 million "Appropriated for CDC to Provide to STLTs" and not yet spent in PPP and CRRSAA rows).

Moreover, the table at ECF No. 80 at 8 is misleading in a few ways. First, the declaration of Jamie Legier makes clear that there are missing additional amounts that were appropriated to HHS, that HHS provided to CDC for the States, but that were not included in the table. *Compare* ECF No. 80-1, ¶¶ 11, 13 *with* ECF No. 80 at 8. Second, neither the table nor any other information in the declaration refer, either by citation or description, to the source appropriations contained within each statute that HHS or CDC obligated to the Plaintiff States through the various agreements at issue in this case. Third, neither the table nor the supporting declaration explains whether the "[a]mount [p]rovided by CDC to STLTs" is meant to include just the agreements at issue in this case, or some other larger, undefined, subset. All this to say that this additional factual information is not particularly illuminating — at bottom, what is known is that HHS has tried to rescind appropriated and obligated funds because it has deemed those appropriations "no longer necessary," when Congress did not delegate HHS that authority.

For clarity, Plaintiff States provide a summary table of the amounts provided to "STLTs" by CDC, the amount spent by the "STLTs," and the amount remaining according to the Declaration of Jamie Legier, ECF No. 80-1:

| Appropriations Bill | Amount Provided to STLTs by CDC | Amount Spent by STLTs | Amount Remaining |
|---|---|---|---|
| ARPA | $18,964,597,077 | $12,241,082,518 | $6,723,514,559 |
| CPRSAA | $1,120,474,306 | $1,099,398,182 | $21,076,124 |
| CARES | $2,108,388,501 | $1,812,715,188 | $295,673,313 |
| PPP | $11,652,785,823 | $10,029,206,313 | $1,623,579,510 |
| CRRSA | $26,700,000,000 | $17,900,000,000 | $8,800,000,000 |
| **TOTAL** | | | **$17,463,843,506** |

The amount of funds available to States under Defendants' own reckoning exceeds the amount of cancellations at issue in this case. Again, as explained above, Defendants' insinuation that it was somehow improper for the Plaintiff States to have funds remaining at this point is not supported by record evidence or federal appropriations law. Defendants never explain how their

capricious disavowal of recently approved "no cost extensions" for many of the affected grants, which would allow grant funds to continue to be expended during the five-year period following the period of availability, comport with Congressional intent. That is, the time frame for expenditure was *not* "set by Congress," ECF No. 80 at 9, but the purposes for which the obligated funds were to be obligated *was*, as was the time period during which they had to be obligated. Now that the period of availability for CPRSA, CARES, and CRRSAA has passed, any funds HHS de-obligates can *never* be used for their congressionally authorized purposes. And, as for the ARPA and PPP funds, HHS has nowhere identified an alternate, congressionally authorized purpose for the funds it has purported to de-obligate through its Public Health Funding Decision.

Puzzlingly, Defendants appear to contend that Congress's recission of certain *other* appropriated funds from CARES, CRRSAA, and PPP in the Fiscal Responsibility Act of 2023 demonstrate some Congressional intent that *unspent* amounts be returned as well. ECF No. 80 at 9. But Congress's intent to rescind the obligated funds at issue is nowhere to be found. Indeed, Congress determined that even some funds that were not yet obligated at the time of the Fiscal Responsibility Act were still necessary. *See, e.g.*, Fiscal Responsibility Act of 2023, Pub. L. 118-5, 137 Stat 10, Div. B, § 2(3) (rescinding certain unobligated funds "with the exception of $2,127,000,000 and—(A) any funds that were transferred and merged with the Covered Countermeasure Process Fund"). Congress's decision after the end of the pandemic to rescind *some* unobligated funds, while preserving *all* of the funding at issue here, evinces clear congressional intent that the funding was necessary, and that HHS lacked authority to determine otherwise. Moreover, Defendants' argument that, through the Fiscal Responsibility Act, Congress did not provide *additional* "specific instructions for the HHS funding that it left in

place," ECF No. 80 at 14, somehow allowed it to abandon Congress's prior instructions is contrary to longstanding canons of interpretation regarding appropriations bills. *See Atl. Fish Spotters Ass'n v. Evans*, 321 F.3d 220, 224 (1st Cir. 2003) ("appropriations bills have no more effect on existing law than that which is manifest in the language of any particular provision").

*Third*, Defendants continue to make scattered references to *Lincoln*. As an initial matter, *Lincoln* does not apply because the Plaintiff States are not challenging any particular allocation decision but rather HHS's refusal to spend congressionally appropriated funds. HHS lacks discretion to refuse to spend $11 billion in congressionally appropriated funds as "no longer necessary" because the pandemic is over. That alone makes *Lincoln* inapplicable.

In any event, the appropriation laws at issue did not commit unfettered discretion to HHS, making *Lincoln* further inapposite. Despite the opportunity for supplemental briefing, Defendants declined to identify each section of the appropriations laws that are the source of funds for the grants and cooperative agreements at issue in this matter. Indeed, HHS did not even address all the appropriations that expressly set aside monies for the States. *Compare* ECF No. 80-3, *with* ARPA §§ 2301, 2401, 2402, and 2501, 135 Stat. 4, 37, 40-42 (2021). Regardless, for the appropriations that the parties have identified, Congress limited HHS's discretion by directing expenditure of the appropriated funds to the specific public health purposes. For example:

- "To prevent, prepare for, and respond to coronavirus, domestically or internationally." CARES Act, 134 Stat. 281, 554 (2020); Coronavirus Preparedness and Response Supplemental Appropriations Act, 2020, Pub. L. 116-123, 134 Stat. 146, 147 (2020); Coronavirus Response and Relief Supplemental Appropriations Act, 2021 (Div. M of the Consolidated Appropriations Act, 2021), Pub. L. 116-260, 134 Stat. 1182, 1911 (2021).

- "[E]stablish and expand Federal, State, local, and territorial testing and contact tracing capabilities, including through investments in laboratory capacity, such as academic and research laboratories, or other laboratories that could be used for

processing of COVID-19 testing; community-based testing sites and community-based organizations; or mobile health units, particularly in medically underserved areas." ARPA, 135 Stat. 4, 40-41 (2021).

- "[F]or surveillance, epidemiology, laboratory capacity expansion, contact tracing, public health data surveillance and analytics infrastructure modernization, disseminating information about testing, and workforce support necessary to expand and improve COVID testing." Paycheck Protection Program and Health Care Enhancement Act, Pub. L. 116-139, 134 Stat. 620, 624 (2020).

Despite Congress's direction to fund public health, irrespective of the pandemic's duration, Defendants unlawfully decided that these funds are "no longer necessary." *See* ECF No. 60 at 33. These purposes cannot be ignored and provide a standard for the Court's judicial determination of compliance with the APA (as well as the Spending Clause). *See Healthy Teen Network v. Azar*, 322 F. Supp. 3d 647, 657 (D. Md. 2018) (citing *Mach Mining, LLC v. E.E.O.C.*, 575 U.S. 480, 486-89 (2015)). Moreover, HHS has not and cannot deny that its own regulations limit its discretion regarding termination of grants in a manner that puts HHS's mass termination decision squarely before the Court. *See Am. Med. Ass'n v. Reno*, 57 F.3d 1129, 1134–35 (D.C. Cir. 1995) (agency discretion over resource allocation does not bar review of whether the agency provided a reasoned explanation or whether its spending decisions contravened statutory requirements); *Pol'y & Rsch., LLC v. U.S. Dep't of Health and Hum. Servs.*, 313 F. Supp. 3d 62, 83 (D.D.C. 2018); *Planned Parenthood of Greater Wash. & N. Idaho v. U.S. Dep't of Health and Hum. Servs.*, 328 F. Supp. 3d 1133, 1147 (E.D. Wash. 2018); *King County v. Azar*, 320 F. Supp. 3d 1167, 1175 (W.D. Wash. 2018).

*Finally*, Defendants suggest that the fact that States are still drawing down allocated funds "should factor into the Court's analysis" of whether a preliminary injunction is needed. ECF No. 80 at 13. But they never rebut extensive evidence that the Public Health Funding Decision's premature elimination of already obligated grants upon which Plaintiff States rely for

14

ongoing public health programs will cause irreparable harm. *See, e.g.*, Mot. for PI at 13-19. Nor do Defendants rebut Plaintiff States' evidence that grantees have been unable to identify alternative sources of funding to offset the terminated grants, *see, e.g.*, ECF No. 4-4, Ferrer Decl. ¶ 13; certainly, HHS itself never identifies, either in the termination notices or their papers, any alternative source of appropriated, unobligated funds available to replace the grants terminated as a result of the Public Health Funding Decision. The evidence before the Court demonstrates that the task of modernizing the public health system "cannot be achieved overnight," but requires years of careful planning, investment, and execution. ECF No. 4-37, Sutton Decl. ¶ 10; *see also* ECF No. 4-1, Sjolander Decl. ¶ 17; ECF No. 4-23, Hertel Decl. ¶ 51; ECF No. 4-40, Fehrenbach-Marosfalvy Decl. ¶ 13. A preliminary injunction is needed to allow Plaintiff States to continue to do this work as Congress intended.

**II.    This Court Has Jurisdiction over Plaintiff States' Constitutional Claims.**

Defendants renew their jurisdictional argument with the remarkable claim that even though Court of Federal Claims does not have jurisdiction over Plaintiff States' constitutional claims, the Tucker Act still strips this Court of jurisdiction. Not so. As the Supreme Court has long held, "where Congress intends to preclude judicial review of constitutional claims its intent to do so must be clear," a "heightened showing" required "in part to avoid the 'serious constitutional question' that would arise if a federal statute were construed to deny any judicial forum for a colorable constitutional claim." *Webster v. Doe*, 486 U.S. 592, 603 (1988) (citation omitted). Here, HHS has fallen woefully short of such a showing.

None of the cases cited stand for the federal government's remarkable position. Indeed, of the cases cited, only two even arguably involved a constitutional or statutory challenge. The first case held only that "[w]e agree with the Government that a claim that a government agency has violated a party's right to due process by refusing performance under a contract is substantively

indistinguishable from a breach of contract claim." *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1127-28 (Fed. Cir. 2007). This narrow holding in no way suggested that the Tucker Act strips district courts of jurisdiction for constitutional claims. Likewise, in *Consolidated Edison Co. of New York v. U.S. Dep't of Energy*, the plaintiffs, having unsuccessfully previously brought suit in the Court of Federal Claims under the Tucker Act doctrine of "illegal exactions," attempted to recast their claims under the APA in federal district court. 247 F.3d 1378, 1381, 1384-85 (Fed. Cir. 2001). *Consolidated Edison* merely held that this tactic was impermissible under the circumstances of that case, and that the relief the plaintiff already sought in the Court of Federal Claims "overlaps" with and would provide full relief for its prospective claims. *Id.* at 1385. The court repeatedly emphasized that the case did *not* involve the "complexities of the ongoing federal-state relationships present in *Bowen*," *id.*, suggesting that even in that case the outcome would have been different had it involved a complex, ongoing state-federal relationship, as is the case here.

Neither of the other two cases involve constitutional claims or has any bearing here. In *Christopher Village, L.P. v. United States*, the Federal Circuit concluded that a federal district court had lacked jurisdiction to review federal contract claims only after foreclosure and sale of the property at issue left the money damages as the litigant's only possible remedy. 360 F.3d 1319, 1327 (Fed. Cir. 2004). In contrast, Plaintiff States seek urgent injunctive relief to overturn the Public Health Funding Decision and prevent imminent damage to public health programs. And in *Village West Associates v. Rhode Island Housing and Mortgage Finance Corporation*, an owner of a public housing project sued a public housing administrator alleging breach of contract, and the administrator attempted to implead HUD based on another contract. 618 F. Supp. 2d 134, 136 (D.R.I.), *judgment entered*, 641 F. Supp. 2d 135 (D.R.I. 2009). The court held

that "the gravamen of RIHMFC's complaint is that HUD breached the ACC contract," a claim that belonged in the Court of Federal Claims. *Id.* at 139.

In contrast, cases challenging withholding of funding are appropriately brought in federal district court when they arise from violations of the underlying appropriations statutes. *See, e.g.*, *Nat'l Ctr. for Mfg. Sci. (NCMS) v. United States*, 114 F.3d 196, 200 (Fed. Cir. 1997). Based on the same reasoning, this Court likewise has jurisdiction.

Finally, as Plaintiff States explained in their prior briefing, *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam), does not change the analysis. That case did not involve any constitutional claim. Nor did the Court decide that the Tucker Act served to strip district courts of jurisdiction over constitutional or statutory claims. That preliminary, emergency docket decision concluded only that the federal government was likely to prevail in its assertions that *that case* brought breach-of-contract claims. But under HHS's overreading, *Department of Education v. California* overruled *Bowen*, *NCMS*, and a large volume of other cases. *See* ECF No. 77 at 80 (Defendants' counsel's admission that "before the Supreme Court issued its decision in *California v. Department of Education* I might have not even made this argument"). The Supreme Court has never condoned this type of overreading of emergency docket decisions, especially where the Court never indicated that it was overruling any cases or making a broad change in the law. *See, e.g.*, *Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring) ("To reiterate: The Court's stay order is not a decision on the merits").[7] Simply put, *Bowen* and its progeny remain good law.

---

[7] Defendants discuss the purported precedential effect of per curiam opinions granting applications for injunctive relief. ECF No. 80 at 2 n.1. Those opinions are inapposite, however, because an application for an injunction "demands a significantly higher justification than a

In sum, this Court has jurisdiction to review constitutional claims involving HHS's violation of separation of powers by unlawfully refusing to spend $11 billion in congressionally appropriated funds. As the briefing on this issue demonstrates, these claims are clearly not, at their essence, breach-of-contract claims.

## CONCLUSION

For these reasons and those detailed in the motion and reply, Plaintiff States respectfully request a preliminary injunction order as this case proceeds.

Respectfully submitted,

**PHILIP J. WEISER**
Attorney General of Colorado

By: */s/ David Moskowitz*
David Moskowitz*
*Deputy Solicitor General*
Joseph G. Michaels*
*Assistant Solicitor General*
Sam Wolter*
*Assistant Attorney General*
1300 Broadway, #10
Denver, CO 80203
(720) 508-6000
David.Moskowitz@coag.gov
joseph.michaels@coag.gov
Samuel.Wolter@coag.gov

*Counsel for the State of Colorado*

**PETER F. NERONHA**
Attorney General of Rhode Island

By: */s/ Sarah W. Rice*
Sarah W. Rice (RI Bar No. 10465)
*Deputy Chief, Public Protection Bureau*
*Assistant Attorney General*
Keith Hoffmann (RI Bar No. 9874)
*Chief of Policy*
*Assistant Attorney General*
Julia Harvey (RI Bar No. 10529)
*Special Assistant Attorney General*
150 South Main Street
Providence, RI 02903
(401) 274-4400, Ext. 2054
srice@riag.ri.gov
khoffmann@riag.ri.gov
jharvey@riag.ri.gov

*Counsel for the State of Rhode Island*

---

request for a stay," including because an injunction is warranted only "where the legal rights at issue are indisputably clear." *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613 (2020) (Roberts, C.J., concurring in denial of application for injunction) (internal quotation marks omitted).

**ROB BONTA**
Attorney General of California

By: */s/ Crystal Adams*
Neli Palma*
*Senior Assistant Attorney General*
Crystal Adams*
Anna Rich*
*Deputy Attorneys General*
1300 I Street
Sacramento, CA 95814
(916) 210-7522

*Counsel for the State of California*

**NICHOLAS W. BROWN**
Attorney General of Washington

By: *s/ Ellen Range*
Ellen Range*
*Assistant Attorney General*
Office of the Washington State Attorney
General
7141 Cleanwater Drive SW
P.O. Box 40111
Olympia, WA 98504-0111
(360) 709-6470
Ellen.Range@atg.wa.gov

Cristina Sepe*
*Deputy Solicitor General*
1125 Washington Street SE
PO Box 40100
Olympia, WA 98504-0100
(360) 753-6200
Cristina.Sepe@atg.wa.gov

*Counsel for the State of Washington*

**KEITH ELLISON**
Attorney General of Minnesota

By: */s/ Brian S. Carter*
Brian S. Carter*
Jennifer Moreau*
*Assistant Attorneys General*
445 Minnesota Street, Suite 1400
St. Paul, Minnesota, 55101
(651) 300-7403
Brian.Carter@ag.state.mn.us
Jennifer.Moreau@ag.state.mn.us

*Counsel for the State of Minnesota*

**KRISTIN K. MAYES**
Attorney General of Arizona

By: */s/ Mary M. Curtin*
Mary M. Curtin*
*Senior Litigation Counsel*
Arizona Attorney General's Office
2005 North Central Avenue
Phoenix, Arizona 85004
(602) 542-3333
Mary.Curtin@azag.gov

*Counsel for the State of Arizona*

**WILLIAM TONG**
Attorney General of Connecticut

*/s/ Andrew Ammirati*
Andrew Ammirati*
*Assistant Attorney General*
165 Capitol Avenue
Hartford, CT 06106
Phone: (860) 808 5090
Andrew.Ammirati@ct.gov

*Counsel for the State of Connecticut*

**KATHLEEN JENNINGS**
Attorney General of Delaware

By: */s/ Vanessa L. Kassab*
Ian R. Liston**
*Director of Impact Litigation*
Vanessa L. Kassab**
*Deputy Attorney General*
Delaware Department of Justice
820 N. French Street
Wilmington, DE 19801
(302) 683-8899
vanessa.kassab@delaware.gov

*Counsel for the State of Delaware*

**BRIAN L. SCHWALB**
Attorney General for the District of Columbia

*/s/ Samantha Hall*
Samantha Hall*
*Assistant Attorney General*
Public Advocacy Division
Office of the Attorney General for the District of Columbia
400 Sixth Street, N.W.
Washington, D.C. 20001
(202) 788-2081
Samantha.hall@dc.gov

*Counsel for the District of Columbia*

**ANNE E. LOPEZ**
Attorney General of Hawaiʻi

By: */s/ Kalikoʻonālani D. Fernandes*
David D. Day*
*Special Assistant to the Attorney General*
Kalikoʻonālani D. Fernandes*
*Solicitor General*
425 Queen Street
Honolulu, HI 96813
(808) 586-1360
kaliko.d.fernandes@hawaii.gov

*Counsel for the State of Hawaiʻi*

**KWAME RAOUL**
Attorney General of Illinois

By: /s/ John Hazinski
John Hazinski*
*Assistant Attorney General*
Office of the Illinois Attorney General
115 S. LaSalle St.
Chicago, IL 60603
(773) 590-6944
john.hazinski@ilag.gov

*Counsel for the State of Illinois*


**OFFICE OF THE GOVERNOR *ex rel.*
ANDY BESHEAR**
in his official capacity as Governor of the
Commonwealth of Kentucky

*/s/ Travis Mayo*
S. Travis Mayo*
*General Counsel*
Taylor Payne*
*Chief Deputy General Counsel*
Laura C. Tipton*
*Deputy General Counsel*
Kentucky Office of the Governor
700 Capitol Avenue, Suite 106
Frankfort, KY 40601
(502) 564-2611
travis.mayo@ky.gov
taylor.payne@ky.gov
laurac.tipton@ky.gov

*Counsel for the Office of the Governor*


**AARON M. FREY**
Attorney General of Maine

By: */s/ Margaret Machaiek*
Margaret Machaiek*
*Assistant Attorney General*
Office of the Attorney General
6 State House Station
Augusta, ME  04333-0006
Tel.:  207-626-8800
Fax:  207-287-3145

*Counsel for the State of Maine*


**ANTHONY G. BROWN**
Attorney General of Maryland

By: */s/ James C. Luh*
James C. Luh*
Senior Assistant Attorney General
Office of the Attorney General
200 Saint Paul Place, 20th Floor
Baltimore, Maryland 21202
410-576-6411
jluh@oag.state.md.us

*Counsel for the State of Maryland*

**ANDREA JOY CAMPBELL**
Attorney General of Massachusetts

By: */s/ Katherine B. Dirks*
Katherine B. Dirks*
*Chief State Trial Counsel*
Phoebe Lockhart*
Assistant Attorney General
1 Ashburton Pl.
Boston, MA 02108
(617.963.2277)
katherine.dirks@mass.gov
phoebe.lockhart@mass.gov

*Counsel for the Commonwealth of Massachusetts*


**AARON D. FORD**
Attorney General of Nevada

By: */s/ Heidi Parry Stern*
Heidi Parry Stern (Bar. No. 8873)*
*Solicitor General*
Office of the Nevada Attorney General
1 State of Nevada Way, Ste. 100
Las Vegas, NV 89119
HStern@ag.nv.gov

*Counsel for the State of Nevada*


**DANA NESSEL**
Attorney General of Michigan

By: */s/ Jennifer M. Jackson*
Jennifer M. Jackson (P67126)*
Carl Hammaker (P81203)*
Assistant Attorneys General
Michigan Department of Attorney General
Attorneys for State of Michigan
525 W. Ottawa St.
Lansing, MI 48933-1067
517.335.7573
jacksonj5@michigan.gov
hammakerc@michigan.gov

*Counsel for the State of Michigan*


**MATTHEW J. PLATKIN**
Attorney General of New Jersey

*/s/ Jessica L. Palmer*
Jessica L. Palmer*
Anaiis Gonzalez*
*Deputy Attorneys General*
Office of the Attorney General
124 Halsey Street, 5th Floor
Newark, NJ 07101
(609) 696-4607
Jessica.Palmer@law.njoag.gov
Anaiis.Gonzalez@law.njoag.gov

*Counsel for the State of New Jersey*

**RAÚL TORREZ**
Attorney General of New Mexico

By: */s/ Anjana Samant*
Anjana Samant*
*Deputy Counsel*
New Mexico Department of Justice
408 Galisteo Street
Santa Fe, New Mexico 87501
asamant@nmdoj.gov
(505) 270-4332

*Counsel for the State of New Mexico*

**LETITIA JAMES**
Attorney General of New York

By: */s/ Rabia Muqaddam*
Rabia Muqaddam*
*Special Counsel for Federal Initiatives*
Gina Bull*
*Assistant Attorney General*
28 Liberty St.
New York, NY 10005
(929) 638-0447
rabia.muqaddam@ag.ny.gov
gina.bull@ag.ny.gov

*Counsel for the State of New York*

**JEFF JACKSON**
Attorney General of North Carolina

By */s/ Daniel P. Mosteller*
Daniel P. Mosteller*
*Associate Deputy Attorney General*
Laura Howard
*Chief Deputy Attorney General*
North Carolina Department of Justice
PO Box 629
Raleigh, NC 27602
919-716-6026
dmosteller@ncdoj.gov

*Counsel for State of North Carolina*

**DAN RAYFIELD**
Attorney General of Oregon

By: */s/ Deanna J. Chang*
Deanna J. Chang*
*Senior Assistant Attorney General*
100 SW Market Street
Portland, OR 97201
(971) 673-1880
Deanna.J.Chang@doj.oregon.gov

*Counsel for the State of Oregon*

23

**JOSH SHAPIRO**
in his official capacity as Governor of the
Commonwealth of Pennsylvania

Jennifer Selber
*General Counsel*

*/s/ Aimee D. Thomson*
Aimee D. Thomson*
Jonathan D. Koltash*
*Deputy General Counsel*
Pennsylvania Office of the Governor
30 N. 3rd St., Suite 200
Harrisburg, PA 17101
(223) 234-4986
aimeethomson@pa.gov
jokoltash@pa.gov

*Counsel for Governor Josh Shapiro*

*Admitted pro hac vice*
**Pending pro hac vice applications to be filed*

**JOSHUA L. KAUL**
Attorney General of Wisconsin

By: */s/ Lynn K. Lodahl*
Lynn K. Lodahl*
*Assistant Attorney General*
17 West Main Street
Post Office Box 7857
Madison, Wisconsin 53707-7857
(608) 264-6219
lodahllk@doj.state.wi.us

*Counsel for the State of Wisconsin*

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that, on April 29, 2025, I filed the foregoing document through this Court's Electronic Case Filing (ECF) system, thereby serving it upon all registered users in accordance with Federal Rule of Civil Procedure 5(b)(2)(E) and Local Rules Gen 304.

<u>/s/ David Moskowitz</u>
*Deputy Solicitor General*