## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

|  |  |  |
|---|---|---|
| STATE OF COLORADO; STATE OF RHODE ISLAND; STATE OF CALIFORNIA; STATE OF MINNESOTA; STATE OF WASHINGTON; STATE OF ARIZONA; STATE OF CONNECTICUT; STATE OF DELAWARE; THE DISTRICT OF COLUMBIA; STATE OF HAWAI'I; STATE OF ILLINOIS; OFFICE OF THE GOVERNOR *EX REL.* ANDY BESHEAR, in his official capacity as Governor of the Commonwealth of Kentucky; STATE OF MAINE; STATE OF MARYLAND; COMMONWEALTH OF MASSACHUSETTS; STATE OF MICHIGAN; STATE OF NEVADA; STATE OF NEW JERSEY; STATE OF NEW MEXICO; STATE OF NEW YORK; STATE OF NORTH CAROLINA; STATE OF OREGON; STATE OF WISCONSIN; JOSH SHAPIRO, in his official capacity as Governor of the Commonwealth of Pennsylvania, | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) |  |
| Plaintiffs, | ) ) |  |
| v. | ) ) | C.A. No. 1:25-cv-00121-MSM-LDA |
| U.S. DEPARTMENT OF HEALTH AND HUMAN SERVICES; ROBERT F. KENNEDY, JR., in his official capacity as Secretary of the U.S. Department of Health and Human Services, | ) ) ) ) ) ) ) ) |  |
| Defendants. | ) ) |  |

## MEMORANDUM AND ORDER

Mary S. McElroy, United States District Judge.

Bracing for the financial impact of an unprecedented public health crisis, Congress appropriated billions of dollars in spending across six appropriation acts starting in March 2020. The U.S. Department of Health and Human Services ("HHS") administered that money to all fifty States through grant programs aimed at responding to the ongoing health crisis. After the pandemic's official end in 2023, Congress reviewed its COVID-era spending and rescinded some appropriations it no longer saw as necessary, and left others in place. Since then, HHS has continued to administer the funding without issue.

On March 24, 2025, HHS suddenly terminated $11 billion of the public health grants appropriated by Congress to fund certain health programs and services, effective immediately ("Public Health Funding Decision). HHS began sending mass termination notices which contained the same boilerplate explanation that "[t]he end of the pandemic provides cause to terminate COVID-related grants. Now that the pandemic is over, the grants are no longer necessary." (ECF No. 4-40 Ex. A at 5.) Though Congress appropriated the funds during the pandemic, they did much more than address COVID-related public health concerns.

The terminations impact a wide range of the States' public health programs and services. The terminated funds addressed infectious disease outbreaks, including rising threats like measles and H5N1 (avian influenza). They ensured access to immunizations among vulnerable populations. They fortified emergency

2

preparedness for future public health threats.  They provided mental health and substance abuse services.  And they modernized critical public health infrastructure. Without the funds, these programs could not continue.

Challenging the Government's failure to comply with statutory and regulatory processes and fundamental Separation of Powers principles, a coalition of twenty-three States and the District of Columbia (the "States") sued in the District of Rhode Island.[1]  The States now move for a preliminary injunction—a temporary court order requiring HHS to reinstate the funds, at least while their case is pending.

For the reasons discussed below, the Court GRANTS the States' Motion for a Preliminary Injunction (ECF No. 60).  The Court DENIES the Defendants' Motion for Reconsideration and Request to Vacate the Temporary Restraining Order and Motion for a Stay Pending Appeal (ECF No. 56).

## I.    BACKGROUND

The Court begins with a preliminary statement of facts.

### A.  Congress's Appropriation of Public Health Funding

In March 2020, the world came to a screeching halt because of COVID-19.  It sparked lockdowns across the globe, forced schools and businesses to shut their doors indefinitely, and quickly overwhelmed hospitals and healthcare providers.

---

[1] For ease of reading, the Court refers to the Defendants collectively as either "HHS" or "the Government."  The Court refers to the Plaintiff-States collectively as "the States."

In response, Congress passed six appropriation acts to help people and businesses cope with the financial impact caused by the crisis. Congress enacted the laws to outline a path toward recovery, but also to better prepare the country for future public health threats. (ECF No. 60 at 3–4.) The funding was designed to strengthen healthcare outcomes and address gaps in the country's health system that were highlighted by the pandemic. *Id.*

Through these appropriations, Congress allocated large sums of money to HHS. HHS, in turn, was to distribute the money to the States by allocating certain amounts of the appropriated money to the Center for Disease Control ("CDC") and the Substance Abuse and Mental Health Services Administration ("SAMHSA"). (ECF No. 68 at 3-4.) As sub-agencies of HHS, both CDC and SAMHSA were responsible for allocating money to the States; they did so expeditiously through a variety of grant programs aimed at responding to the ongoing health crisis. *Id.* CDC and SAMHSA would either add the funds to existing awards to get the money to the States quickly or provide new grants to ensure the States could adequately respond to the pandemic. *Id.* at 4. The funds were largely used by the States, but in some cases, the agencies allowed for no-cost extensions of the grant awards if the funds could not be readily or timely used by the recipients. *Id.* As for CDC, some of the appropriations statutes direct a minimum amount of funding to be provided to state, tribal, local, and territorial entities, commonly referred to by HHS as "STLTs." (ECF No. 80-1 ¶ 7.)

Congress provided funds through six appropriation acts:

- Coronavirus Preparedness and Response Supplemental Appropriations Act, 2020, ("CPRSA") Pub. L. No. 116-123, 134 Stat. 146 (2020) ($8 billion);

- Families First Coronavirus Response Act, ("FFCRA") Pub. L. No. 116–127, 134 Stat. 178 (2020) ($15 billion);

- The Coronavirus Aid, Relief, and Economic Security Act, Pub. L. No. 116-136, 134 Stat. 281 (2020) ($2.1 trillion);

- The Paycheck Protection Program and Health Care Enhancement Act, Pub. L. No. 116-139, 134 Stat. 620 (2020) ($483 billion);

- The Coronavirus Response and Relief Supplemental Appropriations Act, (2021) Pub. L. No. 116-260, 134 Stat. 1182 (2020) ($900 billion); and

- The American Rescue Plan Act of 2021, Pub. L. No. 117-2, 135 Stat. 4 (2021) ($1.9 trillion).

Below, the Court describes with greater specificity what each act accomplished.

First, Congress passed CPRSA on March 6, 2020. Pub. L. No. 116-123, 134 Stat. 146 (2020). Title III of CPRSA specifically outlines the amount of money and purpose of the money being allocated to the CDC through HHS. *Id.* at 147–48. Congress specifically allocated $2,200,000,000 for "CDC-Wide Activities and Program Support" and further broke down that number into smaller allocations. For example, it required $950,000,000 be provided "for grants to or cooperative agreements with [STLTs] to carry out surveillance, epidemiology, laboratory capacity, infection control, mitigation, communications, and other preparedness and response activities[.]" *Id.* at 147.

Following the CPRSA, Congress passed the FFCRA on March 18, 2020. Pub. L. No. 116–127, 134 Stat. 178 (2020). FFCRA did not allocate any appropriations directly to CDC or SAMHSA; instead, the only allocations were $1,000,000,000, to

HHS, for the Public Health and Social Services Emergency Fund, "to remain available until expended." *Id.* at 182. It also gave $250,000,000 to HHS for Aging and Disability Services Programs. *Id.*

Next, Congress passed the CARES Act, which provided financial assistance to individuals, businesses, and local governments. CARES Act, Title VIII, 134 Stat. 281, 554–55 (2020). The Act includes provisions for direct payments to individuals, expanded unemployment benefits, and support for small businesses. *Id.* Additionally, it established the Coronavirus Relief Fund, which allocated $150,000,000,000 to help state and local governments manage the pandemic's impact. *Id.* at 554. The 2020 Supplemental Act further appropriated $950,000,000. 2020 Supplemental Act, Title III, 134 Stat. at 147. Together, these funds were for HHS to administer grant-in-aid programs with States and local jurisdictions to carry out surveillance, epidemiology, laboratory capacity, infection control, mitigation, communications, and other preparedness and response activities. Specifically, Congress appropriated $4,300,000,000 to CDC, of which $1,500,000,000 was appropriated for awards to STLTs, to remain available until September 30, 2024.[2] 134 Stat. 281 at 554. As of April 14, 2025, CDC made available $2,108,388,501 to the STLTs, and the STLTs spent $1,812,715,188 of the awarded CARES Act funds. (ECF No. 80-1 ¶ 10.)

---

[2] Pursuant to 31 U.S.C. §§ 1552(a), 1553(a), the States have until the fifth fiscal year after the period of availability for obligation to spend the funds.

Next, on April 24, 2020, Congress passed the Paycheck Protection Program and Health Care Enhancement Act ("PPP"), Pub. L. No. 116-139, 134 Stat. 620 (2020). Through the PPP, Congress appropriated $11,000,000,000 to HHS for STLTs in total. (ECF No. 80-1 ¶ 11.) Congress specified that $750,000,000 be appropriated for the Indian Health Service, resulting in $10,250,000,000 billion appropriated for non-Indian Health Service STLTs. *Id.* HHS also transferred another $282,311,516 to CDC, and Congress separately appropriated another $1,000,000,000 directly to CDC under the PPP. *Id.* As of April 14, 2025, CDC made available $11,652,785,823 to the STLTs, and the STLTs spent $10,029,206,313 of the awarded PPP funds. *Id.*

With the Coronavirus Response and Relief Supplemental Appropriations Act ("CRRSAA"), Congress appropriated $8,750,000,000 to CDC, of which $4,290,000,000 was specifically appropriated for awards to STLTs, to remain available until September 30, 2024. Pub. L. No. 116-260, 134 Stat. 1182, 1911 (2021). As of April 14, 2025, $5,426,073,054 was made available to the STLTs from CRRSAA funds, and the STLTs spent $3,811,438,554 of the awarded CRRSAA funds. (ECF No. 80-1 ¶ 12.) Congress appropriated $1,650,000,000 for the Substance Abuse Prevention and Treatment Block Grant and $1,650,000,000 for the Community Mental Health Services Block Grant. 134 Stat. 1182 at 1913. The CRRSAA directed that SAMHSA award no less than 50 percent of the CMHS Block Grant appropriation to community mental health centers. *Id.*

Lastly, through the American Rescue Plan Act of 2021 ("ARPA"), Congress appropriated $1,000,000,000 to the CDC. Pub. L. No. 117-2, 135 Stat. 4, 38 (2021).

CDC received another $17,964,597,077 from HHS and CMS under ARPA. *Id.* As of April 14, 2025, $18,964,597,077 was made available to the STLTs, and the STLTs had spent $12,241,082,518 of the awarded ARPA funds. (ECF No. 80-1 ¶ 13.) As of April 14, 2025, HHS records show $6,723,514,559 of unspent ARPA funds that had been awarded to STLTs. *Id.* Congress appropriated $1,500,000,000 for the Substance Abuse Prevention and Treatment Block Grant and $1,500,000,000 for the Community Mental Health Services Block Grant. 135 Stat. 4 at 45–46.

## B. Congress's June 2023 Review of COVID-Era Funding Laws

Around a month after health officials declared that the pandemic was over, Congress undertook a review of its COVID-era spending, rescinding some appropriations and indicating others were to remain available. In June 2023, Congress passed the Fiscal Responsibility of Act of 2023, which canceled $27,000,000,000 in appropriations that were no longer necessary due to the end of the public health emergency. Pub. L. 118–5, Div. B, Sec. 1-81 (June 3, 2023). The rescissions included funds that had been appropriated under the laws at issue here, the 2020 Supplemental Act, Pub. L. No. 116-123, the Families First Coronavirus Response Act, Pub. L. No. 116-127, the CARES Act, Pub. L. No. 116-136, the Paycheck Protection Act, Pub. L. No. 116-139, the 2021 Supplemental Act, Pub. L. No. 116-260, and ARPA, Pub. L. No. 117-2. *Id.* In undergoing its June 2023 review, Congress clarified that certain funds were unnecessary, while others were to remain intact, such as the funding impacted by HHS' 2025 Public Health Funding Decision.

### C.  HHS' Administration of Funds

As Congress was busy handling appropriations during and after the pandemic, HHS worked diligently with the States.  The money, which remained after congressional review, was funding various public health programs and services including treatment to those struggling with substance abuse and mental health issues, improvements to infectious disease tracking and response capability, and efforts to modernize the States' and their local jurisdictions' public health infrastructure.  *See* ECF Nos. 4-13 ¶ 10; 4-6 ¶¶ 40–50; 4-27 ¶ 18.  HHS even granted extensions to the States to draw down the funds, in some cases through June 2027, and issued guidance on how to appropriately use the funds beyond COVID-related concerns.  *See* ECF Nos. 4-3 ¶¶ 10, 13, 21–22, 48; 4-24 ¶¶ 11, 22; 4-32 ¶ 19.

### D.  The Public Health Terminations

All that changed on March 24, 2025.  Starting that day, the States' local health agencies began receiving termination notices from HHS, CDC, and SAMHSA revealing that their funding was cut ("Public Health Terminations").  (ECF No. 60-1 at 12).

According to the States, HHS' termination notices, distributed across various local programs and agencies, include the same basic components.  *See e.g.*, ECF No. 4-40 at 16, 22, 28, 33, 38; ECF No. 4-41 at 52, 54; ECF No. 4-27 at 82, 95, 107, 125.  The notices were issued on March 24 and 25 and provided no advanced notice to recipients.  *See id.*  The recipients were advised that the funding was terminated "for cause" and HHS referred to the end of the COVID-19 pandemic as the reason.  *See*

9

*id.*  Rather than explaining why the grantee had failed to comply with the terms and conditions or what for cause meant, the notices simply explained that the "end of the pandemic provides cause" to terminate the funds.  (ECF No. 4-27 at 125.)  Finally, the terminations were effective immediately, giving recipients no warning that they stand to lose the money.

Separately, CDC began sending termination notices that stated the following:

> The termination of this award is for cause.  HHS regulations permit termination if "the non-Federal entity fails to comply with the terms and conditions of the award", or separately, "for cause."  The end of the pandemic provides cause to terminate COVID-related grants and cooperative agreements.  These grants and cooperative agreements were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grants and cooperative agreements are no longer necessary as their limited purpose has run out. Termination of [this award] is effective as of the date set out in your Notice of Award.[3]

(ECF No. 4-40, Ex. A at 5.)  Aside from this language, the notices executed by CDC did not provide any additional explanation to the recipients.  (ECF No. 4-7 ¶ 59; 4-15 ¶ 15.)  Prior to the termination, CDC did not notify the States that the grants were being administered in an unsatisfactory manner.  *See, e.g.*, ECF No. 4-3 ¶¶ 19, 45; 4-7 ¶¶ 31, 43; 4-8 ¶ 18; 4-10 ¶ 36.

Although the CDC notices cited the end of the COVID-19 pandemic as cause for termination, many of the programs impacted by the Public Health Funding Decision were in place to advance health outcomes beyond the COVID-19 pandemic.

---

[3] The States note that while the terminations sent to their local programs and agencies do have minor, non-substantive variations, the gist of the language was the same.  (ECF No. 60 at 10 n.2.)

These included funds to research labs investigating a listeria outbreak across multiple states (ECF No. 4-21 ¶ 27) and those preparing for future infectious disease threats such as avian influenza.  (ECF No. 4-4 ¶¶ 7, 20; 4-7 ¶ 46; 4-8 ¶¶ 37, 43, 54; 4-24 ¶ 45.)  And at times, CDC itself had extended the grants beyond the pandemic intentionally.  *See, e.g.*, ECF No. 4-24 ¶¶ 11, 22; ECF No. 4-32 ¶ 19.

Similarly, SAMHSA implemented HHS' Public Health Funding Decision via notices that terminated block grants to the States and were effective immediately on March 24.  (ECF Nos. 4-6 ¶ 11; 4-41 at 52.)  The basis for the terminations was the same as the CDC notices—the end of the pandemic—and similarly, did not provide the recipients advanced notice or an opportunity for a hearing.  *See id.*  A few days later, SAMHSA issued superseding notices to recipients which stated:

> The termination of this award is for cause. The block grant provisions at 42 U.S.C. § 300x-55 permit termination if the state "has materially failed to comply with the agreements or other conditions required for the receipt of a grant under the program involved." The end of the pandemic provides cause to terminate COVID-related grants and cooperative agreements. These grants and cooperative agreements were issued for a limited purpose: to ameliorate the effects of the pandemic. Now that the pandemic is over, the grants and cooperative agreements are no longer necessary as their limited purpose has run out.

(ECF No. 4-6 ¶ 12; ECF No. 4-41 Ex. D at 1.)  Besides this explanation, the SAMHSA notices did not provide any additional detail.  *See id.*  Like the CDC terminations, SAMHSA did not notify the States that they were failing to administer the grants appropriately.  And despite the rationale being the end of the pandemic, the terminated SAMHSA funding supported mental health and substance abuse treatment efforts far beyond pandemic-related care.  For instance, the States were

using the funds to strengthen the 988 Suicide and Crisis Lifeline system; make Naloxone more widely available to prevent fatal overdoses; expand access to mental health treatment among rural communities; serve foster youth with mental health and substance related needs; provide crisis intervention training to law enforcement officials and first responders; and to train crisis counselors to serve those impacted by natural disasters. *See, e.g.*, ECF Nos. 4-6 ¶¶ 40, 41, 50; 4-26 ¶ 14; 4-28 ¶ 5; 4-41 ¶ 33.

### E.  This Case

On April 1, 2025, twenty-three States and the District of Columbia sued for declaratory and injunctive relief against HHS and Secretary Kennedy, initially that the terminations violate the Administrative Procedure Act ("APA"), 5 U.S.C. § 701. (ECF No. 1 ¶¶ 3.)  The States simultaneously moved for a temporary restraining order ("TRO") to restrain HHS "from enforcing or implementing the public health terminations for Plaintiff States and their local health jurisdictions."  (ECF No. 4 at 3.)

On April 3, the Court heard the parties on the TRO and, at the hearing's conclusion granted it.[4]  A written order detailing the Court's reasoning soon followed. The Court found that "the States have established a strong likelihood of success on

---

[4] At the TRO hearing, the Court heard from the States and HHS, though counsel for HHS did not make any substantive arguments, instead objecting to the issuance of the TRO and requesting that the Court to impose a bond.  The Court granted the TRO and asked the States to prepare a proposed order and to confer with the Defendants as to any objections.  The parties promptly complied and submitted a proposed TRO on April 4.

the merits, irreparable harm, and that the balance of equities and public interest favor the States." (ECF No. 54 at 13.) The TRO made clear that the Government was "fully restrained from implementing or enforcing funding terminations that were issued to Plaintiff States . . . or from issuing new funding terminations to Plaintiff States." *Id.* at 14.

Meanwhile, on April 4, the Supreme Court granted an emergency stay application in *Department of Education v. California*, 145 S. Ct. 966 (2025) (per curiam). That case concerned a district court's TRO enjoining the Government from terminating two education-related grant programs. HHS quickly moved for reconsideration of the TRO, arguing that *California* divested this Court of jurisdiction. (ECF No. 56 at 2-3.)[5]

On April 8, the States filed an Amended Complaint, which asserted several additional constitutional claims, and a Motion for a Preliminary Injunction. (ECF Nos. 59, 60.) The States insist that this Court has jurisdiction over their claims, despite the Supreme Court's recent decision in *California*. *Id.* at 22. They also claim that they have established a likelihood of success on the merits because the Public Health Funding Decision was contrary to law, arbitrary and capricious, and violates the Separation of Powers. *Id.* at 2-3. Furthermore, the States submit that absent a preliminary injunction, they stand to suffer immediate, irreparable harm to their

---

[5] After hearing the parties' arguments during the preliminary injunction hearing, the Court determined that it would address the Defendants' Motion for Reconsideration along with the States' Motion for Preliminary Injunction.

local public health programs, services, and initiatives. *Id.* at 3. Lastly, the States claim that the public interest and balance of the equities strongly favor a preliminary injunction in their favor. *Id.* A preliminary injunction hearing was held on April 17.[6]

## II.    PRELIMINARY INJUNCTION STANDARD

"A request for a preliminary injunction is a request for extraordinary relief." *Cushing v. Packard*, 30 F.4th 27, 35 (1st Cir. 2022). "To secure a preliminary injunction, a plaintiff must show '(1) a substantial likelihood of success on the merits, (2) a significant risk of irreparable harm if the injunction is withheld, (3) a favorable balance of hardships, and (4) a fit (or lack of friction) between the injunction and the public interest.'" *NuVasive, Inc. v. Day*, 954 F.3d 439, 443 (1st Cir. 2020) (cleaned up). In evaluating whether the plaintiffs have met the most important requirement of likelihood of success on the merits, a court must keep in mind that the merits need not be "conclusively" determined; instead, at this stage, decisions "are to be understood as statements of probable outcomes only." *Akebia Therapeutics, Inc. v. Azar*, 976 F.3d 86, 93 (1st Cir. 2020) (cleaned up). "To demonstrate likelihood of success on the merits, plaintiffs must show more than mere possibility of success–rather, they must establish a strong likelihood that they will ultimately prevail."

---

[6] Because the Government did not brief the States' constitutional claims in its original briefing—due to the States' amended complaint amid a tight briefing schedule—the Court granted it leave to file additional briefing for the Court's benefit. It did so on April 24, and the States responded on April 29. *See* ECF No. 80, ECF No. 81.

*Sindicato Puertorriqueño de Trabajadores, SEIU Loc. 1996 v. Fortuño*, 699 F.3d 1, 10 (1st Cir. 2012) (per curiam) (cleaned up).

### III. DISCUSSION

#### A. Jurisdiction

Before addressing the merits, the Court must assure itself of jurisdiction. The Government does not dispute in its papers that the States have established Article III standing to challenge the Public Health Funding Decision. *See* ECF No. 68, ECF No. 80. The Court is satisfied that the States have demonstrated standing to challenge HHS' actions. *See Food & Drug Admin. v. All. for Hippocratic Med.*, 602 U.S. 367, 380 (2024).

To start, HHS argues that the Court of Federal Claims has exclusive jurisdiction here because the States' claims are essentially contract actions that fall under the Tucker Act, rather than claims for equitable relief brought under the APA. (ECF No. 68 at 9, 14.) Challenging HHS' actions as contrary to regulatory, statutory, and constitutional law, and asking purely for prospective equitable relief, the States maintain that their claims are properly before the Court. (ECF No. 60 at 21.)

Congress has waived the United States' sovereign immunity and permitted judicial review under the APA in suits challenging agency actions that seek "relief other than money damages." 5 U.S.C. § 702. So when a plaintiff sues the federal government for breach of contract—an action seeking money damages—that claim "falls outside of § 702's waiver of sovereign immunity." *Dep't of Army v. Blue Fox, Inc.*, 525 U.S. 255, 263 (1999). Instead, the Tucker Act "confers jurisdiction upon the

Court of Federal Claims" for contract claims against the United States. *Fisher v. United States*, 402 F.3d 1167, 1172 (Fed. Cir. 2005). It vests jurisdiction there for "any claim against the United States founded either upon the Constitution, or any Act of Congress or any regulation of an executive department, or upon any express or implied contract with the United States, or for liquidated or unliquidated damages in cases not sounding in tort." 28 U.S.C. § 1491(a)(1); *see Maine Cmty. Health Options v. United States*, 590 U.S. 296, 327 (2020). And in suits seeking more than $10,000 in damages, the Court of Federal Claims' jurisdiction is exclusive of the federal district courts. *See, e.g.*, *Burgos v. Milton*, 709 F.2d 1, 3 (1st Cir. 1983).

The "jurisdictional boundary" between the Tucker Act and the APA is well-traversed by litigants seeking relief against the federal government. *Suburban Mortg. Assocs., Inc. v. U.S. Dep't of Hous. & Urb. Dev.*, 480 F.3d 1116, 1117 (Fed. Cir. 2007). But the boundary's precise contours remain elusive. *See id.* at 1124 (listing cases treading the jurisdictional line); *Bublitz v. Brownlee*, 309 F. Supp. 2d 1, 6 (D.D.C. 2004) (noting that "[t]he bright-line rule" between monetary and equitable relief in the Tucker Act–APA context "turns out to be rather dim . . . ."). Plaintiffs at times try to "avoid Tucker Act jurisdiction by converting complaints which at their essence seek money damages from the government into complaints requesting injunctive relief or declaratory actions." *Martin v. Donley*, 886 F. Supp. 2d 1, 8 (D.D.C. 2012) (cleaned up).

But not every "failure to perform an obligation" by the federal government "creates a right to monetary relief" only under the Tucker Act. *United States v.*

*Bormes*, 568 U.S. 6, 16 (2012). Just because "a judicial remedy may require one party to pay money to another is not a sufficient reason to characterize the relief as 'money damages.'" *Bowen v. Massachusetts*, 487 U.S. 879, 893 (1988). The Supreme Court has "long recognized the distinction between an action at law for damages—which are intended to provide a victim with monetary compensation for an injury to his person, property, or reputation—and an equitable action for specific relief." *Id.* (explaining that "insofar as the complaints sought declaratory and injunctive relief, they were certainly not actions for money damages"). And "although the Tucker Act is not expressly limited to claims for money damages, it has long been construed as authorizing *only actions for money judgments* and not suits for equitable relief." *Id.* at 914 (Scalia, J., dissenting) (cleaned up) (emphasis added).

All that is to say: "when traversing the Tucker Act–APA jurisdictional boundary, courts must look beyond the form of the pleadings to the substance of the claim to determine whether the essence of the action is in contract." *Woonasquatucket River Watershed Council v. U.S. Dep't of Agric.*, No. 1:25-CV-00097-MSM-PAS, 2025 WL 1116157, at *12 (D.R.I. Apr. 15, 2025). And the "essence" of an action encompasses two components: the "source of the rights upon which the plaintiff bases its claim" and "the type of relief sought (or appropriate)." *Piñeiro v. United States*, No. 08-CV-2402, 2010 WL 11545698, at *5 (D.P.R. Jan. 26, 2010) (cleaned up).

The Court addresses the elements of this framework in turn below.[7]

## 1. Source of the Rights

First, the Court considers the source of the States' rights. After examining the Complaint, the Court finds that, like in *Woonasquatucket* and *Massachusetts v. NIH*, the "gravamen" of the States' allegations "does not turn on terms of a contract between the parties; it turns" largely "on federal statutes and regulations put in place by Congress" and HHS. *Woonasquatucket*, 2025 WL 1116157, at *13; *Massachusetts v. NIH*, 2025 WL 702163, at *6 (D. Mass. Mar. 5. 2025.). And this case is even clearer than either *Woonasquatucket* or *Massachusetts* because the States also assert constitutional claims alongside its APA claims.

To be more precise: the source of the States' claims do not arise in any contract, but the APA—particularly its provisions forbidding arbitrary and capricious action, action contrary to law, and action in excess of statutory authority and the Constitution's Spending Clause and underlying separation of powers principles.[8] These are precisely the type of claims that belong in district court. *See, e.g.*, *K-Mar*

---

[7] While the First Circuit has not formally adopted the "rights and remedies" test that several other circuits have, district courts within it have used the test to determine whether the "essence" of an action is truly contractual. *See Woonasquatucket*, 2025 WL 1116175, at *12–15; *Massachusetts v. NIH*, No. 25-CV-10338, 2025 WL 702163, at *4–*8 (D. Mass. Mar. 5, 2025); *R.I. Hous. & Mortg. Fin. Corp.*, 618 F. Supp. 2d at 138; *Piñeiro*, 2010 WL 11545698, at *5.

[8] HHS goes on at length about the States' attempts to avoid jurisdiction by amending their complaint. (ECF No. 68 at 14–18.) But the States' motivation for exercising their right under the Federal Rules of Civil Procedure to amend is none of the Court's concern. Fed. R. Civ. P. 15 (a)(1). Before the Court are claims arising from violations of regulations, statutes, and the Constitution.

*Indus., Inc. v. U.S. Dep't of Def.*, 752 F. Supp. 2d 1207, 1214 (W.D. Okla. 2010) ("The source of the rights alleged in this action is not contractual, it is the procedures put in place by the defendants.") To illustrate the point: throughout their briefing, the States have not pointed the Court to specific terms and conditions in their grant agreements. Instead, the States challenge the process HHS undertook in implementing the Public Health Funding Decision based on HHS' alleged violations of federal law. Ultimately, this case concerns the process the Government undertook when terminating the funding based on the end of the pandemic, meaning that the States have not put the specific terms and conditions of their agreements at issue.

To be clear, the fact that there are underlying contractual relationships between the States and HHS does not automatically "convert a claim asserting rights based on federal regulations into one which is, at its essence, a contract claim." *Normandy Apartments, Ltd. v. U.S. Dep't of Hous. & Urb. Dev.*, 554 F.3d 1290, 1299 (10th Cir. 2009) (cleaned up). As in *Massachusetts* and *Woonasquatucket*, the States "have not requested the Court to examine any contract or grant agreement created between the parties." *Massachusetts*, 2025 WL 702163, at *6; *Woonasquatucket*, 2025 WL 1116157, at *13. Instead, they "have asked this Court to review and interpret the governing federal statute and regulations." *Id.*

### 2. Type of Relief Sought

Having recognized that the source of the States' rights is based on federal law rather than on contract, the Court now turns to the relief sought. There is a "distinction between an action at law for damages," which provides monetary

19

compensation, and "an equitable action for specific relief," which might still require monetary relief. *Bowen*, 487 U.S. at 893; *see Great-W. Life & Annuity Ins. v. Knudson*, 534 U.S. 204, 213 (2002) ("Whether [restitution] is legal or equitable depends on the basis for [the plaintiff's] claim and the nature of the underlying remedies sought.") (cleaned up).

Simply because "a judicial remedy may require one party to pay money to another" does not necessarily "characterize the relief as money damages." *Bowen*, 487 U.S. at 893. A hallmark of such equitable actions is the existence of prospective relief in ongoing relationships. *Compare Bowen*, 487 U.S. at 905 (holding that the district court had jurisdiction because declaratory or injunctive relief was appropriate to clarify petitioner state's ongoing obligations under the Medicaid plan), *with Me. Cmty. Health Options v. United States*, 590 U.S. 296, 298 (2020) (holding that petitioners properly relied on the Tucker Act to sue for damages in the Court of Federal Claims because plaintiffs were strictly concerned with "specific sums already calculated, past due, and designed to compensate for completed labors").

The States dispel HHS' attempts to categorize their relief sought as "money damages," which would fall outside the APA's waiver of sovereign immunity under § 702, by highlighting that they have asked the Court for purely prospective, equitable relief. (ECF No. 60 at 22—23.) Rather than seeking compensation for past harm, the States ask the Court to enjoin HHS' likely unlawful termination of promised public health funding. Merely because their requested equitable relief would result in the

disbursement of money is not a sufficient reason to characterize the relief as money damages. *Bowen*, 487 U.S. at 893.

The Government's efforts to categorize the States' relief as money damages are to no avail when they have asked for a specific equitable remedy—an injunction to halt an agency's likely unlawful termination of critical public health funding. The States have asked this Court to vacate the unlawful terminations of grant money under the APA to access federal funds that were already appropriated. When a consequence of "a judicial remedy may require one party to pay money to another," it does not necessarily "characterize the relief as money damages." *Bowen*, 487 U.S. at 893. Absent equitable relief, the States stand to suffer devastating consequences to their public health systems and initiatives. It is clear that the States' primary purpose in bringing their claims is to secure an injunction, and not money damages arising out of a breach of contract claim.

The Court finds that this case does not concern contractual obligations or money damages for past harm. Rather, the States ask for a review of an agency's alleged unlawful action and seek prospective relief based on their ongoing relationship with the federal government to prevent harm to their local health jurisdictions.

### 3. *Department of Education v. California*

HHS argues that the U.S. Supreme Court's recent stay order in *Department of Education v. California*, 145 S. Ct. 996 (Apr. 4, 2025), makes its Tucker Act argument even clearer. The Court disagrees. True, the Supreme Court noted that noted the

APA's waiver of sovereign immunity does not apply to claims seeking money damages, but it also reaffirmed the general rule that "a district court's jurisdiction 'is not barred by the possibility' that an order setting aside an agency's action may result in the disbursement of funds." *Id.* at 968 (quoting *Bowen*, 487 U.S. at 910). The Government overreads the three-page stay order. *See Nken v. Holder*, 556 U.S. 418, 434 (2009) (explaining that the issuance of a stay "is dependent upon the circumstances of the particular case"). The Supreme Court's brief treatment of *Bowen* and *Great-West Life* in *California* and the cursory mention of potential jurisdictional issues do not appear to settle all jurisdictional issues here, despite HHS' arguments to the contrary.[9]

The Court recognizes the tension between *Bowen* and *California*. But the Court is not positioned to disregard *Bowen* and its progeny, even if it appears that it is now in tension with *California*. *See Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 136 (2023) (explaining that district courts "should follow the case which directly controls, leaving to [the Supreme] Court the prerogative of overruling its own decisions."). This holds true even when the lower court "thinks the precedent is in tension with some other line of decisions"—or here, rather than an entire competing

---

[9] Notably, the States point out that in *California*, the Supreme Court weighed the potential harm to the government because the grantees had not promised to return withdrawn funds if the terminations were reinstated and found that the recipients did not stand to suffer irreparable harm while the case played out because they could recover any wrongfully withheld funds in the proper forum. *See California*, 145 S. Ct. at 967. And the States maintain that is not the case here because unlike the plaintiffs in *California*, they do not have the financial wherewithal to keep their public health programs running in the meantime. (ECF No. 65 at 8.)

"line of decisions," a single three-page per curiam order granting a stay.[10]  *See Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring) ("The Court's stay order is not a decision on the merits").  The case that "directly controls," and the one that the Court must follow, is *Bowen*.[11]

### B.  Likelihood of Success on the Merits

The Court now turns to the States' likelihood of success on the merits.  They bring seven total claims.[12]  The first four claims arise under the APA.  Under Count I, the States argue that HHS' sudden termination of $10 billion in grants exceeds its statutory authority—in other words, a violation of the Major Questions Doctrine. (ECF No. 59 ¶¶ 101-102.)  Under Counts II and III, the States allege that HHS' termination of two subsets of grants—those for SAMHSA and CDC—ran afoul of statutory and regulatory requirements.  *Id.* ¶¶ 111, 126–127.  In abruptly terminating the SAMHSA grants, HHS violated three provisions of § 300x-55: its provision

---

[10] In its supplemental briefing, HHS submits that the Court should treat the Supreme Court's decision in *California* as binding precedent on whether there is jurisdiction. (ECF No. 80 at 2 n.1.)  Still, the Supreme Court's limited analysis in *California* is not a decision on the merits.  And the source of the plaintiff-states' rights and their requested relief in *California* bears key differences from the States' claims here.

[11] District courts adjudicating similar claims agree that *California* did not divest them of jurisdiction.  *See Woonasquatucket,* 2025 WL 1116157, at *14; *Maine v. United States Dep't of Agric.*, No. 1:25-CV-00131-JAW, 2025 WL 1088946, at *19 (D. Me. April 11, 2025); *New York v. Trump*, No. 25-cv-39-JJM-PAS, ECF No. 182 at 5–9 (D.R.I. Apr. 14, 2025); *State of Rhode Island, et al. v. Trump et al*, No. 25-cv-128-JJM-LDA, ECF No. 57 at 14—18.

[12] At this stage, the States need only show a substantial likelihood of success on one of their seven claims.  *See, e.g.*, *Worthley v. Sch. Comm. of Gloucester*, 652 F. Supp. 3d 204, 215 (D. Mass. 2023) (collecting cases).

limiting funding terminations to cases where states, "materially failed to comply" with the grant agreements, as well as separate requirements for pre-termination investigation and hearing. *Id.* ¶ 111. And in abruptly canceling the CDC grants, HHS ran afoul of its own regulations, as laid out in 45 C.F.R. § 75.372(a)(2). *Id.* ¶¶ 126–27. Finally, under Count IV, the States allege that HHS' termination was arbitrary and capricious. *Id.* ¶¶ 134. They raise a host of arguments under this count, but their overarching point is that the decision was neither "reasonable" nor "reasonably explained," and each is independently fatal to its viability. *See id.*; *Ohio v. EPA*, 603 U.S. 279, 292 (2024).

The last three claims are constitutional. Under Count V, the States argue that the Executive's actions are an attempt to "unilaterally decline to spend funds," in violation of fundamental Separation of Powers principles and the Take Care Clause. *Id.* ¶ 149-150. Under Count VI, the States argue that the terminations violate the Spending Clause, because they improperly altered the relationship between the States and Congress. *Id.* ¶ 157. Finally, under Count VII, the States argue generally that HHS "lacked statutory or constitutional authority" to terminate the funds, so an injunction is necessary. *Id.* ¶ 164.

The States argue that they have shown a strong likelihood of success on the merits because HHS' Public Health Funding Decision and its implementation was contrary to law, arbitrary and capricious, and violates the Constitution. (ECF No. 60 at 23.) In turn, HHS reaffirms its position that this Court lacks jurisdiction over the States' claims, and that they cannot succeed on the merits. (ECF No. 68 at 21.) Even

aside from those "jurisdictional obstacles," HHS insists that the States have failed to show a likelihood of success on the merits because its actions "were not contrary to law or arbitrary and capricious, nor did they violate the Constitution." *Id.*

### 1. Threshold APA Issues

Before reaching the merits of the APA claims, though, the Court must determine two more threshold issues. First is whether HHS' actions constitute "final agency action," and second is whether, even if so, HHS' actions were of the narrow category "committed to agency discretion" and thus unreviewable under the APA.

A "final agency action" under 5 U.S.C. § 704 has two components: first, it "marks the consummation of the agency's decision-making process" and second, it is either an action "by which rights or obligations have been determined, or from which legal consequences will flow." *Corner Post, Inc. v. Bd. of Governors of Fed. Rsrv. Sys.*, 603 U.S. 799, 808 (2024) (cleaned up).

As to the first element, the States argue that HHS' actions "announce[d] the agency's final decision on the matter," and were effective as of the date set out in the Notice of Award, which was either March 24 or 25. (ECF No. 60 at 24, ECF No. 4-40, Ex. A at 1, 5.) As to the second prong, the States reason that there are "clear legal consequences" because the States immediately lost funding in the wake of HHS' Public Health Funding Decision. (ECF No. 60 at 24.) They also contend that the APA does not preclude bringing this challenge as a single action. *Id.*

Not directly contesting that its actions constituted final agency action, HHS instead argues that its "terminations were consistent with the applicable statutory

and regulatory provisions," meaning that "no further review under the APA is available." (ECF No. 68 at 18.) Even if these claims were reviewable under the APA, HHS says that the terminations were "quintessential agency actions" and "committed to agency discretion by law" under § 701(a)(2). *Id.* In response, the States explain that HHS' actions do not belong in the narrow class of agency actions which are "committed to agency discretion by law" and that "there are applicable statutory or regulatory standards that cabin agency discretion" and "meaningful standard[s] by which to judge the [agency]'s action." (ECF No. 60 at 24.) Thus, the States maintain that HHS' Public Health Terminations are reviewable by this Court. *Id.*

On both fronts, the States have the better of the argument. First, HHS' actions in terminating the public health funding at issue satisfy both prongs of the final agency test. The termination notices announced HHS' decision to cut the funding immediately. An immediate termination of funds surely marks the culmination of HHS' decision to cut the funding; there are no further steps HHS needs to take to determine whether it would cut the funding. As to the second prong, there are clear legal consequences of HHS' Public Health Terminations: the States cannot access previously available funds and consequently, will be forced to lay off highly trained specialists, disband infectious disease research teams, and eliminate public health programs that were created to vaccinate vulnerable populations and rural communities, and to treat those struggling with mental health or substance abuse related issues. *See, e.g.*, ECF Nos. 4-3 ¶ 48; 4-6 ¶¶ 4-7; 4-15 ¶ 17; 4-40 ¶ 11; 4-41 ¶ 3.

As to HHS' other argument: the Court disagrees that the Public Health Terminations were "committed to agency discretion by law" under § 701(a)(2) and thus unreviewable. To start, the APA "embodies a basic presumption of judicial review," and it "instructs reviewing courts to set aside agency action that is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." *Dep't of Com. v. New York*, 588 U.S. 752, 771 (2019) (cleaned up) (citing 5 U.S.C. § 706(2)(A)). And the Supreme Court has read the "committed to agency discretion" exception to judicial review for actions committed to agency discretion "quite narrowly." *Id.* It is restricted to only "rare circumstances" where a court "would have no meaningful standard against which to judge the agency's exercise of discretion." *Id.* (cleaned up).

That is not the case here. There are applicable constitutional, statutory, and regulatory standards that cabin HHS' discretion as an agency. Whether HHS had the requisite authority to implement the Public Health Terminations is exactly the type of legal question district courts are well-equipped to handle. Whether HHS exceeded statutory authority or violated the Constitution by eliminating Congressionally appropriated funds cannot be committed to agency discretion. *See California v. U.S. Dep't of Educ.*, 132 F.4th 92, 97–98 (1st Cir. 2025) *opinion stayed on other grounds*, (explaining that "applicable regulations cabin the [agency's] discretion as to when it can terminate existing grants" which creates a meaningful standard for the court to judge the agency's action); *see also Pol'y & Rsch., LLC v. HHS*, 313 F. Supp. 3d 62, 75–78 (D.D.C. 2018) (concluding that agency's sudden halt on funding to a program was reviewable under the APA because applicable

regulations cabin its termination authority and consequently, provide a standard for judicial review).

While the Government relies on *Lincoln v. Vigil*, 508 U.S. 182 (1993), to support its position that "[a]n agency's determination of how to allot appropriated funds among competing priorities and recipients is classic discretionary agency action that is not susceptible to APA review," the States respond that this case does not concern the allocation of lump-sum appropriations.  (ECF No. 68 at 19, ECF No. 69 at 11.)  The determination of whether HHS had the authority to eliminate the Congressionally appropriated funds based on its own assessment that the appropriations were "no longer necessary" due to the end of the COVID-19 pandemic is certainly not a question about agency discretion.  *See In re Aiken Cnty.*, 725 F.3d 255, 261 n.1 (D.C. Cir. 2013) (explaining that the Executive "does not have unilateral authority" to refuse to spend funds appropriated by Congress).  Similarly, HHS' implementation of the terminations of public health grants already allocated and awarded concerns the application of statutory and regulatory "for cause" provisions, an analysis which district courts "routinely perform." *Pol'y & Rsch., LLC*, 313 F. at 83 (Jackson, J.).

The Supreme Court clarified in *Lincoln* that "an agency is not free simply to disregard statutory responsibilities: Congress may always circumscribe agency discretion to allocate resources by putting restrictions in the operative statutes." *Lincoln*, 508 U.S. at 193 (labeling an action unreviewable because Congress left the decision about how to spend the money up to the agency's discretion).  With that in

mind, courts have held that § 701(a)(2) does not apply when the agency's actions contravene (1) appropriations laws and (2) other applicable regulatory and statutory authority. *California*, 132 F.4th at 97–98; *Pol'y & Rsch., LLC*, 313 F. at 75–78. The States claim that judicial review is proper under both grounds. (ECF No. 69 at 12.)

The Court agrees. First, Congress directed HHS to spend the appropriated funds on specific initiatives per the applicable statutes. Nor is this a case where Congress expressly delegated discretion to HHS. Notably, when reviewing the statutory authority for tribal grants under the CARES Act, the D.C. Circuit concluded that it was "nothing like the statutes at issue in *Lincoln*," and thus not entitled to a presumption of non-reviewability. *See Shawnee Tribe v. Mnuchin*, 984 F.3d 94, 100 (D.C. Cir. 2021) ("Congress has not left the Secretary any flexibility to shift funds within a particular appropriation account so that [he] can make necessary adjustments for unforeseen developments and changing requirements.") (internal quotation marks omitted). So too here.

Second, unlike the lump-sum appropriations in *Lincoln* which were left to agency discretion, HHS' decision to terminate is clearly reviewable when applicable statutory and regulatory language provide a clear standard for the Court's review. *See, e.g.*, 45 C.F.R. § 75.372(a)(2) ("[An] award may be terminated . . . for cause"); 42 U.S.C. § 300x-55(a) (A grant may be "terminated for cause" when "a State has materially failed to comply with the agreements or other conditions"). This is not one of "those rare circumstances where the relevant statute is drawn so that a court would have no meaningful standard against which to judge the agency's exercise of

discretion." *Dep't of Com.*, 588 U.S. at 772. The Government's attempt to frame the Public Health Terminations as matters where it had discretion to choose how Congressionally appropriated funds are spent among competing priorities is without merit. *See Pol'y & Rsch., LLC*, 313 F. Supp. at 75–78.

Having held that the States are likely to establish that the Public Health Terminations constitute a "final agency action" under the APA and that they are not "committed to agency discretion by law," the Court moves to the merits.

### 2.    Count I: Public Health Funding Decision

The States first argue that HHS' Public Health Funding Decision violated the APA in two ways.   First, in determining that the congressionally appropriated funds were no longer necessary, the States argue that HHS overstepped its statutory authority.   And second, the States maintain that HHS acted contrary to law in terminating the grants "for cause" for two reasons: (1) the States complied with the terms and conditions of their awards and HHS has not alleged otherwise and (2) HHS has not pointed to relevant authority which allows termination for cause based on the end of the pandemic, which was over two years ago.  In turn, HHS insists that there is "no question" it had the express authority to terminate the public health grants for cause by applicable regulations.  (ECF No. 68 at 23.)

Starting with the "excess of statutory authority" argument, the States say that HHS, in unilaterally terminating the programs despite Congress's decision not to, violated the major questions doctrine.  Their argument goes like this:  starting in 2020, Congress appropriated funds to grant-in-aid programs and provided specific

purposes and instructions on how to spend the money. In doing so, Congress expressly tied certain programs and funding to the end of the pandemic. And in 2023, Congress reviewed COVID-related appropriation statutes after the pandemic ended and rescinded $27 billion of appropriations. *See* Fiscal Responsibility Act, Pub. L. No. 118-5 137 Stat. 10 (2023) Div. B, § 2(3) (rescinding certain unobligated funds "with the exception of $2,127,000,000 and—(A) any funds that were transferred and merged with the Covered Countermeasure Process Fund"). Since then, Congress did not revoke any of the funding at issue here; it reviewed it and left it in place. As a result, the States insist that leaving the funding in place signaled Congress's determination that the end of the pandemic did not mean that certain programs and appropriated funds were no longer needed.

The Court presumes that "Congress intends to make major policy decisions itself" rather than leaving those decisions to agencies. *West Virginia v. EPA*, 597 U.S. 697, 723 (2022). Congress must "speak clearly" if it wishes to charge an agency with a decision of "vast economic and political significance." *Alabama Ass'n of Realtors v. Dep't of Health & Hum. Servs.*, 594 U.S. 758, 764, (2021) (cleaned up). Thus, an agency "literally has no power to act—including under its regulations— unless and until Congress authorizes it to do so by statute." *FEC v. Cruz*, 596 U.S. 289, 301 (2022). And "where the statute at issue is one that confers authority upon an administrative agency, that inquiry must be shaped, at least in some measure, by the nature of the question presented—whether Congress in fact meant to confer the power the agency has asserted." *W. Virginia v. EPA*, 597 U.S. 697, 721 (2022).

The power that HHS has asserted here is a broad one: terminating $11 billion worth of funding based on its determination that the money is no longer necessary. The Court cannot see how it can claim that power based on the history of congressional action described above. *See Util. Air Regul. Grp. v. EPA*, 573 U.S. 302, 324 (2014).

The Court recognizes that is not the typical "major questions doctrine" case, where the parties can point to—and argue about—one specific grant of power in one part of one statute. *Cf. Biden v. Nebraska*, 600 U.S. 477, 494 (2023) ("We hold today that the Act allows the Secretary to 'waive or modify' existing statutory or regulatory provisions applicable to financial assistance programs under the Education Act, not to rewrite that statute from the ground up."); *Alabama Ass'n of Realtors*, 594 U.S. at 763 ("The Government contends that the first sentence of § 361(a) gives the CDC broad authority to take whatever measures it deems necessary to control the spread of COVID–19, including issuing the moratorium.").

But that is a problem of HHS' making.  In fact, it makes the States' case even clearer, given that no specific language satisfies the "speak clearly" test with regard to the $10 billion decision affecting funds across six statutes made here.  And in any event, broader context including "background legal conventions," constitutional structure, and even "common sense," should inform the Court's analysis of an agency's assertion of power.  *Biden v. Nebraska*, 600 U.S. at 510–513 (Barrett, J., concurring).  That is true even without a single textual hook.

32

All three factors—background legal conventions, constitutional structure, and common sense—caution against accepting HHS' assertion of authority. Congress already considered the appropriations at issue here and clearly determined that some programs and services were still necessary, no matter when the pandemic ended. More importantly, when undertaking this review in June 2023, Congress did not grant HHS authority to rescind or reallocate the funds, nor did it authorize such drastic action. In the interpretation of statutes, the express mention of one thing is to the exclusion of others. *See, e.g., N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 302 (2017) ("If a sign at the entrance to a zoo says, 'come see the elephant, lion, hippo, and giraffe,' and a temporary sign is added saying 'the giraffe is sick,' you would reasonably assume that the others are in good health.") Thus, Congress's express decision to eliminate some COVID-era public health funding, but leave alone the funding at issue here, signals its intent to continue that funding.

Consequently, HHS' Public Health Funding Decision usurped Congress's power to control these public health appropriations. If Congress intended to charge HHS with such a determination, it would have done so at some point—like in June 2023, when it went line-by-line and rescinded some COVID-era funding but left other funding in place. With that in mind, the Court holds that the States are likely to succeed on Count I.

### 3.    Count II: SAMHSA Terminations

The States next assert that the SAMHSA terminations were contrary to law and in excess of statutory authority. Their argument is that HHS departed from

three key statutory requirements governing SAMHSA funding under § 300x-55. (ECF No. 60 at 27.)  And in the States' view, each is sufficient to establish a successful claim.  The Court lays out these three arguments below before addressing them.

First, under 42 U.S.C. § 300x-55(a), the Secretary may "terminate the grant for cause" only "if the Secretary determines that a State has materially failed to comply with the agreements or other conditions required for the receipt of a grant." Despite this requirement, the States claim that HHS "never asserted that any grantee materially failed to comply with agreements or other required conditions." *Id.*; *see, e.g.*, ECF Nos. 4-6 ¶ 12., 4-41 ¶ 42.  Rather, HHS merely stated that "[t]he end of the pandemic provides cause to terminate COVID-related grants.  Now that the pandemic is over, the grants are no longer necessary."  (ECF. No. 4-6, 4-41.)

Second, under § 300x-55(e), the Secretary shall provide to the State involved adequate notice and an opportunity for a hearing" "[b]efore taking action against a State . . . ."  The States submit that HHS did not provide notice to the States or an opportunity for a hearing before taking action to terminate the grant funding, contrary to statutory requirements.

Finally, § 300x-55(g) bars HHS from withholding any funds without "an investigation concerning whether the State has expended payments under the program involved in accordance with the agreements required under the program." The States argue that HHS ignored this requirement.  Just as there was no notice, in violation of § 300x55(e), there was also no investigation.   HHS claims that it

terminated the SAMHSA funding "for cause" that is, the end of the pandemic, and consequently, the statutory requirements for non-compliance are inapplicable.

On this record, it is clear that HHS ignored multiple statutory requirements that govern the termination of block grant programs. HHS argues that Section 300x-55 does not apply to the terminations here because that section is only implicated upon a determination that a State has materially failed to comply with the grant terms or conditions. (ECF No. 68 at 27-28.) But that is a puzzling argument given that HHS relied on Section 300x-55 as its authority to terminate the funding when it issued the termination letters. *See* ECF No. 4-6 ¶ 12; 4-41 Ex. D at 1.

Because § 300x-55 applies, the Court struggles to see how the Government's decision to terminate the funds as "no longer necessary" satisfies the process laid out in the statute.[13]

The Government's argument that the States' material failure to comply is based on the notion that they were "not spending the money that had been allocated for COVID-19 relief purposes" is unavailing. (ECF No. 68 at 28.) Congress did not expressly limit the funds to COVID-19 related programs and services. *See* ARPA,

---

[13] To be sure, each State receives a block grant under SAMHSA based on a statutory formula. *See* 42 U.S.C. § 300x(a) (the Secretary "shall make an allotment each fiscal year for each State in an amount determined in accordance with section 300x–7"). With respect to block grants, agencies have no discretion and must distribute the funds based on the statutory formula. *See City of Providence v. Barr*, 954 F.3d 23, 27 (1st Cir. 2020). Regarding SAMHSA, Congress outlined specific circumstances in which HHS is not required to spend the funds. *See* § 300x-55(a) (A grant may be "terminated for cause" when "a State has materially failed to comply with the agreements or other conditions."). Accordingly, HHS lacked the requisite authority to refuse to spend the funds for any other reason.

Pub. L. No. 117-2, §§ 2701, 2702, 135 Stat. 4, 45-46 (2021) (appropriating $1.5 billion for services related to mental health and $1.5 billion for services related to substance abuse "to remain available until expended"); Coronavirus Response and Relief Supplemental Appropriations Act, 2021 (Div. M of the Consolidated Appropriations Act, 2021), Pub. L. No. 116-260, 134 Stat. 1182 (2020) ("$1,650,000,000 shall be for grants for the substance abuse prevention and treatment block grant program" and "$1,650,000,000 shall be for grants for the community mental health services block grant program").  If Congress intended to tie these funds to the end of the pandemic, it would have done so.

And HHS' offering a hearing after terminating the funds only serves to strengthen the States' position that the Government acted contrary to law.  Recall that under § 300x-55(e), the Secretary must provide the State involved adequate notice and an opportunity for a hearing "[b]efore taking action."  Without that hearing prior to termination, HHS' Public Health Funding Decision and its implementation ran contrary to the States' statutory rights.

### 4.    Count III: CDC Terminations

The States claim that HHS' termination of CDC grants "had no legal basis for its actions because of the end of the pandemic nearly two years ago. Defendants acted contrary to law and in excess of statutory authority."  (ECF No. 60 at 28, 30.) According to the States, the CDC funding was terminated "for cause" based on "HHS regulations," presumably 45 C.F.R. § 75.372(a)(2).  *Id.* at 28.  The States say that the end of the pandemic, nearly two years ago, surely does not qualify when it has

36

previously construed "for cause" as a material failure to comply. *Id.* In turn, HHS says that the "for cause" provision is distinct from non-compliance, and that it was permitted to terminate the grants. (ECF No. 68 at 23.)

Again, the States have the better of the argument. The Court sees no reason to accept HHS' novel interpretation of the "for cause" termination requirement in its regulations, particularly in light of the Supreme Court's guidance on similar questions. *See Christopher v. SmithKline Beecham Corp.*, 567 U.S. 142, 155–56 (explaining that "an agency's interpretation of its own ambiguous regulation" should not receive deference when the agency's interpretation "is nothing more than a convenient litigating position" or a "post hoc rationalization advanced by an agency seeking to defend past agency action against attack," or when it would cause an "unfair surprise" to the regulated parties).

When examining the "for cause" language in the past, HHS has generally construed it to involve a failure to comply with a grant's terms and conditions.[14] *Id.* Similarly, "for cause" has been construed as substantially the same as "failure to comply." *See* OMB, Guidance for Grants and Agreements, 85 Fed. Reg. 49506,49508 (Aug. 13, 2020). What's more, HHS has signaled its intent to adopt the OMB's

---

[14] *See R.I. Substance Abuse Task Force Ass'n*, DAB No. 1642 (1998), 1998 WL 42538, at *1 (H.H.S. January 15, 1998) ("When a grantee has materially failed to comply with the terms and conditions of the grant, [the Public Health Service] may . . . terminate the grant for cause."); *Child Care Ass'n of Wichita/Sedgwick Cnty.*, DAB No. 308 (1982), 1982 WL 189587 at *2 (H.H.S. June 8, 1982) ("'For cause' means a grantee has materially failed to comply with the terms of the grant."). This is consistent with the standard application of "for cause" terminations in statute and regulation. *See, e.g.*, 42 U.S.§ 300x-55(a); 10 C.F.R § 600.25 (allowing "for cause" award termination on the basis of noncompliance or debarment).

interpretation and eliminate the "for cause" provisions, illustrating how it has admitted that it sees the provision as an unnecessarily duplicative part of its regulatory scheme  *See* HHS, Health and Human Services Adoption of the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards, 89 Fed. Reg. 80055, 80055 (Oct. 2, 2024) (effective October 2025) ("for cause" regulation substantially duplicative of "failure to comply regulation").  Nor would the end of the pandemic nearly two years ago seem to require termination when the appropriation statutes at issue extended the funding for purposes beyond the pandemic and Congress determined not to rescind the funds at issue in June 2023.

The States have thus shown a strong likelihood of success in proving that the CDC terminations were contrary to law.

### 5.    Count IV: "Arbitrary and Capricious" Claim

Next, the States argue that the Public Health Funding Decision was arbitrary and capricious because the Government's termination of critical public health funding based on the end of the pandemic nearly two years ago is not substantively reasonable nor was it reasonably explained.  (ECF No. 60 at 30.)  In turn, HHS says that its conduct is not reviewable under the APA and even so, it did not act arbitrarily and capriciously because its decision to terminate the funds was lawful and agencies have discretion on how to allocate funds thus, the decision did not require any additional explanation.  (ECF No. 60 at 31-32.)

The APA requires reviewing courts to "hold unlawful and set aside agency action" that is "arbitrary, capricious, an abuse of discretion, or otherwise not in

accordance with law." 5 U.S.C. § 706(2)(A). An agency action is arbitrary or capricious "if it is not reasonable and reasonably explained." *Ohio v. EPA*, 603 U.S. 279, 292 (2024). The Court cannot "substitute its judgment for that of the agency," but it must take care to "ensure" that the agency has "offered a satisfactory explanation for its action, including a rational connection between the facts found and the choice made." *Id.* (cleaned up). And "an agency cannot simply ignore an important aspect of the problem." *Id.* (cleaned up).

First, the States argue that HHS failed to provide a rational basis for the Public Health Funding Decision. Merely relying on a conclusory explanation that the funds are no longer necessary because the pandemic is over does not demonstrate a "rational connection between the facts found and the choice made." *Ohio*, 603 U.S. at 292. The Government's determination was unreasonable in light of Congress's direction that the appropriations at issue be used beyond the pandemic and to better prepare for future public health threats. *See, e.g.*, ARPA, §§ 2402, 2404, 2501, 135 Stat. at 41-42.

This holds particularly true when Congress expressly limited some appropriations to the end of the pandemic. *See Russello v. United States*, 464 U.S. 16, 23 (1983) ("[W]here Congress includes particular language in one section of a statute but omits it in another section of the same Act, it is generally presumed that Congress acts intentionally and purposely in the disparate inclusion or exclusion.") Even so, in June 2023, Congress undertook a review of COVID-era spending and passed the Fiscal Responsibility Act of 2023 and rescinded $27 billion of

appropriations that were no longer necessary due to the end of the public health emergency. *See* Pub. L. No. 118-5 Div. B, Title I (2023). Given Congress's clear intent to keep the appropriations at issue intact, the Court cannot say HHS provided any rational basis to justify its decision to terminate the funds based on the end of the pandemic. That is sufficient to end the analysis, but to be thorough, the Court will address additional "arbitrary and capricious" arguments.

Next, the States claim that HHS' actions were arbitrary and capricious because it failed to undertake an individualized assessment or acknowledge the important public health initiatives supported by the grants, failing "to consider an important aspect of the problem." (ECF No. 60 at 32.) (quoting *State Farm*, 463 U.S. at 43)). In turn, HHS says that "it is not arbitrary and capricious for an agency to provide the same explanation across multiple decisions." (ECF No. 68 at 32.)

Still, the determination that funding appropriated by Congress is no longer necessary requires an assessment of the grantees' compliance with the agreements, which HHS declined to do. Recall that § 300x-55(g) bars HHS from withholding any SAMHSA funds without "an investigation concerning whether the State has expended payments under the program involved in accordance with the agreements required under the program." And based on its own interpretations, HHS may terminate awards "for cause" when a party has failed to comply with the terms and conditions of the grant under § 75.372(a). There is no evidence that happened here.

Third, the States allege that HHS failed to provide a reasoned explanation for its sudden change in position that appropriations Congress determined were needed

to fund public health initiatives beyond the pandemic were no longer necessary. Such a drastic change of course would require HHS to "show that there are good reasons for the new policy." *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). While HHS acknowledged its change of position, it provided no explanation to the States as to why it did so suddenly and contrary to Congress's will that certain COVID-era spending was needed beyond the immediate public health emergency that ended in May 2023.

Fourth, HHS' Public Health Funding Decision was arbitrary and capricious because it failed to consider the States' reliance interests on the funds and the devastating consequences that would result from abruptly terminating critical public health appropriations. The Government asserts that is an "incorrect premise" because the States "failed to draw down over $160 million of the funds while they were available" and thus, cannot now claim they relied on the funds. (ECF No. 68 at 33.) That said, agencies must consider reliance interests when changing course because "longstanding policies may have engendered serious reliance interests that must be taken into account." *Dep't of Homeland Sec.*, 591 U.S. at 30 (cleaned up); *Fox Television Stations*, 556 U.S. at 515 (explaining that it is arbitrary and capricious to ignore reliance interests). The States and their local agencies and programs relied on this funding and had no reason to suspect that it would be abruptly canceled without process or explanation. The States were granted extensions in some cases through June 2027, and HHS issued guidance on how to appropriately use the funds beyond COVID-related initiatives. *See* ECF Nos. 4-3 ¶¶ 10, 13, 21–22, 48; 4-24 ¶¶

11, 22; 4-32 ¶ 19. Indeed, it appears HHS gave no consideration to the programs and services that would be impacted by these terminations when it decided the funds were no longer necessary based on the end of the pandemic.

HHS maintains that the Court should ignore the States' claimed reliance on these appropriations for two reasons: certain funds were not yet obligated or drawn down by the States and HHS allocated the funds that were statutorily required. (ECF No. 68 at 33.) Indeed, HHS says that it identified over $86 million in SAMHSA funding and nearly $79 million in CDC grants that had not yet been obligated or drawn down while available. *Id.* Still, Congress has already spoken. With respect to SAMHSA, the States had until September 2025 to spend the funds. Pub. L. 117-2, §§ 2701, 2702, 135 Stat. 4, 45-46. And with CDC, the funds were to be obligated by September 2024, but the States have an additional five years to spend those funds. *See* CARES Act Title VIII, 134 Stat. 281, 554; 31 U.S.C. §§ 1552(a), 1553(a).

The Government's decision to allocate, in some cases, more than it was statutorily required to does not alleviate HHS of its obligation to expend the appropriated funds under legislative directives. Notably, in the CARES Act, Congress even outlined specific purposes for the appropriated funds to be used beyond the pandemic including public health data surveillance, infrastructure modernization, disease detection, and emergency response, and surveillance, epidemiology, laboratory capacity, infection control, mitigation, communications, and other preparedness and response activities. *See* CARES Act Title VIII, 134 Stat. 281, 554–555. Based on Congress's direction that the funds remain available, the

Government's argument that it met some of the statutory requirements in the appropriation acts is irrelevant; it is certainly not dispositive of any questions about its refusal to spend the remaining funds because it believes the money is no longer necessary.

Lastly, the States insist that the Government's conduct was arbitrary and capricious because it violated statutory and regulatory authority as HHS never alleged that the States failed to comply with the terms and conditions of the awards. *See* ECF No. 60 at 33. They also say that HHS did not explain its sudden departure from its longstanding position that the funds would extend beyond the pandemic and Congress's express decision to leave the funding in place. *Id.*

The Court agrees that HHS acted arbitrarily and capriciously when it applied "for cause" terminations here because contrary to statutory and regulatory authority, HHS never claimed any failure on part of the States to comply with their grant agreements. *See* § 300x-55(g); § 75.372(a). Instead, HHS merely relied on the end of the pandemic as "cause" to terminate the funds, despite this application being contrary to statutory and regulatory authority and inconsistent with Congress's directive that the funds remain available beyond the pandemic.

Once again, the States have demonstrated a strong likelihood of success on their claim that these terminations were arbitrary and capricious in violation of the APA.

### 6.    Count V: Separation of Powers

Finally, the States are likely to succeed on the merits of their claim that HHS' Public Health Terminations and its implementation violate Separation of Powers. The States argue that, drawing analogies to cases directly about presidential power, HHS is operating at its "lowest ebb," because no constitutional or statutory provision authorizes HHS, as an agent of the Executive Branch, to unilaterally terminate funding appropriated by Congress. (ECF No. 60 at 34.) Rather, "the Executive has taken measures that are incompatible with the express will of Congress related to public health appropriations." *Id.* For their part, HHS insists that it had "inherent authority to spend the money that Congress allocates consistent with the limits Congress sets." (ECF No. 80 at 10.) As such, HHS says that its decision to exercise its discretion within those confines "is entirely consistent with separation-of-powers principles and is an action committed to agency discretion by law for which the APA does not provide an avenue for review. *Id.*

It is axiomatic that "[t]he United States Constitution exclusively grants the power of the purse to Congress, not the President." *City & Cnty. of San Francisco v. Trump*, 897 F.3d 1225, 1231 (9th Cir. 2018); U.S. Const. art. I, § 9, cl. 7 (Appropriations Clause)1; U.S. Const. art. I, § 8, cl. 1 (Spending Clause). It naturally follows that the same is true of the President's agents. "Congress may attach conditions on the receipt of federal funds, and has repeatedly employed the power 'to further broad policy objectives by conditioning receipt of federal moneys upon

compliance by the recipient with federal statutory and administrative directives.'" *Id.* at 1232 (quoting *South Dakota v. Dole*, 483 U.S. 203, 206–07 (1987)).

In contrast, "[t]here is no provision in the Constitution that authorizes the President to enact, to amend, or to repeal statutes." *Id.* (quoting *Clinton v. City of New York*, 524 U.S. 417, 438 (1998)). Simply put, "the President is without authority to thwart congressional will by canceling appropriations passed by Congress" and "does not have unilateral authority to refuse to spend the funds." *Id.* Nor may the President "decline to follow a statutory mandate or prohibition simply because of policy objections." *Id.* "No matter the context, the President's authority to act necessarily 'stem[s] either from an act of Congress or from the Constitution itself.'" *Trump v. United States*, 603 U.S. 593, 607 (2024) (quoting *Youngstown Sheet & Tube Co. v. Sawyer*, 343 U.S. 579, 634 (1952) (Jackson, J., concurring)). And again, the same is true of the Executive's agents. The Separation of Powers and these core principles are integral to our democracy. Meaning that, "liberty is threatened" when "the decision to spend [is] determined by the Executive alone." *Clinton*, 524 U.S. at 451 (Kennedy, J., concurring).

HHS' actions here clearly usurped Congress's authority to spend and allocate funds how it deems appropriate. *See City & Cnty. of S.F. v. Trump*, 897 F.3d 1225, 1235 (9th Cir. 2018) (explaining that without authorization from Congress, "the Administration may not redistribute or withhold properly appropriated funds in order to effectuate its own policy goals.") The power to spend lies solely with the Legislative branch. *See id.* at 1231-32; *see also* U.S. Const. art. I, § 9, cl. 7

45

(Appropriations Clause); U.S. Const. art. I, § 8, cl. 1 (Spending Clause).  With this comes the "exclusive power" to impose conditions on appropriated funds.  *Id.* at 1231.  In contrast, the Executive's role is to "take care that the laws be faithfully executed," and agencies are there to serve that same end.  U.S. Const. art. II, § 3.

As a federal agency, HHS "can spend, award, or suspend money based only on the power Congress has given to them—they have no other spending power."  *New York v. Trump*, No. 25-CV-39-JJM-PAS, 2025 WL 715621, at *1 (D.R.I. Mar. 6, 2025), *denying stay pending appeal*, 2025 WL 914788 (1st Cir. Mar. 26, 2025).  HHS' Public Health Funding Decision contradicts Congress's decision to appropriate funds to the States to address public health concerns.  The Government had no statutory authority to decide that the funds were no longer necessary, particularly considering the Legislative's clear intent that the funds remain available beyond the pandemic.  The Government's decision to allocate, in some cases, more than it was statutorily required to does not alleviate HHS of its obligation to expend the appropriated funds pursuant to Congress's intent.  Indeed, the Legislature even outlined specific purposes for the appropriated funds to be used beyond the time of the pandemic to better prepare the country for future public health threats.  Congress intended that the States have until September 30, 2025, to expend the SAMHSA funds and until 2029 with respect to the CDC grants.  HHS even granted extensions to the States, in some cases through June 2027, and issued guidance on how to appropriately use the funds beyond COVID-related concerns.  *See* ECF Nos. 4-3 ¶¶ 10, 13, 21–22, 48; 4-24

¶¶ 11, 22; 4-32 ¶ 19.  As an agent of the Executive, HHS had "literally has no power to act" unless Congress authorized it to do so.  *FEC,* 596 U.S. at 301.

In sum, the Government's unilateral determination that these funds were no longer needed based on the end of the pandemic violated core Separation-of-Powers principals because Congress made its directives clear in the appropriations statutes and once again when it chose not to rescind the funds in June 2023.  The States have therefore demonstrated a strong likelihood of success on the merits of their claim that HHS' actions violated the Separation of Powers.

### 7.    Count VI and Count VII

Having held that the States are likely to succeed on five of their seven claims, including a constitutional claim, the Court declines to address the sixth and seventh for purposes of resolving this motion for preliminary relief.  *See Woonasquatucket*, 2025 WL 1116157, at *13; *Worthley*, 652 F. Supp. 3d at 215.

### C.  Irreparable Harm

While HHS insists that the States' motion "should be denied solely because they have failed to demonstrate irreparable harm," the Court disagrees.  (ECF No. 68 at 35–36.)  The States have submitted copious examples of irreparable harm flowing directly from HHS' decision to terminate this funding directly to their local health jurisdictions.  *See* ECF Nos. 4-1—4-48.

Plaintiffs seeking preliminary injunctive relief face an uphill battle and must demonstrate "that irreparable injury is likely in the absence of an injunction." *Winter v. NRDC, Inc.*, 555 U.S. 7, 22 (2008) (emphasis omitted).  True, "[p]reliminary

injunctions are strong medicine, and they should not issue merely to calm the imaginings of the movant." *Matos ex rel. Matos v. Clinton Sch. Dist.*, 367 F.3d 68, 73 (1st Cir. 2004).  Harm that is "unlikely to materialize or purely theoretical will not do." *Id.*  Rather, irreparable harm is based on "something more than conjecture, surmise, or a party's unsubstantiated fears of what the future may have in store." *Charlesbank Equity Fund II v. Blinds To Go, Inc.*, 370 F.3d 151, 162 (1st Cir. 2004).

Preliminary relief is appropriate when the alleged injuries cannot adequately be compensated "either by a later-issued permanent injunction, after a full adjudication on the merits, or by a later-issued damages remedy." *Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 76 (1st Cir. 2005); *see also Ross-Simons of Warwick, Inc. v. Baccarat, Inc.*, 217 F.3d 8, 13 (1st Cir. 2000) (*Ross-Simons II*).  "The necessary concomitant of irreparable harm is the inadequacy of traditional legal remedies.  The two are flip sides of the same coin: if money damages will fully alleviate harm, then the harm cannot be said to be irreparable." *K-Mart Corp. v. Oriental Plaza, Inc.*, 875 F.2d 907, 914 (1st Cir. 1989).  District courts have "broad discretion to evaluate the irreparability of alleged harm." *Ross-Simons II*, 217 F.3d at 13 (cleaned up).

Before the Court is an extensive record from the States detailing the harm they stand to suffer in the wake of HHS' Public Health Funding Decision.  The States divide these examples to three categories: protecting public health, the elimination of healthcare services, and impact on public health infrastructure.  The Court discusses each below.

### 1. Protecting Public Health

The States assert that the termination in funding would impair their ability to protect public health because it will cause layoffs of essential staff. (ECF No. 60 at 38.) "Threats to public health and safety constitute irreparable harm that will support an injunction." *Cigar Masters Providence, Inc. v. Omni Rhode Island, LLC*, No. CV 16-471-WES, 2017 WL 4081899, at *14 (D.R.I. Sept. 14, 2017); *Sierra Club v. U.S. Dep't of Agric., Rural Utilities Serv.*, 841 F. Supp. 2d 349, 358 (D.D.C. 2012).

The Minnesota Department of Health ("MDH") will be required to layoff approximately 200 employees, or 12 percent of its staff. (ECF No. 4-24 ¶ 41.) These layoffs will include "epidemiologists, research scientists, and other highly skilled and trained workers." *Id.* There is a risk that MDH will not be able to hire back all staff who were separated, many of whom have subject matter expertise that would be difficult to replace. *Id.* Loss of funds and workforce has significant and immediate implications for programs fulfilling critical public health functions in Minnesota. *E.g.*, the ELC supplemental funds[15] impact MDH's ability to perform disease surveillance and monitoring work for COVID-19 variants, including wastewater surveillance. *Id.* ¶ 44.

Washington state stands to lose 200 employees, including 150 full-time employees that are responsible for planning and responding to communicable disease

---

[15] The CDC established the Epidemiology and Laboratory Capacity for Prevention and Control of Emerging Infectious Diseases ("ELC") Cooperative Agreement to fund the country's ability to detect, prevent, and respond to infectious disease outbreaks. (ECF Nos. 4-4 ¶ 7; 4-13 ¶ 8; 4-21 ¶ 22.)

cases and outbreaks and related laboratory testing and disease surveillance. (ECF No. 4-40 ¶¶ 5, 8–9.) Without these employees, the state would be at greater risk for a variety of infectious diseases, some of which cause severe illness, disability, or death. *Id.* ¶ 17.

Colorado will lose all but one of the employees in its Immunization Program. (ECF No. 4-10 ¶ 53.) "The loss in staff will result in the loss of customer service for our vaccine providers through the immunization information system help desk, and the loss of the ability to provide notification to parents and patients regarding the need for both COVID-19 and routine vaccinations, including flue and the measles, mumps, and rubella (MMR) vaccine during a time of increased measles cases and outbreaks in the U.S." *Id.*

Termination of the funding will also reduce staffing and capacity and resources in programs that address gaps in vaccine access by supporting mobile and community-based clinics, particularly in communities that are underserved and experience barriers in access to care and can be deployed for emergency response such as testing and post-exposure prophylaxis during outbreaks. *Id.* ¶¶ 55–56. Decreased access to and education regarding routine vaccinations will increase cases and outbreaks, which result in lives lost and increased health care costs for those infected. *Id.* ¶ 57.

In Delaware, the termination of a community health worker grant will end support for "33.5 [Community Health Worker] positions across six organizations, including federally qualified health centers and community-based organizations."

(ECF No. 4-14.) And here in Rhode Island, health officials will have to dismantle the Project Firstline team, which would stop the state's Department of Health from providing infection control education to healthcare facilities to prevent outbreaks. (ECF No. 4-39 ¶ 34.) The loss of Epidemiology and Laboratory Capacity Enhancing Detection Expansion funds will also impact the staffing of nurses, epidemiologists, and disease intervention specialists, and the funding of equipment and support software. *Id.* ¶¶ 31–32, 38–39.

Absent an injunction, HHS' termination of this funding will leave the States no choice but to shutter their programs and begin layoffs of highly trained and specialized employees that will be difficult to hire back. *See, e.g.*, ECF Nos. 4-3 ¶ 38; 4-7 ¶¶ 12–13, 42, 46, 54; 4-8 ¶¶ 23, 26, 31–37, 44, 54; 4-9 ¶¶ 49–50, 53, 56, 59–60, 80–81, 108; 4-10 ¶ 20.

### 2.  Elimination of Healthcare Services to States

Next, the States submit that the loss of critical funding will curtail their healthcare services to residents. This includes treatment to those struggling with mental health and substance use disorder, the funding of vaccines to vulnerable populations, and services to address infectious disease outbreaks.

### a.  Mental Health and Substance Abuse Services

In Connecticut, the termination of the Department of Mental Health and Addiction Services' SAMHSA grants will eliminate "housing and employment supports, regional suicide advisory boards, harm reduction, perinatal screening,

early-stage treatments, and increased access to medication assisted treatment." (ECF No. 4-12 ¶¶ 16, 29.)

In Illinois, the termination of mental health block grants means that providers will be unable to provide services through the state's "mobile crisis response units that assist people at risk of suicide." (ECF No. 4-17 ¶ 16.) And without that funding, "providers will simply be unable to help people in suicidal crisis." *Id.*

In New Mexico, the terminated mental health care block grants will cut funding to fifty-four providers who treat over 64,000 people for critical behavioral and mental health services. (ECF No. 4-28 ¶ 14.)

In California, the termination of the substance use disorder prevention and early intervention services for youth in at least eighteen of its counties risk increased substance use among young people. (ECF No. 4-6 ¶ 61).

New Jersey stands to lose funds that support forty-five direct care treatment programs which provide critical live saving services, including crisis intervention and behavioral health treatment services that allow intervention for individuals experiencing mental health and or substance use crises. (ECF No. 4-26 ¶ 7)

And in North Carolina, the termination of SAMHSA funds has halted the work of mental health professionals including therapists and substance use treatment specialists. (ECF No. 4-25 ¶ 7) The loss of funds has also led to termination of a program that helps address substance use recovery and mental health in local universities and colleges. *Id.* ¶ 8. And the termination of funding will also impact

programs designed to address the opioid epidemic by providing naloxone kits and support to opioid community clinics. *Id.*

### b. States' Public Health Programs

Without the funding, California's Immunization and Vaccines for Children program will not be able to provide vaccines for measles, influenza, and COVID-19 to approximately 4.5 million children, roughly half of California's youth population. (ECF No. 4-3 ¶ 17.)

In Minnesota, the funding was being used to address "gaps in infection control practices, training, and resources, identified during the COVID-19 pandemic as a major concern of the operators of long-term care facilities serving older adults." (ECF No. 4-24 ¶ 48.) Because of the terminations, the Minnesota Department of Health had to cancel grants that would have provided infection prevention and control training to more than sixty skilled nursing facilities across the state, potentially exposing over 3,000 long-term care residents to a greater risk of infection. *Id.* Likewise, the terminations forced the cancelation of infection prevention and control training programs for 150 nursing and assisted living facilities, "potentially impacting 7,000 long-term care residents." *Id.*

In Rhode Island, the loss of the Health Disparities grant will curtail efforts to support "community education, mitigation, and response efforts in the state's hardest hit communities" including preparedness and response capacity to the state's designated rural community, Block Island. (ECF No. 4-38 ¶ 17(a).) The loss of COVID-19 vaccination supplemental funding will impact a planned vaccination clinic

for vulnerable populations in Rhode Island, including those living in nursing homes and assisted living communities. *Id.* ¶ 25.

Consequently, HHS' Public Health Funding Decision is not merely an economic loss when it threatens the "very existence" of key mental health, substance abuse, and other healthcare programs in the States, worsening public health outcomes and placing their residents at risk. *See Packard Elevator v. I.C.C.*, 782 F.2d 112, 115 (8th Cir. 1986) (explaining that "economic loss does not, in and of itself, constitute irreparable harm . . . [r]ecoverable monetary loss may constitute irreparable harm only where the loss threatens the very existence of the [programs]").

### 3. Impact on States' Public Health Infrastructure Projects

Lastly, while these funds were initially awarded to help with the COVID-19 pandemic, CDC recognized that most States lacked the necessary disease surveillance and laboratory infrastructure to respond to future health threats, so it encouraged and allowed States to invest these funds in strengthening these capacities. (ECF No. 60 at 17.) The States insist they have "long relied on the CDC's ELC support for infectious disease programs and projects." *Id.*

For instance, some of the funds supported data systems upgrades that facilitate better disease reporting and surveillance. (ECF No. 4-40 ¶ 13.) Washington DOH had planned to use the funding to bring a new system online over the next fourteen months after investing more than $12 million of CDC funding in its development. *Id.* Stopping now would be a loss of the benefits of that investment. *Id.* In Connecticut, the loss of funding impacts data system upgrades for infectious

disease and symptom surveillance. *See* ECF 4-13 ¶ 20 ("tens of millions of dollars spent to date [in updating data systems] will be wasted"). Similarly, Hawaii used the funds to make long overdue investments in its health department's efficiency, effectiveness, and capacity to effectively respond to current and future disease threats. (ECF No. 4-45 ¶¶ 15-17.) Abrupt termination of these funds will result in waste of government resources if the systems being developed cannot be implemented as planned. *Id.* Lastly, ELC funds were budgeted by New Jersey through July 2026 including the Communicable Disease Reporting and Surveillance System ("CDRSS"), an electronic web-enabled system where public health partners timely report and rack incidences of communicable diseases, which is critical for responding to current and future public health threats. (ECF No. 4-27 ¶ 24.) There are needed enhancements for security and improvement and with the loss of ELC funding, NJDOH will not be able to keep CDRSS operation. *Id.*

The Court could go on. The States have clearly demonstrated they are likely to suffer irreparable harm absent preliminary injunctive relief. Here, there is ample evidence to support the States' position that the Public Health Funding Decision is causing immediate damage to their healthcare programs and the safety of their residents. While the Court acknowledges HHS' position that it may be unable to recover the grant funds if it later prevails, Congress's direction that the funds remain intact and the States' reliance on the continuation of the funding overshadows that argument. (ECF No. 68 at 39.) And unlike in *California*, the States here cannot keep their critical public health programs and services running in the meantime, so much

that a later award for money damages would be wholly inappropriate.  *See California*, 145 S. Ct. at 967; ECF No. 60 at 14; ECF No. 65 at 8.

### D. Balance of the Equities and Public Interest

To conclude, the balance of the equities and public interest strongly favor preliminary relief for the States.  Not only do the States have a substantial interest in the effective operation of their public health systems, but the States have also represented that HHS' Public Health Decision, and its implementation, would result in devastating consequences to their local jurisdictions.  (ECF No. 60 at 39.)  As discussed in the preceding sections, the healthcare funding terminations would constrain the States' infectious disease research, thwart treatment efforts to those struggling with mental health and addiction, and  impact the availability of vaccines to children, the elderly, and those living in rural communities.  *See, e.g.*, ECF Nos. 4-3 ¶ 48; 4-6 ¶¶ 4-7; 4-15 ¶ 17; 4-40 ¶ 11; 4-41 ¶ 3.  Not to mention that the terminations were effective immediately, ignoring the States' reliance on the funds.  As a result, the States submit that they will be forced to "take immediate action to curtail their public health programs and undergo massive layoffs of highly trained employees and contractors." (ECF No. 60 at 40.)  In comparison, the Government's argument that it is the one who stands to suffer irreparable harm in the meantime is unavailing. (ECF. 68 at 40.)

The Court weighs the "balancing of the equities and analysis of the public interest together, as they 'merge when the [g]overnment is the opposing party.'"  *Does 1-6 v. Mills*, 16 F.4th 20, 37 (1st Cir. 2021) (quoting *Nken v. Holder*, 556 U.S. 418,

435, 129 S.Ct. 1749, 173 L.Ed.2d 550 (2009)).  The States' interest in safeguarding its public health systems is clearly paramount.

While the Court acknowledges the Government's position that it may be forced to spend money inconsistent with the Executive's agenda, an injunction would strongly serve the public interest in maintaining the States' healthcare systems and initiatives.  (ECF No. 68 at 40-41.)  "[T]he wisdom" of the Executive's decisions "[are] none of our concern." *Dep't of Homeland Sec.*, 591 U.S. at 35 (cleaned up).  Rather, this case is one "about the procedure" (or lack thereof) that HHS followed in trying to enact the Executive's policies.  *Id.*  Agencies do not have unfettered power to further a President's agenda, particularly when Congress appropriated this money to the States to fund their public health systems and initiatives.  Thus, when the Court weighs an agency's unreasoned, unsubstantiated, and likely unlawful determination that funding was "no longer necessary," against the States' interest and reliance on the funds to safeguard their public health outcomes, the balance of the equities and public interest are undeniably in the States' favor.

### E.  Bond

Federal Rule of Civil Procedure 65(c) states that the court may issue a preliminary injunction "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained."  The Government asks the Court to require the States to provide a bond.  (ECF No. 68 at 45–46.)  The Court declines.

Rule 65(c) "has been read to vest broad discretion in the district court to determine the appropriate amount of an injunction bond," *DSE, Inc. v. United States*, 169 F.3d 21, 33 (D.C. Cir. 1999), "including the discretion to require no bond at all," *P.J.E.S. ex rel. Escobar Francisco v. Wolf*, 502 F. Supp. 3d 492, 520 (D.D.C. 2020) (internal quotation omitted). A bond "is not necessary where requiring [one] would have the effect of denying the plaintiffs their right to judicial review of administrative action." *Nat. Res. Def. Council, Inc. v. Morton*, 337 F. Supp. 167, 168 (D.D.C. 1971) (collecting cases); *cf. Nat'l Ass'n of Diversity Officers in Higher Educ. v. Trump*, No. 25-CV-333, 2025 WL 573764, at *30 (D. Md. Feb. 21, 2025) (setting a nominal bond of zero dollars because granting the defendants' request "would essentially forestall [the] [p]laintiffs' access to judicial review"). In a case where HHS is alleged to have unlawfully terminated large sums of appropriated and committed funds to numerous recipients against Congress's will and in excess of HHS' statutory authority, it "would defy logic—and contravene the very basis of this opinion—to hold" the States "hostage for the resulting harm." *Woonasquatucket*, 2025 WL 1116157, at *24.

## IV.   PRELIMINARY INJUNCTION

Upon consideration of the States' Motion for a Preliminary Injunction (ECF No. 60), it is hereby ORDERED:

1) Defendants and all their respective officers, agents, servants, employees and attorneys, and any persons in active concert or participation with them who receive actual notice of this order (collectively "Enjoined Parties") are hereby preliminarily enjoined from implementing or enforcing through any

means the decision made on or about March 24, 2025 that numerous health programs and appropriations responsible for $11 billion of critical federal financial assistance were "no longer necessary" because the "COVID-19 pandemic is over" ("Public Health Funding Decision"), including any funding terminations, or from taking any action to reinstitute the Public Health Funding Decision for the same or similar reasons. This injunction is limited to funding for Plaintiff States, including their local health jurisdictions and any bona fide fiscal agents of Plaintiff States or their local health jurisdictions.

2) The Enjoined Parties shall immediately treat any actions taken to implement or enforce the Public Health Funding Decision, including any funding terminations, as null and void and rescinded. The Enjoined Parties must immediately take every step necessary to effectuate this order, including clearing any administrative, operational, or technical hurdles to implementation.

3) Defendants' counsel shall provide written notice of this order to all Defendants and agencies and their employees, contractors, and grantees by the end of the day on Tuesday, May 20, 2025.

4) By the end of the day on Tuesday, May 20, 2025, the Defendants SHALL FILE on the Court's electronic docket a Status Report documenting the actions that they have taken to comply with this Order, including a copy of the notice and an explanation as to whom the notice was sent.

5) For the reasons stated in the Court's Order, the Court finds that a bond is not mandatory under these circumstances and exercises its discretion not to require one.

IT IS SO ORDERED,

_____
Mary S. McElroy,
United States District Judge

Date:        May 16, 2025